UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

In re: CCA Recordings 2255 Litigation,

        Petitioners,

v.                              Case No. 19-cv-2491-JAR

United States of America,

        Respondent.


**<u>ORDER</u>**

The government has filed a motion for a protective order, asking to be relieved of its burden of fully responding to petitioners' discovery requests (ECF No. 359). Significantly, the requests at issue were previously approved by the undersigned U.S. Chief District Judge Julie A. Robinson and U.S. Magistrate Judge James P. O'Hara after the court considered and overruled the government's objections thereto.[1] Despite this, the government asserts a protective order now must be entered because its "diligent efforts to comply with the petitioners' discovery requests have revealed that fully responding . . . is not just difficult or overly burdensome, but impossible."[2] The government hasn't persuaded the court of this "impossibility." Nor has the government met its burden of

---

[1] *See* ECF Nos. 79, 96, & 126.

[2] ECF No. 359 at 2.

1

showing the discovery sought is disproportional to the needs of the case.  Therefore, the government's motion for a protective order is respectfully denied.

In these 100+ habeas cases that have been consolidated for discovery purposes, the court set a procedure under Rule 6 of the Rules Governing Section 2255 Proceedings ("Rule 6") for parties to obtain approval from the court prior to service of proposed discovery.[3]  This procedure enables the court to ensure good cause exists for the proposed discovery and that the proposed discovery is appropriately narrow.  The party seeking to serve discovery files a motion for leave to do so, attaching the proposed discovery as an exhibit.  The opposing party then may raise any objections to the proposed discovery in a response brief.  The court analyzes the proposed discovery and objections thereto to determine what discovery may be served and how discovery must be limited.  Once discovery is served, the responding party must answer without objection (other than for privilege) "given that any objections should have been raised in response to the motion itself and been decided by the court."[4]

In January-April 2020, petitioners followed this process and sought approval to serve three sets of discovery on behalf of petitioner Petsamai Phommaseng and one set of discovery on behalf of petitioner Mamoudou Kaba.[5]  The government exercised its

---

[3] *See*  ECF No. 82.

[4] *Id.* at 4.

[5] Although the discovery requests were brought by two specific petitioners, the parties have agreed, and the court has ordered, that for the sake of efficiency the

2

opportunity to object to the discovery in response briefs and opposed the discovery, in part, on the basis that it was overbroad and unduly burdensome.   The court overruled the overbreadth/undue burden objections because they were not sufficiently specific and were not supported by an affidavit.[6]  The government now seeks a do-over.

The government "requests a protective order that states the government is not required to undertake additional searches of electronically stored information ["ESI"] in responding to the petitioners' approved discovery requests."[7]  Petitioners question whether a protective order is available to the government, given the unique procedure followed in this litigation for the preapproval of the subject discovery.  They assert that by not fully developing the undue-burden argument in its briefs opposing petitioners' requests to serve discovery, the government forfeited the opportunity.

Petitioners concede "there may be arguments no party could reasonably raise in response to a Rule 6 motion," such that "[c]ourts may consider such arguments after determining there exists good cause to do so."[8]  But, petitioners maintain, even if the government could establish good cause for its late assertion of the argument, the

---

information produced may be used by any of the consolidated petitioners.  ECF No. 96 at 2-3.

[6] ECF No. 79 at 6-9.  As petitioners note, the government's "undue burden" objection in its Rule 6 discovery briefs was not developed and certainly did not raise the issues the government now asserts in its motion for a protective order.

[7] ECF No. 359 at 2.

[8] ECF No. 399 at 4.

government has not met the considerations set forth in Rule 26 for the issuance of a protective order.  The court agrees.  Because the government has not met its burden of establishing the need for a protective order, the court does not reach the issue of whether the government must establish good cause for its delay.

Rule 26(c)(1) permits a court, upon a showing of "good cause," to issue an order protecting a party from, inter alia, "undue burden or expense" in responding to discovery. In evaluating the burden and expense of discovery, the court heeds the mandate in Rule 26(b)(1) that discovery must be "proportional to the needs of the case."  The court considers six factors in the proportionality analysis: "[1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit."[9]

The party seeking the protective order bears the burden of establishing good cause for its entry.[10]  Assertions of "undue burden must be clearly supported by an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery

---

[9] Fed. R. Civ. P. 26(b)(1).

[10] *Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.,* No. 17-1156-EFM, 2019 WL 3740594, at *2 (D. Kan. Aug. 8, 2019).


Judge Robinson recognized in the litigation underlying these petitions, *United States v. Carter*, the "systemic prosecutorial misconduct of the type alleged here" has "far reaching implications in *scores* of pending § 2255 cases."[17]

The individual interests at stake also are of the utmost importance. Petitioners stand to gain their very liberty, a highly protected right in the American legal system.[18] The Supreme Court has recognized that the loss of one's liberty is an injury of "such weight and gravity" that it is "greater than any possible harm to the state."[19]

It is beyond dispute, then, that this litigation involving the alleged violations of the constitutional rights of more than 100 petitioners—and implicating the very liberty of those petitioners—concerns issues of the highest importance.[20] This factor strongly weighs in

---

[17] No. 16-20032-JAR, ECF No. 758 at 184 (D. Kan. August 13, 2019) (emphasis added).

[18] *See Lassiter v. Dept. of Soc. Services*, 452 U.S. 18, 25 (1981) (recognizing the potential deprivation of liberty triggers the right to counsel); *Addington v. Texas*, 441 U.S. 418, 425 (1979) (requiring due-process protection for commitment proceedings that could deprive one of liberty).

[19] *Addington*, 441 U.S. at 427.

[20] In its reply brief, the government raises for the first time an argument that the court should also consider the public's interest in "the suppression of crime and conviction of guilty criminals," and the best use of the resources of the United States Attorney's Office, District of Kansas ("USAO"). ECF No. 401 at 8-9 (quotations and citations omitted). To avoid sandbagging by counsel, the court doesn't consider (or give much weight) to arguments raised for the first time in reply briefs. *See Ambac Assurance Corp. v. Fort Leavenworth Frontier Heritage Cmtys., II, LLC*, 315 F.R.D. 601, 608-09 (D. Kan. 2016); *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003). But even if the government's asserted public interest in such general prosecutorial and fiscal matters were considered, the court believes they are decidedly outweighed by the public interest in enforcing petitioners' constitutional rights.

6

O:\19-2491-JAR, In Re CCA\-359.docx

favor of petitioners.

### The Amount in Controversy

In evaluating the next proportionality factor, courts compare the cost of the discovery at issue to the amount in controversy. This factor is not at play in these cases, given that petitioners seek to have their criminal judgments vacated or sentences reduced; monetary damages are not available in § 2255 cases. Rule 26(b)(1) recognizes that "many cases in public policy spheres . . . may involve . . . no money at all, but . . . vindicate vitally important personal or public values."[21] Such are the instant cases. The loss of one's liberty is beyond monetary value.[22]

### The Parties' Relative Access to Relevant Information

The court turns next to the parties' relative access to relevant information. "In considering this factor, courts look for 'information asymmetry'—a circumstance in which one party has very little discoverable information while the other party has vast amounts of discoverable information."[23] "[T]he burden of responding to discovery lies heavier on

---

[21] Fed. R. Civ. P. 26(b)(1) advisory committee notes to the 2015 amendments.

[22] Petitioners assert their loss of liberty should be analyzed under this second proportionality factor. They have cited no case that supports their position. The Rule 26 advisory committee notes to the 2015 amendments suggest the loss of personal rights is a consideration under the first proportionality factor. In any event, the court considers petitioners' liberty interests in its proportionality analysis, and it really makes no practical difference under which prong they fall.

[23] *Lawson*, 2020 WL 3288058, at *12 (quoting *Oxbow Carbon & Minerals, LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 8 (D.D.C. 2017), which in turn quoted Fed. R. Civ. P. 26(b)(1) advisory committee notes to the 2015 amendment)).

the party who has more information, and properly so."[24]

There is no doubt that in these actions the government alone has access to the highly relevant information sought in the discovery requests.[25]  The court has noted that each petitioner "must establish, as elements of his claim, that the government 'purposefully intruded into the attorney-client relationship' and became 'privy to' attorney-client communication 'because of its intrusion.'"[26]  Evidence of "how the [USAO] obtained and used audio and video recordings in each case,"[27] will be found only in the government's information repositories.  The court has recognized, for example, that information about "whether, and how, the prosecution's improperly obtained information about the defendant's trial strategy may have been used" is in the hands of the government.[28]  "[I]n such cases the government and the defendant will have unequal access to knowledge.  The prosecution team knows what it did and why.  The defendant can only guess."[29]

---

[24] Fed. R. Civ. P. 26(b)(1) advisory committee notes to the 2015 amendment.

[25] *See, e.g.,* ECF No. 79 at 8 (approving document request seeking documents and materials related to "communications of inmates and attorneys;" overruling objection that "evidence showing the USAO or its agents obtained, possessed, listened to, or watched confidential attorney-client communications is not relevant").

[26] ECF No. 79 at 3 (quoting *United States v. Carter*, No. 16-20032-02, 2019 WL 3798142, at *75 (D. Kan. Aug. 13, 2019)).

[27] *Id.* at 5.

[28] *Carter*, No. 16-20032, ECF No. 758 at 155 (quoting *United States v. Danielson*, 325 F.3d 1054, 1070 (9th Cir. 2003)).

[29] *Id.* at 155-56 (quoting *Danielson*, 325 F.3d at 1070).

The government concedes the information sought in petitioners' discovery requests is kept on the USAO's "local server drives and cloud storage," "retired hard drives," "retired network storage," "CDs, DVDs, and USB flash drives," and further that "petitioners do not have access to the USAO's computer network . . . or any of the other electronic storage locations described."[30]  But the government notes it has given petitioners a "list of keyword search results" from searches run on the computer hard drives assigned to the prosecutors in petitioners' underlying criminal cases[31] and "tens of thousands of e-mails and attachments."[32]  The government seems to be suggesting this gives petitioners near-equal access to the government repositories that remain to be searched and/or to repositories that have been subject to a keyword search but that still need to be reviewed for responsive documents.  The court rejects this illogical suggestion outright.  There is no getting around the fact that the government has access to the ESI that must be searched and petitioners do not.  This factor weighs in petitioners' favor.

The Parties' Resources

The fourth proportionality consideration is the relative resources of the parties.  The government has been recognized as "the richest, most powerful, and best represented

---

[30] ECF No. 359 at 2 and 16.

[31] The government submitted the hard drives of said prosecutors to the Department of Justice's Computer Crimes and Intellectual Property Section Cybercrime Laboratory ("CCIPS Lab"), which ran forensic searches on the drives.  ECF Nos. 401-4 & 401-5.

[32] ECF No. 359 at 16-17.

O:\19-2491-JAR, In Re CCA\-359.docx

litigant" to appear in U.S. courts.[33]  By contrast, all of the petitioners in these cases are indigent and represented by court-appointed counsel.  It's beyond dispute that the government is in a better financial position to identify documents responsive to petitioners' court-approved discovery requests.

The government asks the court to look past the fact that "the respondent in this case is the United States of America," and to consider only the budget of the USAO when weighing this factor.[34]  The government submits the affidavit of Randy Miller, who states the USAO typically earmarks $250,000 a year in litigation expenses for the entire office, but the USAO has already spent more than $325,362 in responding to petitioners' discovery requests.[35]  The court declines to take such a limited view of the government's resources.

The government suggests no reason why the U.S. Department of Justice ("DOJ") would not be expected to help finance this litigation.  The USAO acts under the control and authority of the DOJ,[36] and the DOJ has been involved in these cases almost since the

---

[33] *United States v. Parker*, 762 F.3d 801, 809 (8th Cir. 2014) (internal quotations and citation omitted).

[34] ECF No. 359 at 17.

[35] ECF No. 359-1 at ¶¶ 5, 7.

[36] *See* https://www.justice.gov/usao/mission (last visited July 21, 2020) ("The United States Attorneys serve as the nation's principal litigators under the direction of the Attorney General."); https://www.justice.gov/file/1047436/download (last visited July 21, 2020) (DOJ organizational chart).

beginning.[37]   Miller acknowledges the DOJ, through its Executive Office for U.S. Attorneys,[38] may be called upon to help assist with and finance the litigation.[39]   But the government has presented no evidence of the DOJ's budget, nor has it presented evidence that the USAO has requested funding from the DOJ to satisfy its obligations in this litigation.   Generally, at least since Judge Robinson issued the order in the underlying *Carter* litigation and these habeas cases were consolidated for discovery, leadership at the local USAO-level has made good-faith efforts to comply with discovery orders.   But in hindsight, it's clear they have not been able to meet their obligations and should have sought support from the DOJ earlier.   The DOJ cannot simply wash its hands of the "systemic practice of purposeful collection, retention, and exploitation" of recordings[40] in an office under its supervision and direction.   It's past time for the vast resources of the DOJ to be tapped in support of this significant litigation.

Because the government's resources far outweigh those of petitioners, this factor favors petitioners.

The Importance of the Discovery in Resolving the Issues

---

[37] *See Carter*, No. 16-20032, ECF No. 758 at 59 (noting a July 14, 2017 letter from the DOJ to the special master in the underlying litigation).

[38] The Executive Office provides administrative and technical support to local United States Attorney offices.  *See* https://www.justice.gov/usao/eousa (last visited July 21, 2020).

[39] ECF No. 359-1 at ¶¶ 7, 10.

[40] *Carter*, No. 16-20032, ECF No. 758 at 180.

Next, the court considers whether the discovery served is important to resolution of issues in the case. "In analyzing the importance of the discovery in resolving the issues in the case, the court looks to whether the discovery seeks information on issues 'at the very heart of [the] litigation.'"[41]

As noted above, the discovery at issue already has been vetted by the court under the Rule 6 process established in this litigation. The court examined each request at issue and determined each is relevant and narrowly tailored.[42] Although this process did not require the court to specifically consider whether the information sought "goes to the heart" of the litigation, the court finds the discovery as a whole meets this standard.

The government does not seek protection from any one particular discovery request. Nor does the government make an argument that any particular request fails to seek information at the heart of the litigation. Thus, the court will not drill down into an analysis of every outstanding request. Suffice it to say, the requests as a whole seek information that will help petitioners meet their burdens in these cases. Most seek information about whether the government became privy to attorney-client communication, such as information about whether the USAO requested, obtained, or relied upon recordings of

---

[41] *Lawson*, 2020 WL 3288058, at *14-15 (quoting *Oxbow Carbon*, 322 F.R.D. at 8 (alteration in original)).

[42] *See* ECF Nos. 79, 96, and 126.

O:\19-2491-JAR, In Re CCA\-359.docx

attorney-client communications.[43]  As earlier indicated, the court has ruled petitioners must show the government became privy to such information as an essential element of their Sixth Amendment claims.[44]  Other requests seek information about whether the USAO adequately preserved files, e-mails, and documents relevant to petitioners' Sixth Amendment claims.[45]  The government's failure to preserve and produce material speaks to whether the USAO acted for a legitimate law-enforcement purpose, another element of petitioners' claims, as well as the appropriate remedy to which a petitioner may be entitled—both issues at the heart of this litigation.[46]

Because the government does not dispute the discovery petitioners seek involves information at the heart of the issues in this case,[47] this factor also weighs in petitioners' favor.

<u>Whether the Burden or Expense of the Discovery Outweighs its Likely Benefit</u>

---

[43] *See, e.g.,* ECF No. 96 at 5 (discussing Kaba Request No. 5); ECF No. 79 at 8 (discussing Phommaseng Request No. 8).

[44] *Carter*, No. 16-20032, ECF No. 758 at 162.

[45] *See, e.g.,* ECF No. 126 at 10 (discussing Phommaseng Request Nos. 21-24, 27, and 29).

[46] *See Carter*, No. 16-20032, ECF No. 758 at 162, 177, 180-81.

[47] ECF No. 359 at 17-18. Although the government asserts that any further electronic discovery it conducts will produce information largely duplicative of the e-mails and physical files it produced to petitioners on July 1, 2020, this consideration is addressed under the final proportionality factor below.

13

The final proportionality consideration is whether the burden or expense of conducting the remaining discovery outweighs its likely benefit.  Most of the government's arguments for a protective order fall under this factor.  According to the government, "the burden and expense of the full scope of petitioners' requested electronic discovery is astronomical—more than $3.5 *million*—and likely will provide minimal marginal benefit given all of the other discovery the government will provide."[48]  The court finds scant support for the government's assertions, especially on the "benefit" side of the scale.

On the "expense/burden" side of the scale, the government has obtained a single bid from a third-party vendor, who has estimated that "complying with the petitioners' request that the government search all electronically stored information . . . would cost $3.5 million and take a year to do."[49]  The government states the vendor would be required to image current and retired local servers, cloud storage, network storage, and hard drives, as well as various other electronic media (such as CDs, DVDs, and USB flash drives).  Petitioners question whether this estimate is unusually high because the government "waited until the month before its production deadline to pursue a quote, and then allowed for only three days of bidding."[50]  The court need not resolve this sub-dispute because, even accepting

---

[48] ECF No. 359 at 18 (emphasis in original).

[49] ECF No. 359 at 2 (citing ECF No. 359-1); *see also id.* at 14.

[50] ECF No. 399 at 26 (citing ECF No. 359 at 13 and ECF No. 359-1 at 2).

14

the bid as an accurate measure of the cost of completing discovery, the court finds below the cost is outweighed by the likely benefit of the discovery.

On the "benefit" side of the scale, the government elaborates on the steps it has taken to date to comply with the discovery requests and asserts any further discovery would be cumulative and of little value.[51]  It notes it has searched the physical files of each petitioner's case and produced the electronic media found therein.[52]  A paralegal also has searched "discarded loose media" in USAO offices, but has determined "not very much" of the discarded media is responsive to this litigation."[53]  The government "has run keyword searches aimed at returning e-mails responsive to the petitioners' requests through the e-mail accounts most likely to contain any responsive material" and has hired a third-party contractor to review the search results to produce responsive materials.[54]  Finally, the government explains the CCIPS lab ran keyword searches on the hard drives assigned to the prosecutors in petitioners' underlying criminal cases which returned "literally millions" of results, "indicat[ing] that running similar searches through all of the electronic storage [identified by the government] also would be minimally useful, in large part because sifting through the results makes searching for a needle in a haystack seem easy."[55]

---

[51] *See* ECF No. 401 at 10.

[52] *See* ECF No. 359 at 8.

[53] *See id.* at 9-10 (quoting Moore Aff., ECF No. 359-2 at ¶ 9).

[54] *Id.* at 17.

[55] *Id.* at 18.

O:\19-2491-JAR, In Re CCA\-359.docx

For at least three reasons, the government's argument about the minimal benefit of continued discovery does not hold up.  First, the government has it within its power to decrease costs attributable to discovery and document review by pursuing a more focused keyword search.  As petitioners note, the documents in the government's repositories "were created, stored, and/or maintained by" the government, placing the government "in the better position to develop the most appropriate list of search terms capable of producing the requested documents."[56]  If the search terms "need to be more specific to answer" petitioners' outstanding requests, then the government "should modify the terms accordingly."[57]  Petitioners should not be forced to forego potentially impactful discovery results based on the expense caused by an overly broad keyword search.[58]

Second, the government's argument that further discovery results will be cumulative is not supported by the record.  To date, the government has produced discovery gleaned from searches of the e-mail repositories of "relevant USAO personnel" via a system that stores e-mails that postdate May 2014.[59]  But the court has approved requests that seek ESI

---

[56] ECF No. 399 at 14 n.58 (quoting *Spieker v. Quest Cherokee, LLC*, No. 07-1225-EFM, 2008 WL 4758604, at *2 (D. Kan. Oct. 30, 2008)).

[57] *Spieker,* 2008 WL 4758604, at *2.

[58] *See id.* ("Defendant cannot escape its burden of production by now arguing that plaintiffs' suggested search terms are 'not specific enough.'"); *see also Spieker v. Quest Cherokee, LLC*, No. 07-1225-EFM, 2009 WL 2168892, at *3 (D. Kan. July 21, 2009) ("[T]he court is at a loss to understand why defendant would use search terms that would capture large volumes of [irrelevant] information.").

[59] ECF No. 359 at 6 n.7 (explaining the search was of Proofpoint, "an automatic e-mail archive system that is managed by the . . . EOUSA").

held in government repositories *beyond* the e-mail accounts of key prosecutors[60] and that *date back* to 2010 (upon agreement of the parties).[61]   As to the government's search of "discarded loose" electronic media found in USAO offices, the affidavit of Sean Moore states 93 pieces of media in the Topeka and Kansas City offices were encrypted and could not be accessed.[62]   Considering what has not yet been searched, it appears more likely than not that continued searching by the government will uncover responsive information not previously identified.

Third, the government cannot say with any certainty that the benefit of continued discovery will not be significant to petitioners.  Instead, the most the government can say is that the importance "remains to be seen but is *likely* minimal."[63]   This is simply a guess that does little to support the government's burden on this motion.

---

[60] This is important because evidence presented in the underlying *Carter* litigation showed key players in this litigation, including Assistant U.S. Attorneys Metzger and Treadway, self-reported that repositories other than their e-mail messages likely contain information relevant to the allegations herein.  *See Carter*, No. 16-20032, ECF No. 758 at 45.

[61] *See* ECF No. 180 at 1 (referencing parties' agreement that government would search "documents going back a decade").   The government indicates searching repositories for documents created in the 2010-2014 date range will not significantly increase its burden.  ECF No. 401 at 5 ("the date range is not the primary driver of the burden the government describes"); *id.* ("even if the FPD were to agree to a date range for its requests that begins in May 2014, that would not materially reduce the more than 300 TB of data the government estimates would need to be searched").

[62] ECF No. 401-3 at 1.

[63] ECF No. 359 at 17 (emphasis added).

17

In the end, the government hasn't come close to carrying its burden of demonstrating the discovery approved by the court and served by petitioners is not proportional to the needs of the case, as all five of the applicable proportionality considerations under Rule 26(b)(1) weigh in petitioners' favor.  There's no question that fully responding to the discovery will require the expenditure of additional government resources—in very short order, more people need to be hired to complete the process and the cost of such completion could well exceed $3.5 million.  To be clear, regardless of whether the ultimate price tag of the government's ESI-discovery compliance in this very complex constitutional case ends up in the neighborhood of $3.5 million, or whether an effective competitive bidding process with vendors in what the court knows is a very robust ESI marketplace might bring the price tag down to even $1.5 million, the court fully appreciates that relatively speaking this is a <u>very</u> expensive ESI case.  In any event, for all the reasons explained above, the bottom line is that the burden and expense to the government is not disproportionally high, particularly given this litigation affects a significant constitutional right—and, indeed, the liberty—of more than 100 people who may have been wrongfully convicted.

IT IS THEREFORE ORDERED that the government's motion for a protective order is denied.  The government shall redirect its resources and do what is necessary to fully

O:\19-2491-JAR, In Re CCA\-359.docx

respond to petitioners' discovery requests on a rolling basis,[64] but no later than **August 28, 2020.**

IT IS FURTHER ORDERED that petitioners' deadline to file stipulations on individualized prejudice or to respond to the government's Interrogatory No. 24 and Request No. 23[65] is reset for **September 11, 2020**.[66] Petitioners' deadline to file a motion to compel arising from the government's responses to date remains at **30 days after the date of this order**.[67]

Dated July 27, 2020, at Kansas City, Kansas.

 s/ Julie A. Robinson
Julie A. Robinson
Chief U.S. District Judge


 s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge

---

[64] The court strongly suggests petitioners prioritize the order in which they would like the government's repositories searched and so inform the government.

[65] *See* ECF Nos. 230 & 274.

[66] This deadline was previously stayed pending the resolution of the instant motion. *See* ECF No. 398.

[67] *See* ECF No. 403.

O:\19-2491-JAR, In Re CCA\-359.docx