**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

In re: CCA Recordings
2255 Litigation,

                Petitioners,

v.

United States of America,

                Respondent.

              **Case No. 19-cv-2491-JAR-JPO**

              **(This Document Relates to All Cases.)**

## UNITED STATES' NOTICE OF INTENT NOT TO PROVIDE FURTHER DISCOVERY

The United States, and the undersigned United States Attorney in particular, has great

respect for both Chief Judge Robinson and the Court. But the United States, after careful

consideration and review by the Department of Justice (Department), has determined that it

cannot and will not comply with the Court's July 27, 2020 discovery order, which the

Department has concluded is both unreasonable and contrary to law.[1] The United States already

has produced voluminous and extensive discovery to date and will not produce any further

discovery in these related cases. The Department understands that this decision may result in the

Court imposing a sanction against the United States, although we believe that doing so would be

unwarranted and that petitioner Petsamai Phommaseng's motion under 28 U.S.C. § 2255, as well

as the other motions before the Court, should proceed to resolution without further discovery

---

[1] The Department's position is not new; these arguments have been presented to the
Court throughout this litigation, *see, e.g.*, *Phommaseng* Doc. 593 at 33-55, including in the
government's recent motion for protective order, *see* Doc. 359 at 14-19.

    Citations to "*Phommaseng* Doc. ___" refer to filings in in *United States v. Phommaseng*,
No. 15-20020 (D. Kan.). Citations to "Doc. ___" refer to filings in these cases. And citations to
"*Black* Doc. ___" refer to filings in *United States v. Black*, No. 16-20032 (D. Kan.), which on
appeal is styled as *United States v. Carter*, No. 20-3042 (10th Cir.). Lorenzo Black and Karl
Carter were codefendants in the District of Kansas case.

from the government in light of the extraordinary amount of discovery the government already has produced throughout this litigation, both in these consolidated cases and in *United States v. Black*, No. 16-20032 (D. Kan.). Respectfully, the government asks the Court to rule on—and deny—the motions filed under 28 U.S.C. § 2255 by all of the petitioners in this consolidated litigation without further production of discovery from the government, either by receiving and deciding dispositive motions or reaching the merits of the petitions at this time.

The Court, and previously its special master, has investigated the conduct of the United States Attorney's Office for the District of Kansas (USAO) for four years, much as a financial auditor would minutely review a corporation's every file and document, irrespective of the precise and narrow issue presented in *Black* and in the consolidated § 2255 cases. Instead of focusing on whether the government violated an individual petitioner's Sixth Amendment rights in any of the cases now in litigation, the Court has permitted the Federal Public Defender (FPD) to engage in a sweeping and unbounded inquiry seeking to examine actions in other cases tracing back more than a decade that have no relevance to resolution of the § 2255 petitions pending before the Court. Respectfully, that is not the FPD's or the Court's role.

In taking this position, we are mindful that this litigation stems from the Court's investigation that commenced following the conduct of a former Special Assistant United States Attorney (SAUSA) who received by grand jury subpoena video recordings of the interior and exterior of a pretrial detention facility in Leavenworth, Kansas. *See Black* Doc. 745 at 13-14. Those recordings included soundless videos of rooms in which inmates met with other individuals, including their attorneys. *Black* Doc. 214 at 2. The SAUSA also obtained recordings of calls inmates made from the detention facility, which included a small percentage of calls to attorney phone numbers. *See Black* Doc. 183 at 1-3.

When these actions came to light, the Court appointed a special master to "investigate . . . whether, and the extent to which, the Government has violated the Sixth Amendment . . . in this and other criminal cases." *Black* Doc. 146 at 7. The special master's initial investigation, as described in more detail below, revealed *no* evidence of widespread or systematic constitutional violations, but the Court nonetheless expanded the special master's mandate to investigate potential "misconduct" *or* Sixth Amendment violations with the aim of taking "curative action" and "encourage[ing] a cultural change" in the USAO. *Black* Doc. 253 at 44. According to the special master, those "remedies" were to include efforts to end the careers of some particular, disfavored prosecutors in the Kansas City office of the USAO. *See Black* Doc. 697 at 8-11.

The USAO opposed the expansion of the special master's mandate and opposed the broad and invasive discovery that followed. *See Black* Docs. 334, 335, 340, 341, 360, 370. The government sought relief through a mandamus petition to the Tenth Circuit. *See Black* Doc. 398. The Tenth Circuit granted in part the government's mandamus petition, agreeing that the investigation exceeded the Court's authority in some respects and directing the Court to limit its investigation to the "defendants before the court" and "parties in *Black* who . . . filed Rule 41(g) motions in that proceeding." *See id.* at 2. After the Tenth Circuit's order, the USAO *voluntarily* provided as much of the voluminous material the special master demanded as it could in the impossibly short time frame set by the Court. *See Black* Doc. 697 at 24-29. And that production was substantial—seven USAO productions totaled nearly 30 gigabytes of information, including thousands of internal e-mails and documents. *See Black* Doc. 697 at 29; Affirmation of Stephen R. McAllister, *Black* Doc. 697-2 (attached as Ex. A). Despite the USAO's efforts, under unrealistic time constraints that required the United States Attorney, the First Assistant, and the Special Counsel appointed by the Deputy Attorney General *personally* to spend dozens of hours

3

reviewing e-mails and documents, the Court found the government in contempt for failing to comply with the special master's discovery requests. *See Black* Doc. 758 at 143-44. The Court subsequently closed the record and promised to apply its August 19, 2019 findings of fact and conclusions of law against the government in these more than 100 pending § 2255 cases. *See Black* Doc. 758 at 145-78. The government's appeal of those decisions is pending. *See United States v. Carter*, No. 20-3042 (10th Cir.).

The § 2255 petitions at issue in this litigation ostensibly involve claims by more than 100 petitioners alleging Sixth Amendment violations based on the government's possession of soundless video or audio jail-call recordings. But the petitioners' *actual, individual* Sixth Amendment claims have played little (if any) role in this litigation. Rather, these § 2255 proceedings have been used to continue the FPD's attempts (and perhaps the Court's) to investigate the government's litigation decisions, the USAO's "culture," and its policies and procedures, and to target disfavored prosecutors. This is not a situation where more than 100 aggrieved petitioners separately filed § 2255 petitions that were consolidated after it was determined that they raised similar plausible claims. Instead, the FPD has sought out and solicited every conceivable defendant on whose behalf it could file a petition, requesting a windfall dismissal or sentencing reduction for every one of them, irrespective of the merits of any potential or imagined claims, and regardless of the significant benefits the vast majority of these petitioners already received in exchange for their guilty pleas.

Now, the Court has authorized a single petitioner, Phommaseng, which in reality means the FPD, to re-launch the special master's investigation (which failed to prove what the FPD apparently sought to prove in the *Black* litigation) on behalf of more than 100 others in the purported name of civil discovery. It is no coincidence that Phommaseng's first set of discovery

requests are taken—nearly verbatim—from the special master's August 17, 2018 subpoena duces tecum. *Compare Phommaseng* Doc. 584 at 6-8, ¶¶ 3-13 *with Phommaseng* Doc. 697-1 at 6, ¶¶ 1-8, 11-13. Unfortunately, the Court approved these discovery requests aimed at reexamining the unfounded allegations in *Black*, which is now concluded except for a pending appeal. But these requests have nothing to do with any Sixth Amendment claim petitioner Phommaseng actually has alleged, or apparently is willing to allege, concerning his own case.

The same fundamental problem is apparent with any of the more than 100 pending § 2255 petitioners: none of them are entitled to relief as none have, will, or can articulate any facts to support a Sixth Amendment claim concerning the handling of recordings in their cases. As described more fully below, through the extensive discovery productions already made, the government has produced relevant information that possibly could bear on the vague claims the petitioners have made. Moreover, the government has responded to each § 2255 petition with *affirmative evidence* contradicting each petitioner's claims—sworn affidavits from prosecutors that they did not view videos of or listen to calls of attorney-client communications in the course of prosecuting the petitioner's underlying criminal case. And as explained below, a forensic examination of the retired hard drives of these prosecutors' computers was consistent with their denials of wrongdoing.

Further, it is hard to escape the fact that virtually *all* of the petitioners, approximately 100, pleaded guilty to their crimes and are unable to articulate any proper basis for the relief they now seek. There are no "wrongful convictions" here in terms of an innocent person being convicted, nor is there a shred of evidence that any prosecutor intruded on the attorney-client relationship of any of these petitioners in order to obtain a conviction or an advantage at sentencing. To the contrary, the defendants in the only two cases in which there has been any

evidence of misconduct by a federal prosecutor related to inmate-attorney telephone calls—Juan Herrera-Zamora and Michelle Reulet—are not among the petitioners in this consolidated § 2255 litigation. This is because the government took appropriate steps to resolve those cases in a mutually satisfactory manner to take into account the improper conduct of those prosecutors.[2]

Despite the government's fundamental and respectful disagreement with the Court's discovery orders, the government has endeavored to respond to the disproportional court-approved discovery requests in this litigation to the best of its ability at great cost and significant disruption of its core mission. To date, in responding to the approved discovery requests, the USAO has devoted more than 700 staff hours, countless attorney hours, and more than $300,000 contracting for outside resources to respond. These USAO efforts have collected and reviewed nearly 100,000 e-mails and attachments, and produced more than 20,000 documents. The USAO has reviewed more than 100 physical case files and produced more than 2,700 pages from those files. And the USAO sent 20 retired hard drives from computers assigned to the Assistant United States Attorneys (AUSAs) who prosecuted the petitioners' cases to the Department's Computer Crimes and Intellectual Property Section Cybercrime Laboratory ("CCIPS Lab"), in Washington, D.C. *See* Doc. 359 at 8-10; Doc. 401 at 7-8; Doc. 401-4. As described in more detail below, the Lab found no evidence of the audio files or video files containing the recordings that form the

---

[2] In *United States v. Herrera-Zamora*, No. 14-20049 (D. Kan.), the case was returned to district court from the Tenth Circuit on an unopposed motion to remand, Herrera-Zamora was charged with a reduced charge by information, pleaded guilty, and was sentenced to time-served after then-SAUSA Erin Tomasic came forward after approximately 10 months and informed her supervisor that she had knowingly listened to calls that she knew were required to be, but had not been, filtered to remove any attorney-client communications. *See Herrera-Zamora* Docs. 200, 202, 233. In *United States v. Reulet*, No. 14-40005-03 (D. Kan.), on joint motions, Reulet's sentence was reduced to time served with no supervised release after then-AUSA Tanya Treadway testified that she had listened to calls between attorneys and a defendant, calls she had previously denied listening to in response to questioning by the trial judge in the *Reulet* case. *Reulet* Docs. 1260, 1262.

basis of the petitioners' claims, except on the hard drive of former SAUSA Erin Tomasic, whose assignment to the USAO was terminated in May 2017. *See Black* Doc. 276 at 6. Although the USAO has sought to resolve discovery concerns informally with the FPD, those efforts have not been productive. Twice the USAO asked the Court to assist the parties in focusing the petitioners' approved discovery requests to a reasonable scope, but also without success.

Most recently, the USAO moved for a protective order relieving the government of undertaking additional, extremely costly and burdensome efforts to respond to the approved discovery requests until a petitioner shows good cause for discrete and limited discovery that is both necessary and supported by a specific and articulable showing that the request is proportional to the needs of the case. *See* Docs. 359, 401. Instead, the Court ordered the USAO to produce *all* remaining discovery requested by the FPD—*within 32 days*—even though complying would take at least a year and cost taxpayers $3.5 million or perhaps more. The Department now respectfully provides notice that the United States cannot and will not comply with the Court's July 27, 2020 order (Doc. 446) that imposes discovery obligations inconsistent with the rules governing discovery in § 2255 proceedings, irrelevant to resolution of petitioners' claims, and impossible to fulfill.

## I.    Background

In *United States v. Black*, No. 16-20032 (D. Kan.), the Court appointed a special master to investigate the USAO's possession and possible use of soundless video recordings of attorney-client meetings and audio recordings of attorney-client calls. *Black* Doc. 146 at 3. The special master "tentatively conclude[d]" that: "(1) neither the [USAO] nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA Leavenworth in May of 2016; and (2) neither the [USAO] nor any law enforcement officer ha[s] ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at

7

CCA-Leavenworth." *Black* Doc. 214 at 26-27. The special master also concluded that, of the 48,802 call recordings the government provided in response to the Court's clawback order, 229 (or 0.47%) were made to attorney telephone numbers. *Black* Doc. 187 at 3. The special master did not find or suggest that any USAO employees or agents listened to any of those 229 calls. *Id.* at 3-4. Indeed, throughout this litigation, there has been no evidence that the prosecution in any of the petitioners' underlying criminal cases either viewed the soundless videos or listened to attorney calls. On this basis alone, the petitioners' Sixth Amendment claims must be denied.

Nevertheless, the Court expanded the special master's investigation and denied the USAO's objections to the scope of the proceedings. *Black* Doc. 253 at 5-6. After seeking guidance from the Department, the USAO voluntarily attempted to cooperate with the investigation while maintaining appropriate privileges and legal positions. *See, e.g.*, *Black* Doc. 697 at 29; *Black* Doc. 697-1 at 44; *Black* Doc. 697-2. Despite the USAO's best efforts to comply—including seven productions totaling nearly 30 gigabytes of information—the Court found the government in civil contempt for allegedly failing to fully comply with certain orders, and rendered advisory opinions on the law concerning the FPD's Sixth Amendment claims, which the Court indicated it would apply, and has applied, in these later § 2255 proceedings. *See Black* Doc. 758 at 143-45. The government has appealed the Court's decision in *Black*, and the appeal is pending before the Tenth Circuit. *See United States v. Carter*, No. 20-3042 (10th Cir.).

In the consolidated § 2255 cases, the Court has granted two petitioners leave to seek discovery—Petsamai Phommaseng and Mamoudou M. Kaba.[3] *See* Doc. 79 (approving, in part,

---

[3] Although Kaba has since died, Doc. 374, the government has agreed to treat Kaba's request as surviving him, with the right to receive responses to that request transferred to Phommaseng. Doc. 475 at 1-2. No other petitioner has moved for leave to serve discovery, as required, *see* Doc. 82 at 3-4, and the time for them to do so has passed, *see* Doc. 98 (setting May

requests proposed in *Phommaseng* Doc. 584 and Doc. 50); Doc. 96 (approving one request in Doc. 53); and Doc. 126 (approving most of the requests in Doc. 108-1 and Doc. 109-1). None of Phommaseng's first set of proposed discovery requests was specific to his case; each sought information about the special master's investigation in *Black*. *See* Doc. 50 at 5 (renewing the requests in *Phommaseng* Doc. 584, except requests 1, 2, and 11(b)); *see also Phommaseng* Doc. 584 at 6-9. Nonetheless, the Court granted Phommaseng leave to serve those requests, finding that the "wider-scale *Black* investigation," to which he was not a party, was relevant to his claims. Doc. 79 at 5, 7. Phommaseng's requests seek internal USAO documents relating to litigation holds, USAO management instructions, and any use of a taint team in *Black*. *See Phommaseng* Doc. 584 at 6-7, ¶¶ 3-4, 6, 7. He also broadly seeks "[a]ny documents or materials . . . relating to" *any* allegations that the government "acted in violation of the U.S. Constitution, statute or other law." *Id.* at 7, ¶ 8. Kaba's request is similarly expansive. It seeks any "information relating to . . . allegations the USAO requested, obtained, reviewed, disseminated, received summaries/reports of, or relied on recordings of attorney-client communications, and the identities of anyone who took such action or directed or permitted the same," Doc. 53 at 5, which includes any audio or video recordings—whether involving Kaba or not, and whether involving an attorney or not, *see* Doc. 126 at 8-9.

Phommaseng's subsequent requests are mostly duplicative of his and Kaba's first requests, but ask for the information to be organized to correspond to various more specific topics and in batches corresponding to "each petitioner." *See* Doc. 108-1 at 5-9; Doc. 109-1 at 5-14. The fact that Phommaseng alone was allowed to seek information for "each petitioner"

---

4, 2020 as the deadline for motions for leave to serve discovery); Doc. 179 (denying the petitioners' motion to extend the May 4, 2020 deadline).

underscores the breadth of the Court's initial ruling that Phommaseng could seek information unrelated to his own case.

Notably, the Court has pointedly *declined* to resolve disputes about the elements of the petitioners' claims that could narrow the scope of discovery, *see, e.g.*, Doc. 39 at 34-37, *declined* to rule on government proposals to streamline the litigation by using test cases and by expediting video-only cases, *see* Doc. 21 at 56-59; Doc. 69-1 at 4, and *declined* to respond to government requests to engage with the parties to find a reasonable, realistic middle ground on discovery, *see* Doc. 114 at 3; Doc. 401 at 2.

In responding to the wide-ranging approved discovery requests, the USAO has run searches on Proofpoint e-mail archives of relevant USAO personnel and provided the results (nearly 100,000 e-mails and attachments) to a contractor for review and production. The cost to do so was $325,362.28, which exceeds by nearly $100,000 the amount the USAO typically earmarks for litigation expenses for an entire fiscal year. Miller Aff., Doc. 359-1 at 1, ¶ 6. The USAO prioritized searching and reviewing relevant e-mail accounts for responsive material because e-mail has been the primary means of communication during the relevant time period; e-mails were therefore the most likely place to find the most relevant responsive material; the Proofpoint e-mail system provided a known way to search e-mails for responsive material for the relevant time period; and the Proofpoint e-mail system automatically preserved e-mails at the moment the e-mail was sent or received through the Department's e-mail system so that USAO personnel could not delete, add, or edit any e-mails archived there. *See Black* Doc. 694 at 2511-13.

On July 1, 2020, the USAO produced more than 20,000 e-mails and attachments to the FPD in response to the numerous court-approved requests. Most of the requests covered a time

period of January 1, 2010 to the present. The e-mails and attachments related to jail calls, video surveillance recordings at CCA, *Black*-related allegations of wrongdoing by the USAO in connection with audio and video recordings of inmate communications with counsel, filter teams, translators, computer preservation, cooperation with and production of documents to the special master during the *Black* litigation, litigation holds, an August 2, 2016 meeting at the USAO, KBI Special Agent Stokes and his handling of any jail calls or video recordings, the closing of USAO files, and retention of documents in those files—among other topics. Of the more than 20,000 documents, about 7,330 mention at least one of the petitioners' names.

The USAO has spent more than 700 staff hours reviewing physical files and producing responsive documents, Doc. 359 at 8, and more than 100 hours reviewing 1,701 discarded CDs, DVDs, and thumb drives, Moore Aff., Doc. 359-2; Moore Supp. Aff., Doc. 401-3 at 1, ¶ 7. The USAO also sent retired hard drives from computers assigned to 20 AUSAs to the CCIPS Lab for forensic testing. *See* Doc. 401-4. The hard drives included those assigned to the prosecutors in the petitioners' cases. *See* Doc. 128 at 1. The Lab found no evidence of the audio files or video files containing the recordings that form the basis of the petitioners' claims, except on the hard drive of former SAUSA Erin Tomasic, who was immediately terminated from her assignment to the USAO in May 2017 when she admitted to her supervisor that she had knowingly listened to calls that she knew were required to be, but had not been, filtered after previously having denied doing so. *See* CCIPS Lab Report, Doc. 401-4 at 4; *Black* Doc. 276; *Black* Doc. 758 at 98.

Specifically, with respect to soundless video recordings the CCIPS Lab searched the hard drives for the three video file types associated with the soundless video recordings and checked the search hits against the file names of recordings of attorney meeting rooms. No matching files were found. Doc. 401-4 at 4. The Lab also searched each of the hard drives for the presence of or

reference to 330 specific audio files, which included every audio file of a recorded jail call that is the basis for a petitioner's Sixth Amendment claim in these cases.[4] The CCIPS Lab report states:

> A search was conducted on all other devices for the 330 audio file names that were provided to the Lab by AUSA Capwell. The 330 audio file names were not found in the index searches on any of the computers except for the Tomasic computer.

CCIPS Lab Report, Doc. 401-4 at 4. The report lists 10 audio file names that were found on the Tomasic computer, three of which it described as "Exact Matches" and seven of which it described as "Partial Matches." *Id.*

Two of the partial matches were to audio file names related to defendant Juan Herrera-Zamora, whose case was resolved in March 2018 by an agreement to a time-served sentence with no term of supervised release. *See United States v. Herrera-Zamora*, No. 14-20049 (D. Kan.), Doc. 232 at 2. Two of the exact matches and five of the partial matches are calls Securus identified as being made by petitioner Frenklyn Piggie.[5] Two of those matches (one exact and one partial match) appear to relate to the same recording because the file name is the same, only the file extension is different. *See* Doc. 401-4 at 4. And only three of the recordings are identified in Piggie's privilege log. In fact, Piggie was sentenced in the District of Kansas on October 24, 2011, almost four years before the calls at issue took place. *See United States v. Piggie*, No. 10-20145 (D. Kan.), Doc. 46. The calls identified in Piggie's privilege log are from August and September 2015, when he was held at CCA only on charges in a Western District of Missouri prosecution. In April 2017, Piggie stipulated to violating the terms and conditions of his

---

[4] The FPD provided the government all but eight of the 330 file names. The eight file names the FPD did not provide related to *United States v. Herrera-Zamora*, No. 14-20049 (D. Kan.), and the USAO obtained those file names directly from Securus.

[5] Because the FPD initially refused to share with the government the case(s) to which the CCIPS matches related, the government sought and received that information from Securus directly.

supervised release for his District of Kansas case, and the Court revoked his supervised release. *Piggie* Docs. 63, 64. The final match, an exact match, is a call Securus identified as being made by petitioner Julie Clifton. According to call detail records from Securus, the call duration was zero and the call is not included on Clifton's privilege log.

In addition, the USAO sought to identify any and all additional locations where responsive electronically stored information might be stored, including both current and historical sources. It became apparent, however, that the scope of searches required by the petitioners' requests involved so much data in so many locations that the searches would require more time, personnel, and examination tools than were available in-house at the USAO. The range of repositories the USAO was able to identify, which are described in more detail below, would have required imaging hundreds of hard drives, including servers, and searching more than 300 terabytes of data. Since the task was clearly beyond the USAO's capability, the USAO sought outside help. The USAO first requested the assistance of the Department's Litigation Technology Service Center (LTSC). The LTSC responded that it did not have the capacity to assist with a project of this size. So the USAO again turned to third-party contractors for assistance. The USAO received only one response. Miller Aff., Doc. 395-1 at 2, ¶ 9. The quote from that vendor was for $3.5 million with an approximate period of performance of one year to image and search the data, review and tag the documents, and package the responsive materials for final production. *Id.* at 2, ¶¶ 8-9; *see also* Miller Supp. Aff., Doc. 401-2 at 2-4.

Because the prospect of spending $3.5 million—in addition to the $325,362.28 the USAO already had spent on discovery in these cases—exceeded what the rules of discovery allow, was not feasible, and was completely out of proportion to the needs of the case, the USAO filed a motion for protective order. Doc. 359. That motion catalogued the breadth of the

approved discovery requests, the USAO's good-faith and tireless efforts in responding to the requests, the magnitude of the remaining amount of discovery, and the meaninglessness of expending additional resources on discovery given how unrelated the requests were to the petitioners' own Sixth Amendment claims. The motion sought an order relieving the government from undertaking additional searches of electronically stored information in responding to the approved discovery requests unless and until a petitioner was able to show good cause for *discrete* and limited follow-up discovery that is both necessary and supported by a specific and articulable showing that the request is proportional to the needs of the case. Doc. 359 at 19; Doc. 401 at 2.

The Court denied the government's motion for protective order. Doc. 446. It noted that "leadership at the local USAO-level has made good-faith efforts to comply with discovery orders," *id.* at 11, but that "the burden and expense to the government is not disproportionally high, particularly given this litigation affects a significant constitutional right," *id.* at 18. In reaching that conclusion, the Court stated that the USAO "should have sought support from the DOJ earlier," and that it is "past time for the vast resources of the DOJ to be tapped in support of this significant litigation." Doc. 446 at 11. To be clear, from the beginning of this litigation, really even before and during the *Black* litigation, the USAO has been in regular and direct communication with the Department. As the Court is well aware, in late July 2018, Deputy Attorney General Rod Rosenstein informed the Court that the Department could not support a tentative proposed settlement of the litigation. That did not end the Office of the Deputy Attorney General's consultation with the USAO in this litigation, which has continued throughout these proceedings to the present day.

14

When the Court issued its July 27, 2020 order, United States Attorney Stephen R. McAllister immediately sent the decision to the Office of the Deputy Attorney General and other components of the Department and scheduled a call to discuss the Court's decision. Discussions between the USAO and the Department have been ongoing since then, and this filing is fully supported by the Department.

## II.   The Court Lacks Authority to Conduct These Proceedings and to Issue the July 27, 2020 Discovery Order.

### A.  These proceedings violate 28 U.S.C. § 2255 and the Rules Governing Section 2255 Proceedings.

Section 2255(b) provides, "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255. The Rules Governing Section 2255 Proceedings provide that when a § 2255 petition is filed, the "clerk must promptly forward the motion to the judge who conducted the trial and imposed sentence or, if the judge who imposed sentence was not the trial judge, to the judge who conducted the proceedings being challenged." Rule 4(a) of the Rules Governing Section 2255 Proceedings. The "judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ." Rule 4(b). "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." *Id.*

These rules, and 28 U.S.C. § 2255 itself, emphasize the importance of expeditious and efficient proceedings focused on the particular constitutional violation the petitioner alleges. In many of the consolidated cases, these basic procedures have not been followed. Instead, the

cases have been taken away from the "judge who conducted the proceedings being challenged," even though that judge is available in many of the cases. *See* Rule 4(a). And there is no indication that the individual § 2255 petitions have been "examine[d]" to determine whether the "moving party is . . . entitled to relief" before allowing wide-ranging discovery. *See* Rule 4(b).

Determining whether any petitioner is entitled to relief requires clearly articulating the elements of the petitioners' Sixth Amendment claims and the relief the petitioner seeks. *See United States v. Weeks*, 653 F.3d 1188, 1200 (10th Cir. 2011) (concluding the petitioner was entitled to a hearing only after explaining in detail how the petitioner had alleged facts that, if true, would satisfy each element of the petitioner's ineffective assistance of counsel claim); *see also United States v. Hassen*, No. 07-20099-04, 2019 WL 2085668, at *3 (D. Kan. May 13, 2019) (concluding that the petitioner was not entitled to a hearing because he "had not shown that his non-conclusory allegations, if true, would entitle him to relief"), *certificate of appealability denied*, 793 F. App'x 810 (10th Cir. 2020) (unpublished). Each motion must be evaluated to determine whether it plausibly alleges facts that, if true, would entitle the movant to relief. *See Weeks* 653 F.3d at 1200 (explaining that the first step in § 2255 habeas review— before granting discovery or a hearing—is "whether the defendant is entitled to relief if his allegations are proved"). The allegations must be plausible, that is, "more than mere speculation" that the movant is entitled to relief. *Strickler v. Greene*, 527 U.S. 263, 286 (1999).

The § 2255 petitions in these cases make no showing that the individual petitioners have suffered a Sixth Amendment violation, prejudicial or otherwise, and are entitled to relief. The Court has refused to scrutinize the petitioners' allegations, based in part on its unsupported and incorrect legal conclusion that there is "no requirement that a petitioner's 'specific allegations' address each of the elements of the petitioner's claim." Doc. 56 at 9. Instead of scrutinizing the

16

§ 2255 petitions, the Court has allowed each of the more than 100 petitioners to maintain his or her § 2255 petition without alleging facts that would support a legally recognized basis for the claims asserted or for awarding the relief each petitioner seeks—dismissal of charges with prejudice or an arbitrary sentence reduction. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977) (proving a Sixth Amendment violation requires "tainted evidence," "communication of defense strategy to the prosecution," "purposeful intrusion," and "at least a realistic possibility of injury"); *Shillinger v. Haworth*, 70 F.3d 1132, 1140 (10th Cir. 1995) ("[A]bsent some prejudicial effect on the defendant's proceeding 'there is no basis for imposing a remedy in that proceeding.'" (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1980))); *Lafler v. Cooper*, 566 U.S. 156, 170-74 (2012) (explaining that Sixth Amendment remedies are not one-size-fits-all, but must be "tailored"). Indeed, not *one* of the § 2255 petitions alleges that the prosecution watched any soundless video recording, listened to any audio call recording, or learned the content of any privileged communication that forms the basis of the petitioner's Sixth Amendment claim.[6] Nor has any petitioner alleged any prejudice as a result of any alleged actions by the government. Not only is prejudice an element of the petitioners' Sixth Amendment claims, *see Weatherford*, 429 U.S. at 558, prejudice is required for showing entitlement to the relief the petitioners seek, *see Shillinger*, 70 F.3d at 1140 (citing *Morrison*, 449 U.S. at 364).

---

[6] In informal discovery responses, the petitioners allege that at some "unknown" time, some "unknown" member of the "prosecution team" "viewed or otherwise became privy to" the soundless video and/or audio recordings that form the basis of their Sixth Amendment claims. This assertion is so vague as to be meaningless. In any event, there is no evidence that anyone on the prosecution teams improperly viewed, listened to, or used any recordings of petitioners' attorney-inmate meetings.

While failing to scrutinize the petitioners' allegations, the Court has delayed or avoided ruling on essential legal questions that could streamline this litigation, *see, e.g.*, Doc. 39 at 34-37 (declining to clarify in these cases what the petitioners have to show to prevail on their Sixth Amendment claims); the Court has ignored or rejected the government's proposals for expediting the cases, *see, e.g.*, Doc. 21 at 56-57; Doc. 69-1 at 4; and contrary to the rules, the Court has precluded the government from filing early dispositive motions to dismiss any of the consolidated § 2255 petitions based on their insufficient allegations and legal defects, Doc. 83 at 2; Doc. 127 at 4. Instead of focusing discovery on the elements of a valid Sixth Amendment claim, the Court has authorized unfettered, fishing-expedition discovery. *See, e.g.*, Doc. 359 (government motion detailing the burden of the court-approved discovery). Instead of engaging the parties in an effort to plan realistic and proportional discovery, the Court has effectively "punished" the government by insisting on compliance with impossible discovery demands. *See Phommaseng* Doc. 583 at 19 (asking the Court to "punish" the government).

During the special master's investigation in *Black*, the government argued the proper way to address any alleged Sixth Amendment violation was in the context of individual § 2255 petitions. *See, e.g.*, *Black* Doc. 745 at 129 n.96, 166. The government expected, however, that any § 2255 proceedings would follow the rules of such proceedings, focused on claims and allegations specific to each individual petitioner. They have not.[7] *See In re United States*, 398

---

[7] Indeed, at the outset of this litigation, before permitting the government to brief the proper scope of discovery, this Court pre-determined that it would require "global" rather than appropriately narrow discovery. For example, it refused to "cabin off discovery with respect to one particular defendant/petitioner who was prosecuted by a given prosecutor and make that a test case" because this would "foreclose[ ] the discovery of evidence for perhaps 404(b) evidence or other evidence that would be relevant to that case about how perhaps that prosecutor handled similar matters in other cases." Doc. 21 at 57. This approach ignores that such "404(b) evidence or other evidence" has no bearing on a § 2255 petition if the petitioner has not alleged the elements necessary to establish a Sixth Amendment violation in the first place.

F.3d 615, 618 (7th Cir. 2005) ("Judges often are tempted to seek a larger role in the conduct of litigants that appear frequently before them. Temptation may be especially strong for a judge who spent many years as a prosecutor before donning the robe. . . . But temptation must be resisted in order to maintain separation between executive and judicial roles, and between the formulation and evaluation of positions in litigation." (citation omitted)).

The statement at the end of the Court's order denying the government's motion for protective order, which characterizes these cases as affecting "the liberty . . . of more than 100 people who may have been wrongfully convicted," is telling given that *none* of the actual cases before the Court involves any claim of wrongful conviction. *See* Black's Law Dictionary (11th ed. 2019) (defining "wrongful conviction" as "conviction of a person for a crime that he or she did not commit"). Of the more than 100 petitioners, 100 pleaded guilty, including Phommaseng. Of those, 76 received below-guideline sentences, and/or had § 924(c) charges dismissed, and/or the government agreed to dismiss or not to file notices of prior felony drug convictions. *See* Doc. 474-1 (chart with details concerning each petitioner's criminal proceedings). And at least a quarter of all petitioners received sentencing benefits for helping the government investigate and prosecute others. These hardly seem the stuff of wrongful convictions or unfair sentences. Not only do petitioners not claim innocence, they also have not alleged (or produced an iota of evidence) that their guilty pleas were the product of an intrusion into the attorney-client relationship. And the prosecutors in their cases have submitted sworn affidavits that they did not view or listen to recorded attorney-client communications in the course of prosecuting each petitioner's underlying criminal case.

The government takes seriously the constitutional rights of criminal defendants and claims of prosecutorial misconduct. But the wide-ranging investigation to which the Court is

again subjecting the USAO finds no support in the § 2255 petitions, the Rules Governing § 2255

Proceedings, or the Federal Rules of Civil Procedure. These proceedings already have imposed a

substantial cost on taxpayers and the important public-safety and criminal-justice missions of the

USAO. Using discovery to force the USAO to further divert its limited time, money, and

attorney resources as "punishment" for the Department's refusal to agree to arbitrary sentencing

reductions without particularized evidence of Sixth Amendment violations would be contrary to

law and unjust.

### B. The Court's discovery order violates Rule 6 of the Rules Governing Section 2255 Proceedings and Rule 26 of the Federal Rules of Civil Procedure.

In § 2255 proceedings, a "judge may, for good cause, authorize a party to conduct

discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance

with the practices and principles of law." Rule 6(a) of the Rules Governing Section 2255

Proceedings. Good cause is established where discovery will "aid in developing facts necessary

to decide whether to order an evidentiary hearing or to grant the writ following an evidentiary

hearing." Advisory Committee Note to Rule 6 of the Rules Governing Section 2254

Proceedings.[8] Any discovery granted must be "relevant and appropriately narrow." *Id.* The

Federal Rules of Civil Procedure, which the Court has chosen to apply in these cases, allow

parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's

claim or defense." Fed. R. Civ. P. 26(b)(1). But any discovery must be "proportional to the needs

of the case," which requires considering, among other things, "whether the burden or expense of

the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

---

[8] *See* Advisory Committee Note to Rule 6 of the Rules Governing Section 2255 Proceedings ("The discussion [in the Advisory Committee Note to Rule 6 of the § 2254 rules] is fully applicable to discovery under these rules for § 2255 motions.").

Phommaseng, the only living petitioner who has served discovery requests, was charged in three separate cases in 2015. *See Phommaseng* Doc. 597 at 2-3. He pleaded guilty to drug and gun charges, admitted his guilt before the Court, and received a favorable sentence based on an agreed-upon range. *See* Doc. 194-1 at 186-87; *Phommaseng* Doc. 593 at 31. His 15-year sentence was possible only because the government dismissed two counts that carried a mandatory consecutive penalty of 25 years each. *See* Doc. 328 at 3, 7; *Phommaseng* Doc. 593 at 31. Otherwise, in just one of his three cases, he faced a 55-year statutory mandatory minimum sentence. *See Phommaseng* Doc. 593 at 5, 31. Phommaseng's petition does not allege that any prosecutor watched any of the soundless videos or listened to any of the call recordings that form the basis of his Sixth Amendment claims. *See generally Phommaseng* Doc. 550, 583. Indeed, Phommaseng pleaded guilty in all three cases on April 26, 2016—more than a month before the USAO had possession of the CCA videos, *see Black* Doc. 758 at 66—and the plea agreements bound the government to argue for no more than 240 months' imprisonment. Overall, at least half of the petitioners making video claims pleaded guilty before the government obtained the soundless videos. And many petitioners, like Phommaseng, received jail calls as Rule 16 discovery yet never complained during the underlying criminal case that attorney calls were included in the production.

The facts of Kaba's case are no more compelling. Kaba, now deceased, was charged with bank robbery and using, carrying, and brandishing a firearm during a crime of violence. *See United States v. Kaba*, No. 15-cr-20092 (D. Kan.), Doc. 2 at 1-2. He pleaded guilty to these two charges and the Guidelines range for both was 121 to 130 months—37 to 46 months on the bank robbery count and a mandatory consecutive seven years on the firearm charge. *Kaba* Doc. 54 at 1, § III. The government agreed to recommend a sentence at the low-end of the Guidelines range

and a 2- or 3-level reduction for acceptance of responsibility. *Kaba* Doc. 30 at 4 ¶ 5. The Court sentenced Kaba to 85 months. *Kaba* Doc. 53 at 2. His Sixth Amendment claim was based on a single soundless video recording in which he and his attorney apparently reviewed materials on his attorney's computer, though there is no indication in the FPD's description of the video that any of those materials are visible in the video. *See* Doc. 205-2 at 91.

The discovery the Court has allowed Phommaseng to seek is neither appropriately narrow nor proportional to his Sixth Amendment claims. Nevertheless, the government has provided Phommaseng with more than 20,000 e-mails and attachments in response to his discovery requests. More than 700 of the e-mails and more than 1,000 of the attachments include his name. The government also provided Phommaseng more than 70 pages of documents from the government's physical files in Phommaseng's cases. CCIPS has searched the retired hard drives assigned to the prosecutors in his cases and found no evidence of the soundless video or audio recordings that form the basis of Phommaseng's Sixth Amendment claims. And the USAO is not aware of a single shred of evidence that has been uncovered supporting Phommaseng's claim that there was any interference with his right to counsel. Nevertheless, the Court has allowed Phommaseng to seek discovery relating to more than 100 other petitioners and has ordered the government to expend millions of dollars and thousands of hours searching for more, in service of the seemingly impossible task of overcoming the Court's apparent, but unfounded, *presumption* that Phommaseng's (indeed every petitioner's) Sixth Amendment rights have been violated. *See, e.g.*, *Black* Doc. 758 at 180 (stating that the Court "always anticipated individual relief for particular defendants"); *Black* Doc. 758 at 186 (stating that the Court's findings of fact and conclusions of law in *Black* were intended to "create a comprehensive record and establish legal standards and threshold procedures that will give individual § 2255 litigants the opportunity

to finally obtain efficient, fair, and consistent relief without further delay"); *see also* *Phommaseng* Doc. 597-1 through 597-5 (prosecutor and law enforcement affidavits swearing that no one viewed or listened to recordings of attorney-client communications).

The discovery the government has produced already far exceeds the limitations of Rule 6(b) of the Rules Governing § 2255 Proceedings, which requires approved discovery to be "appropriately narrow," *see Phommaseng* Doc. 608 at 8, and the limitations of Rule 26(b)(1) of the Federal Rules of Civil Procedure, which require discovery to be proportional to the needs of the case. In determining whether discovery is proportional to the needs of the case, Rule 26(b)(1) provides the following six factors to consider: (1) the importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.

The Court's determination that Phommaseng's approved discovery requests are proportional to the case and not unduly burdensome boils down to three incorrect conclusions: (1) the USAO has a "systemic practice of purposeful collection, retention, and exploitation" of attorney-client recordings; (2) the Department has "vast resources" that can and must be "tapp[ed]" to fully respond to Phommaseng's requests; and (3) no burden or expense would be too great to impose on the government because the petitioners have asserted Sixth Amendment violations. *See* Doc. 446 at 11, 18. Each of the Court's conclusions fails to withstand examination. The first finds no support in the record or the substantial discovery produced, the second ignores the very rules the Court has chosen to apply in this litigation, and the third flies in the face of logic and supportable legal argument.

*First*, there has been no evidence of a "systemic practice of purposeful collection, retention, and exploitation" of attorney-client recordings. If anything, evidence produced by the government in discovery has further undermined the Court's finding to this effect in *Black*. Of the 20 hard drives of AUSAs (those assigned to petitioners' underlying criminal cases) the government sent to the Department's CCIPS Lab for forensic testing, the only one that contained evidence of any video or audio recording that forms the basis of a petitioner's claim was former SAUSA Erin Tomasic's hard drive, and she was terminated from her assignment to the USAO as soon as she admitted to knowingly listening to calls that she knew were required to be, but had not been, filtered. *See* CCIPS Lab Report, Doc. 401-4; *Black* Doc. 276 at 6; *see also* Doc. 401 at 14-16 (describing the CCIPS Lab results). If the "systemic" practice the Court claims really existed, one would have expected the special master's investigation and the CCIPS Lab's forensic testing to find *some* evidence of it, but neither did. In fact, the special master "tentatively conclude[d]" that not one USAO employee or law enforcement officer watched any of the soundless video recordings of attorney-client meetings, *Black* Doc. 214 at 26-27, and did not find or suggest that any USAO employees or agents listened to any attorney-client calls, *see Black* Doc. 187 at 3-4. More specifically, the substantial efforts already undertaken by the government clearly establish that the government did not violate the Sixth Amendment rights of Phommaseng, who pleaded guilty, because there is no evidence either that the videos at issue contain attorney-client information, or that the government ever watched the videos or listened to the calls, let alone that Phommaseng suffered any prejudice. Indeed, the government did not come into possession of the videos until a month after entering a plea agreement in which the government made concessions as to its sentencing position.

*Second*, the USAO has spent more funds on responding to the petitioners' discovery requests in this case ($325,362.28) than it has spent on all other litigation expenses this fiscal year ($187,400), and more than the USAO typically earmarks for all litigation expenses in a year ($250,000). Miller Aff., Doc. 359-1 at 1-2, ¶¶ 5-7. The USAO's financial resources are limited and this litigation has depleted them. *See id.* at 2, ¶ 7. Though the USAO may "coordinate with EOUSA on the possibility of being allocated additional funds . . . ., there is no guarantee the additional dollars will be available and may require a claw-back from [other] districts to cover the expense." Miller Supp. Aff., Doc. 401-2 at 4, ¶ 10. For example, in FY2020, "the USAO community [is] projecting a $30M shortfall and EOUSA already issu[ed] a request on July 2, 2020 requesting USAOs to identify funds for possible return to maintain overall department solvency through the end of the fiscal year." *Id.*

*Third*, the government takes extremely seriously its obligation to respect and protect the constitutional rights of criminal defendants; a conviction or sentence achieved unfairly is not justice at all. But despite a lengthy investigation by the court-appointed special master and extraordinary discovery provided by the government, there has not been a shred of evidence to date that the government has violated the rights "of more than 100 people who may have been wrongfully convicted." Doc. 446 at 18. Respectfully, the Court unfortunately exceeds its authority when it cites unfounded factual and legal conclusions, such as this, as a basis for imposing impossible discovery obligations upon the government. No defendant has produced a shred of evidence that the government obtained his conviction or sentence through an intrusion into his right to counsel. And the government has produced evidence to the contrary in the form of affidavits from the prosecutors on the petitioners' underlying criminal cases.

### III.     Compliance with the Discovery Order Is Impossible.

The Court's order (Doc. 446) requires the government to produce within 32 days discovery that the government's best information suggests would take more than a year and cost more than $3.5 million to produce. Those time and cost estimates were *supported by affidavits* and a bid from a third-party contractor. Doc. 359-1; Doc. 401-2. And the estimate is limited to gathering and producing responsive materials in the USAO's possession or under its control; the estimate does not include the broader universe of data the petitioners seek that is directly possessed and controlled by other components of the federal government that would have to be searched in order to fully comply with the Court's order. *See* Doc. 399 at 23. The order suggests that compliance is possible by "tapp[ing]" the "vast resources of the DOJ"—"in very short order, more people need to be hired to complete the process and the cost of such completion could well exceed $3.5 million." Doc. 446 at 11, 18. The order defies reality and "manifests a clear error of judgment." *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 647 (10th Cir. 2008). Indeed, the USAO's efforts to seek additional bids from third-party contractors have turned up empty, likely because of the unrealistic scope of the work.

The repositories of electronically stored information within the USAO's possession, custody, or control include the following:

(1) Network Backup Drives Preserved by the Office of the Chief Information Officer (OCIO) (approximately 116 TB), which is stored in a "Networker native format" that compresses the data for storage and would take more than eight months to restore to a fully readable format;

(2) Current Network Storage (approximately 42 TB), which includes all storage areas used or accessible by a user (AUSAs or support staff) on the USAO's active network, including cloud- and server-based storage;

26

(3) Current Desktop/Laptop Storage (approximately 98 TB), which includes the hard drives located in the desktop and laptop computers in use across the District;

(4) Retired/Cloned Desktop/Laptop Storage (approximately 98 TB), which includes the "spinner" hard drives from the in-use desktop and laptop computers across the District that were replaced with solid-state hard drives between August and November 2017;

(5) Retired Network Storage (approximately 52 TB), which includes retired servers previously used for network storage that were cloned (duplicated) and replaced with new servers that contained all the cloned data; and

(6) 2019 Preservation Drives (approximately 35 TB), which consists of data copied from USAO cloud storage and user profile directories onto two hard drives, one 32 terabytes and the other 3 terabytes.[9]

Setting aside the first category of electronically stored information, which alone would take eight months to restore to a readable format, the remaining electronic storage would have to be imaged before it could be searched. Imaging is a standard and necessary first step to avoid any inadvertent alteration or spoliation. *See, e.g.*, *Black* Doc. 155 at 6; *see also Black* Doc. 172 at 16. Next, the more than 300 terabytes of data would have to be searched for material responsive to the approved discovery requests. Many of these requests are broadly worded. For example, one of Phommaseng's requests seeks "[a]ny documents or materials . . . relating to" any allegations that the government "acted in violation of the U.S. Constitution, statute or other law."

---

[9] The government provided this information to the Court in the government's motion for protective order, except for the information related to the network backup drives preserved by OCIO, which was not known at the time. *See* Doc. 359 at 11. The government's motion for protective order also stated that the cloud storage backup occurred in March or April 2019, *see id.* at 13, but the government has since learned that although the USAO purchased the backup drive array for OCIO in March 2019, OCIO did not begin the cloud storage backup process until May 2019 and did not complete the backup until early 2020 due to technical issues.

*Phommaseng* Doc. 584 at 7, ¶ 8. And Kaba's request seeks any "information relating to . . . allegations the USAO requested, obtained, reviewed, disseminated, received summaries/reports of, or relied on recordings of attorney-client communications, and the identities of anyone who took such action or directed or permitted the same," Doc. 53 at 5, which includes *any* audio or video recordings—whether involving Kaba or not, and whether involving an attorney or not, *see* Doc. 126 at 8-9.

The contractor estimates the project will require a total of 1,920 Project Manager hours; 38,400 Legal Assistant IV hours; 1,050 Forensic Analyst hours; and 200 Senior System Analyst hours. Miller Supp. Aff., Doc. 401-2 at 4, ¶ 6(j). Taking just the Legal Assistant portion as an example of the scope of the Court's order, it would take 160 legal assistants working around the clock in eight-hour shifts, seven days a week for 30 days, to complete that part of the project. The USAO currently employs 16 legal assistants; if they did absolutely none of their other work for the USAO, it would take 10 months for them to complete this project, assuming they worked an inhuman schedule, which is not possible. And this does not even include the network backup drives preserved by OCIO, or any electronically stored information in the possession, custody, or control of any component of the federal government outside the USAO.

When the Court ruled on July 27, 2020, the Court gave the government roughly 768 hours to comply with its order. The USAO plainly lacked the resources to comply with such a demanding order under any circumstances. More importantly, what the Court demanded is not justified by the law, any applicable rules, the facts, or fundamental principles of justice and fairness.

**Conclusion**

The Court's July 27, 2020 order (Doc. 446) violates the rules that govern § 2255 proceedings, the rules of civil discovery (which the Court has chosen to apply), and the separation of powers. Quite simply, the Court's order demands the impossible. The USAO appreciates that the Court recognized the USAO has over the past several challenging months acted in good faith and more than exhausted its limited, taxpayer-funded resources attempting in vain to comply with far-reaching discovery orders. But, respectfully, this litigation is now far beyond any proportionality principle recognized in the civil rules, and the United States cannot and will not produce any further discovery in these related cases.

The United States, and this United States Attorney, therefore with great respect, ask the Court to rule on—and deny—the petitioners' pending § 2255 petitions without further production of discovery from the government, either by receiving and deciding dispositive motions or by reaching the merits of the petitions at this time. Respectfully, the United States already has produced voluminous and extensive discovery to date, and requiring any further discovery efforts would be unlawful and unwarranted, and the United States does not intend to engage in any further such efforts.

Respectfully submitted,

s/ Stephen R. McAllister
Stephen R. McAllister, #15845
United States Attorney
District of Kansas
500 State Ave., Suite 360
Kansas City, KS 66101
Tel: (913) 551-6730
stephen.mcallister@usdoj.gov

Attorney for the United States in the
consolidated cases except for
*DeHaven v. United States*, No. 18-cv-2474,
*Mebane v. United States*, No. 18-cv-2413,
*Wright v. United States*, No. 19-cv-2400

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2020, the foregoing was electronically filed with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to

all counsel of record in the above-captioned case.

s/ Stephen R. McAllister