**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

---

**In re: CCA Recordings 2255 Litigation**,
                                    **Petitioners,**

**v.**
                                            **Case No. 19-cv-2491-JAR-JPO**
                                            **(This Document Relates to All Cases)**

**United States of America,**
                          **Respondent.**

---

## <u>MEMORANDUM AND ORDER</u>

In its Memorandum and Order dated October 15, 2020, this Court asked for supplemental briefing on issues related to two categories of legal defenses raised by the government: (1) defenses the government characterized as jurisdictional, and (2) collateral-attack waiver by plea.[1] The government subsequently filed an additional motion requesting the Court to require the petitioners to comply with Rule 2(b) of the Rules Governing Section 2255 Proceedings, which it also characterizes as jurisdictional.[2]  After reviewing the parties' submissions, the Court ordered additional briefing on the application of *Tollett v. Henderson*[3] and its progeny to cases in which the petitioner pleaded guilty pursuant to the standard plea agreement utilized by the government in the District of Kansas.[4]  The parties have made their additional submissions and the Court is prepared to rule on these issues.[5]

---

[1] Doc. 588 at 55–56, 60–61.

[2] Doc. 605.

[3] 411 U.S. 258 (1973).

[4] Doc. 677.

[5] Docs. 602, 729 (petitioners), 611, 613, 725 (government).

## I.      Introduction

The Court assumes the reader is familiar with its ruling in another criminal case in the

District of Kansas, *United States v. Carter et al.* (the "*Black* Order") that precipitates the § 2255

motions before the Court.[6]   That comprehensive opinion was intended to provide a record for

future consideration of the many anticipated motions filed pursuant to 28 U.S.C. § 2255 and is

incorporated by reference herein.   The Court likewise assumes the reader is familiar with the

proceedings in the consolidated master case that precipitate the matter before the Court.   The

Court does not restate the underlying facts and conclusions of law in the *Black* Order or these

proceedings in detail but will provide excerpts from the orders and record as needed to frame its

discussion of the issues presently before it.

During the *Black* investigation, the Department of Justice ("DOJ") and the Office of the

United States Attorney ("USAO") repeatedly urged that the appropriate mechanism for

investigation of any alleged Sixth Amendment violations is through 28 U.S.C. § 2255 litigation.

In the *Black* Order, the Court attempted to provide a roadmap for future consideration of the

many cases pending on these issues under § 2255.   Although many common issues overlap in the

individual Sixth Amendment claims, the Court stressed that particularized findings must be made

with respect to each § 2255 claimant.   The Court made clear the common legal standards that

will govern in those proceedings and what must remain pending for particularized findings in

each case.   The Order also created an evidentiary record to inform the individualized

determinations required in § 2255 litigation.   And by reassigning the habeas actions to the

---

[6] Case No. 16-20032-JAR, Doc. 785 (D. Kan. Aug. 13. 2019).  As discussed in that Order, petitioners' Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA") in Leavenworth, Kansas.  That facility has since been renamed CoreCivic. The Court continues to refer to it as CCA in this Order.

undersigned and consolidating the cases for discovery, it was the Court's intent that the process for seeing over 100 cases to completion would be streamlined for all parties.

Pending before the Court are 106 motions seeking relief under § 2255 based on alleged violations by the government of petitioners' Sixth Amendment rights.  All but six of these motions involve petitioners who entered a guilty plea; six petitioners proceeded to trial and were convicted by a jury.  Building from the findings and conclusions in the *Black* Order, petitioners allege across the board the same basis for relief: that once a petitioner shows the government intruded into the attorney-client relationship by intentionally and unjustifiably becoming privy to attorney-client communications, this Court must grant that petitioner's § 2255 motion, leaving only the question of determining what remedy to impose.[7]  Each petitioner asks the Court to impose the same remedy for this constitutional violation: to vacate the judgment and discharge the petitioner immediately, with prejudice to further prosecution, or alternatively, to reduce the sentence by 50%.[8]

As the supplemental issues discussed in this Order illustrate, however, petitioners' all-or-nothing approach is antithetical to the individual procedural barriers, standards, and burdens of proof each petitioner faces in seeking habeas relief.  Petitioners' approach does not take into consideration whether a petitioner pleaded guilty or proceeded to trial, the nature of the sentence imposed, the timing of the alleged Sixth Amendment violation, or whether petitioner remains in custody.  Likewise, the government's scorched-earth approach to defending the motions has compounded the Court's ability to conduct a meaningful initial review as required by the Rules Governing Section 2255 Proceedings.  Disputes over discovery and whether the recordings are

---

[7] *See, e.g.* Doc. 87 at 21–25.

[8] Some petitioners have withdrawn their collateral attack of their sentences in light of their release from custody.

protected by the Sixth Amendment consumed much of the parties' and Court's attention during the first year of these consolidated proceedings, ultimately ending with the Court reviewing hundreds of audio and video recordings and imposing discovery sanctions against the government. The government's latest procedural fencing invoking a Rule to require all petitioners to certify their motions—made over a year into these consolidated proceedings in the wake of the government's demand that the Court rule immediately on its myriad procedural defenses—further delayed this Court's review.

At this juncture, the Court advises the parties that particularized consideration will be given to each petition, and any future briefing, motions, and arguments should likewise give each petition individual attention. The Supreme Court has described the habeas writ as "both the symbol and guardian of individual liberty."[9] While deterrence and correction of governmental misconduct are also available consequences of habeas relief, petitions are initiated and considered with respect to the propriety of restraints on individual liberty. Dozens of petitions have been collected together in this action for efficient handling, but each petition must ultimately stand or fall on its own. Sweeping claims about misconduct or deterrence interests put potentially meritorious petitions at risk when their survival is staked to other petitions that are unlikely to survive the rigorous requirements and limitations of collateral relief. Similarly, lumping materially dissimilar petitions together in an attempt to dismiss large swaths of claims or petitions does not enable this Court to evaluate the injuries and liberty interests at stake for the many aggrieved individuals who have petitioned this Court for help.

Given the number of cases affected by the issues presently before the Court, it will again endeavor to establish legal standards common to various categories of petitioners, with

---

[9] *Peyton v. Rowe*, 391 U.S. 54, 58 (1968) (citations omitted).

individualized application to follow for each petitioner.  The Court begins by discussing the standard in the Tenth Circuit for Sixth Amendment intentional-intrusion claims invoked by petitioners as the basis for their § 2255 motions for habeas relief.  Next, the Court addresses the collateral-attack waiver defense and application of the so-called *Tollett* rule to cases in which petitioners pleaded guilty.  Finally, the Court addresses numerous jurisdictional defenses raised by the government, including standing, mootness, and certification requirements under Rule 2(b).

## II.     Sixth Amendment Standard

Throughout the *Black* case and continuing with these consolidated § 2255 proceedings, the parties have debated what is required to establish a violation of the Sixth Amendment based on the government's alleged intentional intrusion into petitioners' protected attorney-client communications.  Review of the applicable law and the Court's prior rulings leading up to this dispute frame the issues presently before the Court.  Because the parties' arguments have evolved since the *Black* Order was issued, and in light of the government's position that the Order does not control this § 2255 proceeding, the Court reaffirms its analysis and legal determinations here.

### A.     Overview

The Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for defense."[10]  This right is "indispensable to the fair administration of our adversarial system of criminal justice."[11]  It "safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding."[12]  There are three

---

[10] U.S. Const. amend. VI.

[11] *Maine v. Moulton*, 474 U.S. 159, 168 (1985).

[12] *Id.* at 169.

general components to the Sixth Amendment right to counsel: (1) the absolute right to be represented by counsel in a criminal proceeding that could result in imprisonment; (2) the qualified right to counsel of one's choice; and (3) the right to effective assistance of counsel.[13]

Government intrusion claims like those at issue here are one of four categories of cases to be considered when deciding if a defendant has been denied the right to effective assistance of counsel. These categories are "distinguished by the severity of the deprivation and the showing of prejudice required of the defendant in order to succeed on his claim."[14] Generally speaking, these categories are: (1) general ineffective assistance of counsel claims analyzed under the familiar *Strickland v. Washington* two-pronged framework;[15] (2) severe circumstances that constitute per se violations;[16] (3) cases where counsel labored under an actual conflict of interest;[17] and (4) government invasions of the attorney-client relationship.[18]

In addition to prohibiting the government from preventing the accused from obtaining assistance of counsel, the Sixth Amendment imposes an affirmative obligation on the government "not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel."[19] This second category of per se violation claims includes "various kinds of state interference with counsel's assistance."[20] The Supreme Court has held that in very

---

[13] *United States v. Nichols*, 841 F.2d 1485, 1496 n.7 (10th Cir. 1988) (citations omitted).

[14] *United States v. O'Neil*, 118 F.3d 65, 70 (2d Cir. 1997).

[15] 466 U.S. 668 (1984).

[16] *United States v. Cronic*, 466 U.S. 648, 658 (1984) (describing "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.").

[17] *See Mikens v. Taylor*, 535 U.S. 162 (2002).

[18] *See United States v. Morrison*, 449 U.S. 361, 365 (1981); *Weatherford v. Bursey*, 429 U.S. 545, 557–58 (1977).

[19] *Maine v. Moulton*, 474 U.S. 159, 170–71 (1985).

[20] *Strickland*, 466 U.S. at 692; *United States v. Cronic*, 466 U.S. 648, 658 & n.24 (1984) (collecting cases in which the Court has discussed circumstances justifying a presumption of prejudice).

limited circumstances, the government violates the Sixth Amendment when it intrudes on the attorney-client relationship, preventing counsel from "participat[ing] fully and fairly in the adversary factfinding process."[21]  Examples of government interference found to violate a defendant's Sixth Amendment rights per se include: refusing to allow defense counsel closing argument in a bench trial;[22] prohibiting direct examination of the defense by counsel;[23] requiring defendants who chose to testify to do so before any other defense witness;[24] and prohibiting any consultation between a defendant and his attorney during an overnight recess separating the direct-examination and the cross-examination of the defendant.[25]

The Sixth Amendment right to effective assistance of counsel also includes the ability to speak candidly and confidentially with counsel free from unreasonable government interference.[26]  Petitioners assert that the right to communicate privately with counsel about certain subjects is not just a requirement "that a trial be fair;" instead, like the right to have counsel at all and the right to have counsel of choice, the right to such communication is a requirement "that a particular guarantee of fairness be provided."[27]  Petitioners cite no authority supporting this theory, however, nor did the Court's independent research reveal any cases that characterize intentional-interference claims such as this one as anything but one for the effective

---

[21] *Herring v. New York*, 422 U.S. 853, 858 (1975).

[22] *Id.*

[23] *Ferguson v. Georgia*, 365 U.S. 570 (1961).

[24] *Brooks v. Tennessee*, 406 U.S. 605 (1972).

[25] *Geders v. United States*, 425 U.S. 80 (1976).

[26] *See Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977) ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

[27] *See, e.g.*, Doc. 87 at 16–17 (first citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006); then citing *Perry v. Leeke*, 488 U.S. 272, 276, 279–80 (1989)).

assistance of counsel.[28]  Thus, as an ineffective-assistance claim, a petitioner's claim necessarily derives from the right to a fair adversary proceeding.[29]

Under this fourth category of ineffective-assistance claims, and relevant to these proceedings, the Supreme Court has held that the government violates the Sixth Amendment right to effective counsel if it intentionally interferes with the confidential relationship between defendant and defense counsel and that interference prejudices the defendant.[30]  In the seminal decision of *Weatherford v. Bursey*, the Court rejected the contention that "whenever conversations with counsel are overheard the Sixth Amendment is violated and a new trial must be had."[31]  Instead, "the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial."[32]  The Court identified four factors that are relevant to the determination of whether the defendant suffered injury from the government's intrusion: (1) whether the government purposely intruded into the attorney-client relationship; (2) whether any evidence offered at trial was obtained directly or indirectly from the intrusion; (3) whether the prosecutor obtained any details of the defendant's trial preparation or defense strategy; and (4) whether the overheard conversations were used in any other way to the substantial detriment of the defendant.[33]

---

[28] *See, e.g., United States v. Morrison*, 449 U.S. 361, 365 (1981) (treating a Sixth Amendment claim based on alleged governmental interference in the defendant's communications with counsel as relating to "the effective assistance of counsel and a fair trial"); *Weatherford*, 429 U.S. at 547 (describing the defendant's claim regarding governmental interference in the defendant's communications with counsel as a question of "effective assistance of counsel"); *Shillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995) (acknowledging that the "benchmark" of a Sixth Amendment claim is "the fairness of the adversary proceeding"); *cf. Perry v. Leeke*, 488 U.S. 272, 279, 284 (1989) (distinguishing between the "right to be represented by counsel" and "the right to effective assistance" of counsel).

[29] *Gonzalez-Lopez*, 548 U.S. at 146–48.

[30] *See Morrison*, 449 U.S. at 365; *Weatherford*, 429 U.S. at 554 n.4.

[31] *Weatherford*, 429 U.S. at 551.

[32] *Id.* at 552.

[33] *Id.* at 551.

The Court did not, and still has not, resolved "the issue of who bears the burden of persuasion for establishing prejudice or lack thereof when the Sixth Amendment violation involves the transmission of confidential defense strategy information."[34]  As discussed in detail in the *Black* Order, federal appellate courts are divided on the issue.[35]  The Second,[36] Sixth,[37] and Eighth[38] Circuits place the burden on the defendant to establish prejudice, even where the government intentionally intrudes in the attorney-client relationship.  The Third,[39] Tenth,[40] and District of Columbia[41] Circuits have found the intentional intrusion into the defendant's attorney-client relationship producing privileged communications constitutes a per se Sixth Amendment violation, with no need to demonstrate that the defendant has suffered prejudice as a result of the

---

[34] *Cutillo v. Cinelli*, 485 U.S. 1037 (1988), *denying cert to Cinelli v. City of Revere*, 820 F.2d 474 (1st Cir. 1987) (White, J., dissenting); *see Kaur v. Maryland*, 141 S. Ct. 5, 2020 WL 5882039 (2020), *denying cert to Kaur v. Maryland*, No. 2516, 2019 WL 2407997 (Md. Ct. App. June 7, 2019) (Sotomayor, J., statement).

[35] *See Cutillo*, 485 U.S. at 1037–38 (White, J., dissenting) (noting conflicting approaches between the Circuits in cases where the Sixth Amendment violation involves the transmission of confidential defense strategy information).

[36] *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985).

[37] *United States. v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted." (citing *Morrison*, 449 U.S. 365–66)).

[38] *United States v. Johnson*, 47 F.3d 272, 275 (8th Cir. 1995) (holding that dismissal was improper because even assuming the government intentionally violated the defendant's Sixth Amendment rights, he had failed to "demonstrate a nexus between the intrusion and any benefit derived by the prosecution" (citing *United States v. Davis*, 646 F.2d 1298, 1303 (8th Cir. 1981)); *Clark v. Wood*, 823 F.2d 1241, 1249–50 (8th Cir. 1987).

[39] *United States v. Costanzo*, 740 F.2d 251, 254–55 (3d Cir. 1984) (holding Sixth Amendment violation follows from finding of prejudice); *United States v. Levy*, 577 F.2d 200, 209–10 (3d Cir. 1978) (holding that "the inquiry into prejudice must stop" where defense strategy material is actually disclosed to the prosecution or the government intentionally sought such confidential information).

[40] *Shillinger v. Haworth*, 70 F.3d 1132, 1141–42 (10th Cir. 1995) (holding that an intentional intrusion into the attorney-client relationship "must constitute a *per se* violation of the Sixth Amendment," and that if the government "lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed.").

[41] *Briggs v. Goodwin*, 698 F.2d 486, 494–95 (D.C. Cir. 1983), *vacated on other grounds*, 712 F.2d 1444 (D.C. Cir. 1983) (holding when the privileged communication contains details of the defendant's trial strategy, the defendant is not required to prove he was prejudiced by the governmental intrusion, but prejudice may be presumed).

intrusion.  And the First[42] and Ninth[43] Circuits have taken a middle position, holding that once the defendant has shown that confidential defense strategy was transmitted to the prosecution, the burden shifts to the government to show there was no prejudice to the defendant from the disclosure.

### B.    *Shillinger*

Under extant Tenth Circuit law, the government's purposeful intrusion into the attorney-client relationship with no legitimate law enforcement justification constitutes a per se violation of the Sixth Amendment, with no affirmative showing of prejudice necessary.[44]  In *Shillinger v. Haworth*, the Tenth Circuit held that "when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed."[45]  The court reasoned that "no other standard can adequately deter this sort of misconduct," and that "prejudice in these circumstances is so likely that case-by-case inquiry

---

[42] *United States v. Mastroianni*, 749 F.2d 900, 907–08 (1st Cir. 1984) (noting that "[l]ike the District of Columbia and Third Circuits, we believe that placing the entire burden on the defendant to prove both disclosure and use of confidential information is unreasonable," but "[l]ike the Ninth Circuit, however, we believe that there are certain circumstances in which the revelation of confidential communications by the informant is harmless"); *United States v. DeCologero*, 530 F.3d 36, 64 (1st Cir. 2008) ("'[T]he government's intrusion into the attorney-client relationship' is not a *per se* Sixth Amendment violation; there must also be some demonstration of resulting prejudice.  Because such intrusions pose a serious risk to defendants' constitutional rights, and because it would be unreasonably difficult for most defendants to prove prejudice, we only require defendants to make a prima facie showing of prejudice by 'prov[ing] that confidential communications were conveyed as a result' of the government intrusion into the attorney-client relationship.  The burden then shifts to the government to show that the defendant was not prejudiced; that burden is a demanding one." (quoting *Mastroianni*, 749 F.2d at 907–08)).

[43] *United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003) (rejecting a per se rule of prejudice; rather the defendant bears the initial burden of making "a prima facie showing of prejudice" by demonstrating the government "acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information;" once a *prima facie* showing has been made, the burden shifts to the government to show there has been no prejudice to the defendant as a result of these communications).

[44] *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (1995).

[45] *Id.*

into prejudice is not worth the cost."[46]  The court further explained that its holding "subsumes the state's argument that harmless error analysis should apply to this sort of Sixth Amendment violation because our *per se* rule recognizes that such intentional and groundless prosecutorial intrusions are never harmless because they 'necessarily render a trial fundamentally unfair.'"[47] The court observed that "dismissal of the indictment could, in extreme circumstances, be appropriate."[48]  The court clarified, however, that this per se rule "in no way affects the analysis to be undertaken in cases in which the state has a legitimate law enforcement purpose for its intrusion."[49]  Such cases would require proof of prejudice, or "'a realistic possibility of injury to [the defendant] or benefit to the State in order to constitute a violation of a defendant's Sixth Amendment rights.'"[50]

As the court recognized, however, even where there has been an unjustified intrusion resulting in a per se Sixth Amendment violation, the court must fashion a remedy "tailored to the injury suffered."[51]  Under *Morrison*, the remedy for a Sixth Amendment violation should not "unnecessarily infringe on competing interests."[52]  Those competing interests are: (1) the constitutional right to the assistance of counsel, "fundamental to our system of justice to assure fairness in the adversary criminal process," and (2) society's interest in the administration of criminal justice.[53]  Thus, the Supreme Court emphasized in *Morrison* that its preferred approach

---

[46] *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984)).

[47] *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 577 (1986)).

[48] *Shillinger*, 70 F.3d at 1143 (citations omitted).

[49] *Id.* (citing *Weatherford v. Bursey*, 429 U.S. 545, 557 (1977)).

[50] *Id.* (quoting *Weatherford*, 429 U.S. at 558).

[51] *Id.* (quoting *Morrison*, 449 U.S. at 364).

[52] 449 U.S. 361, 364 (1981); *Shillinger*, 70 F.3d at 1142–43.

[53] *Morrison*, 449 U.S. at 364 (citations omitted).

"has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."[54]  Thus, the *Shillinger* court remanded the case to the district court to determine whether the proper remedy for "Sixth Amendment [v]iolations [o]ccasioned by [p]rosecutorial [m]isconduct" was retrial of the defendant or dismissal of the indictment.[55]

*Morrison* further held that dismissal of the indictment is a "drastic" form of relief.[56] Other cases suggest that dismissal of the indictment is appropriate only where the injury is irreparable.[57]  And the Tenth Circuit recently counseled that *Morrison* requires that courts rule out "more narrowly tailored remedies" before resorting to the "extraordinary remedy" of dismissing an indictment.[58]  Notably, and relevant to these proceedings, the *Morrison* Court suggested that a more severe remedy might be appropriate even in cases where the harm is not irreparable, but where there is a "pattern of recurring violations" by the government.[59]

The government argues that petitioners are not entitled to rely upon *Shillinger*'s per se rule for several reasons.  First, the government contends that the per se rule is dictum.  It argues that because there was demonstrable prejudice in *Shillinger*, the Tenth Circuit had no need to "fashion" a new rule for when prejudice "must be presumed,"[60] and thus the per se rule was not

---

[54] *Id.* at 365.

[55] *Shillinger*, 70 F.3d at 1143.

[56] *Morrison*, 449 U.S. at 364.

[57] *See Delaware v. Robinson*, 209 A.3d 25, 55–57 (Del. 2019) (collecting cases).

[58] *United States v. Orozco*, 916 F.3d 919, 925 (10th Cir. 2019).

[59] *Morrison*, 449 U.S. at 365 n.2 (noting the record did "not reveal a pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter further lawlessness"); *see also Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993) ("[while] not presented with such a situation here[,] . . . [o]ur holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict"); *Robinson*, 209 A.3d at 57–59 (discussing *Morrison*).

[60] *Shillinger*, 70 F.3d at 1141–42.

essential to the determination of the case.  The Court disagrees.  Dicta are "statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case at hand."[61]  The Tenth Circuit has explained that, unlike dicta, "[a] holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment."[62]  Under that definition, *Shillinger*'s crafting of a per se rule is a holding, "not a lurking proposition."[63]  Although the court could have affirmed based on actual, as opposed to presumptive, prejudice, it followed a different "decisional path" by holding that when the government intentionally and unjustifiably becomes privy to protected attorney-client communications, prejudice must be presumed.[64]  Because the *Shillinger* court expressly concluded that this per se rule provides "the relevant standard" for assessing intentional-intrusion claims, it is binding Tenth Circuit precedent.[65]

Citing *United States v. Gonzalez-Lopez*,[66] the government next argues that petitioners must nonetheless establish actual prejudice to demonstrate that the government violated the Sixth Amendment.  In that case, the Supreme Court discussed the separate grounding of the effective-assistance component of the right to counsel and the right to representation of counsel of

---

[61] *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1129 (10th Cir. 2009) (quoting *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995)).

[62] *Id.*

[63] *Id.*

[64] *Shillinger*, 70 F.3d at 1139, 1141–42 (adopting and applying the per se rule to intentional-intrusion claims because it is the only standard that is capable of adequately deterring the type of misconduct at issue).

[65] *Id.* at 1142; *Thompson*, 582 F.3d at 1129–30 (distinguishing between questions that courts expressly address and resolve and those that "merely lurk in the record") (quoting *United Food & Com. Workers Union, Local 1564 v. Albertson's, Inc.*, 207 F.3d 1193, 1199 (10th Cir. 2000)).

[66] 548 U.S. 140 (2006).

choice.[67]  The "recognition of the right to effective counsel within the Sixth Amendment was a consequence of [the Court's] perception that representation by counsel 'is critical to the ability of the adversarial system to produce just results.'"[68]  "Having derived the right to effective representation from the purpose of ensuring a fair trial, we have, logically enough, also derived the limits of that right from the same purpose."[69]

By contrast, the Court explained that the right to select counsel of choice "has never been derived from the Sixth Amendment's purpose of ensuring a fair trial, but instead "has been regarded as the root meaning of the constitutional guarantee" to assistance of counsel.[70] Significantly, where the latter right is wrongly denied, "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation," because "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."[71] The Court further held that, once established, a Sixth Amendment violation of the right to representation by counsel of choice required automatic reversal of a subsequent conviction, as that is a "structural error," and therefore not subject to harmless error analysis.[72]

In making this distinction, the Court explained that a defendant must generally demonstrate prejudice to succeed on an ineffective-assistance-of-counsel claim, citing *Strickland v. Washington* as support for this general rule.[73]  *Strickland* instructs that a petitioner seeking to

---

[67] *Id.* at 146–48.

[68] *Id.* at 147 (quoting *Strickland v. Washington*, 466 U.S. 658, 685 (1984)).

[69] *Id.* (citation omitted).

[70] *Id.* at 148 (citations omitted).

[71] *Id.*

[72] *Id.* at 149–50.

[73] *Id.* at 146 (citing *Strickland*, 466 U.S. 668 (1984)).

establish a Sixth Amendment violation must typically demonstrate "some effect . . . on the reliability of the trial process" as a component of the violation itself.[74]  Thus, a petitioner who alleges that defense counsel's performance was constitutionally inadequate must show both that counsel's performance "fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[75]  But in consideration of the standard for measuring the quality of the lawyer's work, the *Strickland* Court noted that direct governmental interference with the right to counsel is a different matter, expressly finding that the "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense."[76]  As the Court explained, this type of government misconduct is presumed to result in prejudice because "in these circumstances [it] is so likely that a case-by-case inquiry into prejudice is not worth the cost,"[77] and because the government is "directly responsible" for, and can therefore easily prevent, such misconduct.[78]

        In fashioning a rule that "best accounts for the competing interests at stake," the Tenth Circuit in *Shillinger* recognized and drew upon this category of cases where Sixth Amendment prejudice is presumed, in which direct state interference with the right to effective counsel has

---

[74] *United States v. Cronic*, 466 U.S. 648, 658 (1984) (noting "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect is has on the ability of an accused to receive a fair trial"); *Gonzalez-Lopez*, 548 U.S. at 147 (explaining "a violation of the Sixth Amendment right to effective representation is not 'complete' until the defendant is prejudiced.").

[75] *Strickland*, 466 U.S. at 693 ("Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.").  The Supreme Court has subsequently held that "prejudice is presumed 'when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken.'" *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000)); *see United States v. Jasso Chavero*, 630 F. App'x 866, 868 (10th Cir. 2015) (holding a particularized claim that counsel failed to file a notice of appeal despite a timely request from the defendant is generally sufficient to warrant relief).

[76] *Strickland*, 466 U.S. at 686 (collecting cases).

[77] *Id.* at 692.

[78] *Id.*

been held to violate the defendant's Sixth Amendment right per se.[79]   The court cited the rationale behind the use of a per se rule in such cases: because such "state-created procedures impair the accused's enjoyment of the Sixth Amendment guarantee by disabling his counsel from fully assisting and representing him."[80]   The quoted passage goes on to state, "[b]ecause these impediments constitute direct state interference with the exercise of a fundamental right, and because they are susceptible to easy correction by prophylactic rules, a categorical approach is appropriate."[81]   The court proceeded to hold that a prosecutor's intrusion into the attorney-client relationship likewise constitutes a "direct interference" with the Sixth Amendment rights of a defendant that constitutes a per se violation of the Sixth Amendment.[82]

The *Shillinger* court expressly acknowledged both *Strickland*'s general rule and its direct-interference exception.[83]   Thus, *Gonzalez-Lopez* does not alter that exception that a defendant need not always show prejudice to prove a Sixth Amendment claim.   And because the Tenth Circuit reached the same conclusion in *Shillinger*, the decision is consistent with the Supreme Court's decision in *Gonzalez-Lopez*.

Similarly, the government continues to question whether *Shillinger* is good law in light of the Supreme Court's view in *Weatherford* and *Morrison* that at least "a realistic probability" of prejudice must be demonstrated to substantiate a Sixth Amendment violation of the kind alleged here, and a presumption falls short of this demonstration.[84]   But as this Court has explained, the Tenth Circuit analyzed and distinguished *Weatherford*, noting that the Supreme Court

---

[79] *Shillinger*, 70 F.3d at 1141 (citing *Strickland*, 466 U.S. at 692).

[80] *Id.* (quoting *United States v. Decoster*, 624 F.2d 196, 201 (D.C. Cir. 1979)).

[81] *Id.*

[82] *Id.* at 1142.

[83] *Id.* at 1141 (citing *Strickland*, 466 U.S. at 692).

[84] *See* Doc. 745 at 133 n.97.

"emphasized both the absence of purposefulness in the prosecutor's intrusion and the legitimate law enforcement interests at stake."[85]  The *Shillinger* court concluded, unlike in *Weatherford*, that "the intrusion here was not only intentional, but also lacked a legitimate law enforcement purpose."[86]  The court also explained that *Morrison* "left open the question of whether intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice."[87]  As previously discussed, *Morrison* never reached the prejudice question, "holding only that even if the defendant's Sixth Amendment rights were violated, dismissal of the indictment was an inappropriate remedy in that case."[88]

Finally, the government argues that the *Shillinger* per se rule has no application to cases resolved by guilty plea instead of proceeding to trial.  The government notes that in *Shillinger*, the Tenth Circuit stated that intentional and unjustifiable intrusions render trials unfair but said nothing about the impact of such intrusions on cases involving guilty pleas.  "The Sixth Amendment, however, is not so narrow in its reach."[89]  Instead, "[t]he Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding," including the plea-bargaining stage, sentencing, and direct appeal.[90]  As detailed in the *Black* Order, the government's own conduct belies its argument that prosecutors can only exploit the information learned from protected attorney-client communication at trial.[91]  The case against Michelle Reulet is a prime example of such exploitation.

---

[85] *Shillinger*, 70 F.3d at 1138–39.

[86] *Id.* at 1139.

[87] *Id.* at 1140.

[88] *Id.*

[89] *Lafler v. Cooper*, 566 U.S. 156, 165 (2012).

[90] *Id.* at 164–65 (citations omitted).

[91] *See Black* Order at 67–80 (describing in detail the instigating event in this litigation in *United States v. Dertinger*); 185 n.673 (list of additional cases involving plea agreements in which the government forestalled any

AUSA Tanya Treadway, who retired before the October 2018 hearing in *Black*, was the USAO's Senior Litigation Counsel and served as a primary filter, or taint, attorney for the USAO.[92]  While prosecuting Reulet's criminal case, Treadway obtained and reviewed Reulet's phone calls with, *inter alia*, her attorney handling her child custody proceedings and her attorney handling her separate DUI case.[93]  While this might have appeared objectively irrelevant to the criminal case that Treadway was prosecuting, Reulet's attorney in that case provided the subjective adversarial value when she testified at the *Black* hearing to the role of the child custody issue in resolving the criminal case and the DUI related to Reulet's pretrial detention.[94]  Counsel explained that the child custody matter was relevant to Reulet's decision to accept a plea offer and that the DUI conversations with her attorney were used by Treadway in a contested pretrial matter, including an appeal to the Tenth Circuit Court of Appeals.[95]  Treadway lied about not listening to the calls in court proceedings before Judge Daniel D. Crabtree.[96]  But undisputed evidence at the *Black* hearing showed Treadway listened to and took extensive notes of Reulet's conversations with her counsel as they discussed these matters.[97]  The notes include discussions about defense trial strategy, plea negotiations, risk-benefit assessment of trial versus plea, and estimates of the sentence Reulet faced.  Treadway's misrepresentation was not discovered in the *Reulet* litigation; rather, it surfaced later when she testified at the *Black* hearing.[98]  Days after

---

finding of Sixth Amendment violations by approving reduced sentences to time-served for defendants in other cases who had pending motions filed under Fed. R. Crim. P. 41(g) or where it had listened to, procured, or used video and audio recordings of attorney client communications).

[92] *Id.* at 98.

[93] *Id.* at 99.

[94] *Id.* at 99–100.

[95] *Id.*

[96] *Id.* at 100.

[97] *Id.* at 99. Treadway's notes of these conversations comprised 106 pages of a legal pad.

[98] *Id.* at 100–101.

Treadway's testimony, Judge Crabtree signed an agreed order vacating Reulet's sentence.[99]  Of course, because the government quickly settled the matter, Reulet never collaterally attacked her conviction and any resulting Sixth Amendment issues were never litigated.

Thus, the government's arguments that petitioners cannot rely upon *Shillinger* are unavailing.  Petitioners base their claims for habeas relief on *Shillinger*—which sets a high bar to establish a per se Sixth Amendment violation—and it is the *Shillinger* elements petitioners must satisfy.  The *Shillinger* per se rule, like the per se rules adopted by other courts, presupposes that the defendant has first established that protected attorney-client information was communicated to the prosecution team.[100]  Thus, in *Black*, this Court determined that under *Shillinger*, a per se Sixth Amendment violation occurs when a defendant makes the following prima facie case: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[101]  Once these elements are established, prejudice is presumed in determining whether a Sixth Amendment violation occurred.  The harmless-error test does not "apply to this sort of Sixth Amendment violation."[102]

---

[99] *Id.* at 101.

[100] *Shillinger*, 70 F3d. at 1132, 1134–36 (finding defendant demonstrated that the prosecution learned about confidential attorney-client discussions from a deputy sheriff); *United States v. Danielson*, 325 F.3d 1054, 1074 (9th Cir. 2003) (finding defendant made prima facie showing of prejudice where privileged information "was told to, and preserved by, members of the prosecution team" and "the prosecutor in charge of the case kept much (perhaps all) of this information in his private office"); *United States v. Mastroianni*, 749 F.2d 900, 907–08 (1st Cir. 1984) ("the defendant must prove that confidential communications were conveyed as a result of the presence of a government informant at a defense meeting" before the burden shifts to the government to demonstrate the absence of prejudice); *United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978) ("We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government agencies responsible for investigating and prosecuting the case[.]").

[101] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[102] *Shillinger*, 70 F.3d at 1142.  Also relevant to the individual Sixth Amendment claims, but not to the issues currently before the Court, are rulings in the *Black* Order and these consolidated proceedings regarding the

Using the *Black* Order as their foundation, petitioners argue that *Shillinger*'s per se rule not only presumes the existence of prejudice for purposes of determining whether a Sixth Amendment violation occurred; it also treats prejudice as irrelevant for purposes of determining whether the resulting violation requires relief.  Petitioners allege that once a petitioner shows the government intruded into the attorney-client relationship by intentionally and unjustifiably becoming privy to attorney-client communications, this Court must grant the petitioner's § 2255 motion, leaving only the question of determining what remedy to impose.[103]

Petitioners acknowledge that individual prejudice is relevant at this stage of the inquiry but urge that the need to address and deter the government's conduct on a collective basis justifies an extreme remedy.  They contend that the government's actions were part of a large-scale pattern of similar misconduct that the government later attempted to conceal, obfuscate, minimize, and excuse.  In making this determination, petitioners urge the Court to take into account the government's: (1) pattern of committing similar Sixth Amendment violations;[104] (2) subsequent attempts to prevent this Court from discovering those violations;[105] and (3) continuing efforts to evade responsibility for its actions.  Under these circumstances, each petitioner asks the Court to vacate his judgment and discharge him immediately, with prejudice to further prosecution.  Any other remedy, they argue, is inconsistent with the Tenth Circuit's goal of "adequately deter[ing] this sort of misconduct."[106]  Alternatively, petitioners ask the Court to reduce their sentence by 50%.

---

threshold showing required to establish the protected communication element of petitioners' claims, privilege, implied and actual waiver, and procedural defenses. *See, e.g.*, Docs. 225, 588.

[103] *See, e.g.* Doc. 87 at 21–25.

[104] *See Black* Order at 6.

[105] *See id.* at 6–7.

[106] *Shillinger*, 70 F.3d at 1142.

### III.      Collateral-attack Waiver by Plea

The Court previously addressed this issue in the context of the government's response to Petitioner Petsamai Phommaseng's motion for leave to conduct discovery under Rule 6 of the Rules Governing Rule 2255 Proceedings with respect to his audio recording claims.[107]  As noted, Phommaseng's Fed. R. Civ. P. 11(c)(1)(C) plea agreements contained the following waiver provision often used by the United States Attorney's Office in the District of Kansas (the "standard plea agreements"):

> **Waiver of Appeal and Collateral Attack**.  The defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, his conviction, or the components of the sentence to be imposed herein, including the length and conditions of supervised release, as well as any sentence imposed upon revocation of supervised release.  The defendant is aware that 18 U.S.C. § 3742 affords him the right to appeal the conviction and sentence imposed.  The defendant also waives any right to challenge his sentence, or the manner in which it was determined, or otherwise attempt to modify or change his sentence, in any collateral attack, including, but not limited to, a motion brought under Title 28, U.S.C. § 2255 (except as limited by *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001)), or a motion brought under Federal Rule of Civil Procedure 60(b). *Notwithstanding the forgoing waivers, the parties understand that the defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel or prosecutorial misconduct.*[108]

The government argued that Phommaseng could not show good cause for his discovery requests under Rule 6(a) because his Sixth Amendment "confidential communications claim" was waived (1) by operation of law under *Tollett v. Henderson*,[109] or (2) by the express waiver

---

[107] *United States v. Phommaseng*, D. Kan. No. 15-20020-JAR-5, Doc. 608.  Phommaseng pleaded guilty in three separate cases that all contained this waiver language.

[108] *Id.* at 10 (emphasis added).

[109] 411 U.S. 258 (1973).

provision he signed as part of his three plea agreements.  The Court disagreed and denied the government's motion to enforce the plea waiver.

First, the Court agreed with Phommaseng that his plea agreements specifically reserved his right to appeal or collaterally attack his convictions and sentence based on a claim of prosecutorial misconduct.[110]  The Court explained that Phommaseng's Sixth Amendment claim was not an "independent confidential communications claim," but rather, a prosecutorial misconduct claim alleging the government's misconduct violated his Sixth Amendment right to effective counsel, which was expressly excepted from the waiver in the plea agreements that affirmatively assured a defendant who is pleading guilty that he "in no way waives" the right to subsequently bring such claims.[111]  The Court then addressed the government's motion to enforce the waiver of appeal or collateral attack in the plea agreements.  The Court rejected the government's argument that Phommaseng had waived any Sixth Amendment claim because prosecutorial misconduct can only arise in the context of the Fifth Amendment, as prosecutorial misconduct can prejudice a specific constitutional right amounting to a denial of that right as well as the denial of  a defendant's due process right.[112]

After the *Black* Order was issued, Phommaseng supplemented his § 2255 motion, arguing broadly that the government's interference with his attorney-client relationship violates the Sixth Amendment by infringing on his right to the effective assistance of counsel as well as his right to counsel in general and that, unlike a petitioner who alleges that defense counsel's performance was constitutionally inadequate, intentional-intrusion claims either presume that prejudice

---

[110] *Phommaseng*, D. Kan. No. 15-20020-JAR, Doc. 608 at 10.

[111] *Id.*

[112] *Id.* at 11–12 (citing *United States v. Christy*, 916 F.3d 814, 824–25 (10th Cir. 2019) (citing *Underwood v. Royal*, 894 F.3d 1154, 1167 (10th Cir. 2018)).

occurred or treat it as altogether irrelevant.[113]  The government responded, again citing the rule in *Tollett* that a defendant who enters an unconditional guilty plea may not thereafter raise independent claims relating to deprivation of constitutional rights antecedent to the plea and that *Shillinger*'s per se rule does not apply to defendants who enter a plea rather than proceed to trial.[114]  Without any discussion of the specifics or timing of the alleged Sixth Amendment violations or his standard plea agreements, Phommaseng replied that his decision to enter a plea does not render the Tenth Circuit's per se approach inapplicable and thus he does not need to show that he would have proceeded to trial rather than entering a plea.[115]

Because subsequent replies filed by other petitioners in these consolidated proceedings who also pleaded guilty under a standard plea agreement raised new issues regarding collateral attack of the voluntary and intelligent character of their guilty pleas and the necessary showing required to succeed on such a claim,[116] the Court directed supplemental briefing from both parties on this issue.[117]  After reviewing the parties' submissions, the Court revisits its previous ruling on the government's argument that an independent Sixth Amendment claim is foreclosed as a matter of law under *Tollett*.[118]

---

[113] Doc. 87 at 16–19.

[114] Doc. 328 at 56–57.

[115] Doc. 522 at 29–31.

[116] Doc. 588 at 54–55.

[117] *Id.* at 55; Doc. 677.

[118] *See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224–25 (10th Cir. 2007) (explaining "law of the case" doctrine is discretionary, and that district courts remain free to reconsider their earlier interlocutory rulings made before the entry of judgment).

### A. Whether the Carve-out Provision in the Standard Plea Agreements Waived or Forfeited Application of the *Tollett* Rule

It is well-settled that a defendant who pleads guilty waives most non-jurisdictional antecedent issues, including allegations of constitutional error, unless he entered a conditional plea and specifically reserved his right to raise such claims. As the Supreme Court held in *Tollett*, "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[119] Review of any challenge to a conviction obtained via a guilty plea is ordinarily confined to whether the plea was both counseled and voluntary; otherwise the collateral attack is foreclosed.[120] Thus, a defendant's unconditional and voluntary guilty plea constitutes a waiver of all non-jurisdictional defenses to the charge(s) to which he has pleaded guilty except: (1) due process claims alleging vindictive prosecution, (2) double jeopardy claims that are evident from the face of the indictment, or (3) claims that the statute of conviction is unconstitutional.[121] In applying this rule, the Tenth Circuit has noted that "a defendant can waive claims that even implicate a charge of government misconduct" unless such misconduct constitutes a matter of jurisdiction or due process that cannot be waived.[122]

The government previously argued that Phommaseng's claim that the government violated his Sixth Amendment right to confidential attorney-client communications is not

---

[119] 411 U.S. 258, 267 (1973).

[120] *United States v. Broce*, 488 U.S. 563, 569 (1989).

[121] *See United States v. DeVaughn*, 694 F.3d 1141, 1145–46 (10th Cir. 2012) (stating that an unconditional and voluntary guilty plea waives all non-jurisdictional claims except for constitutional due process claims for vindictive prosecution and double jeopardy claims that are evident from the face of the indictment); *Class v. United States*, 138 S. Ct. 798, 803 (2018) (holding that guilty plea by itself does not bar a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal).

[122] *United States v. Doe*, 698 F.3d 1284, 1293 (10th Cir. 2012).

jurisdictional, nor does it implicate any one of the three types of claims identified in *DeVaughn* and *Class* as falling outside the general waiver rule.  The government contended that because Phommaseng is now raising an independent claim relating to the alleged deprivation of constitutional rights that purportedly occurred before the entry of his guilty plea—and he does not challenge his plea as either uncounseled or involuntary—his claim is foreclosed under *Tollett*.

The government has revised its position since the Court's order in *Phommaseng*.  It now agrees that petitioners with standard plea agreements may rely on the carve-out provision in the agreements to challenge their guilty pleas, but in assessing such claims, the Court must still consider the relevant controlling law for rendering a guilty plea involuntary.  In other words, the carve-out provision does not create an exception to the rule in *Tollett*, which is not based on a plea agreement but admission of factual guilt.  Instead, the government asserts that petitioners must still show their intentional-intrusion claims caused them to plead guilty, when they otherwise would have gone to trial.  Petitioners argue that they are free to bring independent Sixth Amendment claims because the government relinquished its *Tollett* defense in the carve-out provision in the standard plea agreements, under which they "in no way waives any subsequent claims" of ineffective assistance of counsel or prosecutorial misconduct.

Thus, the government does not dispute that certain claims of ineffective assistance of counsel or prosecutorial misconduct are outside the scope of the waiver provision in the standard plea agreements.  Instead, the question before the Court is whether the carve-out provision in the standard plea agreements effectively limits or creates an exception to application of the foreclosure-by-operation-of-law rule under *Tollett* and its progeny.  Petitioners argue that because the rule in *Tollett* is not jurisdictional, the government is free to waive or forfeit such a

defense just as it can waive or forfeit any other nonjurisdictional bar to § 2255 relief, and that the government knowingly and intentionally bargained away its right to invoke *Tollett* in response to a narrow class of claims, including the alleged intentional-intrusion claims.  The Court disagrees.

The rule in *Tollett* reiterates a principle announced by the Supreme Court in the so-called *Brady* trilogy.[123]  "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment."[124]  This rule "inheres in the nature and function of the guilty plea itself, which 'represents a break in the chain of events which has preceded it in the criminal process.'"[125]  By pleading guilty, a defendant "forgoes not only a fair trial, but also other accompanying constitutional guarantees."[126]  "Allowing a defendant to plead guilty unconditionally, but nevertheless to raise on appeal the very constitutional challenges that a guilty plea is designed to relinquish, would give the defendant the benefits of a guilty plea without the attendant waiver of rights that a plea necessarily entails."[127]  As the Supreme Court has explained, a valid guilty plea "renders irrelevant—and thereby prevents the defendant from appealing—the constitutionality of case-related government conduct that takes place before the plea is entered."[128]

The Court agrees that the carve-out provision in the standard plea agreements created only an exception to the collateral-attack waiver provisions in the plea agreement itself, and not

---

[123] *See Brady v. United States*, 397 U.S. 742, 748 (1970) ("[T]he plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered"); *McMann v. Richardson*, 397 U.S. 759, 774 (1970) (a defendant who pleads guilty "assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts"); *Parker v. North Carolina*, 397 U.S. 790, 797 (1970) (same).

[124] *Boykin v. Alabama*, 395 U.S. 238, 242 (1969).

[125] *United States v. Chavez-Diaz*, 949 F.3d 1202, 1206 (9th Cir. 2020) (quoting *Tollett*, 411 U.S. at 267).

[126] *Class*, 138 S. Ct. at 805 (quoting *United States v. Ruiz*, 536 U.S. 622, 628–29 (2002)).

[127] *Id.*

[128] *Id.* (citing *Haring v. Prosise*, 462 U.S. 306, 320 (1983)); *see also Haring*, 426 U.S. at 321 (recommending against the use of the term "waiver" to describe the effect of *Tollett*, which rests instead on the fact that the claim is "irrelevant to the constitutional validity of the conviction.").

to the rule of law in *Tollett*.  First, that rule of law is not based on the plea agreement, but rather, on the admission of guilt during a guilty plea.  In other words, the *Tollett* rule creates a separate legal bar to relief, regardless of language in plea agreement; thus, a defendant cannot preserve a right to collaterally attack his conviction on grounds that could not be preserved by pleading unconditionally.  Absent the inclusion of a Rule 11(a)(2) conditional plea, a plea agreement itself does not undermine the import of *Tollett*, even if it includes waiver language pertaining to pre-plea issues because a defendant cannot retain a right that does not exist.  To rule otherwise would impermissibly circumvent the rule in *Tollett* and its progeny.

Second, in interpreting the standard plea agreements, the Court "looks to the express language in the agreement to identify both the nature of the government's promise and the defendant's reasonable understanding of this promise at the time of the entry of the guilty plea."[129]  Courts apply "general principles of contract law . . .  looking to the express language and construing any ambiguities against the government as the drafter of the agreement."[130]  Here, the carve-out provision does not alter the standard for determining the validity of a guilty plea, but simply states that the petitioner's waiver of appeal and collateral attack do not waive his right to appeal or collaterally attack his prosecution, conviction, or sentence based on a claim of ineffective assistance of counsel or prosecutorial misconduct.  The provision does not state that the government is waiving anything and makes no mention of the substantive standard that applies to such subsequent claims.  Petitioners do not cite, nor did the Court independently find, any authority supporting their position that the government can silently bargain away a defense

---

[129] *United States v. Trujillo*, 537 F.3d 1195, 1200 (10th Cir. 2008) (quoting *United States v. Van Dam*, 493 F.3d 1194, 1199 (10th Cir. 2007)).

[130] *United States v. Altamirano-Quintero*, 511 F.3d 1087, 1094 (10th Cir. 2007) (quoting *United States v. Rodriguez*, 456 F.3d 1246, 1250–51 10th Cir. 2006)).

based on the rule of law in *Tollett* short of a conditional plea of guilty under Fed. R. Crim. P. 11(a)(2). Instead, in cases where courts have concluded that a defendant's collateral challenge falls within the carve-out to the collateral-attack waiver, the *Tollett* standard has applied— whether the defendant's plea was knowing and voluntarily made.[131] Thus, petitioners' argument that the government unambiguously waived application of this standard lacks support in both the law and the language of the standard plea agreements.

Nor has the government waived or forfeited application of the *Tollett* standard by failing to raise it. Although not always labeled as a procedural defense, the government's responses in these consolidated cases argue that *Tollett* and its progeny preclude petitioners from challenging their guilty pleas.[132] Neither of the cases cited by petitioners to support their waiver argument is persuasive. In *Wood v. Milyard*, "the State twice informed the District Court that it 'will not challenge, but [is] not conceding' the timeliness" of the petitioner's petition, and thus the Supreme Court held that the Tenth Circuit erred in overriding the State's deliberate waiver.[133] The government has not "strategically with[e]ld . . . or cho[sen] to relinquish" its argument that *Tollett* and its progeny apply.[134] In *United States v. DeVaughn*, the Tenth Circuit found that the government had waived or forfeited the preclusive effect of an unconditional plea by failing to raise the argument in its briefing on appeal as such a defense is not jurisdictional.[135] The government has not waived the argument here.

---

[131] *See, e.g., United States v. Almazan*, No. 17-10150-01-EFM, 2019 WL 4537194, at *3 (D. Kan. Sept. 19, 2019); *United States v. Gilchrist*, No. 12-20066-40-KHV, 2016 WL 2989150, at *4 (D. Kan. May 24, 2016); *United States v. King*, No. 12-10197-MLB, 2014 WL 4704842, at *4 (D. Kan. Sept. 22, 2014).

[132] *See, e.g.*, Doc. 328 at 56–57.

[133] 566 U.S. 463, 474 (2012) (alteration in original).

[134] *Id.*

[135] 694 F.3d 1141, 1154–55, 1158 (10th Cir. 2012).

Accordingly, the Court finds there was no government waiver of the defense that *Tollett* forecloses an independent inquiry into a petitioner's Sixth Amendment claim. Instead, as discussed below, the Court must consider relevant controlling law, including the standard adopted in *Tollett*. Consequently, the carve-out language in the standard plea agreement does not limit petitioners from bringing ineffective assistance of counsel or prosecutorial misconduct claims that bear on the voluntary and intelligent nature of their guilty pleas.[136] To the extent the Court's previous order held or suggested otherwise, the Court reconsiders and clarifies its ruling at this time.

This ruling also applies to petitioners who pleaded guilty pursuant to Western District of Missouri plea agreements that did not contain the carve-out language in this District's standard plea agreements, as well as to petitioners who pleaded guilty without any written agreement.[137] Thus, the Court proceeds to address the application of *Tollett* and its progeny to all member cases in which the petitioner pleaded guilty.

**B.      Whether Petitioners' Sixth Amendment Claims as Alleged Satisfy the *Tollett* Standard**

**1.      Pre-plea Violations**

While a Sixth Amendment intentional-intrusion violation is not limited to trials, application of *Shillinger*'s per se rule in the context of an interceding guilty plea must be reconciled with the rule of law in *Tollett* that "forecloses direct inquiry into the merits of claimed

---

[136] *But see United States v. Beasley*, 820 F. App'x 754, 758–59 (10th Cir. 2020) (concluding exception for ineffective- assistance claim in standard plea agreements used in the District of Kansas was not limited to *Cockerham* ineffective-assistance claims and that district court erred by not permitting defendant to raise *any* ineffective-assistance claim, specifically that counsel was ineffective for failure to raise certain Fourth Amendment challenges that were tangential to the plea agreement and waiver).

[137] *See United States v. Ramos*, 492 F. App'x 688, 689 (7th Cir. 2012) (citing *Tollett*, 411 U.S. at 266–67) (discussing defendant who pleaded guilty without a plea agreement).

antecedent constitutional violations."[138]  Petitioners contend that they are not precluded from alleging the government committed a *Shillinger* violation during the plea-bargaining stage of their criminal case because the rule announced in *Tollett* is subject to an exception for government misconduct that calls into question the voluntary nature of the plea itself.  And, they argue, they can prevail on those claims by making the same showing as any other petitioner, that is, by showing the government intentionally and unjustifiably became privy to their protected communications.

The rule in *Tollett* rests on the rationale that "a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it *quite validly* removes the issue of factual guilt from the case," and "simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction, if factual guilt is validly established."[139]  The Court explained that because "[t]he focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity," a defendant who has pleaded guilty on the advice of counsel "must demonstrate that the advice was not 'within the range of competence demanded of attorneys in criminal cases.'"[140]  This standard is materially similar to the familiar two-pronged test for an actual ineffective assistance of counsel claim set forth in *Strickland*.[141]

---

[138] 411 U.S. at 267 (explaining, "while claims of prior constitutional deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief.").

[139] *Haring v. Prosie*, 462 U.S. 306, 321 (1983) (emphasis in original) (quoting *Menna v. New York*, 423 U.S. 61, 62–63 (1975)); *see also Class v. United States*, 138 S. Ct. 798, 805 (2018) (same); *United States v. Broce*, 488 U.S. 563, 569 (1989) ("A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence.").

[140] *Tollett*, 411 U.S. at 266 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

[141] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In *Hill v. Lockhart*, the Supreme Court held that in the guilty plea context, the *Strickland* prejudice requirement "focuses on whether counsel's constitutionally effective performance affected the outcome of the plea process."[142]  Thus, a defendant must demonstrate that, but for counsel's errors, the defendant would not have pled guilty and would instead have insisted upon proceeding to trial."[143]  The government argues that petitioners who pleaded guilty cannot prevail under the *Tollett*—or *Hill*—standard unless they allege and show that defense counsel performed deficiently and there is a reasonable probability that but for counsel's unreasonable errors, petitioners would have insisted upon going to trial rather than pleading guilty.

Petitioners argue that this exception to *Tollett*'s rule is not so narrow.  As the government acknowledges, *Tollett* does not permit any and all ineffective assistance of counsel or prosecutorial misconduct claims, but only such claims that bear on the "voluntary and intelligent character of the guilty plea."[144]  As petitioners stress, their Sixth Amendment claims do not advance actual-ineffectiveness claims against defense counsel, but claim the government intentionally and unjustifiably intruded upon protected attorney-client communications.  To the extent this government misconduct occurred during the plea-bargaining phase, they assert that the resulting per se Sixth Amendment violation is not an independent Sixth Amendment violation, but instead qualifies as an exception for a claim that calls into question the voluntary nature of the plea itself.  Citing *Brady v. United States*,[145] petitioners proceed under the theory that the government's misconduct presumptively rendered their guilty pleas involuntary by

---

[142] 474 U.S. 52, 59 (1985).

[143] *Id.* at 58–59.

[144] 411 U.S. at 267; *see also Hill*, 474 U.S. at 60.

[145] 397 U.S. 622, 755 (1970).

"disabling" defense counsel "from fully assisting and representing" them.[146]  Accordingly, the

Court will analyze petitioners' argument under the standard set forth in *Brady*.

"[A] guilty plea is a grave and solemn act to be accepted only with care and discernment

. . . "[147]  "When a defendant pleads guilty he or she, of course, foregoes not only a fair trial, but

also other accompanying constitutional guarantees."[148]  Thus, a guilty plea "not only must be

voluntary but must be [a] knowing, intelligent act[ ] done with sufficient awareness of the

relevant circumstances and likely consequences."[149]  "The longstanding test for determining the

validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among

the alternative courses of action open to the defendant.'"[150]

The *Brady* Court defined the standard for determining the voluntariness of a guilty plea:

> A plea of guilty entered by one fully aware of the direct
> consequences, including the actual value of any commitments
> made to him by the court, prosecutor, or his own counsel, must
> stand unless induced by threats (or promises to discontinue
> improper harassment), misrepresentation (including unfulfilled or
> unfulfillable promises), or perhaps by promises that are by their
> nature improper as having no proper relationship to the
> prosecutor's business (e.g. bribes).[151]

Accordingly, to set aside a plea as involuntary based on prosecutorial misconduct, a

defendant who was fully aware of the direct consequences of the plea must show that (1) "some

egregiously impermissible conduct" by the government "antedated the entry of his plea," and (2)

"the misconduct influenced his decision to plead guilty or, put another way, that it was material

---

[146] Doc. 602 at 7, 11–14.

[147] *Brady v. United States*, 397 U.S. 742, 748 (1970).

[148] *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)).

[149] *Brady*, 397 U.S. at 748.

[150] *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).

[151] *Brady*, 397 U.S. at 755 (citation and internal quotation marks omitted).

to that choice."[152]  Petitioners argue that a pre-plea *Shillinger* per se violation necessarily satisfies that two-part test, thus rendering plea involuntary.  The Court disagrees.

A petitioner must first show that impermissible government conduct occurred.  As the cases cited by petitioners illustrate, courts have sometimes allowed defendants to raise claims of government misconduct despite a guilty plea where the misconduct was so egregious that it called into question the defendant's guilt.[153]  These cases involved claims that the government made affirmative misrepresentations that rendered the defendants' guilty pleas involuntary.[154]  Although no petitioner alleges such misrepresentations (or threats or promises), the Court assumes, arguendo, that if a member of the prosecution team intentionally became privy to a defendant's protected attorney-client communications without any legitimate law-enforcement justification for doing so, the government agent engages in egregiously impermissible conduct.  As the Tenth Circuit explained in *Shillinger*, "[t]his sort of purposeful intrusion on the attorney-client relationship strikes at the center of the protections afforded by the Sixth Amendment."[155]

In addition, however, a petitioner must show that the misconduct induced him to plead guilty.  In other words, a petitioner must show "a reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial."[156]  Petitioners assert that once the Court presumes the government's misconduct resulted in prejudice under *Shillinger* during the plea-bargaining stage, a reviewing court must also presume

---

[152] *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013) (quoting *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006) (citing *Hill*, 474 U.S. at 59); *see also Brady*, 397 U.S. at 755.

[153] *See, e.g.*, *Fisher*, 711 F.3d at 464–65; *Ferrara*, 456 F.3d at 290.

[154] *Id.*

[155] *Shillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995) (quoting *United States v. Decoster*, 624 F.2d 196, 201 (D.C. Cir. 1979)).

[156] *Ferrara*, 456 F.3d at 294 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

that the government's misconduct rendered the plea involuntary under the *Tollett* and *Hill* standard.

In order to address Petitioners' theory, it requires unraveling. Petitioners argue that a *Shillinger* "error" is presumptively prejudicial. An error is prejudicial only if there exists a reasonable probability that, but for the error, "the result of the proceeding would have been different."[157] When the proceeding in question is at the plea-bargaining stage, an error is prejudicial only if there is a reasonable probability that, but for the error, the defendant would have refused to enter a plea and would have insisted upon going to trial. Thus, in light of *Shillinger*'s presumption of prejudice, a petitioner who alleges that an intentional-intrusion "error" occurred during the plea bargaining stage is necessarily alleging there presumptively exists a reasonable probability that, but for the disabling impact of this misconduct on defense counsel's representation, the result of the proceeding would have been different. In other words, once a petitioner establishes that an intentional and unjustifiable intrusion occurred, a reviewing court must presume the intrusion resulted in prejudice. This is so, petitioners argue, because at the plea-bargaining stage, the test for determining whether an error resulted in prejudice is the same as the test for determining whether an error rendered the plea involuntary: whether there is a reasonable probability that, but for the error, the defendant would not have pleaded guilty and would have proceeded to trial instead.

Petitioners' argument is misplaced. First, the test they cite for determining whether an act or omission is prejudicial—a reasonable probability that, but for the act or omission, the result of the proceeding would have been different—is quoted out of context and is the standard

---

[157] *United States v. Weiss*, 630 F.3d 1263, 1274 (10th Cir. 2010).

used to determine the prejudice necessary to demonstrate plain error.[158]  Under *Shillinger*, as with all intentional-intrusion claims, the prejudice necessary to prove the Sixth Amendment violation is a reasonable probability of injury to the defendant or benefit to the state.[159]  But the *Shillinger* rule that the prejudice necessary to establish a Sixth Amendment *violation* can be presumed has no application here.  Instead, at issue here is whether a petitioner has made a showing of prejudice necessary to demonstrate his *guilty plea* was involuntary.

The Court is not persuaded that a *Shillinger* presumption of prejudice can serve as a makeweight for prejudice under *Hill*'s standard, as such a presumption does not speak to whether a petitioner would have insisted on going to trial and that it would have been rational for him to do so.  Petitioners cite no authority supporting such extrapolation of the *Shillinger* presumption to that required for a guilty plea to be rendered involuntary.  Petitioners' argument ignores the lesson from *Tollett* that the merits of an alleged pre-plea constitutional violation are rendered irrelevant and should not be conflated with the largely separate question of whether a defendant's plea was involuntary.  Instead, Supreme Court precedent instructs the Court to look to whether the alleged Sixth Amendment violation *caused* a petitioner's plea to be involuntary or uncounseled.

Petitioners also contend that they should not have to make a prejudice showing under *Tollett* because the pre-plea *Shillinger* constitutional violation they allege is a "structural error," that is, presumptively prejudicial and not subject to harmless error.[160]  But the fact that a pre-plea

---

[158] *Id.* (holding that even assuming there was an error that is plain, defendant did not demonstrate that this error affected his substantial rights, explaining "[a]n error only affects substantial rights when it is prejudicial, meaning that there is 'a reasonable probability that, but for the error claimed, the result of the proceeding would have been different'") (quoting *United States v. Algarate-Valencia*, 550 F.3d 1238, 1242 (10th Cir. 2008)).

[159] *Shillinger*, 70 F.3d at 1142 (citing *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

[160] *Id.* (citing *Rose v. Clark*, 478 U.S. 570, 577 (1986)).

constitutional violation is a structural error is not "by definition" an error that renders a plea involuntary.  "The notion that a structural error occurring prior to a guilty plea necessarily invalidates the subsequent guilty plea would be at odds with the result in *Tollett*, wherein the defendant sought to invalidate his guilty plea on the basis that blacks were systematically excluded from the grand jury that indicted him," which "would amount to structural error."[161]

In apparent recognition that this presumption-of-prejudice argument cannot be squared with *Tollett and Hill*, petitioners acknowledge in a lengthy footnote that, "[t]o be clear, this doesn't mean all petitioners in all § 2255 cases are free to pursue all claims arising from all pre-petition errors, even assuming those errors are prejudicial."[162]  Petitioners concede that some pre-plea errors do not "influence" the defendant's subsequent decision to enter a plea, and therefore "wouldn't independently or automatically undermine the voluntariness of the plea itself,"[163] citing the error during grand jury proceedings at issue in *Tollett* as an example.[164]  Petitioners explain, "[s]uch an error is prejudicial if it influenced the grand jury's decision to indict—not if it influenced the defendant's subsequent decision to enter a plea—and therefore wouldn't independently or automatically undermine the voluntariness of the plea itself."[165]  But as the government points out, this argument creates more problems for petitioners than it solves because no petitioner in these consolidated cases has alleged any connection between the government's alleged intentional intrusion into his protected attorney-client communications and

---

[161] *United States v. Moussaoui*, 591 F.3d 263, 280 n.12 (4th Cir. 2010).

[162] Doc. 602 at 10 n.34.

[163] *Id.*

[164] *Id.* (citing *Tollett*, 411 U.S. 258, 259 (1973)).

[165] *Id.*

his decision to plead guilty rather than go to trial or articulated how the government's misconduct influenced his decision to do so.

Petitioners' attempt to cast their claims as implicating the right to counsel in general is also unavailing.  The Fourth Circuit addressed a similar argument in *United States v. Smith*, where the defendant argued on appeal that his guilty plea was rendered involuntary because the district court erroneously denied his requests for substitute counsel.[166]  After acknowledging the rule in *Tollett* that when a defendant pleads guilty, he "has no non-jurisdictional ground upon which to attack the judgment except the inadequacy of the plea," the court addressed whether that rule shielded a challenge alleging the total absence of the assistance of counsel.[167]  The court held that if the defendant could show that he was denied his Sixth Amendment right to the appointment of a substitute and thus constructively denied counsel, "a constitutionally compelled finding of involuntariness would immediately follow from the underlying Sixth Amendment violation."[168]  After applying these principles, the court went on to conclude that the evidence did not show that the defendant was constructively without counsel during plea negotiations and thus had established neither a Sixth Amendment violation nor the involuntariness of his guilty plea.[169]  Despite asserting the government's misconduct disabled defense counsel from rendering effective assistance, petitioners do not go so far as to allege they were constructively without counsel during the plea negotiation process.[170]

---

[166] 640 F.3d 580, 585 (4th Cir. 2011).

[167] *Id.* at 591–92 (citing *United States v. Moussaoui*, 591 F.3d 263, 279 (4th Cir. 2010)).

[168] *Id.* at 593.

[169] *Id.* at 593–94.

[170] *See United States v. Cronic*, 466 U.S. 648, 654 n.11 (1984) (explaining a constructive denial of counsel results from circumstances where "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided" at all).

Nor does petitioners' argument that a "*Shillinger* error" presumptively establishes that a plea was involuntary on the rationale that counsel was disabled from representing the petitioner find any support in the law.  Such an argument presupposes that in order to enter a voluntary plea a defendant must have full awareness and knowledge of each available defense or constitutional claim.  The Supreme Court has rejected the notion that such lack of awareness or knowledge of a particular defense, even if constitutionally grounded, necessarily renders a guilty plea involuntary.  In *Tollett*, the Court refused to find on the papers submitted that the defendant's guilty plea was rendered involuntary based on a constitutional claim that he discovered after he pleaded guilty, namely, that he was indicted by an unconstitutionally selected grand jury in violation of his Fourteenth Amendment due process rights.[171]  The Court stated, "[a] guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry."[172]

More recently, in *United States v. Ruiz*, the Court reversed the Ninth Circuit's ruling that the defendant's plea was involuntary on the basis that the government failed to disclose material impeachment evidence to him prior to entering his guilty plea.[173]  While the Court recognized that a plea must be entered knowingly, intelligently, and with sufficient awareness of the relevant circumstances and likely consequences, it noted that "the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a

---

[171] 411 U.S. at 260–61.

[172] *Id.* at 267.

[173] 536 U.S. 622, 630 (2002).

defendant might labor," such as misapprehending the quality of the government's case, the relevant penalties, or potential defenses.[174]

For all these reasons, the Court finds that petitioners' presumption-of-prejudice argument does not satisfy the applicable standard in *Brady, Tollett,* or *Hill.*  Without any analogous authority from the Tenth Circuit or Supreme Court supporting petitioners' argument that a *Shillinger* per se violation presumptively renders a guilty plea involuntary or unknowing, this Court declines to do so in the first instance.  Accordingly, each petitioner is held to the applicable standard for showing his plea was involuntary—a reasonable probability that, but for the government's misconduct, he would not have pleaded guilty and would instead have insisted on going to trial.[175]

A court charged with determining such a reasonable probability must take an objective approach.[176]  Reviewing whether such a reasonable probability existed in a given case involves a "holistic inquiry into all of the factual circumstances surrounding the plea to determine whether the petitioner would have proceeded to trial," including assessment of "objective facts specific to a petitioner, such as his age, the length of the sentence he faced under the terms of the plea deal, the prospect of minimizing exposure to other charged counts, and so on."[177]  Further, proof of prejudice requires a petitioner to show that a decision to go "to trial would have been objectively 'rational under the circumstances.'"[178]  Under this standard, it is not unreasonable to predict that Ms. Reulet could have mounted a colorable collateral attack on her guilty plea stemming from

---

[174] *Id.* at 629–31 (citations omitted).

[175] *Ferrara v. United States*, 456 F.3d 278, 294 (1st Cir. 2006) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

[176] *United States v. Walters*, 269 F.3d 1207, 1215 (10th Cir. 2001).

[177] *Beard v. Addison*, 728 F.3d 1170, 1183 (10th Cir. 2013).

[178] *Id.* at 1184 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

AUSA Treadway's misconduct. Because no petitioner in these consolidated proceedings attempts to meet this standard, however, they have not established that their guilty pleas are subject to vacatur and their § 2255 motions are subject to dismissal on this basis.[179]

The government has provided the Court with a list of petitioners who received favorable charge and/or sentence-related bargains as part of a plea agreement, and speculates that the reason petitioners have not attempted to make the applicable showing for withdrawal of a plea is because the vast majority of the cases in this consolidated litigation involved overwhelming evidence, the real prospect of a lengthy sentence, the lack of any colorable factual or legal defense to the charges by petitioners, and highly favorable plea deals.[180] Indeed, petitioners do not seek to have their pleas withdrawn or voided but instead, seek dismissal of their cases with prejudice or alternatively, reduction of their sentences. Petitioners' choice appears to be calculated, as the appropriate remedy for a defendant who asserts in post-conviction proceedings that his plea was involuntary is to grant his motion conditioned on withdrawal of the plea.[181]

The Court declines to analyze these petitioners' claims under the applicable standard without acknowledgement that an individual petitioner wishes to withdraw his respective plea and, at a minimum, a sworn declaration attesting that he would not have pleaded guilty had he known of the government's misconduct.[182] Accordingly, the Court will give petitioners who allege pre-plea violations additional time to consider whether to seek leave to amend their

---

[179] The Court's initial review of the motions and record identified over twenty petitioners whose Sixth Amendment claims are based on audio and/or video recordings the USAO received before they entered their guilty pleas.

[180] Doc. 722 (sealed).

[181] *See Gill v. Turner*, 443 F.2d 1064, 1066 (10th Cir. 1971) (holding that the state should be allowed to retry prisoner entitled to federal habeas relief before writ is actually issued); *see also United States v. Wright*, 43 F.3d 491, 494 (10th Cir. 1994) ("Having pled guilty, a defendant's only avenue for challenging his conviction is to claim that he did not voluntarily or intelligently enter his plea." (citations omitted)).

[182] *See Ferrara v. United States*, 456 F.3d 278, 295 (2006).

motions to withdraw their respective pleas under the applicable standard for showing their guilty pleas were involuntary. Petitioners should be prepared to address this issue at the status conference set for January 26, 2021.

### 2. Post-plea Violations

In many member cases, any governmental intrusion with respect to the petitioner's video recording claims could only have occurred after petitioner pleaded guilty but before he was sentenced. As petitioners acknowledge, these petitioners cannot demonstrate that the government's post-plea misconduct rendered their pleas involuntary. Petitioners argue, however, that *Tollett* does not preclude claims that the government intentionally and unjustifiably became privy to protected recordings after a petitioner entered a plea, thus violating his Sixth Amendment rights during sentencing. The government agrees that *Tollett* does not apply where the alleged constitutional violation took place after a defendant pleaded guilty but maintains that the Court lacks authority to grant the sentencing relief petitioners request. The Court addresses this issue below in its discussion of whether these petitioners have standing.

Petitioners further argue that they may rely on any pre-plea constitutional violations to collaterally attack subsequent stages of the criminal proceedings, including the sentence, even if a petitioner cannot rely on the alleged violation to challenge his guilty pleas. They assert that the government necessarily remained privy to those pre-plea communications after a petitioner pleaded guilty and thus this continued familiarity with a petitioner's confidential information necessarily "disabled" defense counsel from fully assisting and representing him during each subsequent stage of the proceedings, including sentencing. And, petitioners argue, there is a reasonable probability that but for these disabling effects, the results of the post-plea proceedings would have been different.

The government argues that petitioners are barred from relying on any pre-plea violation to collaterally attack their sentence.  The Court agrees.  "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment."[183]  Petitioners cite no authority for their argument, which is contrary to the teaching of the *Brady* trilogy and *Tollett* that "a guilty plea represents a break in the chain of events which has preceded it in the criminal process," and thus after pleading guilty, a defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[184] Finding such a continuing violation would render this precedent meaningless.  Moreover, several Circuit courts have held that *Tollett* precludes a defendant from challenging his sentence based on evidence that the defendant contends the government obtained before his plea in violation of his constitutional rights.[185]  Petitioners' concern that the prosecutor "remained privy to" the information through his sentencing would be true of any allegedly unconstitutionally-obtained information or evidence that predated a defendant's plea.  Thus, petitioners cannot use a pre-plea alleged violation to challenge their sentence.

---

[183] *Boykin v. Alabama*, 395 U.S. 238, 242 (1969).

[184] *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *see also United States v. Broce*, 488 U.S. 563, 569 (1989) ("A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilty and a lawful sentence.").

[185] *See United States v. Quezada*, No. 93-1972, 1994 WL 66104, at *2 (1st Cir. Mar. 4, 1994) ("By pleading guilty, appellant waived the right to assert his Fourth Amendment claim for the purpose of attacking his sentence."); *United States v. Robeson*, 231 F. App'x 222, 224 (4th Cir. 2007) (holding that under *Tollett*, the defendant waived her argument that "her sentence should be vacated because the drugs upon which her sentence was calculated were seized in violation of the Fourth Amendment"); *United States v. Smallwood*, 920 F.2d 1231, 1240 (5th Cir. 1991) ("Smallwood cannot resuscitate [F]ourth [A]mendment concerns solely to challenge the consideration of the evidence at sentencing."); *see also United States v. Hubble*, No. 84-5866, 1985 WL 13619, *2 (6th Cir. Aug. 22, 1985) (relying on *Tollett* in holding that because the defendant did not contend that defense counsel's failure prior to entry of plea to file a suppression motion or pursue a § 3006A(e) psychiatric examination affected his decision to plead guilty, he may not collaterally attack his sentence on those grounds); *Flowers v. United States*, No. 98-1690, 2000 WL 125851, at *4–5 (6th Cir. Jan. 24, 2000) (relying on *Tollett* to reject the defendant's motion to vacate his sentence).

## IV.      Jurisdictional Defenses

In response to this Court's directive for additional briefing on jurisdictional issues, the government has raised several jurisdictional, mootness, and procedural arguments.  Generally, the government argues that certain categories of petitioners lack standing to challenge either their convictions or sentences, while others lack standing to challenge their sentences: (1) petitioners who have been deported following completion of their custodial sentences cannot challenge their sentences, as any such challenges are moot; (2) petitioners sentenced to statutory mandatory minimum terms cannot challenge their sentences; (3) petitioners whose Sixth Amendment claims are based on video or audio recordings that the government did not receive until after the petitioners' sentencing lack standing to challenge either conviction or sentence; (4) petitioners cannot challenge their conviction or sentence if the government received the recordings after the petitioners entered into binding plea agreements and were then sentenced consistent with the agreement; and (5) petitioners cannot challenge convictions if the government received the recordings after petitioners entered a plea or were convicted.[186]  Further, the government objects that the petitions uniformly fail to satisfy the certification requirement of Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings, and, as a result, the claims cannot be considered.

Petitioners respond that the Sixth Amendment intrusions are per se prejudicial and satisfy the injury requirements for habeas relief regardless of when the intrusions may have occurred for individual petitioners.  The petitioners rely, in part, on this Court's stated intent to presume the misconduct occurred at least before sentencing as a discovery sanction.[187]  Petitioners deny that any of their petitions are subject to dismissal for mootness or lack of standing.  Finally,

---

[186] Doc. 603, Ex. A.

[187] Doc. 587.

petitioners deny that Rule 2(b) compliance is jurisdictional and urge the Court to ignore the government's arguments.

### A. Standard

Federal courts must have a statutory or constitutional basis to exercise jurisdiction.[188] And, without jurisdiction, a court must dismiss the case.[189] Courts thus must determine, either *sua sponte* or upon a challenge by a party "at any stage in the litigation," whether subject matter jurisdiction exists.[190]

Article III's case-or-controversy requirement applies at all stages of litigation.[191] A case or controversy requires the parties to have a personal stake in the outcome of the litigation; among other things a petitioner's injury must be capable of redress by a favorable ruling.[192] When circumstances change, extinguishing a party's interest in the case, it becomes moot and is subject to dismissal.[193] A habeas petitioner's release from custody is one such change in circumstance.[194]

"A habeas corpus petition is moot when it no longer presents a case or controversy under Article III, § 2, of the Constitution."[195] To satisfy the case or controversy requirement, "the

---

[188] *Davenport v. Wal-Mart Stores, Inc.*, No. 14-2124-JAR-JPO, 2014 WL 3361729, at *1 (D. Kan. July 9, 2014).

[189] *Id.*; *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[190] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (explaining that challenges to subject matter jurisdiction "may be raised . . . at any stage in the litigation, even after trial and the entry of judgment.").

[191] *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).

[192] *Id.* at 477–78.

[193] *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 794 (10th Cir. 2009) (quoting *Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1245 (10th Cir. 2009) ("If, during the pendency of the case, circumstances change such that the plaintiff's legally cognizable interest in a case is extinguished, the case is moot, and dismissal may be required.")).

[194] *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

[195] *Aragon v. Shanks*, 144 F.3d 690, 691 (10th Cir.1998).

[petitioner] must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."[196]  In other words, "[a]n issue becomes moot when it becomes impossible for the court to grant 'any effectual relief whatsoever' on that issue to a prevailing party."[197]  "Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction."[198]

"[A] criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." [199]  Sibron also recognized that it is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences."[200]  It therefore follows, as the Court said in *Spencer*, that "[a]n incarcerated convict's (or a parolee's) [habeas] challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction."[201]

### B.   The Government's Standing and Mootness Challenges

The government's jurisdictional and standing arguments are rooted in the nature of the alleged infirmity identified in the various categories of petitions.  Each category is discussed below, although some have been consolidated.

---

[196] *Id.* (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).

[197] *United States v. Hahn*, 359 F.3d 1315, 1323 (10th Cir. 2004) (quoting *Smith v. Plati*, 258 F.3d 1167, 1169 (10th Cir. 2001)).

[198] *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996).

[199] *Sibron v. New York*, 392 U.S. 40, 57 (1968).

[200] *Id.* at 55.

[201] *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

### 1.     Completion of Sentence and Removal From Country

The first category of motions the government discussed in its brief are petitioners who have completed their custodial sentences and subsequently been deported.[202]  The government contends that such petitioners lack standing to challenge their sentences, primarily relying on Tenth Circuit precedent in *United States v. Vera-Flores*.[203]  In that case, the Tenth Circuit dismissed a direct appeal by an appellant who had been deported following a custodial sentence but remained on supervised release, albeit only in a hypothetical sense as the appellant was no longer in the country.[204]  The Tenth Circuit held that Vera-Flores' deportation "has eliminated all practical consequences associated with serving a term of supervised release," curtailing the "redressability" potential in a discussion that cites *Spencer*,[205] a case the petitioners here rely on broadly in response to the government's brief.  The court then dismissed the appeal as moot. Remote hypothetical consequences about what might happen if these petitioners reentered were not sufficient in *Vera-Flores* for the appeal to survive a mootness challenge.  The government does not suggest that they lack standing to challenge their convictions.

Petitioners first address specific petitioners, correctly arguing that Camargo-Simental, Carrillo-Elias, and Tabares-Aviles do not challenge their sentences, only their convictions.[206]  In addition, the Court notes that petitioner Stephen Dillow has not been removed by a deportation order; his custodial sentence was reduced and his term of supervised release was terminated through a compassionate release order.  He thereby has withdrawn his sentencing challenge but

---

[202] Doc. 603 at 6–8.

[203] 496 F.3d 1177 (10th Cir. 2007).

[204] *Id.* at 1180–82.

[205] 523 U.S. 1, 7 (1998).

[206] Doc. 610 at 15.

retains the challenge to his conviction.  Petitioners distinguish the remaining nine cases identified

by the government in this category from *Vera-Flores* by contending they, unlike the appellant in

that case, have challenged their supervised release terms, and that the court is compelled to

provide some form of relief now that it has concluded, or least offered an intent to presume, that

a non-harmless constitutional violation took place.  Finally, petitioners contend that subsequent

changes to the sentencing guidelines undermine the Tenth Circuit's holding in *Vera-Flores* that

an injury is not redressable for an individual under supervised release who has been deported

from the country.[207]

      *Vera-Flores* remains binding on this Court, and petitioners' attempts to distinguish their

cases from *Vera-Flores* fall short.  While this Court could hypothesize about possible injuries

related to the term of supervised release for each of the nine subject petitioners should they

attempt to reenter the United States, as the petitioners invite this court to do, such hypothetical

consequences were squarely rejected in *Vera-Flores* as a basis for relief.[208]  Regarding the

deterrence effect of the supervised release term, this also appears hypothetical, as removal from

the country in and of itself precludes the petitioners from committing offenses in the United

States, begging the question as to what acts they can be deterred from undertaking.  While other

circuits have deemed a continuing theoretical deterrence effect to be a sufficient, the Tenth

Circuit has not done so.

      Turning to a broader defense that, as established in *Spencer*, a lack of custody is

insufficient to render sentencing claims moot, petitioners struggle to answer a critical question:

What redressability is there for individuals who have served their sentences and been deported?

---

[207] *Id.* at 16–18.

[208] 496 F.3d at 1181–82.

A continuing injury is required to establish standing for these petitioners, i.e., a collateral consequence.[209]  Petitioners' arguments for broad presumptions of standing lie in statements from *Spencer* describing an earlier era of more permissive standing in habeas cases.  The *Spencer* Court noted that standing has tightened considerably over time.[210]  Collateral consequences cannot be presumed simply based on the nature of the alleged misconduct, either, because, as noted in *Spencer*, it does not matter if the mootness was the result of conduct by the state: "mootness, however it may come about, simply deprives [the Court] of . . . power to act."[211]  While deterrence of future governmental misconduct may be something for the Court to consider when developing habeas relief, it does not, standing alone, resolve the redressability issue.  Petitioners' nearly singular focus on deterrence also does not account for systematic remedies that have already been implemented to correct practices in the USAO and provide financial compensation to many incarcerated petitioners.  Prevention of future misconduct and some measure of compensation has already been meted out, habeas proceedings are not intended as means for retribution, and deterrence without some redressability for the alleged injuries the individual petitioners suffered does not suffice to satisfy the redressability requirement to proceed under § 2255.  The Court must be able to provide some sort of redress to the individual prevailing habeas petitioner, not just systematic relief.[212]

---

[209] *Spencer*, 523 U.S. at 7 (quoting *Lewis*, 494 U.S. at 477–78 ("This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.... The parties must continue to have a 'personal stake in the outcome' of the lawsuit.").

[210] *Spencer*, 523 U.S. at 11–13 (noting that a "parsimonious view of standing" has developed over time that could limit presumptions regarding the existence of collateral consequences in habeas challenges).  In addition, in some cases, there may be reason to doubt this Court should presume collateral consequences exist if petitioner has prior convictions and already suffers the consequences of those unchallenged elements of his criminal record.  *See Romero v. Goodrich*, 480 F. App'x 489, 494 (10th Cir. 2012) (citing *Malloy v. Purvis*, 681 F.2d 736 (11th Cir.1982)).

[211] *Spencer*, 523 U.S. at 18.

[212] *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (explaining that to satisfy Article III's case or controversy requirement, "a litigant must have suffered, or be threatened with, an actual injury traceable to the

Petitioners within this category have not demonstrated that adequate collateral consequences for their convictions exist now that they have been deported following completion of their custodial sentences. They do not raise any of the other possible exceptions to mootness. Considering this, petitioners Adrian Ayala-Garcia, Manuel Bailon-Valles, Fernando Cabral Torres, Jose Garcia-Velasquez, Eladio Marquez, Gerardis Rodriguez-Torres, Jose Silva-Cardona, Paola Soto-Camargo, and Juan Vasquez-Montalvo cannot satisfy the redressability component of standing required to challenge their sentences. This Court cannot provide these individuals any relief with respect to their completed sentences. Their removal from the United States following the end of their custodial sentences rendered the § 2255 challenges to their sentences moot. Deportation does not render their conviction challenges moot, however.

## 2.  Mandatory Minimum Sentences

The Court must next address the category of petitioners who were sentenced to statutory mandatory minimum terms. The government argues that the Court lacks authority to reduce these petitioners' sentences, precluding them from satisfying the case or controversy requirement for Article III standing.

Petitioners respond that the Court has broad discretion under § 2255 to modify a petitioner's sentence as relief, despite any limitations on judicial authority embodied in 18 U.S.C. § 3553. Petitioners rely on *United States v. Pearce*[213] for this sweeping sentence correction authority, but this reliance is misplaced. In *Pearce*, the district court declined, as a matter of discretion, to resentence a defendant after vacating most of his convictions.[214] That

---

defendant and likely to be redressed by a favorable judicial decision." (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).

[213] 146 F.3d 771 (1998).

[214] *Id.* at 775.

case had nothing to do with mandatory minimum sentences or reducing a sentence subject to a statutory mandatory minimum as a function of habeas relief.  The circumstances under which a court can impose a sentence lower than the statutory mandatory minimum are limited and proscribed.  Under 18 U.S.C. § 3553(e), a district court can only deviate below the statutory minimum on the  government's motion based on substantial assistance.  Safety valve relief under § 3553(f) only applies in limited circumstances, and there is no reason to believe that such relief was withheld as a result of any alleged governmental conduct here.  Petitioners do not allege that any of these established routes for sentencing below the statutory minimums would be applicable.

Petitioners do not cite any cases in which a court has provided relief under § 2255 by reducing a sentence imposed in accordance with statutory mandatory minimums, nor has the Court identified any such cases.  The Court may not sentence any of the petitioners who were subject to mandatory minimum sentences below that required by statute, except as noted above. There is no indication that the outcome of sentencing for these petitioners could have been any different had there been no constitutional violation.  While petitioners urge this Court to accept that the intrusion into attorney-client privilege was itself a sufficient injury to allow these cases to go forward, their request flies in the face of the individual, case-by-case approach required to provide the extraordinary relief sought in these cases.

Petitioners urge this Court to look beyond what it is authorized to do at sentencing and proceed unfettered under 28 U.S.C. § 2255 yet provide no basis for doing so beyond a general citation to the habeas statute.[215]  There is no authority to support this position.  The only other method of post-sentencing relief is sentence modification, which only applies in specific, limited

---

[215] Doc. 610 at 11.

circumstances authorized by Congress.[216]  This Court is not empowered to ignore statutory mandatory minimums or other limits on its authority when resentencing in response to a § 2255 petition.  Accordingly, petitioners subject to mandatory minimum sentences have not demonstrated that their sentencing challenges are redressable, and they are hereby limited to challenging their convictions only.  As of today, these petitioners include Jessie Silva and Jorge Soto-Saldivar.[217]

### 3.    Audio and Video Recordings Received After Sentencing

The government has identified eleven petitioners who were sentenced before the government received either the soundless video or audio recordings related to those petitioners.[218]  The government and the petitioners disagree with respect to whether the Court should presume the subject petitioners were prejudiced.  Specifically, the parties raise the question of whether the *Shillinger* presumption of prejudice applies.[219]

In the *Black* Order, this Court previously considered *Shillinger* and determined that the government had no legitimate purpose for the intrusion into the attorney-client privilege of the petitioners, at least with respect to the video recordings.  This Court observed that post-*Shillinger*

---

[216] A federal district court may modify a defendant's sentence only where Congress has expressly authorized it to do so. *See* 18 U.S.C. § 3582(b)–(c); *United States v. Blackwell*, 81 F.3d 945, 947 (10th Cir. 1996). Congress has set forth only three limited circumstances in which a court may modify a sentence: (1) upon motion of the Director of the Bureau of Prisons or defendant under § 3582(c)(1)(A); (2) when "expressly permitted by statute or by Rule 35;" and (3) when defendant has been sentenced "based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c).  Relief under subsection (2) includes compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) or, alternatively, home confinement under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. Law 116-136, 134 Stat. 281 (2020).  None of these measures are relevant to the issues discussed herein.

[217] While also sentenced to a statutory mandatory minimum term, the Court notes Vernon Brown will soon be released from custody and has withdrawn his motion to reduce his sentence.  His conviction challenge remains undisturbed.

[218] Doc. 603, Ex. A.  Two Petitioners identified in this category were also identified as individuals who have been deported.  While they are unable to challenge their sentences due to deportation, their challenges to their convictions remain potentially valid and therefore the discussion here applies to them with equal force.

[219] *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995).

cases in the Tenth Circuit have indicated that it is not just the intrusion itself that matters with respect to prejudice, but what is done with the improperly obtained communications that also determines whether there has been a Sixth Amendment violation.[220]  The *Shillinger* holding places great importance on the actual fairness of proceedings.[221]  In reaffirming *Shillinger*, the Tenth Circuit declined to presume prejudice where it was undisputed that the prosecutors themselves did not access privileged communications and thus could not have used them to undermine the actual fairness of trial.[222]

For petitioners who concede that there was no violation until after sentencing, there is nothing the government could have done with the recordings that would implicate the fairness concerns of *Shillinger*.  This conclusion does not disregard the seriousness of a governmental intrusion into the attorney-client relationship, which has led this Court to undertake an unprecedented investigation and impose numerous sanctions, but the mere fact of the intrusion is not the only matter the court must consider.  As this Court previously observed, "a *per se* Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest."[223]  At the same time, this

---

[220] Doc. 758 at 157–58.

[221] The *Shillinger* court also instructed that, "[i]n tailoring relief for infractions of the attorney-client privilege that amount to constitutional violations, the proper approach is 'to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial.'" *United States v. Kaufman*, 2005 WL 2087759 *3 (D. Kan. Aug, 25, 2005) (quoting *Shillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995)).

[222] *United States v. Singleton*, 52 F. App'x 456, 459–60 (10th Cir. 2002).

[223] *Black Order* at 162.  It was not the Court's intent to include intrusions that, after review of the record, clearly could not have occurred during that time frame.  The Court emphasized that "the attorney-client privilege and the Sixth Amendment are personal to the defendant."  *Id.* at 163.

Court declined to make a blanket finding of Sixth Amendment violations for all petitioners here, indicating that each petitioner would need to meet the *Shillinger* test in order to qualify for the presumption.[224]  Petitioners still seek a one-size-fits-all approach, but this Court stands by its previous decision to apply the *Shillinger* test to each petitioner individually.

Where it is undisputed that the government could not have made any use of the privileged communications as a result of not receiving them until after a petitioner was sentenced, this Court will follow the Tenth Circuit's example in *Singleton* and decline to presume the petitioner was prejudiced.  In the absence of the presumption, there is no nexus between the petitioners' alleged injuries and the government's conduct.  For these petitioners, the intrusion cannot be tied to any claimed unfairness or impropriety in the conviction, plea, or sentencing processes. Without such a nexus, these petitioners cannot proceed with claims challenging either their convictions or sentences.  Although the Court has generally presumed as true that an intrusion occurred prior to plea, conviction, or sentencing, these individuals will be unable to demonstrate that any presumptive intrusion included privileged materials, as they are still required to show.[225] The Court will dismiss the subject motions for lack of standing to pursue § 2255 relief.

### 4. Video and Audio Recordings Received After Petitioner Entered Into a Binding Plea and Received Sentence Agreed to in Plea

Next, the government contends that thirteen petitioners who entered into binding plea agreements for a specific term of imprisonment before the government received either audio or video recordings of potentially privileged communications and were then subsequently sentenced to the agreed upon term of imprisonment lack standing to challenge either their convictions or

---

[224] *Id.*

[225] Doc. 587 at 14.

their sentences.[226]  Petitioners contend that the intrusion into the attorney-client privilege

provides standing for every petitioner regardless of the timing of the intrusion.[227]  Neither

position adequately addresses the *Shillinger* approach to prejudice.

The intrusion for these petitioners occurred after guilty plea or conviction, eliminating the

possibility that the intrusion could have tainted these petitioners' convictions.  As noted above,

the intrusion itself is not a sufficient injury to provide standing.  Absent the possibility of any

related unfairness or injury at the conviction stage, these petitioners do not have standing to

challenge their convictions under § 2255.

However, the intrusions in these cases, unlike those for the petitioners in the previous

discussion, occurred *before* sentencing.  Here, the *Shillinger* presumption does apply, as there is

a proceeding subsequent to the intrusion which may have been unfair or somehow tainted.  At

this stage, the Court need not and should not determine whether any petitioners actually suffered

an injury related to the intrusion and may presume that the petitioners were injured.  This creates

standing to survive the government's challenge to these petitioners' sentencing claims.  While

the actual sentence imposed may be relevant to whether an injury was actually incurred, it has no

bearing on the *Shillinger* presumption test and the related fairness concerns.

### 5. Soundless Recordings Received After Plea or Conviction Lack Standing to Challenge Conviction

Incorporating the above discussion, this Court concludes that post-conviction or plea

intrusions preclude conviction challenges.  As with earlier categories, petitioners in this category

would be unable to demonstrate, despite this Court's general presumption, that anything the

prosecutors were privy to contained privileged information.  The fairness concerns of *Shillinger*

---

[226] Doc. 603 at 12–13.

[227] Doc. 610 at 13–14.

are not implicated, no redressable injury is present, and a necessary element of a challenge to their convictions could not be met.

### C.     Failure to Certify

In November 2020, the government filed a document entitled "Motion Requesting Compliance with Rules Requiring all 28 U.S.C. § 2255 Petitions to be Signed Under Penalty of Perjury,"[228] arguing that local rules as well as Rule 2 of the Rules Governing Section 2255 Proceedings require a motion to be signed by the petitioner or a next friend under penalty of perjury.[229]  The government insists that petitioners must conform to this procedural requirement or they cannot proceed with their claims.

The court concludes that Rule 2(b)(5), as a court-made procedural rule, is not jurisdictional but rather a mandatory claim processing rule, such that it must be enforced when invoked, but is otherwise waivable.[230]  The Supreme Court has explained that "the procedural rules adopted by the Court for the orderly transaction of its business are not jurisdictional and can be relaxed by the Court in the exercise of its discretion."[231]  A court has no authority to create equitable exceptions to jurisdictional requirements.[232]  Furthermore, rules that are not

---

[228] Doc. 605.

[229] *Id.* at 1.

[230] *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S.Ct. 13, 17–18 (2017) ("Mandatory claim-processing rules are less stern [than jurisdictional limits imposed by Congress].  If properly invoked, mandatory claim-processing rules must be enforced, but they may be waived for forfeited.").  The *Hamer* Court specifically differentiated court-made processing rules from statutory jurisdictional requirements.  *Id.* at 17.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (explaining that claim-processing rules are non-jurisdictional rules "that seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times").  Unlike jurisdictional requirements, claim-processing rules can be waived or forfeited.  *Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 783 (10th Cir. 2013).

[231] *Schacht v. United States*, 398 U.S. 58, 64 (1970).

[232] *Bowles v. Russell*, 551 U.S. 205, 214 (2007).

jurisdictional may still be mandatory claim processing rules, which, absent invocation, may otherwise be waived or forfeited.[233]

Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings requires § 2255 petitions to "be signed under penalty of perjury by the movant or by a person authorized to sign it for the movant."[234]  The advisory committee notes for Rule 2(b)'s 2004 amendments specifically use "an attorney for the movant" as an example of one who might be authorized to sign on behalf of the movant.[235]  The Committee envisioned a "next-friend" standing analysis for deciding whether a signer was actually authorized to sign a motion on behalf of a movant.[236]  The advisory committee notes also state that courts should allow movants to submit corrected motions conforming to Rule 2(b).[237]  This approach both underscores the claim processing nature of the rule and the proper remedy for violations: allow petitioners to either submit certifications of their motions or permit appointed counsel to do it for them as next friend.

In the habeas context, 28 U.S.C. § 2242 provides in pertinent part that an "[a]pplication for writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf."  In *Whitmore v. Arkansas*, the Supreme Court made clear that standing to proceed as next friend on behalf of a prisoner "is by no means granted automatically to whomever seeks to pursue an action on behalf of another."[238]  A party seeking to represent a prisoner in a habeas proceeding must: (1) explain why the real party in interest cannot prosecute the action in his own behalf; and (2) establish a significant relationship

---

[233] *Hamer*, 138 S. Ct. at 17.

[234] R. Gov. § 2255 Proc. 2.

[235] R. Gov. § 2255 Proc. 2 advisory committee's notes to 2004 amendment.

[236] *Id.*

[237] *Id.*

[238] 495 U.S. 149, 163 (1990).

with and a true dedication to the best interests of the real party in interest.[239]  A "next friend"
bears the burden of clearly establishing the propriety of his or her status, and thereby justify the
jurisdiction of the court.[240]

The Tenth Circuit allows defendants to correct § 2255 motions that have not met
procedural requirements.  In *Guerrero*, the court considered an amended claim filed under §
2255 by a pro se litigant in an unverified memorandum and held that the defendant could correct
his motion to meet the procedural requirements of Rule 2(b).[241]  If Rule 2(b) was jurisdictional,
the result would have been a dismissal of the petition, not remand with an opportunity to amend.

Even though Rule (2)(b)(5) is a claim processing rule and not jurisdictional, it must be
enforced now that it has been invoked.[242]  This Court will not accept an invitation to materially
delay any forthcoming proceedings in this case due to the petitioners' non-compliance with Rule
2(b).[243]  The Court has previously made findings of fact on which it may rely in evaluating the
petitions, as well as other facts and materials in the record.  Allegations made in uncertified
petitions will not be treated as evidence, however, and this Court advises petitioners or their
counsel to comply with Rule 2(b) in order to present particular evidence in each motion.  As
noted throughout this memorandum, blanket approaches to either dismiss or defend these
motions are insufficient for the fact-specific analyses required in habeas cases.  While the
motions are not presently subject to dismissal, the government has invoked the Rule 2(b)
certification requirements.  Petitioners must therefore comply, or their motions will be dismissed.

---

[239] *Id.*

[240] *Id.* at 164.

[241] 488 F.3d 1313, 1316 (10th Cir. 2013).

[242] *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017).

[243] The government suggests that proceedings will need to be stayed while awaiting compliance with the
certification rules.  Doc. 605 at 6-7.  Such a delay is not necessary given the materials already in the record.

The Court hereby orders all petitioners to verify their motions on or before **February 26, 2021**. Unverified motions will be subject to dismissal. Each motion must be individually verified, particularly in light of this Court's statement on the need for individualized treatment of the motions collected together in this matter. The government and petitioners will work together to draft forms for verification directly by petitioners as well as through the next friend process. The Court anticipates that appointed counsel will take up the next friend mantle where needed. These agreed proposed forms will be submitted to the Court prior to the status conference on January 26, 2021, or each party must file an explanation for a failure to comply.

## V.      Conclusion

The fairness of the adversary system has been called into question by the allegations of government misconduct here. The Court has endeavored to give the consolidated § 2255 litigants an opportunity to seek efficient, fair, and consistent relief. Unfortunately, it appears that many of petitioners' claims fall short of the rigorous standards required for habeas relief. As this Order makes clear, the remedy sought may be procedurally foreclosed for many consolidated litigants who pleaded guilty. The Court intends to grant petitioners certificates of appealability to facilitate review of these issues of first impression by the Tenth Circuit.

The Court notes, however, evidence of systemic government abuse that came to light in the *Black* investigation has not gone without consequences. Such evidence may still be relevant for determining an appropriate remedy should petitioners who proceed to an evidentiary hearing prevail on their claims. In addition, the *Black* investigation and evidentiary hearing were able to shine light on the practices and environment of the USAO, which in turn led to important reforms within the entire District of Kansas. A mandatory comprehensive policy was issued in May 2017 that is largely curative of many of the issues that came to light in the *Black* case,

which includes a requirement that prosecutors make their requests for CCA calls in writing on request forms and provides for a filter team procedure.[244]  CCA, Securus, and the United States Marshal's office have all also implemented reforms in light of the revelations in these collected cases.

Moreover, in January 2020, this Court approved the settlement of a civil class action brought on behalf of detainees who had their attorney-client telephone calls recorded by CCA and Securus Technologies, Inc.[245]  Under this settlement, more than 500 former detainees received progressive payments from a $1.45 million settlement fund, ranging from approximately $500, $2,000, and $6,000, depending on the nature of their injury.  This civil action was not meant to be a substitute for habeas relief, and the plaintiffs did not waive or forfeit any right to file a § 2255 motion in return for participation in the class action; in fact, many plaintiffs are petitioners in this consolidated action.[246]

The Court will soon issue orders in individual cases either dismissing claims as noted above, or granting an evidentiary hearing on claims, all consistent with the particularized approach the parties must take going forward.  While numerous global procedural and discovery issues have been addressed by the Court over the last several years, ultimately "habeas relief sought must be considered on an individual basis."[247]

**IT IS THEREFORE ORDERED BY THE COURT** that the government's Motion Requesting Compliance with Rules Requiring all 28 U.S.C. § 2255 Petitions to be Signed Under Penalty of Perjury (Doc. 605) is **granted**.  Petitioners shall verify their motions on or before

---

[244] *Black* Order at 120.

[245] *Huff v. CoreCivic*, D. Kan. No. 17-cv-2320-JAR-JPO, Doc. 177 (Jan. 28, 2020).

[246] *See id.*, Doc. 177-1 (list of settlement class members).

[247] *Wang v. Reno*, 862 F. Supp. 801, 811 (E.D.N.Y 1994) (denying sweeping, non-particularized non-declaratory relief to collected habeas cases, instead electing to consider each case on its own).

**February 26, 2021**.  To facilitate this compliance, by **January 25, 2021**, the parties shall meaningfully confer and attempt to reach agreement on the verification forms required to certify the motions under Rule 2(b).  If the parties are unable to reach agreement, they shall raise any disputes in a joint motion filed by that same date.  Such motion shall be limited to five (5) double-spaced pages, equally divided between the parties.

**IT IS FURTHER ORDERED** that petitioners affected by the Court's collateral-attack waiver by plea ruling shall advise the Court at the January 26, 2021 status conference whether they intend to seek leave to amend their motions.

**IT IS SO ORDERED.**

Dated: January 18, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE
