**In the United States District Court
for the District of Kansas**

---

**In re: CCA Recordings 2255 Litigation**,
                           **Petitioners,**

**v.**

                                    **Case No. 19-cv-2491-JAR-JPO**
                                 **(This Document Relates to All Cases)**

**United States of America,**
                           **Respondent.**

---

## MEMORANDUM AND ORDER

On January 18, 2021, this Court entered a Memorandum Order ("Order") (Doc. 730) ruling on several legal issues in these consolidated habeas proceedings. This matter is now before the Court on: (1) petitioners' Motion to Clarify, or in the Alternative, to Reconsider (Doc. 756) certain portions of that Order; and (2) the government's Motion to Reconsider the Court's Ruling Regarding Certain Petitioners with Rule 11(c)(1)(C) Pleas (Doc. 757). For the reasons explained in detail below, the Court grants Petitioners' motion to clarify in limited part, but otherwise denies reconsideration of the Order; the Court also grants in part the government's motion with respect to petitioners with binding plea agreements.

**I.      Background**

On October 15 and December 15, 2020, the Court addressed and asked for supplemental briefing on issues related to two legal defenses raised by the government: (1) defenses characterized as jurisdictional, and (2) collateral-attack waiver by plea agreement, specifically

1

application of *Tollett v. Henderson*[1] and its progeny to cases in which the petitioner pleaded guilty.[2]

In ruling on those legal defenses, the Court endeavored to establish legal standards common to various categories of petitioners, with individualized application to follow for each petitioner. After discussing the applicable standard in the Tenth Circuit for Sixth Amendment intentional-intrusion claims governed by *Shillinger v. Haworth*,[3] the Court addressed the collateral-attack waiver defense and application of the rule in *Tollett* to cases in which petitioners pleaded guilty, as well as numerous jurisdictional defenses based on mootness and standing. Until their motion to clarify and reconsider, petitioners collectively took the same approach to their individual Sixth Amendment claims that did not address the timing issues that the government argues alter or end the course of certain categories of claims. As petitioners note, the Order generally divides these alleged violations into the following categories: (1) violations that occurred before the plea or conviction; (2) violations that occurred after the plea or conviction but before sentencing; and (3) violations that occurred after sentencing.

Highly summarized, the Court concluded that certain petitioners cannot maintain all or part of their Sixth Amendment claims because of when and how petitioners were convicted, when petitioners were sentenced, and whether they received a mandatory minimum sentence. The Court held that petitioners who challenge their convictions by alleging pre-plea violations cannot allege independent Sixth Amendment claims, but instead must move to amend their motions under the applicable standard to seek vacatur of their pleas or otherwise face dismissal of their motions. Moreover, the Court held such petitioners cannot rely on any pre-plea

---

[1] 411 U.S. 258 (1973).

[2] Docs. 588, 677.

[3] 70 F.3d 1132 (10th Cir. 1995).

constitutional violations to collaterally attack subsequent stages of the criminal proceedings, including sentence, rejecting petitioners' continuing violation theory as contrary to the teaching of *Tollett* that "a guilty plea represents a break in the chain of events which has preceded it in the criminal process," and thus after pleading guilty, a defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[4]  The Court further stated that it would grant petitioners a certificate of appealability on this constitutional issue.

The Court also held that several categories of petitioners lacked standing to challenge their convictions, sentences, or both: (1) petitioners who have completed their custodial sentences and subsequently were deported cannot challenge their sentences; (2) petitioners subject to mandatory minimum sentences cannot challenge their sentences; (3) petitioners who challenge their conviction and sentence who were sentenced before the petitioner made or the government received their protected recordings are subject to dismissal; and (4) petitioners who allege an intrusion occurred after either a non-binding or binding guilty plea but prior to sentencing cannot challenge their conviction but may challenge their sentence.  Finally, the Court held that petitioners must comply with the certification requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings on or before February 26, 2021, or their motions will be dismissed.[5]

---

[4] Doc. 730 at 59 (quoting *Tollett*, 411 U.S. at 267); *see also United States v. Broce*, 488 U.S. 563, 569 (1989) ("A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilty and a lawful sentence.").

[5] The majority of petitioners timely met the certification requirements; the remaining petitioners were granted an extension until March 29, 2021 to do so.  Docs. 782, 783.

Also relevant to the matters currently before the Court is application of the discovery sanction requested by petitioners. After the government filed a Notice[6] that it would not comply with the Court's discovery orders, the Court announced its intent to invoke a discovery sanction against the government under Fed. R. Civ. P. 37(b)(2) in an October 15, 2020 Order.[7] Specifically, the Court held that it "intends to take as established a petitioner's claim that before each petitioner entered a plea, was convicted, or was sentenced, each member of the prosecution team became 'privy to' each recording listed in the petitioner's privilege log, either by watching or listening to them or by directly or indirectly obtaining information about them from someone who did," with respect to any petitioner who establishes that he or she is entitled to an evidentiary hearing under § 2255.[8] As this Court stressed in the October 15, 2020 Order, however, it will not apply this sanction in a manner that contradicts uncontroverted facts. Nor will it apply the sanction in contravention of the law, as explained below.

## II.   Standard

D. Kan. Rule 7.3(b) governs motions to reconsider non-dispositive orders, while Fed. R. Civ. P. 59 and 60 govern motions to reconsider dispositive orders.[9] Under D. Kan. Rule 7.3, a motion to reconsider a non-dispositive order must be based on: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice."[10] A motion to reconsider is appropriate where the court has

---

[6] Doc. 540. The Court notes that only former United States Attorney Stephen R. McAllister signed the Notice of intent not to produce further discovery; four AUSAs who have entered an appearance in these cases, including now-acting United States Attorney Duston J. Slinkard, did not sign the Notice or the government's response to petitioners' motion for sanctions. *See id.* at 30; Doc. 570 at 11.

[7] Doc. 587.

[8] *Id.* at 13, 16.

[9] D. Kan. R. 7.3; *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 748 F. Supp. 2d 1261, 1264 (D. Kan. 2010).

[10] D. Kan. R. 7.3(b).

misapprehended the facts, a party's position, or the controlling law, but is not appropriate to revisit issues already addressed or to advance arguments that could have been raised in prior briefing.[11]  A party's failure to present its strongest case in the first instance does not entitle it to a second chance in the form of a motion to reconsider.[12]  Whether to grant a motion to reconsider is left to the court's discretion.[13]

While motions for clarification are not recognized by the Federal Rules of Civil Procedure, district courts "possess the inherent procedural authority to [clarify a prior order] for causes seen by it to be sufficient."[14]

## III.    Discussion

Petitioners seek clarification or  reconsideration of several aspects of the Court's order regarding the temporal classification of their claims.  The government seeks reconsideration of the Court's ruling regarding the timing and effect of binding plea agreements.  The Court addresses the parties' requests in turn.

### A.    Temporal Classification of Petitioners' Claims

The Court does not devote much discussion to petitioners' complaints about the timing and source of objections related to the issues in the Order.  Under Rule 4(b) of the Rules Governing Section 2255 Proceedings, this Court has an obligation to determine whether

---

[11] *See, e.g., Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (addressing motion under Rule 59(b)).

[12] *BHC Dev., LC v. Baily Gaming, Inc.*, 985 F. Supp. 2d 1276, 1295–96 (D. Kan. 2013).

[13] *Coffeyville Res. Refining & Mktg., LLC*, 748 F. Supp. 2d at 1264 (citing *In re Motor Fuel Temp. Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1166 (D. Kan. 2010)).

[14] *APL Logistics Am., Ltd. v. TTE Tech., Inc.*, No. 10-cv-2234-P, 2013 WL 12124588, *2 (N.D. Tex. Mar. 5, 2013) (citations omitted); *see Overstreet v SFTC, LLC*, No. 13-CV-0165 RB/LFG, 2013 WL 12415207, at *1 (D.N.M. Sept. 3, 2013) (noting such motions are not formally recognized by the Federal Rules of Civil Procedure and are most commonly filed after the court has entered judgment; when no final judgment has been entered, courts have "discretionary authority to resolve any ambiguity in an order.").

prehearing dismissal of a § 2255 motion is appropriate.  "A § 2255 petitioner must allege facts that, if proven, would warrant relief from his conviction or sentence."[15]  Federal courts must have a statutory or constitutional basis to exercise jurisdiction.[16]  And, without jurisdiction, a court must dismiss the case.[17]

After reviewing the parties' motions, responses, and replies, the Court directed the parties to provide supplemental briefing on these specific legal issues, which necessarily touch upon temporal issues related to petitioners' guilty pleas and sentencing.  As part of this supplementation, the government moves to dismiss any § 2255 motion in which the petitioner pleaded guilty and challenged his conviction by alleging pre-plea violations.  The government also moves to dismiss part or all of 57 petitioners' § 2255 motions for lack of standing, and included a list of cases it contends are post-plea or sentence violations prepared in conjunction with its brief on jurisdictional defenses.[18]  All but six of the petitioners on this list bring claims based on video recordings.

As discussed in the Order, the temporal classification of petitioners' claims is primarily driven by whether a petitioner challenges his conviction or his sentence.  Temporal categorization of claims also depends in large part on whether the recording at issue was a video or audio recording.  With respect to video recordings, on May 17, 2016, CCA provided six DVR hard drives to the United States Secret Service ("USSS") containing surveillance footage from

---

[15] *United States v. Almaraz*, No. 16-20092-JAR, 2020 WL 3429486, at *1 (D. Kan. June 23, 2020) (citing *In re Lindsey*, 582 F.3d 1173, 1175 (10th Cir. 2009)).

[16] *Davenport v. Wal-Mart Stores, Inc.*, No. 14-2124-JAR-JPO, 2014 WL 3361729, at *1 (D. Kan. July 9, 2014).

[17] *Id.*; *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[18] Doc. 603-1.

inside and outside of the facility, including in rooms used for inmate-attorney meetings.[19]  This Court in *Black* found that the USAO did not come into possession of the CCA videos until June 1, 2016.[20]  On August 16, 2016, the Court issued  "clawback" and impoundment orders to CCA and the USAO and their agents, for all video and audio recordings of attorney-client communications in their possession.[21]  Petitioners do not contest that the USAO disgorged all copies of the soundless video recordings at issue to the Court on August 9, 2016.[22]  Nor is there any evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[23]  The government moved to dismiss nine cases where the USAO received the video recordings after the petitioner was sentenced and eleven cases where the USAO received the video recordings after the petitioner entered a binding plea for a specific term of imprisonment, which the Court imposed.[24]

By contrast, recordings of telephone calls individual petitioners had with counsel from CCA do not have such clearly established temporal parameters.  With respect to the audio recordings, several petitioners merely state the number of "documented requests" for calls from CCA in the case, with no details or exhibits.  In several responses, the government provides specific information about when and how a prosecutor obtained calls from CCA and whether those calls were provided to defense counsel in discovery, including the specific date(s) the prosecution requested from CCA recordings of phone calls that petitioner placed from CCA

---

[19] *United States v. Carter et al.*, No. 16-20032-JAR ("*Black*"), Doc. 278 at 66–67.

[20] *Black*, Doc. 785 at 66.

[21] *Id.* at 10.

[22] Doc. 765 at 7.

[23] Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[24] Doc. 603-1, Categories C and E.

using his assigned pin number, the date CCA responded by delivering the recorded calls to the prosecutor or investigator, and the date the prosecutor signed a receipt indicating the calls had been received.  Some of these calls were obtained by the government pre-plea; others were obtained by the government post-plea or post-sentencing as part of the *Black* investigation.  The government seeks dismissal of five audio claim cases on standing grounds, specifically that the petitioners' calls were either made or received by the USAO after the petitioner was sentenced or after the petitioner entered a binding plea.  The government does not seek dismissal of the remaining cases alleging audio call claims on standing grounds.

### 1.    Applicable Temporal Test

Petitioners first ask the Court to clarify or reconsider its decision regarding how it temporally classified their Sixth Amendment claims.  They argue that the Order incorrectly classifies based on when the USAO obtained the petitioners' protected recordings, when the touchstone under *Shillinger* is when the prosecution team became privy to the recording's contents.  The Court agrees in part and clarifies that the date the prosecution team became privy to the protected recording marks the earliest possible violation date.  As explained below, the discovery sanction requested by petitioners takes as established that the prosecution team became privy to the recordings either before the petitioner entered a guilty plea or was convicted, or alternatively, before the petitioner was sentenced.  But petitioners ask this Court to ignore the date, when known, that the government actually came into possession of recordings when determining the time at which it became privy to the recordings.  At this stage of the proceedings, the Court must rely on what is asserted in the § 2255 motions, responses, and replies, as well as the privilege logs and fact sheets.  Because petitioners have not specifically alleged when any Sixth Amendment violation occurred, the date the USAO obtained the

recording is relevant to the Court's determination of how to temporally categorize many of petitioners' claims.

In cases where a petitioner challenges his conviction and the government obtained the video recordings prior to that petitioner's guilty plea, *Tollett* applies to the alleged pre-plea violation.  Likewise, *Tollett* applies in cases where the petitioner who challenges his conviction alleges that he made a call from CCA and the government obtained a recording of that call prior to the guilty plea.  As explained in the Order, these petitioners must request leave to amend their motions to seek vacatur of their guilty pleas under the applicable standard or face dismissal of their challenges to conviction and may not use pre-plea violations to attack their sentence.

In many cases, however, any governmental intrusion with respect to petitioners' video recording claims could only have occurred after a petitioner pleaded guilty, that is, in cases where the petitioner entered a plea before the government even had possession or access to the recordings.  Likewise, in several audio claim cases, the petitioner did not make the calls listed in his privilege log until after he entered his guilty plea.  There is no dispute that *Tollett* does not apply in such cases, where the predicate for the alleged constitutional violation took place after a petitioner pleaded guilty but before he was sentenced.  As explained in the Order, these petitioners may challenge their sentence but not their conviction.

Finally, in other cases, petitioners were sentenced before the USAO obtained the video recordings or  before a call was made from CCA.  As explained in the Order, these petitioners lack standing to challenge their conviction and sentence and their motions are subject to dismissal.

## 2.   "Dual Allegations"

Petitioners next argue that in light of the government's discovery violations, they do not know what date each member of the prosecution team became privy to the protected recordings. Consistent with the Court's stated intent in its Rule 37(b)(2) sanctions order, they assert that the Court should presume that date fell (1) before the plea or (2) after the plea but before sentencing. Because they cannot neatly divide their allegations into pre-plea and post-plea categories, however, petitioners ask the Court to clarify or rule that in cases where the government obtained the petitioner's recordings before the plea—and therefore could have "logically" become privy to the recordings either before the petitioner pleaded guilty or after they did so—the petitioner can rely on the disjunctive adverse inference to allege both pre-plea and post-plea violations. And, they argue, petitioners who advance these "dual allegations" understand that unless they amend their motions, they are precluded from relying on the alleged pre-plea violations to challenge their convictions but need not amend their motions to rely on post-plea violations as a basis for challenging their sentences. The Court disagrees in part.

In their § 2255 motions, petitioners challenge both their conviction and their sentence without specifically stating the date they allege the violation occurred.[25] As the Order makes clear, however, a petitioner may only challenge his conviction if the Sixth Amendment violation occurred prior to that petitioner entering a guilty plea. With few exceptions, petitioners have not argued that they claim discrete pre-and post-plea violations, but instead have consistently asserted that if the government first became privy to a petitioner's protected communication before that petitioner pleaded guilty, the government necessarily remained privy to those same

---

[25] Some petitioners have withdrawn their collateral attack of their sentences in light of their release from custody.

communications after the petitioner pleaded guilty.[26]  The Court rejected this "continuing violation" theory because petitioners cited no authority for it and because it would render meaningless the rule in *Tollett*.

To get around the Court's ruling, petitioners now attempt to assert multiple theoretical Sixth Amendment violations.  For example, they speculate that one part of the government could have become privy to a petitioner's recordings before the petitioner pleaded guilty and then communicated information about the recordings to another part of the government after the guilty plea, or that the USAO could have obtained the audio recordings prior to a guilty plea, but did not become privy to the contents of those recordings until after the petitioner's plea.[27]

The Court agrees with the government that this attempt to recast petitioners' continuing-violation theory as advancing "dual allegations" is both an attempted end-run around *Tollett* and its progeny and inconsistent with that rule and the authority cited by the Court.  The Court does not clarify or rule that only pre-plea challenges to convictions are subject to dismissal.  Any petitioner who has a good-faith basis to allege an individualized and specific post-plea violation of this nature must seek leave to amend his § 2255 motion and must advise the Court in the proposed amended pleading that he is opting to have the Court presume that the government became privy to the recordings prior to sentencing but after plea or conviction.  None of these

---

[26] *See* Doc. 729 at 18.  For example, petitioner Petsamai Phommaseng lists sixteen calls with counsel from CCA in his privilege log that occurred prior to his guilty plea.  Also prior to his plea, the prosecutor in his case requested and received from CCA all calls Phommaseng placed from CCA for a certain time period.  Phommaseng also met with counsel in person at CCA prior to his plea, but the government did not have possession of the video recordings of those meetings until after his plea, but prior to his sentencing.  Thus, Phommaseng must seek leave to amend his § 2255 motion to seek vacatur of his guilty plea or face dismissal of his challenge to conviction under *Tollett*.  Although Phommaseng may not use the pre-plea audio recordings to attack both his conviction and sentence, he may use the pre-plea video recordings to challenge his sentence, as the intrusion could not have occurred until after he entered his plea.  *See Phommaseng v. United States*, No. 18-2479-JAR-JPO, Docs. 2, 5, 6.

[27] See Doc. 756-1 at 1–4, Part A (listing video-only petitioners who pleaded guilty after June 1, 2016; asserting these petitioners may "logically rely on" both parts of the discovery sanction to allege pre- and post-plea violations); Part E (listing petitioners who pleaded guilty or were convicted on or after August 10, 2016, and likewise may assert both parts of the discovery sanction).

presumptions will overcome factual impossibility, however, such that post-sentencing calls cannot be used to challenge either convictions or sentences.

While the Court acknowledges petitioners' inability to neatly divide their claims into pre- and post-plea violations, that is in part what the Rule 37(b)(2) sanction was intended to remedy, as it would take as established that each member of the prosecution team became 'privy to' each recording either before the plea agreement or sentencing as listed in the petitioner's privilege log. But petitioners' argument that the Court must apply that sanction in the disjunctive effectively presumes the government became privy to their protected recordings at every moment in time after the government came into possession of or obtained the recordings and is tantamount to a default judgment. The Court does not impose a sanction that bypasses the temporal considerations of *Tollett*, however, or the apparent lack of redressable injury when the alleged intrusions occurred after a petitioner was both convicted and sentenced. As the Court made clear in its October 15, 2020 Order, such a sanction in habeas proceedings should be limited to cases that rise to the level of a due process violation, which is not the case here.[28]

The Court denies reconsideration on this issue.

### 3.      Post-sentence Violations

Next, petitioners request the Court to clarify or reconsider whether certain petitioners allege post-sentence violations. Petitioners argue that a post-sentence seizure is not necessarily a post-sentence violation. While they agree the prosecution team cannot logically become privy to a recorded communication before it occurs, they contend that once that recorded communication

---

[28] Doc. 587 at 10 (citing *United States v. Williams*, No. 15-20034-JWL, 2020 WL 2572409, at *1 (D. Kan. May 21, 2020) (citing *Stines v. Martin*, 849 F.2d 1323, 1324 (10th Cir. 1988)).

occurs, the prosecution team can become privy to the recording's contents before obtaining the recording itself or even without ever doing so.[29]

Petitioners first argue that the Court should reconsider its suggestion at the January 26, 2021 status conference that June 1, 2016, the date when the USAO received the video recordings from the USSS, is the earliest date that a Sixth Amendment violation could have occurred. Petitioners contend that the Court should instead conclude that the earliest date a violation could have occurred is May 17, 2016, when the USSS picked up DVR 6 from CCA, as the USSS could have acted at that point to share information with others, including individuals at the USAO. The government does not appear to dispute that the Secret Service agents were part of the prosecution team or that they were able to review the hard drives before they turned them over to the USAO. Accordingly, the Court will clarify that the applicable time period is between May 17, 2016 and August 9, 2016. Petitioners Jerome Birdsong and Timothy Wilson will not be considered part of this category of claims and their challenges to their sentence are not subject to dismissal for lack of standing.

With respect to audio recordings, petitioners do not dispute that Frenklyn Piggie was sentenced before his recorded calls occurred and thus alleges a post-sentence violation. Petitioners contend that the Court must presume the government can become privy to the contents of an audio recording phone call from CCA before it is accessed using the Securus platform. Buried in a footnote in their addendum is the assertion that unless a recorded call *actually* occurred after the petitioner was sentenced, the prosecution team could have become privy to the contents of the recording before the petitioner was sentenced and may therefore

---

[29] *See* Doc. 756-1 at 2, Part C (listing petitioners who were sentenced before the USAO obtained the videos on June 1, 2016; asserting that petitioners may nevertheless rely on the discovery sanction to allege pre-sentence violations).

"logically invoke" the adverse inference discovery sanction to allege a pre-sentence violation.[30] The government responds by arguing that the date the government first "accessed" the Securus call logs is the first date a Sixth Amendment violation could have occurred, and indicates that it will file a motion to supplement the record with this evidence, which it contends demonstrates that several additional petitioners' § 2255 motions should be dismissed.[31]

The Court declines to clarify or reconsider the Order on this basis. As an initial matter, this discussion only appears relevant to one petitioner's motion: Frenklyn Piggie. As noted, the government only moves for dismissal of five audio claim petitioners on standing grounds. It specifically alleges that petitioner Virok Webb's CCA calls were obtained by the USAO long after he was sentenced as part of the *Black* investigation. But as the government also notes, the Court has not ruled on Webb's pending request to amend his § 2255 motion to include the additional Sixth Amendment intentional-intrusion claim, which the government opposes. The government seeks dismissal of the other three audio claim motions on the grounds that the recordings were not made or received by the USAO until after the petitioner entered a binding plea. However, petitioners Shawn Sneed and Shawn Shutts submitted privilege logs that show the calls from CCA were not made until after they entered their pleas. And the Court declined to dismiss petitioner Felix-Gamez's audio claim based on the effect of his binding plea argument urged by the government, as discussed *infra*. The Court will not address the issue regarding "access to" the audio recordings raised and argued for the first time on reconsideration. Instead, this issue appears to require a merits determination based on the facts and circumstances of individual petitioners' claims.

---

[30] *Id.* at n.3.

[31] Doc. 762 at 8, n.7.

### 4.    Window of Opportunity

Finally, petitioners urge that the window of the government's possession is not necessarily the same as the window of opportunity to become privy to the recordings. Petitioners contend that the last day the government possessed a physical or electronic recording is not necessarily the last day a particular prosecution team could have become privy to its contents.

 As the Court noted, petitioners no longer assert that the USAO or Agent Stokes maintained a copy of DVR 6 after August 9, 2016. Instead, they urge that the government could have maintained derivative information after disgorging the videos and thus members of "different prosecution teams" could have initially become privy to this derivative information on different dates after August 9, 2016. Petitioners note that a member of a single prosecution team could simultaneously view multiple petitioners' attorney-client meetings and further contend that even assuming this initial review could have occurred no later than August 9, 2016, the team that initially reviewed the videos had the opportunity to later share information about the videos' contents with member of other petitioners' prosecution teams. In that case, the other petitioners' prosecution teams would have initially become privy to information about the recordings' contents after the government disgorged the recordings themselves. Petitioners argue the Court should therefore clarify or rule that petitioners may invoke the adverse inference sanction regardless of when the government disgorged the video recordings, to allege the prosecution team became privy to their contents at least before sentencing. In other words, petitioners again request the Court to apply the discovery sanction in the disjunctive to apply to both pre-plea and post-plea violations.

Petitioners in this category pleaded guilty or were convicted on or after August 10, 2016.[32]  For the reasons previously discussed, this argument is also inconsistent with the rule in *Tollett* as well as the discovery sanction.  The Court does not clarify or rule that only pre-plea challenges to convictions are subject to dismissal.  Any petitioner who has a good-faith basis to allege an individualized and specific post-plea violation of this nature must seek leave to amend his § 2255 motion and must advise the Court in the proposed amended pleading that he is opting to have the Court presume that the government became privy to the recordings prior to sentencing but after plea or conviction.  None of these presumptions will overcome factual impossibility, however, such that post-sentencing calls cannot be used to challenge either convictions or sentences.

### B.   Leave to Amend

Next, petitioners ask the Court to rule that if granted leave to amend, petitioners who allege pre-plea violations can satisfy the Order's "minimum requirements" by swearing (1) they wish to withdraw their pleas and (2) they would not have pleaded guilty but for the government's misconduct itself.[33]  Although the Court denies petitioners' request as stated, it will clarify its ruling as follows.

As discussed in detail in the Order, application of *Shillinger*'s per se rule in the context of an interceding guilty plea must be reconciled with the rule of law in *Tollett* that "forecloses direct inquiry into the merits of claimed antecedent constitutional violations."[34]  The Supreme Court explained that because "[t]he focus of federal habeas inquiry is the nature of the advice and the

---

[32] Doc. 756-1, Part E.

[33] Doc. 756 at 9.

[34] *Tollett v. Henderson*, 411 U.S. 258, 267 (1973) (explaining that "while claims of prior constitutional deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief.").

voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity," a defendant who has pleaded guilty on the advice of counsel "must demonstrate that the advice was not 'within the range of competence demanded of attorneys in criminal cases.'"[35]  In order to satisfy the prejudice requirement in the guilty plea context, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted upon going to trial."[36]  Petitioners argued that this exception to *Tollett* was not limited to allegations that defense counsel performed deficiently, but instead included their Sixth Amendment intentional-intrusion claims that call into question the voluntary nature of the plea itself.  Citing *Brady v. United States*,[37] petitioners argued that the government's misconduct presumptively rendered their guilty pleas involuntary because a pre-plea *Shillinger* violation necessarily satisfied the two-part test to set aside a plea as involuntary based on prosecutorial misconduct: (1) "some egregiously impermissible conduct" by the government "antedated the entry of his plea," and (2) "the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice."[38]

This Court was not persuaded that a *Shillinger* presumption of prejudice can serve as a makeweight for prejudice under the applicable Supreme Court standard, as such a presumption does not speak to whether a petitioner would have insisted on going to trial and that it would have been rational for him to do so.  Accordingly, the Court held each petitioner challenging his conviction to the applicable standard for showing his plea was involuntary— a reasonable probability that, but for the government's misconduct, he would not have pleaded guilty and

---

[35] *Id.* at 266 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

[36] *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985).

[37] 397 U.S. 742 (1970).

[38] *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013) (quoting *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)); *see also Brady*, 397 U.S. at 755.

would instead have insisted on going to trial.[39]  The Court further held that a court charged with determining such a reasonable probability must take an objective approach, which involves a "holistic inquiry into all of the factual circumstances surrounding the plea to determine whether the petitioner would have proceeded to trial," including assessment of "objective facts specific to a petitioner, such as his age, the length of the sentence he faced under the terms of the plea deal, the prospect of minimizing exposure to other charged counts, and so on."[40]  Further, proof of prejudice requires a petitioner to show that a decision to go "to trial would have been objectively 'rational under the circumstances.'"[41]  Because no petitioner in this consolidated action attempted to meet this standard, they have not established that their guilty pleas are subject to vacatur, and their § 2255 motions were potentially subject to dismissal on this basis.  The Court gave petitioners who allege pre-plea violations additional time to consider whether to seek leave to amend their motions to seek vacatur under the applicable standard.

Petitioners ask the Court to rule that if granted leave to amend, petitioners who allege pre-plea violations can satisfy the Court's "minimum requirements" by swearing (1) they wish to withdraw their pleas and (2) they would not have pleaded guilty but for the government's misconduct itself.  Petitioners take the Court's "minimum" comment out of context.  Although the government provided the Court with a list of petitioners who received favorable charge and/or sentence-related bargains as part of a plea agreement, the Court declined to analyze these petitioners' claims under the applicable standard without acknowledgement that an individual petitioner wishes to withdraw his plea and, "at a minimum, a sworn declaration attesting that he

---

[39] *Ferrara*, 456 F.3d at 294 (citing *Hill*, 474 U.S. at 59).

[40] *Beard v. Addison*, 728 F.3d 1170, 1183 (10th Cir. 2013).

[41] *Id.* at 1184 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

would not have pleaded guilty had he known of the government's misconduct."[42]  This was not a statement of the "minimum requirements" necessary to satisfy the applicable rule of law cited by petitioners in their *Tollett* briefs, but an explanation why the Court was reluctant to analyze whether a given petitioner had met this standard.  As it stands, petitioners seek nothing less than outright dismissal as a remedy after vacatur of their judgment, without any indication that a petitioner seeks or consents to withdrawal of his guilty plea—which in the Court's view, requires at a minimum, a declaration to that effect from that petitioner.  As invoked by petitioners, the applicable prejudice standard necessary to seek vacatur of a plea agreement is clear: but for the government's misconduct, the petitioner would not have pleaded guilty and would have insisted on going to trial, and it would have been objectively reasonable for him to do so under the totality of the circumstances.[43]  Each petitioner who wishes to seek leave to amend his motion should proceed accordingly.

The Court stresses that by giving petitioners additional time to seek leave to amend their motions, it neither predicts nor guarantees the outcome of any such individual petitioner's request.  Based on the addendum to their motion, it appears counsel for petitioners has sorted petitioners with video claims into the dual categories it advocates in its request for clarification or reconsideration.[44]  The Court's clarification is meant to set petitioners on their way; counsel for petitioners must endeavor to review the particular and individualized facts and circumstance alleged by each petitioner in cases alleging both audio and video claims in determining how to proceed.

---

[42] Doc. 730 at 40.

[43] *See Brady*, 397 U.S. at 755; *Hill*, 474 U.S. at 59.

[44] Doc. 756-1.

### C.      Mandatory Minimum Sentences

Petitioners conclude their motion for reconsideration by urging the Court to reconsider ruling that petitioners subject to statutory mandatory minimum sentences lack standing to challenge those sentences in their § 2255 motions.  Petitioners first contend that the Court's position contradicts the *Shillinger* presumption and the Court's "privy to" presumption that it has stated will apply as a discovery sanction.

Further, petitioners cite pending legislation as an expansion of the legally available sentencing reductions.  The Eliminating a Quantifiably Unjust Application of the Law ("EQUAL") Act, Senate Bill 79, would eliminate the distinction between cocaine and crack cocaine for sentencing purposes under 21 U.S.C. § 841(b)(1)(A) and (B).  Petitioners question whether the "legal availability" of sentencing relief is relevant to § 2255 standing, but assert, arguendo, that the EQUAL Act satisfies that requirement for relevant offenses.

Finally, petitioners allege that the Court can grant alternative forms of sentencing relief, such that a lack of authority to alter a mandatory minimum sentence does not eliminate standing.

The government rejects petitioners' argument, first indicating that petitioners should have raised their *Shillinger* and alternative sentencing relief arguments in their earlier supplemental jurisdictional briefing.  It also states petitioners' alternative sentencing argument is inadequately briefed.  It urges the Court to maintain its position that it cannot presume prejudice where it is nonexistent as a matter of law.  Last, the government observes that the EQUAL Act is not a law but a piece of legislation whose passage is speculative, vitiating any bearing petitioners claim it might have on these proceedings.

As an initial matter, this discussion only appears relevant to one petitioner's motion: Jorge Soto-Saldivar.  In total, there are five petitioners who were sentenced to statutory

mandatory minimum sentences.  This Court has already issued an order granting petitioner

Vernon Brown an evidentiary hearing on his challenge to conviction.[45]  Similarly, Stephen

Dillow has withdrawn his challenge to his sentence.  Jose Garcia-Velasquez is ineligible to

challenge his sentence due to his deportation, so reconsideration of the Court's prior decision

regarding standing to challenge a statutory mandatory minimum sentence would have no bearing

on him.  The only intrusions relevant to Jesse Silva occurred after his sentencing, and, as this

Court previously held and maintains, post-sentencing violations cannot be used to support a

challenge to either a sentence or a conviction.  This leaves petitioner Jorge Soto-Saldivar as the

only individual for whom any reconsideration of this matter is not moot.

The Court is not persuaded by petitioners' motion for reconsideration on this matter.

Contrary to the petitioner's argument, the possibility of redressability is required to have

standing to raise a claim under § 2255.[46]  The Court's previously identified lack of authority to

modify a sentence imposed as a statutory mandatory minimum is not altered by a bill introduced

to a Senate committee that, in its present form, would eliminate or reduce mandatory minimum

sentences in certain cases if it becomes law.  First, such remote speculative relief has no bearing

on a Court's redressability options.[47]  Second, the EQUAL Act only pertains to crack cocaine

sentences, and Soto-Saldivar was sentenced in conjunction with his conviction for conspiracy

with intent to distribute methamphetamine.  Even if a potential piece of legislation could

---

[45] Doc. 731.

[46] Article III requires a party seeking relief to have "suffered, or be threatened with, an actual injury traceable to the [appellee] and likely to be redressed by a favorable judicial decision [by the appeals court]." *United States v. Meyers,* 200 F.3d 715, 718 (10th Cir. 2000) (alteration in the original) (quotation omitted).  Where judicial relief will not remedy the appellant's injury, "the appellant can no longer satisfy the Article III case or controversy jurisdictional requirement" *Id.*

[47] "The redressability element of standing requires that it be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

somehow be factored in by this Court, the EQUAL Act would make no difference to the sentence at issue.

Further, the Court's conclusions with respect to mandatory minimum sentences do not contradict either *Shillinger* or its earlier sanctions determination.  In fact, it has nothing to do with either.  The Court could assume any amount of prejudice and yet still be unable to provide any redress through reduction of a mandatory minimum sentence.  They are separate, unrelated elements.

Last, the petitioners' reply raises the possibility of alternative sentencing relief that could support standing where reducing a statutory mandatory minimum sentence cannot.  It is worth noting that Soto-Saldivar did not raise the possibility of any alternative relief in his petition, and only mentions the return of forfeited property in his reply to the government's response to his § 2255 motion.  Even assuming a passing reference in the last sentence of a reply is sufficient to raise this possibility, forfeiture is not an appropriate matter for § 2255 motions or relief.[48]  The Tenth Circuit has previously noted that a request for the return of forfeited property "does not relate to guilt, innocence, or sentencing and therefore is irrelevant to [a] § 2255 motion."[49]

Petitioner's motion for reconsideration is denied with regard to this Court's previous determination that petitioners subject to mandatory minimum sentences lack standing to

---

[48] Soto-Saldivar's reply states the following "Alternatively, he asks the Court to reduce his custodial sentence, vacate the term of supervised release, and restore any forfeited money."  *Soto-Salvidar v. United States*, No. 18-4094-JAR-JPO, Doc. 4 at 1–2.  This is the only mention of alternative sentencing relief in either the initial motion or the reply.

[49] *United States v. Simpson*, 32 F. App'x 507, 509 (10th Cir. 2002).  Other Circuit Courts have also held that forfeiture challenges are not cognizable § 2255 claims.  *See United States v. Finze*, 428 F. App'x 672, 677 (9th Cir. 2011) (holding that the defendant's "forfeiture claim is not a cognizable § 2255 claim, because it does not seek release from custody," and holding that such a claim is not cognizable even if brought within a § 2255 motion containing other cognizable claims); *Anderson v. United States*, No. 96–4025, 2000 WL 380081, at *1 (7th Cir. Apr. 12, 2000) (same); *Anders v. United States*, No. 97–6397, 1998 WL 537568, at *1 (6th Cir. Aug. 7, 1998) (same); *Rodriguez v. United States*, No. 95–2322, 1997 WL 770636, at *1 (1st Cir. Dec. 12, 1997) (same); *United States v. Banguera*, No. 93–2710, 1995 WL 449891, at *1 (5th Cir. June 30, 1995) (same).

challenge their sentences due to a lack of redressability.  Orders in individual cases will be forthcoming.

**D.      Binding Plea Agreements**

In its motion for reconsideration, the government asks this Court to reverse its earlier determination that petitioners who entered into binding plea agreements have standing to challenge their sentences.  The government argues that these petitioners *agreed* to their sentences before the alleged intrusions occurred, and therefore could not have been injured at sentencing. The government maintains that a particular sentence was one component of many in the plea negotiations, the petitioners often received substantial additional benefits, and the subsequent sentencing hearings were free of the taint at the center of the Tenth Circuit's *Shillinger* holding. The government argues that any request for sentencing relief would be unfair, as it would effectively release the petitioners from the obligations of their plea agreements while still allowing them to retain most of the benefits.  In the alternative, the government asks the Court, if it maintains its decision on standing, to require the petitioners to either withdraw their challenges to their sentences or move to withdraw their pleas.

Initially, petitioners respond that the government's challenge is untimely, as motions for reconsideration are not the appropriate vehicle for new arguments.[50]  Petitioners also refute the government's argument that seeking relief from sentences following binding pleas without withdrawing the pleas would be unfair, noting that there is nothing unfair about the government bearing the costs of its own intentional misconduct.

---

[50] Doc. 761.

In reply, the government reiterates its fairness argument.[51]  Further, the government claims that allowing the petitioners to challenge their sentences without any consequences to the negotiated binding plea agreement "is antithetical to the agreements themselves."

The government has not met the standard applicable to reconsideration motions.  The government's arguments regarding fairness and honoring the spirit of the plea agreements do not establish any basis for finding that these petitioners lack standing.  The government identifies why the Court *should* not grant relief, but does not identify any reason that the Court *could* not do so.  These may well be potent and effective arguments against what, if any, relief should be tailored to the injuries suffered by these petitioners, should they succeed in demonstrating an entitlement to relief, but they do not demonstrate a lack of standing.[52]

Although the government's arguments do not demonstrate any basis for reconsideration, "the district courts have an independent obligation to address their own subject-matter jurisdiction and can dismiss actions sua sponte for a lack of subject-matter jurisdiction."[53] Standing requires an "injury in fact," a causal connection between the injury and the conduct alleged, and the possibility of redressability.[54]  Upon careful review of the authority governing resentencing for a defendant subject to a binding plea agreement, the Court concludes that, as with petitioners subject to statutory mandatory minimum sentences, a resentencing court would

---

[51] Doc. 771.

[52] The government raised similar "benefit of the bargain" arguments in a challenge to reducing a sentence, originally imposed under a binding plea, in light of 18 U.S.C. § 3852(c)(2), but the Supreme Court rejected such arguments as off the mark.  *Hughes v. United States*, 138 S. Ct. 1765, 1777 (2018) ("[w]hat is at stake in this case is a defendant's eligibility for relief, not the extent of that relief. . . . The district court can consider the benefits the defendant gained by entering a Type–C agreement when it decides whether a reduction is appropriate (or when it determines the extent of any reduction).") (citations omitted).

[53] *City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017) (*citing United States v. Lugo*, 170 F.3d 996, 1002 (10th Cir. 1999)).

[54] *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38–43 (1976).

be unable to provide any sentencing relief for petitioners subject to binding plea agreements under Fed. R. Crim. P. 11(c)(1)(C).

Under Rule 11(c)(1)(C), "[a] plea agreement may specify that an attorney for the government will agree that a specific sentence or sentencing range is the appropriate disposition of the case . . . (such a recommendation or request binds the court once the court accepts the plea agreement)." The Tenth Circuit has emphasized that, according to this language, the sentencing court lacks discretion to consider anything outside of the plea agreement and is bound by the terms of the agreement once it has accepted it.[55] Although the Supreme Court has recognized some limited authority for a court to reduce a sentence imposed in accordance with a binding plea agreement under 18 U.S.C. § 3852(c)(2), when the agreed-upon sentence is based on sentencing guidelines that are subsequently amended, that limited sentence modification authority is not relevant here.[56] When a district court adopts a binding plea agreement, and thereby agrees to be bound by that agreement, its discretion at sentencing is limited to the terms of that agreement.

This discretion is not broadened by vacatur of a sentence granted under § 2255. At resentencing, the scope of sentencing authority is not limited by the vacated sentence and the Court considers the defendant as though he had never been sentenced, absent a controlling

---

[55] *See United States v. Fields*, 339 F. App'x 872, 874 (10th Cir. 2009) ("Where, as here, the District Court accepted a so-called 'C' plea, the answer is simple: the sentence is based on the terms expressly agreed on by the defendant and the government. . . . the Court lacked the discretion to consider anything outside of the parties' agreement in sentencing him.") (quoting *United States v. Sanchez*, 562 F.3d 275, 282 n.8 (3d Cir. 2009)).

[56] *Freeman v. United States*, 564 U.S. 522, 529–32 (2011). The *Hughes* opinion, cited *supra* n. 53, cited *Freeman* heavily and clarified part of its holding that is not relevant here. The Tenth Circuit has applied *Freeman* several times and continues to recognize the binding nature of Fed. R. Crim. P. 11(c)(1)(C) pleas. *See, e.g., United States v. Gilmore*, 841 F.3d 909, 913–14 (10th Cir. 2016) (holding that Rule 11(c)(1)(C) pleas are binding on the sentencing court once it adopts it, with sentence modification narrowly allowed under *Freeman*).

mandate that imposes specific limitations.[57]  As with the recordings, however, there are critical

temporal considerations with respect to petitioners' binding pleas.  Rule 11(c)(1)(C) indicates

that the parties' agreed recommendation "binds the court once the court accepts the plea

agreement."  The time at which the Court agreed to be bound by the plea agreement determines

whether, at resentencing, the Court would still be bound or if it would be able to exercise its

broad discretion to reject the plea agreement.[58]  If the Court agreed to be bound by the plea

agreement at the change-of-plea hearing, a sentencing court would still be bound by that

agreement even if the sentence is vacated under § 2255 and resentencing is granted.  Petitioners

fitting these parameters lack standing to challenge their sentences as there is no possibility of

redressability even if the sentence is vacated.[59]  On the other hand, if the Court deferred

accepting the plea agreement until sentencing, and the sentencing is vacated, the Court would

have discretion at resentencing to accept or reject the plea agreement.

A review of the plea colloquies for each petitioner who entered into a binding plea

agreement reveals that, for two petitioners, the Court accepted the plea agreement at the change

of plea hearing.  These two petitioners, Robert Robinson and Herbert Saysoff, therefore lack

standing to challenge their convictions, and, in reconsideration of its earlier order, the Court will

---

[57] *See, e.g., United States v. Rayford*, 552 F. App'x 856, 859 (10th Cir. 2014) (following vacatur of a sentence under § 2255, "Defendant's original sentence had no continuing effect on him.  Because Defendant's original sentence had been vacated, he stood before the district court as if he had not yet been sentenced.").

[58] *See United States v. Robinson*, 45 F.3d 1423, 1437–39 (10th Cir. 1995) (discussing district court's broad discretion under Rule 11 to reject or accept plea agreements, with some distinctions based on the content of the plea agreement.); *see also United States v. Rakes*, 510 F.3d 1280, 1286 (10th Cir. 2007) ("A district court enjoys substantial discretion in deciding whether to accept or reject a plea agreement.") (citing *Robinson*, 45 F.3d at 1437)).

[59] A sentencing court can only set aside an adopted binding plea agreement if there has been fraud on the court.  *United States v. Black*, 201 F.3d 1296, 1303 (10th Cir. 2000).  No interpretation of the § 2255 motions here suggests any reason to believe that any such fraud allegation would or could permit a court to set aside a plea agreement.  Additionally, every binding plea agreement entered into by petitioners proposed a specific term of imprisonment and period of supervised release, and in each case the sentencing court imposed the agreed-upon sentence.  If the plea agreements had included an agreed sentencing range, there might have been the possibility of some discretion at resentencing, but that is not the case for any petitioner.

dismiss their § 2255 motions for lack of jurisdiction.  For the remainder, the fact that they entered into a binding plea agreement does not hinder their standing to present their § 2255 sentencing challenges where the district court on resentencing would still have the discretion to reject the plea agreement.

The Court cautions the parties not to misinterpret this conclusion.  This is a standing analysis, not a merits determination.  While the Court finds that only two petitioners lack standing where the circumstances of their binding pleas preclude any meaningful form of redress, the Court has not made any evaluation of the merits or likelihood of success for any other petitioner who entered into a binding plea agreement.

**IT IS THEREFORE ORDERED BY THE COURT** that petitioners' Motion to Clarify, or in the Alternative, to Reconsider (Doc. 756) is **granted in part and denied in part**; the Court clarifies that the applicable dates for temporal categorization of video claims is May 17, 2016 to August 9, 2016.

**IT IS FURTHER ORDERED** that any petitioner who seeks leave to amend his § 2255 motion as discussed herein and in the Court's January 18, 2021 Order shall do so within **thirty (30) days** of the date of this Order.  Petitioners' motions and the government's responses shall be filed on an individual basis and shall not exceed twenty (20) pages in length; petitioners' replies shall not exceed ten (10) pages in length.

**IT IS FURTHER ORDERED** that the government's Motion to Reconsider the Court's Ruling Regarding Certain Petitioners with Rule 11(c)(1)(C) Pleas (Doc. 757) is **granted in part**.

**IT IS SO ORDERED.**

Dated: March 3, 2021

 S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE