**In the United States District Court
for the District of Kansas**

**In re: CCA Recordings 2255 Litigation**,
                    **Petitioners,**

v.                                                                    Case No. 19-cv-2491-JAR-JPO

                                                     **(This Document Relates to Case No. 15-cr-20020-JAR-7, *United States v. Eladio Marquez*, and Case No. 18-cv-02484-JAR-JPO, *Eladio Marquez v. United States*)**

**United States of America.**
                      **Respondent.**

**MEMORANDUM AND ORDER**

This matter is before the Court on Petitioner Eladio Marquez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 554).[1] Petitioner alleges the government violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-client communications. As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or alternatively, to vacate his term of supervised release and the $277,200 money judgment.[2] The government has responded opposing the motion. For the reasons explained in detail below, Petitioner's challenge to his conviction is dismissed for lack of standing and his challenge to his sentence, including any term of supervised release, is dismissed as moot.

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 15-20020-JAR-7. Citations prefaced with "*CCA Rec. Lit.*, Doc." refer to filings and entries in this consolidated case, No. 19-2491-JAR-JPO. With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in No. 16-20032-JAR are prefaced with "*Black*, Doc."

[2] Because he completed his custodial sentence during the pendency of these § 2255 proceedings, Petitioner withdraws his request to reduce his term of imprisonment.

## I.   Background

### A.   Procedural History

Petitioner was charged on March 19, 2015, with one count of conspiring to possess with intent to distribute methamphetamine.[3]  Kenton Hall was appointed to represent Petitioner on March 20, 2015, and Magistrate Judge David J. Waxse entered a detention order on March 25, 2015.[4]

On April 27, 2016, the Court accepted Marquez's guilty plea to the conspiracy charge pursuant to a written plea agreement.[5]  After a hearing on August 8, 2016, the Court sentenced Marquez to 60 months' imprisonment followed by 4 years of supervised release.[6]

The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[7]  On September 10, 2018, the FPD filed a motion pursuant to 28 U.S.C. § 2255 on Petitioner's behalf, setting forth a single ground for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship.  The government responded to the motion and Petitioner replied.[8]  Petitioner's custodial sentence ended on July 19, 2019.[9]  Petitioner was deported from the United States after completing his sentence.

---

[3] Doc. 1.

[4] Docs. 9, 25.

[5] Docs. 251, 256.

[6] Doc. 320.

[7] Standing Order 18-3.

[8] *Marquez v. United States*, No. 18-2484-JAR-JPO, Docs. 1, 3, 4.

[9] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Mar. 22, 2021).

### B. The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motions before the Court.[10]  That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events that came to light in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA.  The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA.  The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA") Erin Tomasic and AUSA Kim Flannigan accused defense attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned from the video recordings.[11]  The defense also discovered that the United States Attorney's Office for the District of Kansas ("USAO") had routinely obtained CCA recorded attorney-client phone calls, and that it did so without notice to the attorneys, clients, or courts.[12]

---

[10] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

[11] *Id.* at 70–80.

[12] *Id.* at 29–30.

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[13] (2) the video and audio recordings in USAO custody to be impounded;[14] and (3) the government to preserve its computer hard drives.[15]  By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigations, that is, to determine the number of recordings possessed by the government and how to index and segregate them, and to identify privileged or confidential information within those recordings.[16]

On January 31, 2017, the Special Master issued the "First Report Regarding Video Recordings."[17]  The Special Master determined that the government had obtained from CCA video recordings of the attorney-inmate rooms made between February 20, 2016, and May 16, 2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700 attorney visits.[18]  This Court in *Black* found that the USAO did not come into possession of the CCA videos until June 1, 2016.[19]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[20]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the

---

[13] *Black*, Doc. 253 at 3.

[14] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[15] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[16] *Black*, Doc. 146 (Appointment Order).

[17] *Black*, Doc. 193.

[18] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

[19] *Black* Order at 66.

[20] *CCA Rec. Lit.*, Doc. 784 at 13.

video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[21]

The government did not cooperate with the Special Master's investigation, however, and its failure to cooperate ultimately resulted in a lengthy delay in this Court's ability to rule on these issues. Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[22] The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[23] The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit decision in *Shillinger v. Haworth*,[24] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by

---

[21] *Id.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[22] *Black* Order at 164–65.

[23] *Id.* at 145–63.

[24] 70 F.3d 1132 (10th Cir. 1995).

any legitimate law enforcement interest.[25]  Once those elements are established, prejudice is presumed.[26]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[27]  While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment.  With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[28]  This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[29]

### C. Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[30]  It was this Court's intent that by

---

[25] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[26] *Id.*

[27] *Id.* at 163.

[28] *Id.* at 165.

[29] *Id.* at 166.

[30] *CCA Rec. Lit.*, Doc. 1.

6

reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

The Court also assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations, as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[31]  The government argues that many of the privilege logs fail this subjective test because (1) many of them do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not sufficient to establish privileged attorney-client communications are depicted on a soundless video.  The Court must review the recordings in order to rule on these objections and will do so on a case-by-case basis as needed.  There is no need for such particularized review in the instant case.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses

---

[31] *Id.*, Doc. 21 at 50.

raised in its responses to the § 2255 motions.[32]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims with for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[33]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[34]  Petitioner timely filed a Signed Rule 2(b)(5) Verification on March 29, 2021.[35]

---

[32] *Id.*, Docs. 587, 588.

[33] *Id.*

[34] *Id.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[35] *Id.*, Doc. 812.

### D. Recordings in this Case

On August 13, 2019, this Court released the video recordings to the FPD as a result of the *Black* investigation.[36] The government received two video recordings of Petitioner meeting with Hall at CCA on April 7 and 15, 2016. Petitioner was prosecuted by AUSA James Ward and AUSA Sheri Catania, who both deny that they reviewed the recordings.[37]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, verifying that during these meetings, Petitioner discussed matters relating to legal advice and strategy with Hall.[38] The FPD reviewed the video recordings listed on the privilege log and confirmed that the recordings contained protected communications.[39]

The Court reviewed the video recordings *in camera*. As set out in the privilege log, the Court confirms that the video recordings show Petitioner meeting with Hall and an interpreter on two occasions. In light of the analysis below, however, the details of the meeting visible in the video are not pertinent and will not be discussed in this order.

## II. Discussion

The government argues that Petitioner lacks standing to challenge his conviction. It further argues that because he was removed from the United States after he completed his sentence of incarceration, his challenge to his sentence, including any term of supervised release, is moot. Article III of the Constitution gives federal courts the power to exercise jurisdiction only over "Cases" and "Controversies." Federal courts must have a statutory or constitutional

---

[36] *Black* Order at 165. The FPD took possession of the DVR hard drives on August 16, 2019. *Black*, Doc. 761.

[37] *Marquez*, No. 18-2484-JAR-JPO, Docs. 3, 3-1, 3-2.

[38] *CCA Rec. Lit.*, Doc. 205-2 at 98–99.

[39] *Id.* As noted in the privilege log, Mr. Hall passed away before having an opportunity to review the videos.

basis to exercise jurisdiction.[40]  And, without jurisdiction, a court must dismiss the case.[41] Courts thus must determine, either *sua sponte* or upon a challenge by a party "at any stage in the litigation," whether subject matter jurisdiction exists.[42]

One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing.  That doctrine requires federal courts, before considering the merits of an action, to "satisfy themselves that 'the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant [the plaintiff's] invocation of federal-court jurisdiction.'"[43]  A case or controversy requires the parties to have a personal stake in the outcome of the litigation; among other things a petitioner's injury must be capable of redress by a favorable ruling.[44]  There are three basic elements of standing: (1) an injury, (2) a causal connection between that injury and conduct complained of in the motion, and (3) the likelihood that court action could redress that injury.[45]

Article III's case-or-controversy requirement applies at all stages of litigation.[46]  While standing considers whether there is a case or controversy at the time the action is filed, "mootness ensures it remains one at the time a court renders its decision."[47]  When circumstances

---

[40] *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

[41] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[42] *Arbaugh,* 546 U.S. at 506 (explaining that challenges to subject matter jurisdiction "may be raised . . . at any stage in the litigation, even after trial and the entry of judgment.").

[43] *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

[44] *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 2021 WL 850106, at *6–7 (Mar. 8, 2021) (holding that nominal damages, where legally available, can satisfy the redressability requirement for standing).

[45] *Uzuegbunam*, 2021 WL 850106, at *2.

[46] *Lewis*, 494 U.S. at 477.

[47] *Brown v. Buhman*, 822 F.3d 1151, 1155 (10th Cir. 2016).

change, extinguishing a party's interest in the case, the case becomes moot and is subject to dismissal.[48]  A habeas petitioner's release from custody is one such change in circumstance.[49] "Failure to satisfy the requirements of either doctrine places a dispute outside the reach of the federal courts."[50]  Although the petitioner bears the burden of showing standing, the government bears the burden of demonstrating mootness.[51]

### A.     Timing of the Alleged Violation

The recorded meetings between Petitioner and Hall took place on April 7 and 15, 2016, before he entered his guilty plea on April 27, 2016, and before he was sentenced on August 8, 2016.  As noted above, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.  Thus, any alleged Sixth Amendment violation could not have occurred until after Petitioner entered a guilty plea, leaving no redressable injury.

As this Court discussed in its January 18, 2021 Order, when the intrusion occurs after the petitioner entered a plea, "the intrusion cannot be tied to any claimed unfairness or impropriety in the conviction [or] plea . . . .  Without such a nexus, these petitioners cannot proceed with claims challenging  . . . their convictions . . . ."[52]  Petitioner cannot demonstrate an injury or any nexus between an injury and the USAO's conduct, and thereby cannot satisfy the minimal

---

[48] *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 794 (10th Cir. 2009) (quoting *Kan. Jud. Rev. v. Stout*, 562 F.3d 1240, 1245 (10th Cir. 2009) ("If, during the pendency of the case, circumstances change such that the plaintiff's legally cognizable interest in a case is extinguished, the case is moot, and dismissal may be required.")).

[49] *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

[50] *Brown*, 822 F.3d at 1164.

[51] *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1183 (10th Cir. 2012).

[52] *See CCA Rec. Lit.*, Doc. 730 at 53.

requirements for standing.  The Court concludes that Petitioner lacks standing to challenge his conviction and plea.

### B.      Sentencing Challenge After Deportation

"[A] criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction."[53]  The Supreme Court has recognized that it is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences."[54]  It therefore follows, as the Court stated in *Spencer v. Kemna*, that "[a]n incarcerated convict's (or a parolee's) [habeas] challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction."[55]

The government contends that Petitioner's challenge to his term of supervised release is moot, primarily relying on Tenth Circuit precedent in *United States v. Vera-Flores*.[56]  In that case, the Tenth Circuit dismissed a direct appeal by an appellant who had been deported following a custodial sentence but remained on supervised release, albeit only in a hypothetical sense as the appellant was no longer in the country.[57]  The Tenth Circuit held that Vera-Flores' deportation "has eliminated all practical consequences associated with serving a term of supervised release," curtailing the "redressability" potential in a discussion that cites *Spencer*.[58]  The court then dismissed the appeal as moot.  Remote hypothetical consequences about what

---

[53] *Sibron v. New York,* 392 U.S. 40, 57 (1968).

[54] *Id.* at 55.

[55] *Spencer*, 523 U.S. at 7.

[56] 496 F.3d 1177 (10th Cir. 2007).

[57] *Id.* at 1180–82.

[58] *Id.* at 1181 (citing *Spencer*, 523 U.S. at 7).

might happen if Petitioner reentered are not sufficient under *Vera-Flores* to survive a mootness challenge.

Petitioner distinguishes his case from *Vera-Flores* by contending he, unlike the appellant in that case, has challenged his term of supervised release, and that this Court is compelled to provide some form of relief now that it has offered an intent to presume that a non-harmless constitutional violation took place as a Rule 37 discovery sanction.  In addition, Petitioner contends that subsequent changes to the sentencing guidelines undermine the Tenth Circuit's observations in *Vera-Flores* regarding the lack on injury for an individual under supervised release while also removed from the country.

*Vera-Flores* remains the law within the Tenth Circuit and Petitioner's attempt to distinguish his case from *Vera-Flores* falls short.  While this Court could hypothesize possible injuries related to the term of supervised release for Petitioner should he attempt to reenter the United States, such hypothetical consequences were squarely rejected by the *Vera-Flores* holding as a basis for relief.[59]  Regarding the deterrence effect of the supervised release term, this also appears hypothetical, as removal from the country in and of itself precludes Petitioner from committing offenses in the United States, begging the question as to what acts he can be deterred from undertaking.  While other circuits have deemed a continuing theoretical deterrence effect to be a sufficient, the Tenth Circuit has not.

---

[59] *Id.* at 1181–82.

13

A critical question remains unanswered: What continuing injury, i.e., collateral consequence, is there for individuals who have served their sentences and have been deported?[60] Although, based on timing alone, Petitioner may have had standing at the time he filed his § 2255 motion, mootness considerations require the Court to determine whether a cognizable, actionable interest in the case remains. Petitioner's arguments for broad presumptions of a continuing interest lie in statements in *Spencer* that were grounded in an earlier era of more permissive standing in habeas cases, and the *Spencer* Court noted that standing had tightened considerably.[61] Nor can collateral consequences be presumed simply based on the nature of the alleged misconduct because it does not matter if the mootness was the result of conduct by the state: "mootness, however it may come about, simply deprives [the Court] of . . . power to act."[62] Petitioner's deportation has deprived this Court of the power to act.

While deterrence of future governmental misconduct may be something for the Court to consider when developing habeas relief, it does not, standing alone, resolve the continuing interest issue. Petitioner's nearly singular focus on deterrence also does not account for systematic remedies that have already been implemented to correct practices in the USAO and provide financial compensation to many incarcerated petitioners.[63] Prevention of future

---

[60] *Spencer*, 523 U.S. at 7 (quoting *Lewis*, 494 U.S. at 477–78 ("This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. . . . The parties must continue to have a 'personal stake in the outcome' of the lawsuit.").

[61] *Id.* at 11–13 (noting that a "parsimonious view of . . . standing" has developed over time that could limit presumptions regarding the existence of collateral consequences in habeas challenges). In addition, in some cases, there may be reason to doubt this Court should presume collateral consequences exist if the petitioner has prior convictions and already suffers the consequences of those unchallenged elements of his criminal record. *See Romero v. Goodrich*, 480 F. App'x 489, 494 (10th Cir. 2012) (citing *Malloy v. Purvis*, 681 F.2d 736 (11th Cir.1982) (dismissing habeas petition as moot where petitioner already suffered collateral consequences from prior convictions)).

[62] *Spencer*, 523 U.S. at 18.

[63] *See CCA Rec. Lit.*, Doc. 730, at 58–59 (detailing changes and reforms implemented by the USAO, CCA, Securus, and the United States Marshal's Office, as well as a $1.45 million civil class action settlement brought by former detainees at CCA whose attorney-client calls were recorded by CCA and Securus).

misconduct and some measure of compensation has already been meted out, habeas proceedings are not intended as means for retribution, and deterrence for the alleged injuries the individual petitioners suffered does not suffice to satisfy the redressability requirement to proceed under § 2255. The Court must be able to provide some sort of redress to Petitioner, not just systematic relief, and that is not possible here.[64]

Petitioner has not demonstrated that adequate collateral consequences for his term of supervised release exist now that he has been deported following completion of his custodial sentence. As such, this Court cannot provide him any relief with respect to his completed sentence or term of supervised release. Petitioner's removal from the United States following the end of his custodial sentence rendered his § 2255 challenge to his sentence moot, including any term of supervised release, and deprives this Court of jurisdiction for further consideration. Petitioner's § 2255 motion is dismissed.[65]

### III. Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[66] If the district court denies a habeas petition on procedural grounds without reaching the merits of petitioner's underlying constitutional claim, "the prisoner must show both (1) 'that jurists of reason would find it

---

[64] *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (explaining that to satisfy Article III's case or controversy requirement, "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." (quoting *Lewis*, 494 U.S. at 477)).

[65] Because this lack of jurisdiction provides a sufficient basis to dismiss Petitioner's § 2255 motion, the Court does not address the government's other arguments regarding timeliness under § 2255(f)(4).

[66] 28 U.S.C. § 2253(c)(2).

debatable whether the district court was correct in its procedural ruling' *and* (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"[67]  For the reasons explained above, Petitioner has not met either showing and the Court therefore denies a COA.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Eladio Marquez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 554) is **dismissed**. Petitioner is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: March 30, 2021

 S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[67] *United States v. Park*, 727 F. App'x 526, 528 (10th Cir. 2018) (emphasis in original) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).