**In the United States District Court**
**for the District of Kansas**

---

In re: CCA Recordings 2255 Litigation,
                        Petitioners,

v.                                                  Case No. 19-cv-2491-JAR-JPO

                                                    **(This Document Relates to Case No. 14-
                                                    cr-20068-DDC-6, *United States v. Matthew
                                                    C. Spaeth*, and Case No. 19-cv-2413-JAR-
                                                    JPO, *Matthew C. Spaeth v. United States*)**

United States of America.
                        Respondent.

---

**MEMORANDUM AND ORDER**

This matter is before the Court on Petitioner Matthew Spaeth's Motion to Vacate and

Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 486).[1]  Petitioner alleges the government

violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-

client communications.  As a remedy, he asks the Court to vacate his judgment with prejudice to

refiling or alternatively, to reduce his term of imprisonment by approximately 50% and vacate

his term of supervised release and any monetary penalties.  The government has responded,

opposing the motion and seeking dismissal on grounds that Petitioner's Sixth Amendment claim

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 14-20068-DDC-6.  Citations prefaced with "*CCA Rec. Lit.*, Doc." refer to filings and entries in this consolidated case, No. 19-2491-JAR-JPO.  With the exception of *United States v. Carter*, No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in No. 16-20032-JAR are prefaced with "*Black*, Doc."

is foreclosed by the rule in *Tollett v. Henderson*.[2]  For the reasons explained in detail below, Petitioner's motion is dismissed.

## I.    Background

### A.    Procedural History

Petitioner was charged in a third superseding indictment with conspiracy to possess with the intent to distribute at least 50 grams of methamphetamine (Count 1); possession with intent to distribute 50 grams or more of methamphetamine (Count 3); possession with intent to distribute 50 grams or more of methamphetamine (Count 23); possession of a firearm in furtherance of a drug-trafficking crime (Count 24); and being a felon in possession of a firearm (Count 25).[3]  Counts 1, 3, and 23 each carried a statutory mandatory minimum term of 10 years' imprisonment and a maximum term of life; Count 24 carried a mandatory, consecutive sentence of at least five years.[4]

On September 20, 2016, Petitioner entered into a binding plea agreement, pursuant to Fed. R. Crim. P. 11(c)(1)(C), and pleaded guilty to Count 1, conspiracy to possess with the intent to distribute 50 grams or more of methamphetamine.[5]  Pursuant to this agreement, the parties proposed that the court sentence Petitioner to a total sentence of 180 months' imprisonment followed by a five-year term of supervised release on Count 1.[6]  In exchange for Petitioner's guilty plea, the government agreed to dismiss the remaining charges and not bring additional charges against Petitioner arising out of the facts forming the basis for the third superseding

---

[2] 411 U.S. 258 (1973); *see Spaeth v. United States*, No. 19-2413-JAR-JPO, Docs. 3, 7, 8; *CCA Rec. Lit.*, Docs. 730, 785.

[3] Doc. 98.

[4] *Id.* at 1, 3, 10–11; *see also* 18 U.S.C. § 924(c)(1)(A)(i); 21 U.S.C. § 841(b)(1)(A)(viii).

[5] Doc. 247.

[6] *Id.* ¶ 4.

indictment.[7]  Petitioner's Rule 11(c)(1)(C) plea agreement contained the following waiver provision often used by the United States Attorney's Office in the District of Kansas (the "standard plea agreements"): "Notwithstanding the forgoing [appellate and collateral attack] waivers, the parties understand that the defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel or prosecutorial misconduct."[8]

In advance of sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR"), in accordance with the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or "Guidelines").[9]  The PSR determined Petitioner's advisory Guidelines sentencing range on Count 1 was 210 to 262 months' imprisonment.[10]  At sentencing on January 9, 2017, Judge Carlos Murguia determined that the applicable Guidelines range was 210 to 262 months' imprisonment, and sentenced Petitioner to 180 months' imprisonment and a five-year term of supervised release, as recommended by the parties.[11]  Petitioner did not file a direct appeal, nor has he filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was first represented by Bruce Kips in the underlying criminal proceedings. After Kips withdrew on August 25, 2015, Petitioner was represented by Norman Robb Edmonds.[12]  The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[13]  On July 17, 2019, the FPD filed a motion pursuant to § 2255 on Petitioner's behalf, setting forth a single ground for relief: the government violated the

---

[7] *Id.* ¶ 6.

[8] *Id.* ¶ 12.

[9] Doc. 256.

[10] *Id.* ¶ 123.

[11] Docs. 260, 261.

[12] Docs. 180, 181.

[13] Standing Order 18-3.

Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship.  The government responded to the motion and Petitioner replied.[14]  Petitioner is currently incarcerated at Forrest City Medium FCI, and his release date is January 21, 2028.[15]

### B.     The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motions before the Court.[16]  That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events that came to light in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA.  The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA.  The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA") Erin Tomasic and AUSA Kim Flannigan accused defense attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned from the video recordings.[17]  The defense also discovered that the  United States

---

[14] *Spaeth*, No. 19-2413-JAR-JPO, Docs. 3, 4.

[15] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Apr. 1, 2021).

[16] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in the *Black* Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

[17] *Id.* at 70–80.

Attorney's Office for the District of Kansas ("USAO") had routinely obtained CCA recorded attorney-client phone calls, and that it did so without notice to the attorneys, clients, or courts.[18]

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[19] (2) the video and audio recordings in USAO custody to be impounded;[20] and (3) the government to preserve its computer hard drives.[21]  By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigations, that is, to determine the number of recordings possessed by the government and how to index and segregate them, and to identify privileged or confidential information within those recordings.[22]

The government did not cooperate with the Special Master's investigation, however, and its failure to cooperate ultimately resulted in a lengthy delay in this Court's ability to rule on these issues.  Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order.  As detailed in the Order, the *Black* investigation revealed in relevant part that CCA recorded some of the outgoing phone calls between detainees and their counsel using equipment provided by Securus Technologies, Inc.

---

[18] *Id.* at 29–30.

[19] *Black*, Doc. 253 at 3.

[20] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[21] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[22] *Black*, Doc. 146 (Appointment Order).

("Securus").[23]  The Court discussed the flaws in CCA's privatization procedures and noted that as a result of these flaws, "calls between defense attorneys and clients at CCA were routinely recorded even when the attorney properly requested privatization."[24]  The Court further detailed how prosecutors at the Kansas City Office of the USAO not only knew that CCA recorded such calls, but that they could obtain the resulting recordings by making "a general request for detainee calls."[25]  The Court found that the government routinely made requests for detainee calls—without taking any precautionary measures to avoid protected communications—and routinely received recordings of attorney-client calls as a result.[26]  The USAO also used a grand jury subpoena to obtain recorded detainee calls associated with approximately 40 detainees as part of the *Black* investigation.[27]

The *Black* Order further discussed, among other things, the government's view that the audio recordings are not protected communications because detainees at CCA signed a general waiver and consent to the recording and monitoring of their calls.[28]  The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[29]  The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit decision in *Shillinger v. Haworth*,[30] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication;

---

[23] *Black* Order at 5, 80, 85.

[24] *Id.* at 80–88.

[25] *Id.* at 106.

[26] *Id.* at 101–06.

[27] *Id.* at 90–91.

[28] *Id.* at 166–76.

[29] *Id.* at 145–62.

[30] 70 F.3d 1132 (10th Cir. 1995).

(2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[31]  Once those elements are established, prejudice is presumed.[32]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[33]  While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment.  With respect to the audio recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD: (1) the telephone recording exists; and (2) a given call contains protected attorney-client communication, i.e., communication that relates to legal advice or strategy sought by the client.[34]  This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the call(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[35]

C.      Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth

---

[31] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[32] *Id.*

[33] *Id.* at 163.

[34] *Id.* at 166.

[35] *Id.*

Amendment claims and for consolidated discovery.[36]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

The Court also assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  The Court must review the audio recordings in order to rule on the government's objections to the privilege logs, and will do so on a case-by-case basis as needed. There is no need for such particularized review in the instant case.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[37]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) ordered petitioners asserting audio recording claims to supplement the record with affidavits on the issue of waiver; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy

---

[36] *CCA Rec. Lit.*, Doc. 1.  After Judge Murguia resigned from the bench, Petitioner's criminal case was reassigned to Judge Daniel D. Crabtree on February 21, 2020.  Doc. 504.

[37] *CCA Rec. Lit.*, Docs. 587, 588.

to" element of their Sixth Amendment claims for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[38]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue and application of *Tollett*; and (3) addressing jurisdictional defenses raised by the government, including certification requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[39]  Petitioner timely filed a Notice of Signed Rule 2(b)(5) Verification on February 25, 2021.[40]

### D.    Recordings in this Case

Upon arriving at CCA, Petitioner signed several documents acknowledging that telephone calls that he made from CCA may be monitored and recorded and advising him that calls with his attorney were subject to being monitored unless he followed the privatization procedure in place to make an unmonitored call.[41]  While Petitioner was detained at CCA, he called his attorneys to discuss his case.

Per the parties' agreement, as part of the *Black* investigation, the government began surrendering recordings and derivative evidence of audio calls from CCA that were in its possession.[42]  The FPD reviewed four recordings of Petitioner speaking with Kips from CCA between July 8, 2015 and August 19, 2015, and one recording of Petitioner speaking with Edmonds from CCA on May 3, 2016.  Pursuant to the Court's Order, Petitioner provided a

---

[38] *Id.*

[39] *CCA Rec. Lit.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[40] *CCA Rec. Lit.*, Doc. 775.

[41] *Spaeth*, 19-2413-JAR-JPO, Docs. 3-4, 3-5.

[42] *Black*, Doc. 705.

privilege log detailing the claimed protected communications, verifying that during five phone conversations, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Kips and Edmonds.[43]  Petitioner also provided a sworn declaration from Edmonds stating that the telephone conversation related to legal advice or strategy; that he did not know or believe that any of his conversations with clients were subject to monitoring or recording, inasmuch as these were private attorney-client phone calls with no one else on the line; that he did not consent to any such monitoring or recording or inform Petitioner that they were subject to monitoring or recording; and that he believed there was no need to privatize his phone number because the attorney-client calls were treated as strictly confidential and protected by the attorney-client relationship.[44]  Petitioner submitted a similar declaration from Kips regarding the four calls to him from Petitioner.[45]

Pursuant to the Court's order, Petitioner supplemented the record with a sworn statement addressing the issue of waiver with respect to his audio recording claims.[46]  He avers that he did not know that by signing the Inmate Handbook and Call Monitoring Sheet, he was consenting to the monitoring and/or recording of his attorney-client calls unless he took certain steps, or that he was consenting to CCA giving the recordings to the USAO and its agents.  Petitioner further avers that at the time he placed the calls listed on the privilege log, he did not believe that the recorded preamble applied to attorney-client calls, that the written warning signs placed on or near the telephone applied to attorney-client calls, that his attorney-client calls were subject to

---

[43] *CCA Rec. Lit.*, Doc. 205-2, at 199–201.

[44] *Spaeth*, No. 19-2413-JAR-JPO, Doc. 6-1.

[45] *Id.*, Doc. 6-2.

[46] *Id.*, Doc. 5.

monitoring or recording, or that the USAO or its agents could obtain recordings of his attorney-client calls from CCA.

Petitioner was prosecuted by AUSAs Terra Morehead, James T. Ward, and Leon Patton, who deny that they listened to the recordings during the pendency of the underlying case.[47] Morehead states that on November 17, 2014, she requested that audio recordings of telephone calls that Petitioner made from CCA between November 3 and 17, 2014 be produced to the case agent as part of the ongoing investigation.[48]  Morehead further states that, to her knowledge, these were the only CCA calls pertaining to Petitioner that she obtained during the course of the prosecution.[49]  It is uncontested that the government also subpoenaed Petitioner's calls from CCA in May 2016 as part of its investigation in *Black*, and that those calls and derivative material were impounded by this Court in August 2016 in response to the Court's clawback order.[50]

After the government objected to Petitioner's privilege log, the Court reviewed the audio recordings *in camera*.  At the beginning of each call, a recorded preamble states the balance of Petitioner's pre-paid call account and the following language: "This is a free call from an inmate at CCA-Leavenworth Detention Center.  This call is subject to recording and monitoring."  There is no discussion of this preamble between Petitioner and Kips or Edmonds in any of the calls listed in the privilege log, nor any statements acknowledging the warning or evincing awareness that the calls were being recorded during their conversations.  As set out in the privilege log, the calls include discussions relating to legal advice or strategy.  In light of the analysis below,

---

[47] *Id.*, Docs. 3-1, 3-2, 3-3.

[48] *Id.*, Doc. 3-1.

[49] *Id.*

[50] *Id.*, Doc. 4, at 2 n.10.  *See Black*, Doc. 806 at 5.

however, the details of the attorney-client conversations are not pertinent to the issue before the Court and will not be discussed in this order.

## II.     Discussion

### A.     *Tollett*

It is well-settled that a defendant who pleads guilty waives most non-jurisdictional antecedent issues, including allegations of constitutional error, unless he entered a conditional plea and specifically reserved his right to raise such claims.  As the Supreme Court held in *Tollett v. Henderson*, "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[51]  Review of any challenge to a conviction obtained via a guilty plea is ordinarily confined to whether the plea was both counseled and voluntary; otherwise, the collateral attack is foreclosed.[52]  Thus, a defendant's unconditional and voluntary guilty plea constitutes a waiver of all non-jurisdictional defenses to the charge(s) to which he has pleaded guilty except: (1) due process claims alleging vindictive prosecution, (2) double jeopardy claims that are evident from the face of the indictment, or (3) claims that the statute of conviction is unconstitutional.[53]  In applying this rule, the Tenth Circuit has noted that "a defendant can waive claims that even

---

[51] 411 U.S. 258, 267 (1973).

[52] *United States v. Broce*, 488 U.S. 563, 569 (1989).

[53] *See United States v. DeVaughn*, 694 F.3d 1141, 1145–46 (10th Cir. 2012) (stating that an unconditional and voluntary guilty plea waives all non-jurisdictional claims except for constitutional due process claims for vindictive prosecution and double jeopardy claims that are evident from the face of the indictment); *Class v. United States*, 138 S. Ct. 798, 803 (2018) (holding that guilty plea by itself does not bar a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal).

implicate a charge of government misconduct" unless such misconduct constitutes a matter of jurisdiction or due process that cannot be waived.[54]

The rule in *Tollett* rests on the rationale that "a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it *quite validly* removes the issue of factual guilt from the case," and "simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction, if factual guilt is validly established."[55]  The Supreme Court explained that because "[t]he focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity," a defendant who has pleaded guilty on the advice of counsel "must demonstrate that the advice was not 'within the range of competence demanded of attorneys in criminal cases.'"[56]  This standard is materially similar to the familiar two-pronged test for an actual ineffective assistance of counsel claim set forth in *Strickland v. Washington*.[57]  In *Hill v. Lockhart*, the Supreme Court held that in the guilty plea context, the *Strickland* prejudice requirement "focuses on whether counsel's constitutionally effective performance affected the outcome of the plea process."[58]  Thus, a defendant must demonstrate that, but for counsel's errors, the defendant would not have pled guilty and would instead have insisted upon proceeding to trial."[59]

---

[54] *United States v. Doe*, 698 F.3d 1284, 1293 (10th Cir. 2012).

[55] *Haring v. Prosie*, 462 U.S. 306, 321 (1983) (emphasis in original) (quoting *Menna v. New York*, 423 U.S. 61, 62–63 (1975)); *see also Class*, 138 S. Ct. at 805 (same); *Broce*, 488 U.S. at 569 ("A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence.").

[56] *Tollett*, 411 U.S. at 266 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

[57] 466 U.S. 668, 687–88 (1984) (holding a successful claim of ineffective assistance of counsel must show first, counsel's performance was deficient and second, counsel's deficient performance actually prejudiced petitioner's defense).

[58] 474 U.S. 52, 59 (1985).

[59] *Id.* at 58–59.

B.      **Decision in Consolidated Proceedings**

On October 15 and December 15, 2020, the Court addressed and asked for supplemental briefing in the consolidated matter on specific legal defenses raised by the government: (1) collateral-attack waiver by plea agreement, and (2) the application of *Tollett* and its progeny to cases in which the petitioner pleaded guilty, including cases that utilized the standard plea agreement.[60]  Petitioners argued that they are free to bring independent Sixth Amendment claims because the government relinquished its *Tollett* defense in the carve-out provision in the standard plea agreements, under which a defendant "in no way waives any subsequent claims" of ineffective assistance of counsel or prosecutorial misconduct.  Alternatively, Petitioners argued that they are not precluded from alleging the government committed a *Shillinger* violation during the plea-bargaining stage of their criminal case because the rule announced in *Tollett* is subject to an exception for government misconduct that calls into question the voluntary nature of the plea itself.  The government agreed that petitioners with standard plea agreements may rely on the carve-out provision in the agreements to challenge their guilty pleas, but argued that the carve-out provision does not create an exception to the rule in *Tollett*.

The Court issued a Memorandum and Order on January 18, 2021, and an order on clarification and reconsideration on March 3, 2021, which are incorporated herein by reference.[61]  The Court does not restate its conclusions of law in detail here but will provide excerpts as needed to frame the application of its rulings to Petitioner's motion presently before it.

In its January 18 Order, the Court endeavored to establish legal standards common to various categories of petitioners, with individualized application to follow for each petitioner.

---

[60] *CCA Rec. Lit.*, Docs. 588, 677.

[61] *CCA Rec. Lit.*, Docs. 730, 784.

After discussing the applicable standard in the Tenth Circuit for Sixth Amendment intentional-intrusion claims governed by *Shillinger*,[62] the Court addressed the collateral-attack waiver defense and application of the rule in *Tollett* to cases in which petitioners pleaded guilty.[63]  The January 18 Order generally divides petitioners' alleged violations into the following categories: (1) violations that occurred before the plea or conviction; (2) violations that occurred after the plea or conviction but before sentencing; and (3) violations that occurred after sentencing. Highly summarized, the Court concluded that certain petitioners cannot maintain all or part of their Sixth Amendment claims because of when and how petitioners were convicted, when petitioners were sentenced, and whether they received a mandatory minimum sentence.

Petitioner's claim falls into the first category.  The Court first held that the so-called "carve-out provision" in petitioners' unconditional standard plea agreements created only an exception to the collateral-attack waiver provisions in the plea agreement itself, and not to the rule of law in *Tollett*.[64]  Instead, the Court must consider relevant controlling law, including the standard adopted in *Tollett*, and consequently, the language in the standard plea agreements does not limit petitioners from bringing ineffective assistance of counsel or prosecutorial misconduct claims that bear on the voluntary and intelligent nature of their guilty pleas.[65]  The Court further held that the government did not waive or forfeit application of that standard in the standard plea agreements.[66]

---

[62] *Id.*, Doc. 730 at 10–20.

[63] *Id.* at 21–42.

[64] *Id.* at 24–29.

[65] *Id.* at 28–29.

[66] *Id.* at 29.  The Court clarified that this ruling also applies to petitioners who pleaded guilty pursuant to Western District of Missouri plea agreements that did not contain the carve-out language in this District's standard plea agreements, as well as to petitioners who pleaded guilty without any written agreement.  *Id.*

The Court proceeded to hold that petitioners who challenge their convictions by alleging pre-plea violations cannot allege independent Sixth Amendment claims, but must move to amend their motions under the applicable standard to seek vacatur of their pleas or otherwise face dismissal of their motions.[67]  The Court rejected petitioners' argument that a "per se violation [under *Shillinger*] presumptively renders a guilty plea involuntary or unknowing," concluding that the "petitioners' presumption-of-prejudice argument does not satisfy the applicable standard in *Brady*, *Tollett*, or *Hill*."[68]  The Court concluded that each petitioner who pleaded guilty and now challenges his conviction "is held to the applicable standard for showing his plea was involuntary—a reasonable probability that, but for the government's misconduct, he would not have pleaded guilty and would instead have insisted on going to trial."[69]  This determination requires an objective approach, and requires a petitioner to show that a decision to go "to trial would have been objectively 'rational under the circumstances.'"[70]  The Court concluded that "[b]ecause no petitioner in these consolidated proceedings attempts to meet this standard, . . . they have not established that their guilty pleas are subject to vacatur and their § 2255 motions are subject to dismissal on this basis."[71]  Instead of dismissing the cases outright, however, the Court gave "petitioners who allege pre-plea violations additional time to consider whether to seek leave to amend their motions to withdraw their respective pleas under the applicable

---

[67] *Id.* at 29–42.

[68] *Id.* at 39 (referencing *Brady v. United States*, 397 U.S. 742 (1970); *Tollett v. Henderson*, 411 U.S. 258 (1973); *Hill v. Lockhart*, 474 U.S. 52 (1985)).

[69] *Id.* (citing *Hill*, 474 U.S. at 59).

[70] *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

[71] *Id.* at 40.

standard for showing their guilty pleas were involuntary."[72]  The Court further stated that it would grant petitioners a certificate of appealability on this issue.[73]

Moreover, the Court held such petitioners cannot rely on any alleged pre-plea constitutional violations to collaterally attack subsequent stages of the criminal proceedings, including sentence.  In so doing, the Court rejected petitioners' continuing-violation theory as contrary to the teaching of *Tollett* that "a guilty plea represents a break in the chain of events which has preceded it in the criminal process," and thus after pleading guilty, a defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[74]

Petitioners asked the Court to clarify or reconsider its January 18 Order, arguing that a "pre-plea seizure isn't necessarily a pre-plea violation," and that "petitioners who pleaded guilty after the government obtained their recordings may logically invoke the disjunctive adverse inference to allege pre-plea *and* post-plea violations."[75]  In the March 3 Order, the Court agreed with petitioners "that the date the prosecution team became privy to the protected recording marks the earliest possible violation date," but otherwise rejected petitioners' argument that they can rely on the disjunctive adverse inference to allege both pre- and post-plea violations.[76]  Specifically, the Court declined "to ignore the date, when known, that the government actually came into possession of recordings when determining the time at which it became privy to the recordings."[77]  Thus, the Court's rulings make clear that any claim challenging a petitioner's

---

[72] *Id.* at 40–41.

[73] *Id.* at 58.

[74] *Id.* at 42 (quoting *Tollett*, 411 U.S. at 267).

[75] *CCA Rec. Lit.*, Doc. 756 at 2, 4 (emphasis in original).

[76] *CCA Rec. Lit.*, Doc. 784 at 8–12.

[77] *Id.* at 8.

conviction based on a recording the government obtained before the petitioner pleaded guilty is subject to dismissal in its entirety under *Tollett* and its progeny.[78]  The Court reaffirmed its holding that "these petitioners must request leave to amend their motions to seek vacatur of their guilty pleas under the applicable standard or face dismissal of their challenges to conviction and may not use pre-plea violations to attack their sentence."[79]

The Court went on to reject petitioners' attempt to rely on the disjunctive adverse inference to allege both pre- and post-plea violations, reiterating that it previously rejected this "continuing-violation theory" because petitioners did not cite any authority for it and because it would render meaningless the rule in *Tollett*.[80]  The Court agreed with the government that petitioners' attempt to recast their continuing-violation theory as advancing "dual allegations" is "both an attempted end-run around *Tollett* and its progeny and inconsistent with that rule and the authority cited by the Court."[81]  The Court concluded that it does not clarify or rule that only pre-plea challenges to convictions are subject to dismissal, and instead required that

> Any petitioner who has a good-faith basis to allege an individualized and specific post-plea violation of this nature must seek leave to amend his § 2255 motion and must advise the Court in the proposed amended pleading that he is opting to have the Court presume that the government became privy to the recordings prior to sentencing but after plea or conviction.[82]

The Court rejected petitioners' "window of opportunity" argument for the same reasons.[83]

---

[78] *Id.* at 9–12, 15–16.

[79] *Id.* at 9.

[80] *Id.* at 11.

[81] *Id.*

[82] *Id.*

[83] *Id.* at 16.

### C.    Application

The recorded phone conversations between Petitioner and attorneys Kips and Edmonds occurred between July 8, 2015 and May 3, 2016, before he entered a binding, unconditional guilty plea on September 20, 2016.  Petitioner contends that the government obtained these protected attorney-client calls as part of his underlying prosecution in November 2014, and as part of the *Black* investigation in May 2016.  Because the recordings were impounded by the Court in August 2016, they were obtained by the government before Petitioner pleaded guilty. Petitioner challenges both his conviction and his sentence based on these alleged Sixth Amendment violations by the government.

On March 26, 2021, Petitioner filed a Notice of Intent Not to Seek Leave to Amend his § 2255 motion.[84]  Petitioner states that he does not intend to seek leave to amend his motion, either: (1) to allege that he can independently satisfy *Hill's* actual-prejudice test, or (2) to assert that although the government obtained recordings of his protected attorney-client calls before he pleaded guilty, the prosecution team nevertheless initially became privy to the contents of those recordings after he did so.[85]  Petitioner further states that he understands that his decision will result in the dismissal of his § 2255 motion in its entirety.

Accordingly, for the reasons set forth in its January 18 and March 3, 2021 Orders, the Court dismisses Petitioner's § 2255 motion.  The carve-out provision in Petitioner's unconditional standard plea agreement does not create an exception to the rule of law in *Tollett*, nor did the government waive or forfeit application of that standard.  As discussed in detail, Petitioner's presumption-of-prejudice argument does not satisfy the applicable standard in

---

[84] *Spaeth*, 19-2413-JAR-JPO, Doc. 9.

[85] *Id.*

*Brady, Tollett*, or *Hill.*  Without any analogous authority from the Tenth Circuit or Supreme Court supporting petitioners' argument that a *Shillinger* per se violation presumptively renders a guilty plea involuntary or unknowing, this Court declines to do so in the first instance.  Thus, Petitioner is held to the applicable standard for showing that his plea was involuntary—a reasonable probability that, but for the government's misconduct, he would not have pleaded guilty and would instead have insisted on going to trial.  Because Petitioner does not attempt to meet this standard, he has not established that his binding, unconditional guilty plea is subject to vacatur.  *Tollett* also precludes Petitioner from challenging his sentence based on any alleged pre-plea violation.  Petitioner's § 2255 motion is therefore dismissed in its entirety.[86]

### III.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[87]  If the district court denies a habeas petition on procedural grounds without reaching the merits of petitioner's underlying constitutional claim, "the prisoner must show both (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling' and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"[88]  The Court concludes that Petitioner has shown both that reasonable jurists could debate whether the Court was correct in its procedural ruling under *Tollett* and

---

[86] The Court does not reach the government's additional procedural arguments that Petitioner's § 2255 motion is procedurally defaulted or untimely under § 2255(f)(4).

[87] 28 U.S.C. § 2253(c)(2).

[88] *United States v. Park*, 727 F. App'x 526, 528 (10th Cir. 2018) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

whether he states a valid Sixth Amendment claim under *Shillinger*.  The Court therefore grants a COA on the following issues: (1) whether the carve-out provision in Petitioner's unconditional standard plea agreement created an exception to the rule of law in *Tollett*; and (2) whether Petitioner's intentional-intrusion Sixth Amendment claim as alleged satisfies the standard in *Tollett* and its progeny.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Matthew Spaeth's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 486) is **dismissed**. Petitioner is also **granted** a COA as set forth above.

**IT IS SO ORDERED.**

Dated: <u>April 2, 2021</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE