# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**In re: CCA Recordings 2255 Litigation**,

     **Petitioners,**

**v.**           **Case No. 19-cv-2491-JAR-JPO**

            **(This Document Relates to *United States v.***
            ***Steven M. Hohn*, Case No. 12-cr-20003-**
            **JAR-3, *Steven M. Hohn v. United States*,**
            **Case No. 19-cv-2082-JAR-JPO)**

**United States of America,**

     **Respondent.**

---

## MEMORANDUM AND ORDER

   This matter comes before the Court on Petitioner Steven Hohn's Motion for Leave to Supplement (Doc. 1010 in 19-2491-JAR-JPO and Doc. 58 in 19-2082-JAR-JPO) his 28 U.S.C. § 2255 motion pursuant to Fed. R. Civ. P. 15.  Hohn seeks to add a claim alleging that the Assistant United States Attorney ("AUSA") who prosecuted him violated his due process rights under *Brady v. Maryland*[1] and *Giglio v. United States*.[2]  The government objects to Hohn's motion as untimely, unauthorized, and futile.  For the reasons discussed in detail below, the Court finds that Hohn's motion is both timely and authorized, but denies his request as futile.

---

[1] 373 U.S. 83 (1963).

[2] 405 U.S. 150 (1972).  Because *Giglio* error is a species of *Brady* error, Hohn refers to his proposed claim as a *Brady* claim.  *Id.* at 154.

## I.      Background

Hohn was indicted on January 25, 2012, on drug and gun charges.[3]  He was detained at

Corrections Corporation of America ("CCA," now CoreCivic) from January 27, 2012, to March

28, 2014.[4]  The investigation that led to Hohn's arrest was led by Deputy Perry Williams in the

Johnson County, Kansas Sheriff's Office.  AUSA Terra Morehead prosecuted Hohn.  The case

was assigned to Judge Carlos Murguia, who presided over pretrial, trial, sentencing, and post-

trial matters until February 21, 2020, when the criminal case was reassigned to the undersigned

after Judge Murguia resigned from the bench.[5]

On May 22, 2012, Hohn was charged in a multi-defendant Second Superseding

Indictment with conspiracy to distribute and possess with intent to distribute 50 grams or more of

methamphetamine (Count 1); possession of a firearm by a user of controlled substances (Counts

13–15); and possession of an unregistered short-barreled shotgun (Count 16).[6]  Many of the

conspirators reached plea agreements with the government and testified against Hohn and his co-

defendant, Michael Redifer, at their trial.

### *Pretrial Threats and Requests for CCA Calls*

The government, via AUSA Morehead or one of her agents, obtained three sets of Hohn's

phone calls from CCA during the course of his prosecution.

---

[3] Doc. 18.  Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 12-cr-20003-JAR-3.  Citations prefaced with "*CCA Rec. Lit.* Doc." refer to filings and entries in this consolidated case, No. 19-cv-2491-JAR-JPO.

[4] *Hohn v. United States*, No. 19-2082-JAR-JPO, Doc. 3.

[5] Doc. 740.

[6] Doc. 84.

### a)   February 2012

In February 2012, Deputy Williams obtained Hohn's CCA calls as part of an investigation into a possible threat to a government witness.[7]  Williams talked to an individual who received a threat from Jeremy Stiers that the individual suspected was made or directed by Hohn.  Williams listened to the calls and was not able to ascertain that there was any such phone call made by Hohn.[8]

One of the calls Deputy Williams listened to was a February 3, 2012 call between Hohn and his sister Tammy, who was taking care of Hohn's two daughters.[9]  On the call, Hohn asserts that his wife, Amanda Hohn, "is part of why I'm sitting in prison."[10]  He then says that he intends to find out what part she played in him being arrested, telling his sister, "It's okay, because I'm going to take this shit to trial, and when I get there and I get my discovery and I find out all the people that are participants in why I'm sitting in prison, I guess I'll know then, won't I?"[11]

On March 8, 2012, Deputy Williams sent an email to AUSA Morehead after he obtained and processed Hohn's February 2012 CCA calls.[12]  The subject of the email is "Death Threat," and states in part: "After listening to 8 hours of telephone calls involving Steven HOHN and Jessica NEWCOME from CCA and interviewing the CI and the supposed suspect Jeremy

---

[7] *Hohn*, 19-2082-JAR-JPO, Doc. 60 at 374.  The transcripts of the August 9 and 10, 2021 evidentiary hearing consist of 2 volumes found at Docs. 59 and 60 in *Hohn*, 19-2082-JAR-JPO, and collectively consist of 397 sequentially paginated pages.  For convenience, the Court cites to these documents by ECF docket entry number, followed by a reference to the page number in the transcript that appears in the upper right corner of each page.

[8] *Id.*

[9] Gov. Ex. 1034.  All citations to exhibits refer to exhibits that were provisionally admitted at Hohn's August 9 and 10, 2021 evidentiary hearing.

[10] *Id.* at 7.

[11] *Id.*

[12] Gov. Ex. 835.

STIERS, we believe we have dispelled any threats coming from HOHN or NEWCOME."[13]  The email clarifies that the death threat referenced was made by Stiers: that "STIERS had made contact with the CI on his own"; that Williams "came to [the] conclusion and STIERS also stated he was not directed by anyone to contact the CI"; that "STIERS was told repeatedly to let this go"; and that "STIERS stated he understood and stated we would not hear about him anymore involving this investigation."[14]

The following day, March 9, 2012, one of Hohn's co-defendants, Robert Baitey, told Deputy Williams that Hohn was concerned that another co-defendant, Michael Quick, was cooperating with the government because Quick had knowledge of a "possible murder" Hohn had been involved in.[15]  Baitey told Williams that Hohn said "anyone who snitches on [him] he will kill them when he gets out of prison."[16]  Two weeks later, Baitey told Williams that Hohn told him about putting a body into an appliance to get rid of it, and that Hohn said a woman who had worn a wire "was going to end up in a trunk when he (Hohn) gets out."[17]

    b)    April 2012

On April 19, 2012, Quick told Deputy Williams about the disappearance and death of Gregory Price, including details about Hohn's role in Price's disappearance.[18]  Quick told Williams that he and Hohn were standing outside a residence when another co-defendant, Tracy Rockers, told them that Price had died inside the residence; that Hohn was involved in deciding not to call the police and instead wrap Price's body in a tarp and put the body into a refrigerator;

---

[13] Hohn Ex. 8.

[14] *Id.*

[15] Gov. Ex. 836 at 4, ¶ 16 (Mar. 9, 2012 Baitey proffer).

[16] *Id.*

[17] Gov. Ex. 839 at 5, ¶¶ 23, 25.

[18] Gov. Ex. 1055 at 2–4, ¶¶ 18–31.

that Hohn provided the tarp, helped wrap Price's body in the tarp, and helped stuff the body into the refrigerator; and that Hohn and Quick loaded the refrigerator in the back of Hohn's truck and dumped it on property located in De Soto, Kansas.[19]  Price's body was recovered on that property later that day.

On April 23, 2012, Williams had Agent Christopher Farkes, a deputy sheriff with the Johnson County Sheriff's Office, issue a subpoena to CCA for Hohn's calls from April 19, 2012 to May 4, 2012.[20]  The subpoena also requested CCA calls for co-defendants Rockers and Quick. One of the calls obtained by Farkes was the April 23, 2012 call between Hohn and defense counsel Campbell that is the subject of Hohn's Sixth Amendment claim.

### c)    May 2013

On May 24, 2013, during a break in Hohn's trial, AUSA Morehead issued a subpoena for his CCA calls, as well as co-defendant Michael Redifer's, from May 13 to May 28, 2013.[21] Morehead was concerned that Hohn had threatened or intimidated Casey Cross, a cooperating government witness whose testimony changed at trial.[22]  The calls did not reveal any threats by Hohn or Redifer.[23]

### *Sentencing Hearing*

On June 5, 2013, after a ten-day trial, a jury found Hohn guilty on all charges.[24]  Based on a total offense level of 42 and a criminal history category of I, the Presentence Investigation Report ("PSR") calculated Hohn's advisory Guideline sentencing range at 360 months to life

---

[19] *Id.*

[20] Gov. Ex. 846.

[21] Gov. Ex. 835

[22] *Hohn*, 19-2082-JAR-JPO, Doc. 59 at 205–06.

[23] *Id.* at 219.

[24] Doc. 316.

imprisonment.[25]  The PSR sets out in great detail findings related to the offense conduct, the victim impact with respect to Kevin Weber, and threats to cooperators Hohn relayed to co-defendants Baitey and Cook.  Specifically, the PSR states that Hohn tied Weber up in Hohn's basement, burned him, and then split his head open for an outstanding drug debt owed to Hohn.[26] The PSR also reports that Hohn, while detained at CCA, told co-defendant Baitey that when Hohn got out of prison, he would kill anyone who snitched on him.[27]  It further reports that Hohn made similar comments to co-defendant Cook about wanting kill co-defendant Quick and his family for telling investigators about Hohn's role in disposing of Price's body.[28]

The PSR calculated the base offense level at 34, based on the quantity of drugs involved, at least 1.5 kg. but less than 5 kg. of methamphetamine; a two-level increase for possession of a dangerous firearm; and a two-level increase because the drugs were imported.[29]  Hohn also received a two-level increase for use of violence and threats of violence during the course of his offense of conviction;[30] and a two-level increase because Weber was physically restrained in the course of the offense.[31]

Hohn raised eighteen objections to the PSR, including the two-level increases related to violence, arguing that the threat of violence towards and restraint of Weber was in retaliation for Weber's injury to a woman and not to further the offense for which Hohn was convicted.[32]  The

---

[25] Doc. 442 ¶ 138.

[26] *Id.* ¶¶ 31, 37.

[27] *Id.* ¶ 87.

[28] *Id.* ¶ 86.  *See* Gov. Ex. 862 (Sept. 13, 2012 Cook proffer).

[29] Doc. 442 ¶¶ 89, 90, 92.

[30] *Id.* ¶ 91; U.S.S.G. § 2D1.1(b)(2).

[31] Doc. 442 ¶ 93.

[32] *Id.* ¶¶ 213, 225.

government and the United States Probation Office took the position that both increases were

supported by the preponderance of the evidence as numerous people testified that the injuries

inflicted upon Weber were related to an unpaid drug debt, that there was testimony that Hohn

was involved in a similar incident involving another individual, and that the physical restraint

enhancement may be applied regardless of whether the person restrained was the victim of the

offense of conviction.

The government presented evidence and witnesses at Hohn's sentencing hearing on

January 28, 2014.[33]  Co-defendant Cook testified about the information he provided Deputy

Williams during his September 13, 2012 proffer, specifically, that Hohn told him while they

were detained at CCA that he was upset at Quick for telling people about how they disposed of

Price's body by placing it in a refrigerator and dumping it in a field.[34]  Cook testified that Hohn

said that he wanted to kill Quick's family in front of him, then kill Quick himself for telling how

they disposed of Price's body.[35]  Cook further testified that Hohn told him that he was going to

trial because he wanted to see who was testifying against him so he could seek revenge once he

got out of prison, no matter how long it took.[36]

Deputy Williams also testified at the sentencing hearing.  He confirmed what Cook told

him during his September 2012 proffer about Cook's conversations with Hohn while detained at

CCA.[37]  Williams further testified that prior to Cook's proffer, he was previously aware of this

information because he obtained recordings of Hohn's CCA calls in February 2012, including

---

[33] Sent. Hrg. Tr., Doc. 526.

[34] *Id.* at 14–15.

[35] *Id.* at 16–17.

[36] *Id.* at 17.

[37] *Id.* at 21–22.

the call between Hohn and his sister in which he said the same thing—"that he was going to go

to trial to find out who was testifying against him, and that he would wait 20 years . . . to be able

to do whatever he needed to do."[38]  That February 3, 2012 call from Hohn to his sister was then

admitted as evidence and played in open court.[39]

Deputy Williams further testified about his interview with Weber about the beating he

received in Hohn's basement in part over unpaid drug debts.[40]  Williams also testified in detail

about Hohn's role in disposing of Price's body and information received from co-defendant

Quick. [41]

After hearing this evidence, as well as taking judicial notice of testimony and evidence at

trial, Judge Carlos Murguia overruled Hohn's objections to the PSR, finding the testimony about

the Weber incident credible and noting the evidence that Hohn physically restrained Weber, at

least in part because of unpaid drug debts.[42]  The court then adopted the findings in the PSR and

determined Hohn's advisory Guidelines range to be 360 months to life imprisonment.[43]  After

stressing that the cooperating witnesses received substantially lighter sentences, defense counsel

requested the court impose the low end sentence of 360 months, which was severe considering

Hohn's lack of any prior criminal history.[44]  AUSA Morehead requested the court impose a life

sentence, in order to deny Hohn any opportunity to make good on his threats of revenge.[45]

---

[38] *Id.* 22–23.

[39] *Id.* 23–24.

[40] *Id.* at 25–28.

[41] *Id.* at 35–40.

[42] *Id.* at 60–62.

[43] *Id.* at 62.

[44] *Id.* at 63.

[45] *Id.* at 64–68.

Morehead based her request on Cook's testimony and emphasized that the February 3, 2012 phone call between Hohn and his sister showed "a pattern and course of thought process" that Hohn was "planning and plotting his revenge against those who . . . testify against him."[46] Morehead also emphasized Hohn's role in disposing of Price's body.[47]  She did not mention any threats against a confidential informant in February or May 2012.

The court denied the government's request and sentenced Hohn to 360 months' imprisonment.[48]  Specifically, the court found that Hohn had a history of violence, including "thoughts of revenge, going after individuals who had testified against [him]" or who were "involved with the disposal and the moving of [Price's] body."[49]  The court concluded that, "although there is some merit to the government's position," it instead sentenced Hohn "to a controlling term of 360 months, which is a substantial sentence."[50]

AUSA Morehead then raised the issue of a potential Guideline amendment that would reduce Hohn's total offense level to 40, with an advisory Guideline sentencing range of 292 to 365 months' imprisonment.[51]  Morehead asked the court to conclude that the 360-month sentence would be an appropriate sentence even if Hohn were to receive the benefit of the Guideline amendment.[52]  After Campbell objected to the request as speculative and inappropriate, the court clarified that the 360-month sentence was not based solely on the low end of the Guideline range, but on the court's consideration of all of the factors set out in 18

---

[46] *Id.* at 65, 66.

[47] *Id.* at 66.

[48] *Id.* at 69–72.

[49] *Id.* at 71.

[50] *Id.*

[51] *Id.* at 74.

[52] *Id.* at 75.

U.S.C. § 3553(a), including Hohn's involvement and actions in the conspiracy, the phone call played at the hearing, and his involvement in Price's disappearance.[53]

### Direct Appeal

Hohn appealed his conviction and sentence to the Tenth Circuit Court of Appeals.[54]  On appeal, Hohn raised six issues regarding trial errors and one regarding his sentence: the court erred in finding his Guideline offense level should be increased two levels for imported drugs. The court affirmed on all grounds, including that the government met its burden to establish the two-level importation enhancement.[55]

### Motion to Reduce Sentence

As predicted, Hohn was subsequently eligible for the two-level reduction of his offense under Amendment 782 to the United States Sentencing Guidelines, which amended the Drug Quantity Table applicable to Hohn's case.  On June 15, 2016, Judge Murguia denied Hohn's motion to reduce his sentence to the new low-end of the advisory Guideline range, 292 months, pursuant to 18 U.S.C. § 3582(c)(2).[56]  The court referenced its findings at Hohn's sentencing hearing, stressing that it imposed the 360-month sentence based on all the circumstances of the case, not because a thirty-year sentence was at the bottom of the Guideline range at that time.[57] At sentencing, the court specifically noted that Hohn's involvement with the conspiracy, his threats of violence, and the violent actions he took in furtherance of the conspiracy, warranted the 360-month sentence and found that thirty years was sufficient but not greater than necessary

---

[53] *Id.* at 75–79.

[54] *United States v. Hohn*, 606 F. App'x 902 (10th Cir. 2015).

[55] *Id.* at 911.

[56] Doc. 607.

[57] *Id.* at 2.

to comply with the purposes of sentencing.[58]  The court noted that, before sentencing, it considered and overruled numerous objections Hohn made to the PSR; that Hohn used threats of violence and actual violence to compel payment of drug debts; illegally used controlled substances; illegally possessed firearms, some of which were stolen; showed a propensity to be vengeful toward family members, those who testified against him, and others; and at a minimum, helped dispose of a body.[59]  The court took "special consideration" of the recorded phone call between Hohn and his sister, in which Hohn stated "that he was going to trial in order to find out who would testify against him, and that he would wait twenty years to be able to do whatever he needed to do."[60]  These factual findings remained relevant to Hohn's sentence, despite the reduced Guideline range, and the court found that a sentence reduction was not warranted based on the factors set out in § 3553(a) for the reasons set out at Hohn's sentencing.[61]

### Section 2255 Motion

In addition to the February 3, 2012 call between Hohn and his sister, the government obtained an April 23, 2012 call between Hohn and defense counsel, James Campbell.  The government produced the recording of the attorney call to the Court on January 7, 2019, and copies were provided to the FPD on January 9, 2019.[62]  On February 12, 2019, Hohn filed a motion to vacate his conviction and sentence under § 2255,[63] alleging a per se Sixth Amendment violation under *Shillinger v. Haworth*.[64]  In support of his motion, Hohn attached an affidavit by

---

[58] *Id.*

[59] *Id.* at 3.

[60] *Id.*

[61] *Id.* at 3–4.

[62] *Id* Doc. 806-3 at 3.

[63] Doc. 718.

[64] 70 F.3d 1132, 1142 (10th Cir. 1995).

Campbell that stated, in part, that, "At the lengthy sentencing hearing, the AUSA played many recorded calls made by my client from CCA.  I received copies of those calls from the prosecutor, but I do not recall receiving any recorded attorney-client calls."[65]

The government responded to Hohn's § 2255 motion and attached an affidavit from AUSA Morehead, dated May 29, 2020.[66]  This affidavit stated in part:

> During my involvement in this case there were several requests made for audio recordings of telephone calls the defendant made from CCA due to concerns of threats to Government witnesses.  **I know calls were reviewed by agents in February 2012 regarding possible threats, which was confirmed during the review of telephone calls.**  There was one recorded call introduced and played at the defendant's sentencing hearing, where he spoke to several individuals on February 3, 2012.  On or about April 19, 2012, it was discovered that the defendant and others may have been involved in a homicide in December 2010, in Johnson County, Kansas, in connection with the charged drug trafficking activities.  On or about April 24, 2012, Johnson County Sheriff's Office personnel obtained CCA calls of the defendant and two other codefendants in connection with their homicide investigation. Reports regarding the obtaining and review of these calls were made by the agents **and provided during discovery**.  There was some inquiry by defense counsel about these calls, **and calls of the defendant from CCA were produced to Mr. Campbell**.  On May 24, 2013, the Government issued a subpoena to CCA staff and requested calls by the defendant made between May 13, 2013 to May 28, 2013, which would have coincided with the jury trial, because there were concerns that the defendant was communicating with Government witnesses.  I was never made aware by agents who reviewed the CCA calls that there were any recordings of communications between the defendant and defense counsel or any individual working for defense counsel.[67]

---

[65] *Id.* at 48–49.

[66] *Hohn*, 19-2082-JAR-JPO, Doc. 3-1.

[67] *Id.* ¶ 8 (emphasis added).

### *Discovery in the Consolidated § 2255 Litigation*

Petitioner's *Brady* claim is based in part on the March 8, 2012 email that was produced as part of the Electronically Stored Information ("ESI") discovery in the consolidated matter on July 1, 2020.[68]  This production applied to over 100 pending § 2255 motions, and included but was not limited to more than 20,000 emails and attachments produced in the form of a .DAT load file.[69]  The government also produced more than 2,700 pages from the petitioners' case files in PDF form.[70]  Of these attachments, 291 referenced "Hohn"; Document 69 of 291 was the March 8, 2012 email.[71]

On September 17, 2020, the FPD informed the government that it had "problems loading the emails into [its] discovery platform," and needed to "verify that the requested tags are working correctly."[72]  The response tags are electronic tags the government contractor used to indicate the particular discovery request to which a particular document within the ESI production was responsive and were partly incompatible with the FPD's discovery database.

The government provided the requested information on September 23, 2020, which confirmed the FPD's suspicion that the tags were not functioning correctly.[73]  The next day, the FPD asked the government to produce electronic folders for all the Requests for Production ("RFPs") or, in the alternative, to produce a comprehensive Bates chart.[74]  The FPD then filed a

---

[68] The FPD represents that, to date, the reports referenced in the email have yet to be produced by the government.

[69] *Hohn*, 19-2082-JAR-JPO, Doc. 62 at 12.

[70] *Id.*

[71] *Id.*

[72] *CCA Rec. Lit.*,  Doc. 572-11 at 3.

[73] *Id.* at 1–2.

[74] *Id.* at 1.

motion to compel on September 25, 2020.[75]  On October 20, 2020, the government produced a spreadsheet that comprehensively identified the documents it had tagged as responsive to each RFP.[76]  The FPD then withdrew its motion to compel.[77]

### Section 2255 Evidentiary Hearing

An evidentiary hearing on Hohn's Sixth Amendment *Shillinger* claim was held August 9 and 10, 2021.[78]  AUSA Morehead, Deputy Williams, and Campbell testified in relevant part about Williams's March 8, 2012 email to Morehead.

AUSA Morehead testified that based on the "context" of Deputy Williams's email, she understood it referred to dispelling any suspicion that the threat to the confidential informant ("CI") came from Hohn and that she also understood "there was some significant information in [Hohn's] phone call to his sister that confirmed there were concerns" that was not mentioned in the email.[79]  Morehead explained that "the e-mail from Mr. Williams had to do with the threat against the CI," and that was not what she was referring to in her affidavit when she stated that review of Hohn's CCA calls "confirmed" the possible threats.[80]  Instead, she explained that the threats she was referring to in the affidavit were the threats that Hohn made in the February 3, 2012 call to his sister that he was going to trial in order to find out who testified against him and his plans to take revenge on those individuals after he was released from prison.[81]  Morehead further testified that she produced both the February 3 call and Williams's reports on the eight

---

[75] *Id.* Doc. 572.

[76] *Id.* Doc. 593.

[77] *Id.*

[78] *Hohn*, 19-2082-JAR-JPO, Doc. 7.

[79] *Id.* Doc. 59 at 201–03.

[80] *Id.* at 203.

[81] *Id.*

hours of calls to defense counsel as part of discovery, but admitted that she had no documentation, such as a transmittal letter or discovery logs, to prove that she did so.[82] Morehead conceded, however, that she relayed to Campbell in an April 12, 2013 email exchange that he could "get all of his client's calls directly from CCA if he chooses," when asked to provide Hohn's calls to counsel.[83]

Deputy Williams testified that his March 8, 2012 email related to a specific threat reported by a person investigators were talking to who thought that the threat made by Jeremy Stiers was coming from Hohn.[84]  He testified that the person "felt that Steve Hohn had got ahold of this individual, Jeremy Stiers, and had him threaten them.  So we listened to all the phone calls during that time and we weren't able to ascertain that there was any such phone call made, at least under Steve Hohn's PIN number."[85]  Williams explained that Morehead's statement in her affidavit that possible threats were confirmed during a review of the calls by agents in February 2012 was not confirmed with respect to the threat investigation he was asked to perform, that is, the Stiers investigation.[86]

Campbell testified that he never received either the March 8 email, the reports it references, or the February 3, 2021 CCA call.[87]  He explained that he was sure he never received this material in discovery because the subject of Deputy Williams's email "concern[ed] a completely unrelated potentially violent matter that my client is at least tangentially accused of

---

[82] *Id.* at 197.

[83] *Id.* at 212; Hohn Ex. 8.

[84] *Hohn*, 19-2082-JAR-JPO, Doc. 60 at 374.

[85] *Id.*

[86] *Id.* at 380–81.

[87] *Id.* at 282–84.

being involved with."[88]  Campbell further explained that while his affidavit stated that "many recorded calls" were played at Hohn's sentencing, it was actually one long call to several recipients who were passed the phone.[89]  He also testified that he had not seen the email prior to that morning, and that he had a complete catalog of all the discovery received in the case and that there were no calls produced.[90]

## II.        Discussion

Hohn seeks leave to supplement or amend his § 2255 motion to add a *Brady* claim based on AUSA Morehead's failure to disclose the March 8, 2012 email from Deputy Williams to AUSA Morehead or the associated reports.  Hohn argues that this email is both exculpatory and material.  The government argues that Hohn's motion for leave is neither timely nor material under *Brady*, and requests the Court deny his motion as untimely, as unauthorized under Rule 15, or as futile.  While the Court finds that Hohn's *Brady* claim is both timely and authorized by Rule 15, it ultimately determines that Hohn's proposed claim is futile.

### A.        Timeliness Under § 2255(f)(4)

Although Hohn refers to his proposed claim as a supplement, he posits that it could constitute either an amendment or a supplement to his § 2255 motion.  Both parties agree that Rule 15 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2255(f) govern motions for leave to amend or supplement a § 2255 motion.  Hohn contends that the proposed *Brady* claim is timely, while the government argues that the evidence on which he bases his new claim could have been discovered through the exercise of due diligence more than one year before he filed his motion, leaving his claim time-barred.

---

[88] *Id.* at 283.

[89] *Id.* at 288.

[90] *Id.* at 282, 289–90.

Section 2255(f) provides that a "1-year period of limitations shall apply" to all § 2255 motions.  Hohn does not argue that his *Brady* claim relates back to the time of filing his original motion, and relies on § 2255(f)(4), which provides that the "limitation period shall run from the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."  This subsection "is an example of what are called 'discovery rules' for delaying the accrual of a cause of action."[91]  The Tenth Circuit has explained that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") rule differs from most discovery rules in one respect:  "[t]he typical provision starts the limitations period either (1) when the plaintiff has actually discovered the pertinent facts or (2) when a person exercising reasonable diligence would have discovered those facts.  The AEDPA provision contains only the second test, an objective standard."[92]  "The exercise of reasonable diligence is an ongoing process.  What is required at any particular time depends on what one has notice of at that time."[93]  "It is irrelevant whether that information has come to the defendant's attention by serendipity or diligence."[94]  "The question is whether the defendant acted with reasonable diligence after the information was acquired.  And once the defendant could have discovered the pertinent facts, the § 2255 motion must be filed within one year."[95]

Under this standard, Hohn's *Brady* claim is timely unless "a person exercising reasonable diligence would have discovered" the facts supporting that claim on or before August 19, 2020.[96]

---

[91] *United States v. Denny*, 694 F.3d 1185, 1189 (10th Cir. 2012).

[92] *Id.*

[93] *Id.* at 1190.

[94] *Id.*

[95] *Id.*

[96] *See United States v. Hurst*, 322 F.3d 1256, 1260–62 (10th Cir. 2003) (explaining § 2255(f)(4)'s one-year clock starts to run the day after the triggering event).

The evidence that forms the basis of Hohn's claim is Deputy Williams's March 8, 2012 email to AUSA Morehead, which Hohn admits was produced on July 1, 2020.  The government takes the position that a mere 291 documents contained Hohn's name and that a reasonably diligent person would have discovered the March 8 email on July 1, 2020, the same day the government produced the email to the FPD.  The Court disagrees.

The Court declines to engage in a calculus of how many seconds per page it would take a reasonable person to review the documents.  There is no dispute that the July 1, 2020 ESI production contained more than 20,000 documents that the FPD claimed were difficult to identify until the government provided the requested spreadsheet regarding the tagging system in October 2020, going so far as to file a motion to compel after the government's initial refusal to comply with its request.  While the spreadsheet did not provide a description of any document produced, it gave the FPD a way to accurately determine which documents were responsive to each RFP.

Moreover, it is not clear to the Court precisely when the FPD discovered that Campbell did not in fact receive the March 8 email, reports, or February 3, 2022 call.  This issue is clouded by AUSA Morehead's affidavit stating that review of the February 2012 CCA calls confirmed possible threats.  It is also clouded by Morehead's apparently false representation to her colleagues, including AUSA Carrie Capwell, that Morehead had produced the materials to Campbell during discovery.  During the August 2021 evidentiary hearing, Morehead testified that she had produced the materials to defense counsel Campbell.  But Morehead's testimony was dispelled by Campbell after he exhaustively reviewed his files following an inquiry from AUSA Capwell when Morehead could not document the discovery production in the case.[97]  It

---

[97] *See Hohn*, 19-2082-JAR-JPO, Doc. 60 at 298–99.

appears to the Court that this information came to light just prior to or during the evidentiary hearing, but in any event, after the spreadsheet was provided in October 2020. Therefore, the Court finds that no reasonably diligent petitioner would have discovered this potential *Brady* evidence until at least October 20, 2020, and Hohn's motion for leave is thus timely under § 2255(f)(4).

## B.    Authorization Under Rule 15

Next, the government argues that even if Hohn's motion for leave to add a *Brady* claim was timely filed, the Court should nevertheless deny his motion under Fed. Rule Civ. P. 15. Hohn first argues that supplementation is appropriate under Rule 15(d), which provides that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The Tenth Circuit has explained that "[s]upplemental pleadings are thus appropriate to 'set forth new facts in order to update [an] earlier pleading," and are "distinct from amendments to pleadings under Rule 15, which 'relate to matters that occurred prior to the filing of the original pleading.'"[98] Because Hohn's new claim is based on events that occurred prior to the filing of the original motion in 2019, Rule 15(d) does not appear to be a cognizable basis upon which to supplement the original motion.[99]

---

[98] *Carter v. Bigelow*, 787 F.3d 1269, 1278 (10th Cir. 2015) (quoting 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1504 (3d ed. 2014)).

[99] Hohn initially argued that his supplemental *Brady* claim was appropriate under the factors cited by the Tenth Circuit in *Carter*, 787 F.3d at 1278–82, and *Douglas v. Workman*, 560 F.3d 1156, 1190–95 (10th Cir. 2009). There, in the context of state habeas proceedings brought under 28 U.S.C. § 2254, the court applied a set of seven factors, which "serve to narrow significantly the circumstances that would justify permitting a habeas petitioner to supplement his first habeas petition" and "will be present" only in "a rare case." *Douglas*, 560 F.3d at 1190. The government argues that these factors weigh against supplementation; Hohn does not reply, other than to state that the comity and federalism concerns at issue in those two cases do not apply to § 2255 motions. In light of the findings above, the Court does not reach this issue.

Alternatively, Hohn suggests that he should be permitted to amend or supplement his motion to conform to the evidence at the August 2021 hearing.  Rule 15(b) addresses amendments during and after trial and is intended to promote deciding cases on their merits.[100] The Tenth Circuit has explained that the rule contains two mechanisms for amending a complaint to conform to the evidence.[101]  A complaint may be impliedly amended "if an issue has been tried with the express or implied consent of the parties and not over objection."[102]  "A party impliedly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence."[103]  "However, implied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case where there is no indication that the party presenting the evidence intended to raise a new issue."[104]  If the opposing party objects to evidence pertaining to a new claim, however, the party wishing to amend the pleadings must utilize the second mechanism of Rule 15(b)(2), which provides that pleadings may be amended if the party files a motion to amend the complaint and the objecting party fails to satisfy the court that it will be prejudiced by the amendment.[105]

Here, Hohn references the second mechanism in Rule 15(b)(2), arguing that the existing record, including the evidence adduced at the recent evidentiary hearing, is sufficient to allow the Court to resolve the proposed *Brady* claim, and that the government had notice of Hohn's *Brady*

---

[100] *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004).

[101] *Id.* at 1280–81.

[102] *Id.*; Fed. R. Civ. P. 15(b)(2).

[103] *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1217 (10th Cir. 2000) (citing *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982)).

[104] *Green Country Food Mkt.*, 371 F.3d at 1280 (citation omitted); Fed. R. Civ. P. 15(b)(2).

[105] *Green Country Food Mkt.*, 371 F.3d at 1280–81.

claim and an opportunity to defend against it.[106]  The government argues that it did not consent

to the trial of Hohn's *Brady* claim and that it will suffer prejudice from the continued attempts to

undermine its credibility via the CCA-related litigation.

As noted, defense counsel Campbell testified at the evidentiary hearing that he had not

seen the March 8 email until the morning of the hearing and that neither the email nor the reports

it references was included in the criminal discovery produced by the government.[107]  On cross-

examination, AUSA James Brown continued to question Campbell about the email and what

AUSA Morehead had produced to him in discovery in the criminal case.[108]  Brown specifically

asked Campbell about the affidavit he prepared as part of the § 2255 proceedings, where

Campbell stated that he received copies of Hohn's CCA calls from the prosecutor that were

played at the sentencing hearing.[109]  Campbell explained that he thought he received the calls,

but when he went back through his entire case file after being contacted by AUSA Capwell to

inquire about what evidence had been produced by AUSA Morehead, he found that he never

received the February 13, 2012 call.[110]  He did, however, receive calls made by co-defendant

Redifer.[111]  This prompted FPD Melody Brannon to contemporaneously email Acting United

States Attorney Duston Slinkard during Campbell's testimony to inform Slinkard that the FPD

believed that Campbell's testimony was sufficient to prove a *Brady* violation and ask whether

this violation might provide a basis for settling Hohn's case.[112]  The government subsequently

---

[106] Doc. 58 at 13 & n.65.

[107] *Hohn*, 19-2082-JAR-JPO, Doc. 60 at 282–83.

[108] *Id.* at 294–95.

[109] *Id.* at 298–99.

[110] *Id.* at 299.

[111] *Id.*

[112] Doc. 58-4.

called Deputy Williams to testify, and presented evidence relevant to whether the email was

material under *Brady*.[113]  Under these circumstances, the Court is satisfied that amendment of

Hohn's § 2255 motion will  not prejudice the government and is therefore authorized under Rule

15(b)(2).

### C.      Futility

Finally, the government argues that Hohn's motion for leave should be denied as futile.

It is well-settled that in ruling on a motion for leave to amend or supplement, courts are

instructed to "freely give leave when justice so requires," and to deny leave to amend only when

an apparent reason, "such as . . . futility of amendment," exists.[114]  Thus, "a court properly may

deny a motion for leave to amend as futile when the proposed amended complaint would be

subject to dismissal for any reason."[115]  "If it plainly appears from [a § 2255] motion that the

moving party is not entitled to relief, the judge must dismiss the motion."[116]  Here, the Court is in

the unusual position of determining whether an amended claim is futile based on the record

established at an evidentiary hearing.[117]

The government has an obligation to disclose both exculpatory evidence and evidence

that possibly could be used to impeach a government witness.[118]  In applying *Brady*, the Tenth

Circuit requires "the prosecution to disclose all evidence that favors the defendant and is material

---

[113] *Hohn*, 19-2082-JAR-JPO, Doc. 60 at 351–382.

[114] Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178 (1962); *Cohen v. Longshore*, 621 F.3d 1311, 1313 (10th Cir. 2010).

[115] *Bradshaw v. Lappin*, 484 F. App'x 217, 225 (10th Cir. 2012) (citation omitted).

[116] Rule 4(b), Rules Governing Section 2255 Proceedings.

[117] The FPD has advised the Court and the government that it does not intend to seek to reopen the evidentiary hearing or record on this issue.

[118] *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S.83, 87 (1963).

either to guilt or to punishment."[119]   To prevail on his *Brady* claim, Petitioner has the burden of demonstrating that: "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material."[120]

"Evidence is *material* if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed."[121]   "A *reasonable probability* means the 'likelihood of a different result is great enough to undermine confidence in the outcome.'"[122]   In other words, courts ask whether the absence of the withheld evidence "shakes our confidence" in the outcome.[123]   Courts "determine materiality after reviewing the record as a whole."[124]

Here, Petitioner's proposed supplemental claim does not ask the Court to vacate his conviction, but to vacate his sentence and resentence him to time served.  The government's discovery obligations under *Brady* extend to sentencing.[125]   At the sentencing stage, the relevant question becomes whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the [sentencing] proceeding would have been different."[126]

Under this standard, the first and second elements of Hohn's proposed *Brady* claim are not seriously at issue.  First, the government does not dispute that AUSA Morehead did not

---

[119] *United States v. Diaz*, 679 F.3d 1183, 1192 (10th Cir. 2012) (quoting *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008)).

[120] *Id.*

[121] *United States v. Reece*, 745 F.3d 1075, 1083–94 (10th Cir. 2014) (citing *Smith v. Cain*, 132 S. Ct. 627, 630 (2012)).

[122] *Id.* (quoting *Cain*, 132 S. Ct. at 630).

[123] *Id.* (quoting *United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011)); *accord Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

[124] *Id.* (citing *Cooper*, 654 F.3d at 1120).

[125] *Cone v. Bell*, 556 U.S. 449, 473–76 (2009) (remanding case to district court to consider whether the government's failure to disclose evidence violated the defendant's rights under *Brady* at the penalty phase).

[126] *Id.* at 491 (Thomas, J., dissenting) (citations and quotations omitted).

disclose the March 8, 2021 email before trial or sentencing and, to date, there is no indication

that the referenced reports have been produced.  To the extent AUSA Morehead has stated

otherwise, evidence adduced at the hearing demonstrates her statements are not credible.  Any

suggestion that Campbell's memory is not up to par is belied by AUSA Morehead's practice not

to produce discovery for anything she did not plan to use, her suggestion that Campbell could get

Hohn's calls directly from CCA, and her total lack of discovery documentation.

Second, the Court assumes, without deciding, that the March 8 email was favorable to

Hohn.  It is exculpatory, as it states that the agents had dispelled "any threats coming from

Hohn" after reviewing the February 2012 CCA calls.  And it is impeaching because Campbell

could have used the materials to cross-examine Deputy Williams.  Although the reports

referenced in the email have to date not been produced, and the Court is unable to be certain of

the content, it also assumes that they were favorable to Hohn.

Instead, the Court focuses its analysis on materiality.  Under the applicable standard,

Hohn must show that there is a reasonable probability that the result of his sentencing would

have been different if the evidence had been disclosed.  Put another way, Hohn must show that

the absence of Deputy Williams's March 8, 2012 email and the reports referenced therein shakes

the Court's confidence in the sentence he received.  The Court concludes Hohn has not made this

showing because there is not a reasonable probability that the outcome of his sentencing would

have been different had the government disclosed the materials.

Hohn contends that the February 3, 2012 call figured prominently in AUSA Morehead's

sentencing argument, as she knew it would leave a lasting impression on Judge Murguia and

provide a counterweight for any favorable conclusions the court might have drawn based on

Hohn's calm demeanor in court.  He argues that the March 8, 2012 email is material because if

Campbell had the email before sentencing, he could have tried to convince the court to assign less weight to the February 3, 2012 phone call that AUSA Morehead played at sentencing. Hohn argues that the likely explanation that Deputy Williams did not mention the February 3, 2012 call to AUSA Morehead in the email was because Williams reached the same conclusion the court would have reached but for Morehead's decision to suppress the email—that Hohn's February 3 call was not proof of an actual threat of revenge at all, but mere frustration expressed to his sister. Hohn concludes that if a 360-month sentence was appropriate with the call, it stands to reason that something less than a 360-month sentence would have been appropriate without the call.

This argument is unavailing for several reasons. First, Hohn attempts to extrapolate Deputy Williams's comment about a specific death threat made by Stiers against a CI who suspected that Hohn was behind Stiers's threat to mean that Williams determined that the threatening statements Hohn made in the call to his sister were also dispelled. However, Williams's testimony, coupled with the text of the entire email, provides context that makes clear that he is referring to the specific Stiers's threat to the CI and neither mentions nor sheds any light on his perception of the threatening statements made in Hohn's call to his sister.

Second, the call played at sentencing speaks for itself and was just one example of evidence of Hohn's anger towards those who cooperated or testified against him. The March 8 email casts no doubt on Deputy Williams's testimony about the more detailed information he subsequently received about Hohn's threats in interviews with Hohn's co-defendants. Baitey and Cook testified or proffered about comments Hohn subsequently made to them about taking revenge on those who cooperated or testified against him, and Cook testified at the sentencing hearing prior to the February 3 call being played.

Third—and critical to the required showing of materiality—Hohn has not shown a reasonable probability that he would have received a below-Guidelines sentence if he had received the March 8 materials before sentencing.  Hohn does not suggest that Campbell would have used the March 8 materials to convince the court to exclude the February 3, 2012 phone call altogether.  Instead, he contends that, armed with those materials, Campbell would have convinced the court to assign the call significantly less weight, resulting in a reasonable probability that the court would have imposed a lesser sentence.  The Court disagrees.

After hearing evidence, the court overruled Hohn's objections and adopted the PSR's findings and advisory Guidelines range of 360 months to life imprisonment without changes.  AUSA Morehead used the February 3 call to argue for a sentence at the high end of the Guideline range, life imprisonment.  While the call provided a specific example of Hohn's temperament and stated intent to take revenge on anyone who testified or cooperated against him, both factors were already well established by the time the call was played.  Hohn's argument that the court stated that the phone call was one of the primary factors that justified the 360-month sentence is not a fair characterization of the record, as Judge Murguia based the sentence on all of the circumstances of the case, including Hohn's involvement in the conspiracy, his threats of violence, and the violent actions he took in furtherance of the conspiracy.  Indeed, in denying Morehead's request for a life sentence, Judge Murguia acknowledged that Hohn said terrible things in the phone call played at the hearing, and that the court tried to put into context Hohn's situation at the time and how he could react in that manner, while also declining to discount the extreme anger by Hohn towards family members and others involving thoughts of revenge.[127]  While the court found some merit to Morehead's position, it ultimately denied her

---

[127] Sent. Hrg. Tr., Doc. 526 at 79–80.

request for a life sentence, and instead sentenced Hohn to 360 months—the sentence that Campbell requested and that the court stressed was based on consideration of the entire record and all of the § 3553(a) factors.

Reviewing the record as a whole, the Court concludes that the absence of the evidence withheld by AUSA Morehead does not shake the Court's confidence in the sentence that Judge Murguia imposed.  In light of the factual findings set out at Hohn's sentencing hearing, there is simply no reasonable probability that, but for Morehead's misconduct in suppressing these materials, the court would have imposed a lesser, below-Guidelines sentence.  The March 8, 2012 materials were thus not material under *Brady*, and Hohn's proposed claim is futile. Accordingly, the Court denies Hohn leave to supplement or amend his § 2255 motion.  The Court stresses, however, that nothing in the Court's ruling precludes Hohn from arguing—as he has throughout these proceedings—that either or both the government's and AUSA Morehead's discovery misconduct is relevant to his pending Sixth Amendment claim.  Needless to say, the Court has not yet decided Hohn's Sixth Amendment claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Steven Hohn's Motion for Leave to Supplement his 28 U.S.C. § 2255 Motion to add a *Brady* claim (Doc. 1010 in 19-2491-JAR-JPO; Doc. 58 in 19-2082-JAR-JPO) is **denied**.

**IT IS SO ORDERED.**

Dated: September 20, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE
