# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

In re: CCA Recordings 2255 Litigation,

     **Petitioners,**

**v.**          **Case No. 19-cv-2491-JAR-JPO**

           **(This Document Relates to *United States v.
Steven M. Hohn*, Case No. 12-cr-20003-03-
JAR, *Steven M. Hohn v. United States*,
Case No. 19-cv-2082-JAR-JPO)**

United States of America,

     **Respondent.**

---

## MEMORANDUM AND ORDER

   This matter is before the Court on Petitioner Steven M. Hohn's Motion to Vacate and

Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 718 in Case No. 12-20003-03-JAR).[1]

Petitioner alleges the government violated the Sixth Amendment by intentionally and

unjustifiably intruding into his attorney-client relationship by becoming privy to his attorney-

client communications.  As a remedy, he asks the Court to vacate his judgment with prejudice to

refiling or, alternatively, to vacate his sentence and impose a new sentence of 180 months, a 50%

reduction of his original custodial sentence.  Also before the Court is the government's Motion

for Reconsideration or Clarification (Doc. 958) of a pre-hearing decision on several legal

matters, which the Court deferred ruling on and will address in this Order, and the government's

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in
this consolidated case, *In re CCA Rec. 2255 Lit.*, Case No. 19-2491-JAR-JPO.  With the exception of
*United States v. Carter*, Case No. 16-20032-03-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"),
citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

Motion in Limine (Doc. 983).  An evidentiary hearing was held August 9 and 10, 2021.  At the close of the hearing, the Court directed the parties to submit proposed findings of fact and conclusions of law.

The Court has carefully reviewed the parties' submissions as well as the testimony and evidence presented at the hearing, and is prepared to rule.  For the reasons explained below, the Court denies the government's Motion for Reconsideration, clarifies its ruling on several legal issues, and denies its Motion in Limine.  The Court also denies Hohn's § 2255 motion on the merits.

## I.     Background and Procedural History

Hohn was indicted on January 25, 2012, on drug and gun charges.[2]  He was detained at Corrections Corporation of America ("CCA") from January 27, 2012, to March 28, 2014.[3]  The investigation that led to Hohn's arrest was led by Deputy Perry Williams in the Johnson County, Kansas Sheriff's Office ("JSCO") and JSCO Deputy Nathaniel Denton, as well as Christopher Farkes, a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA").  Assistant United States Attorney ("AUSA") Terra Morehead in the Kansas City Office of the United States Attorney ("USAO") prosecuted Hohn.  The criminal case was assigned to Judge Carlos Murguia, who presided over pretrial, trial, sentencing, and post-trial matters until February 21, 2020, when the case was reassigned to the undersigned after Judge Murguia resigned from the bench.[4]  The court initially appointed Assistant Federal Public Defender Tim Burdick to represent Hohn.  On April 23, 2012, the court appointed James Campbell as substitute counsel.  Hohn placed a call to Campbell from CCA that day.

---

[2] *United States v. Hohn*, 12-20003-03-JAR, Doc. 18.

[3] Doc. 1004 ¶ 2.

[4] *Hohn*, 12-20003-03-JAR, Doc. 740.

On May 22, 2012, Hohn was charged in a multi-defendant Second Superseding Indictment with conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine; possession of a firearm by a user of controlled substances; and possession of an unregistered short-barreled shotgun.  Many of the conspirators reached plea agreements with the government and testified against Hohn and his co-defendant, Michael Redifer, at their trial.  After a twelve-day trial, a jury convicted Hohn on all counts.  On January 28, 2014, Judge Murguia imposed a 360-month sentence, followed by a five-year term of supervised release.

Hohn appealed his conviction and sentence to the Tenth Circuit Court of Appeals.[5]  On appeal, Hohn raised six issues regarding trial errors and one regarding his sentence: the court erred in finding his Guideline offense level should be increased two levels for imported drugs.  The court affirmed on all grounds.[6]  On June 15, 2016, Judge Murguia denied Hohn's motion to reduce his sentence to the new low-end of the advisory Guideline range, 292 months, pursuant to 18 U.S.C. § 3582(c)(2).[7]

In the course of the litigation in *Black*, it was discovered that the government had obtained recordings of phone calls that detainees placed to counsel from CCA.  The government produced some of these recordings to the Federal Public Defender ("FPD") on January 7, 2019, including the April 23, 2012 call that Hohn made to Campbell.  The FPD filed this § 2255 motion on Hohn's behalf on February 2, 2019.  The Court denied the government's motion to dismiss on procedural default and timeliness grounds under § 2255(f)(4) and set the motion for evidentiary hearing.[8]  The Court subsequently denied the government's motion to reconsider its

---

[5] *United States v. Hohn*, 606 F. App'x 902 (10th Cir. 2015).

[6] *Id.* at 911.

[7] *Hohn*, 12-20003-03-JAR, Doc. 607.

[8] Doc. 758.

decision to grant Hohn an evidentiary hearing, but corrected its description of his sworn statement in its order.[9]

The Court conducted an evidentiary hearing on Hohn's Sixth Amendment claim on August 9 and 10, 2021.  The Court subsequently denied as futile Hohn's motion for leave to supplement or amend his § 2255 motion to allege that AUSA Morehead violated his due process rights under *Brady v. Maryland*[10] and *Giglio v. United States*[11] based on evidence that came to light at the hearing.[12]

## II.    Sixth Amendment Standard

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black Order*") that precipitates the motions before the Court.[13]  That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court also assumes the reader is familiar with its January 18, 2021 Order in the consolidated master case that frames the issue before the Court ("January 18 Order").[14]  That Order addressed the governing standard for Sixth Amendment intentional-intrusion claims under *Shillinger v. Haworth*, and is incorporated by reference herein.[15]  The Court will provide excerpts from these Orders as needed to frame and inform its discussion of the issues presently before it.

---

[9] Doc. 993.

[10] 373 U.S. 83 (1963).

[11] 405 U.S. 150 (1972).

[12] Doc. 1022.

[13] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, petitioners' Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

[14] Doc. 730.

[15] 70 F.3d 1132, 1142 (10th Cir. 1995); *see* Doc. 730 at 5–20.

## A.    Overview

The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defence."[16]  Claims of government intrusion into the attorney-client relationship like those at issue here are included in the category of cases to be considered when deciding if a defendant has been denied the right to effective assistance of counsel.  The Supreme Court has explained that this right has been accorded "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial."[17]

In general, to prevail on an ineffective assistance of counsel claim under the Sixth Amendment, a petitioner has the burden of showing a reasonable probability of prejudice.[18]  In *Strickland v. Washington*, the Supreme Court set forth the familiar two-prong standard for evaluating ineffective assistance of counsel: that counsel's performance was deficient and that deficiency prejudiced the defense.[19]  The prejudice requirement, which is at issue in this case, "arises from the very nature of the right to effective representation."[20]  In other words, "a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced."[21]

Relevant here, the Sixth Amendment right to effective assistance of counsel includes the ability to speak candidly and confidentially with counsel free from unreasonable government

---

[16] U.S. Const. amend. VI.

[17] *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)).

[18] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[19] *Id.*

[20] *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006).

[21] *Id.* (citing *Strickland*, 466 U.S. at 685).

interference.[22]  The Supreme Court has held that the government violates the Sixth Amendment when it intentionally interferes with the confidential relationship between defendant and defense counsel and that interference prejudices the defendant.[23]  The Court did not, and still has not, resolved "the issue of who bears the burden of persuasion for establishing prejudice or lack thereof when the Sixth Amendment violation involves the transmission of confidential defense strategy information."[24]  As discussed in detail in the January 18 Order, federal appellate courts are divided on the issue in cases where the prosecution intentionally obtained, without any legitimate justification, confidential attorney-client information.[25]  As discussed below, the Tenth Circuit has found a per se violation of the Sixth Amendment once the defendant demonstrates that the prosecution improperly intruded into the attorney-client relationship.[26]

### B.    *Shillinger v. Haworth*

In *Shillinger*, the prosecutor solicited information about the defendant's pre-trial preparation sessions from a sheriff's deputy who was present in the courtroom and used that information at trial to impeach the defendant and again in closing argument.[27]  The Tenth Circuit held that the prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant; absent a countervailing state

---

[22] *See Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1979) ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

[23] *See United States v. Morrison*, 449 U.S. 361, 365 (1981); *Weatherford*, 429 U.S. at 554 n.4.

[24] *Cutillo v. Cinelli*, 485 U.S. 1037 (1988) (White, J., dissenting from denial of certiorari); *see Kaur v. Maryland*, 141 S. Ct. 5 (2020) (Sotomayor, J., statement respecting denial of certiorari).

[25] *See Cutillo*, 485 U.S. at 1037–38 (White, J., dissenting) (noting conflicting approaches between the Circuits in cases where the Sixth Amendment violation involves the transmission of confidential defense strategy information); Doc. 730 at 9–10 (discussing split among the circuit courts of appeal and collecting cases).

[26] *Shillinger v. Haworth*, 70 F.3d 1132, 1141–42 (10th Cir. 1995).

[27] *Id.* at 1134–36.

interest, such an intrusion constitutes a per se violation of the Sixth Amendment.[28]  In other words, when the government becomes privy to confidential communications because of its unjustified, purposeful intrusion into the attorney-client relationship, "a prejudicial effect on the reliability of the trial process must be presumed."[29]  The Tenth Circuit clarified, however, that this per se rule "in no way affects the analysis to be undertaken in cases in which the state has a legitimate law enforcement purpose for its intrusion."[30]  Such cases would require proof of prejudice, or "'a realistic possibility of injury to [the defendant] or benefit to the [government]' in order to constitute a violation of a defendant's Sixth Amendment rights."[31]

The court further recognized that even where there has been an unjustified intrusion resulting in a per se Sixth Amendment violation, the court must fashion a remedy "tailored to the injury suffered."[32]  After affirming the lower court's grant of habeas relief, the *Shillinger* court remanded for an evidentiary hearing to determine if the remedy imposed—a new trial—was tailored to cure the taint of the intentional-intrusion violation or whether the government's conduct justified a different remedy, such as recusal of the original prosecution team or even dismissal of the indictment.[33]

In the January 18 Order, this Court rejected the government's broad arguments that the consolidated petitioners are not entitled to rely upon *Shillinger*'s per se rule for several reasons. First, the Court found that the ruling was not dicta.  Because the *Shillinger* court expressly

---

[28] *Id.* at 1142.

[29] *Id.*

[30] *Id.* (citing *Weatherford v. Bursey*, 429 U.S. 545, 557 (1977)).

[31] *Id.* (alteration in original) (quoting *Weatherford*, 429 U.S. at 558).

[32] *Id.* (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)).

[33] *Id.* at 1142–43.

concluded that this per se rule provides "the relevant standard" for assessing intentional-intrusion claims, it is binding Tenth Circuit precedent.[34]

Second, the Court rejected the government's argument that under the Supreme Court's decision in *United States v. Gonzalez-Lopez*,[35] petitioners must nonetheless establish actual prejudice to succeed on their Sixth Amendment claims.[36]  Because the *Shillinger* court expressly acknowledged both *Strickland*'s general rule and its direct state-interference exception, this Court explained that *Gonzalez-Lopez* does not alter that exception that a defendant need not always show prejudice to prove an ineffective-assistance Sixth Amendment claim.[37]  And because the Tenth Circuit reached the same conclusion in *Shillinger*, the decision is consistent with the Supreme Court's decision in *Gonzalez-Lopez*.[38]

Third, the Court addressed the government's position questioning whether *Shillinger* is good law in light of the Supreme Court's view in *Weatherford v. Bursey* and *United States v. Morrison* that at least "a realistic possibility" of prejudice must be demonstrated to substantiate a Sixth Amendment violation of the kind alleged here, and a presumption falls short of this demonstration.[39]  This Court explained that the Tenth Circuit analyzed and distinguished *Weatherford*, noting that the Supreme Court "emphasized both the absence of purposefulness in the prosecutor's intrusion and the legitimate law enforcement interests at stake."[40]  The *Shillinger* court concluded that, unlike in *Weatherford*, "the intrusion here was not only

---

[34] Doc. 730 at 13 (quoting *Shillinger*, 70 F.3d at 1139).

[35] 548 U.S. 140 (2006).

[36] Doc. 730 at 13.

[37] *Id.* at 15–16.

[38] *Id.*

[39] *Id.* at 16–17.

[40] *Shillinger v. Haworth*, 70 F.3d 1132, 1138–39 (10th Cir. 1995).

intentional, but also lacked a legitimate law enforcement purpose."[41]  The court also explained that *Morrison* "left open the question of whether intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice."[42] As previously discussed, *Morrison* never reached the prejudice question, "holding only that even if the defendant's Sixth Amendment rights were violated, dismissal of the indictment was an inappropriate remedy in that case."[43]  Under *Shillinger*, once petitioners demonstrate the prosecution team intentionally and unjustifiably became privy to their protected attorney-client communications, prejudice is presumed.[44]  In the Tenth Circuit, this presumption results in a per se Sixth Amendment violation.[45]

## III.   Motion for Reconsideration or Clarification

Prior to the evidentiary hearing, the government sought reconsideration of this Court's Order denying pre-hearing review of the call on which Hohn bases his Sixth Amendment claim for evidence that might show waiver, the possibility of prejudice, or that the violation was harmless.[46]  The government also sought clarification on the standards the Court would apply to determining whether an attorney-client communication is protected by the Sixth Amendment. The Court denied reconsideration of its decision not to permit the government pre-hearing access to the contents of Hohn's call to Campbell and declined to revisit the protected-communication

---

[41] *Id.* at 1139.

[42] *Id.* at 1140.

[43] *Id.*

[44] *See id.* at 1142; Doc. 730 at 10.

[45] *See Shillinger*, 70 F.3d at 1140, 1142 (distinguishing between the First Circuit's burden-shifting approach, which treats the presumption of prejudice as rebuttable, and the Third Circuit's per se rule, and ultimately adopting the latter approach (first citing *United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir. 1984); and then citing *United States v. Levy*, 577 F.2d 200, 210 (3d Cir. 1978))).

[46] Doc. 940.

standards it has previously addressed and applies in this Order.[47]  The Court took under advisement the remaining legal issues raised in the motion, to be addressed in this post-hearing order.[48]

The government moves for reconsideration pursuant to D. Kan. Rule 7.3(b), which governs motions to reconsider non-dispositive orders.  Grounds for reconsideration under Rule 7.3(b) include: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice."[49]  While a motion to reconsider is available where the court has "misapprehended the facts, a party's position, or the controlling law," such a motion does not permit a party to "revisit issues already addressed or to advance arguments that could have been raised in prior briefing."[50]  "A party's failure to present its strongest case in the first instance does not entitle it to a second chance in the form of a motion to reconsider."[51]  Whether to grant a motion for reconsideration is left to the court's discretion.[52]

## A.    Possibility of Prejudice

The government argues that to fairly defend against allegations it violated the Sixth Amendment, it needs to review the recordings for evidence that will show the prosecution team neither used nor could have used "the substance of the recordings . . . to the government's

---

[47] Doc. 999.

[48] *Id.*

[49] D. Kan. Rule 7.3(b).

[50] *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 748 F. Supp. 2d 1261, 1264 (D. Kan. 2010) (citing *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

[51] *Turner v. Nat'l Council of State Bds. of Nursing*, No. 11-2059-KHV, 2013 WL 139750, at *2 (D. Kan. Jan. 10, 2013) (citing *Cline v. S. Star Cent. Gas Pipeline, Inc*., 370 F. Supp. 2d 1130, 1132 (D. Kan. 2005)).

[52] *Coffeyville Res. Ref. & Mktg., LLC*, 748 F. Supp. 2d at 1264 (citing *In re Motor Fuel Temp. Sales Pracs. Litig*., 707 F. Supp. 2d 1145, 1166 (D. Kan. 2010)).

advantage or to the petitioner's disadvantage."[53]  The government acknowledges that under

certain circumstances, *Shillinger* requires the court to presume prejudice in determining whether

there was a Sixth Amendment violation.  It argues, however, that Hohn cannot rely on this

presumption unless he first proves that there is a realistic possibility that such prejudice

occurred—specifically that the government "could have" used the substance of his attorney-

client call to undermine the fairness of the trial proceedings—and therefore it needs to review the

call for evidence that might prove no such possibility exists.  As this Court previously discussed,

the government's argument requiring an individual showing of a realistic possibility of prejudice

as a requisite for a presumption of prejudice cannot be squared with *Shillinger*'s language or

rationale and would effectively read out the per se rule altogether.[54]  Accordingly, the Court

concludes that the government cannot defend against Hohn's per se *Shillinger* claim by proving

no such possibility existed and denies reconsideration on this ground.

### B.      Harmless Error

The Court first had occasion to address the government's harmless-error argument prior

to the August 9 and 10 evidentiary hearing, where the government argued that it needed to

review the call on which Hohn based his Sixth Amendment claim for evidence that might prove

the alleged violation was harmless.  The Court agreed with Hohn that under *Shillinger*,

intentional-intrusion violations are structural errors that are not subject to harmless-error

analysis.[55]  The government argues that this Court's legal conclusion that Hohn's intentional-

intrusion violation claim is not subject to harmless-error analysis is clearly erroneous.

---

[53] Doc. 891 at 4.

[54] *See* Doc. 588 at 27–28 (rejecting government's suggested "adversarial value" element as effectively reading out the presumption of prejudice under *Shillinger*).

[55] Doc. 940 at 13–15.

It is well-established that on habeas review, the court applies the standard in *Brecht v. Abrahamson* to determine whether constitutional error warrants relief from the challenged conviction or sentence.[56]  Under this standard, constitutional error may be disregarded unless found to have "had substantial and injurious effect or influence in determining the jury's verdict," with the burden on the petitioner to establish that the error "resulted in actual prejudice."[57]  "If a reviewing court is in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must win."[58]  The Tenth Circuit has held that *Brecht*'s harmless-error analysis is applicable in § 2255 cases.[59]  Fed. R. Crim. P. 52(a) also requires that a defendant show prejudice in order to obtain relief in a § 2255 action.[60]

"Notwithstanding *Brecht*, constitutional errors that rise to the level of 'structural error' . . . require automatic reversal" of the conviction or the grant of the writ of habeas corpus.[61]  This Court found that in crafting a per se violation, the Tenth Circuit language in *Shillinger* mirrors that used by the Supreme Court to identify structural error.[62]  Because structural error can arise

---

[56] 507 U.S. 619 (1993) (applying harmless-error review to 28 U.S.C. § 2254 movants).

[57] *Id.* at 637–38 (internal quotation marks omitted).

[58] *Crease v. McKune*, 189 F.3d 1188, 1193 (10th Cir. 1999) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

[59] *See United States v. Dago*, 441 F.3d 1238, 1246 (10th Cir. 2006) (holding "the logic behind *Brecht* . . . is applicable in § 2255 cases" and applying harmless-error review to § 2255 claim); *United States v. Driscoll*, 892 F.3d 1127, 1132 (10th Cir. 2018) (same).

[60] *See United States v. Spaulding*, 802 F.3d 1110, 1119 n.9 (10th Cir. 2015) (explaining that Rule 52(a) "obligates a federal court to disregard errors that do 'not affect substantial rights'").

[61] *Underwood v. Royal*, 894 F.3d 1154, 1176 (10th Cir. 2018); *see United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984); *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006) (noting that the *Brecht* test does not apply if the error is a structural defect in the trial that defies harmless-error analysis).  In addition, the Supreme Court in *Brecht* suggested another potential type of error in the unusual case with egregious trial error coupled with a pattern of prosecutorial misconduct.  *See Brecht*, 507 U.S. at 638 n.9.  Hohn does not invoke this so-called Footnote 9 error here.

[62] Doc. 940 at 13.

in different ways in the context of the denial of the Sixth Amendment right to counsel, the Court pauses to clarify the framework of its analysis.

The Supreme Court has "adopted the general rule that a constitutional error does not automatically require reversal of a conviction."[63]  The Court recognized, however, that "some constitutional errors require reversal without regard to the evidence in a particular case," because some errors "necessarily render a trial unfair."[64]  Such error is structural, meaning it is one that "'affect[s] the framework within which the trial proceeds' rather than being 'simply an error in the trial process itself.'"[65]  "[S]tructural defects in the constitution of the trial mechanism . . . defy analysis by 'harmless-error' standards."[66]  "A defining feature of structural error is that the resulting unfairness or prejudice is necessarily unquantifiable and indeterminate, such that any inquiry into its effect on the outcome of the case would be purely speculative."[67]  The Supreme Court has identified a very limited set of circumstances that constitute structural error.[68]

---

[63] *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991).

[64] *Rose v. Clark*, 478 U.S. 570, 577 (1986) (citing *Champman v. California*, 386 U.S. 18, 23 n.8 (1967); *Payne v. Arkansas*, 356 U.S. 560 (1958) (introduction of coerced confession); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (complete denial of right to counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927) (biased judge).

[65] *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (alteration in original) (quoting *Fulminante*, 499 U.S. at 310).

[66] *Fulminante*, 499 U.S. at 309.

[67] *United States v. Solon*, 596 F.3d 1206, 1211 (10th Cir. 2010) (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005)); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006) ("[A]s we have done in the past, we rest our conclusion of structural error upon the difficulty of assessing the effect of the error.").

[68] *See Weaver*, 137 S. Ct. at 1908 (providing "three broad rationales" for classifying an error as structural: where the right at issue does not protect defendant from erroneous conviction but protects some other interest, where the effects of the error are simply too hard to measure, and where the error always results in fundamental unfairness; any one of these rationales or a combination thereof may explain why an error has been deemed structural); *see, e.g.*, *McCoy v. Louisiana*, 138 S. Ct. 1500, 1511 (2018) (attorney's admission of the defendant's guilt over the defendant's objection); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (deprivation of the right to counsel of choice); *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (erroneous reasonable-doubt instruction); *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (exclusion of grand jurors of the defendant's race); *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984) (deprivation of the right to a public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) (deprivation of the right to self-representation); *Gideon v. Wainright*, 372 U.S. 335, 343–45 (1963) (deprivation of the right to counsel); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (lack of an impartial judge).

Relevant here, the Supreme Court has recognized that certain denials of the Sixth Amendment right to effective assistance of counsel "make the adversary process itself presumptively unreliable."[69]  These per se Sixth Amendment violations are not subject to harmless-error analysis—prejudice is presumed.[70]  The Supreme Court has relieved defendants of the obligation to make an affirmative showing of prejudice, and presumed such effect in a very narrow set of cases, including: the actual or constructive denial of counsel at a critical stage of trial, state interference with counsel's assistance, or counsel that labors under actual conflicts of interest.[71]  Prejudice can be presumed with respect to these "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."[72]  The Court explained that defendants are spared of such individual inquiry into prejudice only in "circumstances of that magnitude."[73]  These types of presumptively prejudicial Sixth Amendment violations are part of the so-called *Cronic*-error variety of Supreme Court jurisprudence.[74]  When this type of error happens, the issue is not whether the error is harmless; instead, the court irrebutably presumes that it was prejudicial.[75]

The Tenth Circuit adopted this reasoning in *Shillinger* to hold that prejudice is presumed for the government's intentional and unjustified intrusion into the defendant's attorney-client relationship.  In fashioning a rule that "best accounts for the competing interests at stake," the

---

[69] *United States v. Cronic*, 466 U.S. 648, 659 (1984).

[70] *Id.*

[71] *Id.* at 658–60; *Strickland v. Washington*, 466 U.S 668, 692 (1984).

[72] *Cronic*, 466 U.S. at 658 & n.24 (collecting cases); *see Strickland*, 466 U.S. at 692; *Mickens v. Taylor*, 535 U.S. 162, 175 (2002).

[73] *Cronic*, 466 U.S. at 659 n.26.

[74] *Id.* at 658.  To be clear, neither Hohn nor consolidated petitioners allege that they were actually or constructively denied the right to counsel at a critical stage of trial.  Instead, they allege state interference with counsel's assistance.

[75] *Id.* at 659 & n.25; *see also Bell v. Cone*, 535 U.S. 685, 695–96 (2002).

Tenth Circuit recognized and drew upon this category of cases where Sixth Amendment prejudice is presumed,[76] specifically cases where direct state interference with the right to effective counsel has been held to violate the defendant's Sixth Amendment right per se.[77]  The court cited the rationale behind the use of a per se rule in such cases: "[t]hese state-created procedures impair the accused's enjoyment of the Sixth Amendment guarantee by disabling his counsel from fully assisting and representing him."[78]  The quoted passage goes on to state, "[b]ecause these impediments constitute direct state interference with the exercise of a fundamental right, and because they are susceptible to easy correction by prophylactic rules, a categorical approach is appropriate."[79]  The court proceeded to hold that a prosecutor's intrusion into the attorney-client relationship likewise constitutes a "direct interference" with the fundamental Sixth Amendment rights of a defendant to a fair adversary proceeding.[80]  Absent a countervailing government interest, such an intentional intrusion constitutes a per se violation of the Sixth Amendment, where "a prejudicial effect on the reliability of the trial process must be presumed."[81]  In adopting this per se rule, the court stressed that "no other standard can adequately deter this sort of misconduct," and that "[p]rejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost."[82]

---

[76] *Shillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995) (first citing *Strickland*, 466 U.S. at 692; then citing *Perry v. Leeke*, 488 U.S. 272, 279–80 (1989); and then citing *Cronic*, 466 U.S. at 658 & n.24).

[77] *Id.* (first citing *Ferguson v. Georgia*, 365 U.S. 579 (1961) (prohibiting direct examination of the defendant by his counsel); then citing *Brooks v. Tennessee*, 406 U.S. 605 (1972) (requiring those defendants who choose to testify to do so before any other defense witnesses); then citing *Herring v. New York*, 422 U.S. 853 (1975) (refusing to allow defense counsel closing argument in a bench trial); and then citing *Geders v. United States*, 425 U.S. 80 (1976) (prohibiting any consultation between a defendant and his attorney during an overnight recess separating the direct-examination and the cross-examination of the defendant)).

[78] *Id.* (quoting *United States v. Decoster*, 624 F.2d 196, 201 (D.C. Cir. 1979)).

[79] *Id.* (quoting *Decoster*, 624 F.2d at 201).

[80] *Id.* at 1142.

[81] *Id.*

[82] *Id*. (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984)).

The court further held that this per se rule subsumes the harmless-error analysis because the rule "recognizes that such intentional and groundless intrusions are never harmless because they 'necessarily render a trial fundamentally unfair.'"[83]   Accordingly, *Shillinger* instructs that the magnitude of these circumstances justifies a presumption of prejudice that precludes application of the harmless-error standard and requires automatic relief.[84]   In other words, the Tenth Circuit has recognized that a *Shillinger* violation constitutes a narrow variety of presumptively prejudicial constitutional error identified by *Strickland* and its progeny.

*Shillinger* has been extant law in the Tenth Circuit for over twenty-five years.   Yet the government continues to argue that even if the government intentionally and unjustifiably intruded into Hohn's attorney-client relationship, the error was harmless.   The government maintains that *Shillinger* was wrong in concluding that harmless-error analysis does not apply to Sixth Amendment intentional-intrusion violations because it conflicts with *Weatherford* and *Morrison*.   As this Court has previously discussed, however, the Tenth Circuit decided *Shillinger* after the Supreme Court decided both of these cases and the court acknowledged and accounted for both decisions.[85]   Further, neither *Weatherford* nor *Morrison* involved a claim that the government intentionally and unjustifiably became privy to protected attorney-client communications.[86]   Thus, neither decision addresses whether the harmless-error rule applies to a violation arising from an unjustified intentional-intrusion.   Despite the government's ongoing objection that *Shillinger* is not good law, this Court is bound to follow Tenth Circuit precedent.[87]

---

[83] *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 577 (1986)).

[84] *Id.*

[85] Doc. 940 at 14–15 (citing *Shillinger v. Haworth*, 70 F.3d 1132, 1138–40 (10th Cir. 1995)).

[86] *See Weatherford v. Bursey*, 429 U.S. 545, 555–58 (1977); *United States v. Morrison*, 449 U.S. 361, 363 (1981).

[87] *See United States v. Torres-Duenes*, 461 F.3d 1178, 1183 (10th Cir. 2006) (noting that once a panel of the Tenth Circuit resolves an issue, the panel's holding remains controlling law in the absence of (1) en banc review

Accordingly, the government's motion to reconsider its pre-hearing order is denied on these grounds, as clarified.

## IV.    Findings of Fact

The government filed a Motion in Limine before the evidentiary hearing seeking to exclude certain evidence, witnesses, and testimony designations.[88]  Because this was a bench hearing, and it is familiar with the record in *Black* and the parties' filings and submissions in the consolidated proceedings, the Court provisionally admitted all materials designated by the parties.[89]  The parties' objections under Fed. R. Evid. 401, 402, 403, and 404 were preserved at the evidentiary hearing.  In making its findings of fact, the Court has disregarded any evidence it deems irrelevant and has assigned the appropriate weight to each piece of relevant evidence admitted herein.

### *Warnings About Calls From CCA*

When Hohn arrived at CCA on January 27, 2012, he signed several documents acknowledging that telephone calls he made from CCA may be monitored and recorded and advising him that calls with his attorney were subject to being monitored unless he followed the privatization procedure in place to make an unmonitored call.  One document was the CCA Inmate Handbook, which included a section entitled "Inmate Telephone System."  It advised

---

or (2) an intervening Supreme Court decision).  The government argues that the Tenth Circuit applied harmless-error analysis in *United States v. Singleton*, 52 F. App'x 456 (10th Cir. 2002).  In that unpublished decision, the court rejected a Sixth Amendment intentional-intrusion claim in defendant's § 2255 proceeding, even though the prosecution had obtained attorney-client communications, because the prosecutors had not seen the privileged communications and had implemented a taint team.  In denying the § 2255 motion, the court expressly relied on *Shillinger*, stating nothing about that case being bad law.  *Id.* at 459–60.

[88] Doc. 983.

[89] Doc. 999.

detainees that "[t]elephone conversations may be monitored and are recorded for safety reasons."[90]  The Inmate Handbook further states:

> Your attorney may request of our facility that calls to their office not be recorded to ensure Attorney/Client privilege.  They may request this by way of sending CCA/LDC a fax on their office letterhead.  This request must include contact information and signature.  They may fax it to (913) 727-2231.  <u>IT IS YOUR RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE.  THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST THEY BE RESTRICTED.</u>[91]

Hohn testified that he read the Inmate Handbook in its entirety within the first week of arriving at CCA in connection with his attempts to make a phone call.[92]  Hohn admits that he did not follow the procedure in the Inmate Handbook for requesting an unmonitored attorney-client call, that he understood that he could make such a request, that it was up to him to do so, and that he did not follow the protocol.[93]

Hohn also received and signed the Monitoring of Inmate/Detainee Telephone Calls form, which advises detainees:

> [CCA] reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public.  An inmate's use of institutional telephones constitutes a consent to this monitoring.  A properly placed phone call to an attorney is not monitored.  You must contact you[r] unit team to request an unmonitored attorney call.[94]

---

[90] Ex. 813 at 9.

[91] *Id.*

[92] *Hohn*, 19-2082-JAR-JPO, Doc. 60 at 245.  The transcripts of the August 9 and 10, 2021 evidentiary hearing consist of two volumes found at Docs. 59 and 60 in *Hohn*, 19-2082-JAR-JPO, and collectively consist of 397 sequentially paginated pages.  For convenience, the Court cites to these documents as Tr. Evid. Hrg., followed by a reference to the page number in the transcript that appears in the upper right corner of each page.

[93] Tr. Evid. Hrg. at 246–47.

[94] Ex. 808 at 7.

Hohn understood that by signing this form, he was consenting to the monitoring and/or recording of his attorney-client calls unless he took certain steps.[95]  He acknowledges that he did not take steps to ensure the call to Campbell would not be monitored or recorded before he placed the call.[96]

Signs placed on and near telephones in the room where Hohn made the call to Campbell stated, "ALL CALLS MAY BE RECORDED/MONITORED" and/or "CALLS ARE SUBJECT TO MONITORING AND RECORDING."[97]  Hohn believed the written warnings and signs placed on or near the telephones at CCA applied to attorney-client calls.[98]

At the beginning of the April 23, 2012 call, a recorded preamble states:  "This is a call from an inmate at CCA-Leavenworth Detention Center.  This call is subject to recording and monitoring."[99]  Hohn believed that the recorded preamble applied to his attorney-client calls.[100]

CCA did not inform the detainees that monitored or recorded calls might be provided to others, including law enforcement or prosecutors for use in criminal investigations and prosecutions, or to attorneys for use in criminal or civil litigation.[101]  When CCA provided recorded calls to outside parties, it did not notify the detainees or their attorneys.[102]

Hohn confirmed during his testimony at the evidentiary hearing that he understood that his attorney-client calls were subject to monitoring for safety and security reasons, including

---

[95] Ex. 812 ¶ 12.

[96] *Id.* ¶ 14.

[97] Doc. 1004 ¶ 31.

[98] Doc. 812 ¶ 16.

[99] Doc. 758 at 10.

[100] Doc. 812 ¶ 15.

[101] Doc. 1004 ¶ 8.

[102] *Id.*

recording, by CCA and Securus Technologies, Inc. ("Securus"), the company that provided the telephone-recording equipment to CCA.[103]  Hohn also understood, based on the information provided to him by CCA, that he had to contact his unit team manager to request an unmonitored call with counsel and conceded that he never followed the procedure to make an unmonitored call.[104]  Hohn further testified that he believed that his calls to counsel would remain confidential from the prosecution team.[105]  No one at CCA informed Hohn that he had a Sixth Amendment right to speak privately with counsel, that if he waived that right, CCA could provide his recorded attorney-calls to the USAO, or that the USAO could use those calls against him in court.[106]  Hohn did not understand that by signing the Inmate Handbook and Monitoring form, he was consenting to CCA providing his recorded attorney-client calls to the USAO unless he took certain steps, nor did he believe that the USAO or its agents could obtain recordings of his attorney-client calls from CCA.[107]

The April 23, 2012 call was the first time Campbell spoke with Hohn after his appointment.  Campbell testified that prior to 2016, he did not know about the phone privatization process at CCA.[108]  He did not know that the call from Hohn was subject to monitoring or recording except for reasons related to institutional security, nor did he believe that the call would be distributed or made available to the USAO or its agents.[109]  Campbell testified that when the defense bar learned during the *Black* case and investigation that the

---

[103] Tr. Evid. Hrg. at 228, 248.

[104] *Id.* at 242, 247.

[105] *Id.* at 273–75.

[106] Doc. 665-1.

[107] *Id.*

[108] Tr. Evid. Hrg. at 284.

[109] Ex. 817 ¶¶ 8, 9.

USAO had obtained and listened to attorney-client phone calls, he was shocked and admonished his clients to be very cautious about placing phone calls from CCA.[110]  Prior to 2016, Campbell never saw anything posted at CCA indicating the need for attorneys to privatize their numbers, nor did anyone from CCA inform him about the need to do so.[111]  Campbell stated that he never contacted CCA to find out how their phone system worked and that Hohn did not tell him that CCA had a procedure for privatizing attorney-client calls.[112]

### Government's Requests for Hohn's CCA Calls

In 2012 through 2014, District of Kansas USAO attorneys and law enforcement agents could obtain recorded CCA calls without a written request, written receipt, or other tracking information.[113]  During that time period, the District of Kansas USAO did not have any internal practice or policy, or standard procedure for issuing, tracking, maintaining, or purging recorded CCA calls.[114]

The government, via AUSA Morehead or one of her agents, obtained three sets of Hohn's phone calls from CCA during the course of his prosecution.  The prosecution team made no effort to exclude recordings of Hohn's attorney-client calls from any of these requests, including using a filter team or any other procedure to identify and protect attorney-client communications among the recorded calls produced by CCA.[115]  None of the recordings provided by CCA to the government included calls from Hohn to his then-attorney, Burdick.[116]

---

[110] Tr. Evid. Hrg. at 284–86.

[111] *Id.* at 285.

[112] *Id.* at 309–10.

[113] Doc. 1004 ¶ 10.

[114] *Id.* ¶¶ 11, 12.

[115] *Id.* ¶¶ 5, 6.

[116] *Id.* ¶ 4.

On February 21, 2012, pursuant to a DEA administrative subpoena, Deputy Williams obtained Hohn's calls from CCA for the time period between January 25, 2012 to February 21, 2012.[117]  As detailed in this Court's order denying Hohn's request for leave to add a *Brady* claim, this subpoena was issued as part of an investigation into a possible threat to a government witness and also requested CCA calls and visitor information for several of Hohn's co-defendants.[118]  Williams emailed AUSA Morehead on March 8, 2012, to summarize eight hours of calls he had listened to and dispel any threats were coming from Hohn.[119]  Williams testified that he prepared a report regarding the February 2012 calls, which he gave to Morehead.[120]

The second subpoena was issued after Hohn's co-defendant Michael Quick told Deputy Williams about the disappearance and death of Gregory Price, including details about Hohn's role in Price's disappearance.[121]  On April 24, 2012, at Williams's request, TFO Farkes obtained CCA calls for Hohn and two co-defendants for the time period of April 19, 2012 to April 23, 2012, pursuant to a DEA administrative subpoena.[122]  TFO Farkes served this subpoena on behalf of the prosecution team.[123]  The request encompassed the "date, time, and duration of each call," as well as the recorded calls themselves.[124]  The call detail records show that Hohn made four calls during that time period, all on April 23, 2012.[125]  Three of the calls were to FPD toll-

---

[117] Exs. 832, 833.

[118] Doc. 1022 at 3–4.

[119] Ex. 8.

[120] Tr. Evid. Hrg. at 380; Ex. 835.

[121] Ex. 1055 ¶¶ 18–31.

[122] Exs. 846, 853.

[123] Farkes Dep. at 9, 16.

[124] Ex. 846.

[125] Ex. 823a.

free telephone numbers, and one call was to Campbell.[126]  Only the call to Campbell was recorded; the calls to the FPD were not recorded because the toll-free numbers had been privatized.[127]

On April 24, 2012, TFO Farkes collected the subpoenaed materials, including a CD and supporting documentation, from CCA.[128]  This CD, marked as N-8, contains a single call—the call Hohn made to Campbell the previous day.[129]  On or about April 25, 2012, Farkes made at least one copy of N-8 for Deputy Williams, Deputy Denton, or both.[130]  In July 2021, Farkes turned over the agency's copy of the CD to the USAO after the government inquired about the recordings.[131]  Farkes testified that he has never listened to the recordings he obtained pursuant to that subpoena.[132]  He further testified that he does not know if the DEA or Johnson County has any written policies about how to handle jail calls, that he never received any training about how to handle such evidence, and that if he ever came across an attorney-client call, he would turn it off and flag that number.[133]

Deputy Williams testified that he requested the April 2012 calls to confirm or provide additional information regarding the Price homicide investigation, but that none of these calls furthered the investigation.[134]  Williams explained that, even though Quick was cooperating,

---

[126] *Id.*

[127] Doc. 1007 ¶ 2.  Hohn called the FPD toll-free numbers multiple times before April 23, 2012; none of those calls were recorded because they were treated as privatized. *Id.*

[128] Ex. 15.

[129] Ex. 91.

[130] *Id.*

[131] Farkes Dep. at 19.

[132] *Id.* at 42.

[133] *Id.* at 39–42.

[134] Tr. Evid. Hrg. at 370.

there was a chance he was holding back everything he knew, and Williams hoped the calls obtained between April 19 and 23, 2021, included conversations between Quick and others he felt more comfortable talking with about what occurred the night Price died.[135]

On May 24, 2013, during a break in Hohn's trial, AUSA Morehead issued a subpoena for his CCA calls, as well as co-defendant Redifer's, from May 13 to May 28, 2013.[136]  Morehead was concerned that Hohn had threatened or intimidated Casey Cross, a cooperating government witness whose testimony changed at trial.[137]  The calls did not reveal any threats by Hohn or Redifer.[138]  Deputy Denton sent Morehead an email on May 29, 2013, summarizing the content of these calls, several of which he referred to as not important.[139]

Deputy Williams testified that he "probably" did not listen to every CCA call obtained in his investigation, but split the task with Deputy Denton.[140]  He explained that there may have been calls they missed, but that he "believe[d] we tried to listen to all of them because that was the point of having them."[141]  Members of the prosecution team reviewed Hohn's CCA calls, discussed the content of those calls, and circulated copies of the calls themselves.[142]  Williams testified, however, that during his investigation, he did not hear any calls between Hohn and a lawyer or anyone who sounded like a lawyer, nor did anyone else working on the case ever tell

---

[135] *Id.* at 371–72.

[136] Ex. 874.

[137] Tr. Evid. Hrg. at 205–06.

[138] *Id.* at 219.

[139] Ex. 8 at 6.

[140] Tr. Evid. Hrg. at 371.

[141] *Id.*

[142] *See* Ex. 807 ¶ 8 (Morehead affidavit discussing calls placed by Hohn and his co-defendants, indicating these calls were obtained "[o]n or about April 24, 2012" in connection with a homicide investigation and that agents reviewed these calls); Ex. 806 ¶ 8 (Morehead affidavit stating "I know calls were reviewed by agents"); Ex. 6 at 1 (February 13, 2019 email from Morehead to AUSAs James Brown and Carrie Capwell stating, "The agents obtained and reviewed calls obtained, and at no time ever reported coming across an attorney call to me.").

him that they heard an attorney-client call.[143]  Williams further testified that he did not request

Hohn's calls for the purpose of listening to conversations between Hohn and his attorney, and

when he asked TFO Farkes to obtain Hohn's CCA calls, he did not think it was very likely that

those recordings would include calls to Hohn's attorney.[144]

AUSA Morehead testified that she did not know about the "second batch" of calls

obtained by Deputy Williams in April 2012.[145]  She testified that the agents working on Hohn's

case never told her that they heard an attorney-client CCA call from Hohn, that she never

received any written report regarding the CCA calls that indicated Hohn was speaking to an

attorney, or that the agents thought attorney calls might be mixed in with the CDs that they

obtained.[146]  Morehead testified that she did not direct Williams or TFO Farkes to obtain Hohn's

CCA calls in February or April 2012.

AUSA Morehead's May 29, 2020 affidavit also discusses these sets of calls placed by

Hohn and his co-defendants.[147]  Morehead specifically states that the agents prepared reports

about the obtaining and review of the calls obtained on April 24, 2012, which were provided in

discovery.[148]  To date, no report on N-8 has been produced.

### April 23, 2012 Call

The FPD reviewed the recording of Hohn speaking by telephone with Campbell on April

23, 2012.[149]  Pursuant to the Court's Order, Hohn provided a privilege log detailing the claimed

---

[143] Tr. Evid. Hrg. at 372.

[144] *Id.* at 373–73.

[145] *Id.* at 192.

[146] *Id.* at 220–21.

[147] Ex. 807 ¶ 8.

[148] *Id.*; Ex. 852.

[149] Doc. 205-2 at 68.

protected communication, verifying that during this phone conversation, Hohn discussed matters "relat[ing] to legal advice or strategy" with Campbell.[150]  Hohn also provided a sworn declaration from Campbell, stating that he reviewed the recording of the call listed on the privilege log placed on April 23, 2012, and confirming that: (1) after the call was transferred by the receptionist, he and Hohn were the only two individuals on the line; (2) the matters discussed related to legal advice or strategy sought by Hohn, as detailed in the log and the declaration; (3) he had no knowledge nor did he believe that the call was subject to monitoring or recording as they were attorney-client protected, that he did not consent to such, and that he did not inform Hohn before the call was made that it was subject to such monitoring and recording in a manner that would be dispensed to prosecutors; and (4) until later litigation and information revealed that phone calls were being monitored and turned over to the USAO or its agents, he had no reason to know or believe that his legal calls were being monitored or released to the government and, after it became known, he privatized his numbers with CCA.[151]

After the government objected to Hohn's privilege log, the Court reviewed the audio recording *in camera*.[152]  As set out in the privilege log, the Court confirmed that the content of the six-minute call contains discussion relating to legal advice or strategy, including: Hohn's desire to have a trial in the matter, his criminal history, what he believed the evidence against him to be and problems with that evidence, concern about his truck being impounded, and the general way that they would proceed to meet and discuss the case going forward.[153]  The Court also confirmed that there is no discussion of the recorded preamble between Hohn and Campbell

---

[150] *Id.*

[151] Doc. 703-1.

[152] Docs. 355, 588.

[153] Doc. 205-2 at 68.  Williams testified the Hohn used his truck to transport Price's body, which had been stuffed into a refrigerator.  Tr. Evid. Hrg. at 359.

in the call listed in the privilege log, nor any statements acknowledging the warning or evincing awareness that the call was being recorded during their conversation.

### Post-Black *Discovery*

Acting United States Attorney Duston Slinkard testified about his role in these proceedings, first as Criminal Chief, then First Assistant United States Attorney.[154]  Slinkard has been involved in the *Black* investigation and litigation since August 2016.  Slinkard described the process the USAO undertook to produce recordings of CCA phone calls in its possession after the FPD filed a motion for discovery in the *Black* case.[155]  In September 2018, Slinkard directed a USAO paralegal to identify, collect, and transmit any jail calls that were in the government's possession.[156]  This plan involved asking prosecutors to identify any jail calls in their individual cases, examine physical files in the government's possession, examine discovery storage spaces on the USAO network, and for any cases identified on the list of potential calls provided by the FPD but had not been located in the USAO office, to reach out to agencies that might have been involved.[157]

After the parties reached "loggerheads" about the process in December 2019, this Court entered an order memorializing the parties' agreement on surrendering the recordings the government was able to identify and collect as well as derivative evidence, along with a written log of the recorded calls.[158]  The FPD would get copies of whatever recordings were surrendered to the Court.  The order directed the government to rely on disinterested entities to do the

---

[154] Tr. Evid. Hrg. at 30.

[155] *Id.* at 37–40.

[156] Ex. 116.

[157] *Id.*

[158] *Black*, Doc. 705.

search.[159]  Acting United States Attorney Slinkard confirmed that the purpose of the agreement was to identify and confirm which calls were in the government's possession, and remove the recordings from the government's possession so that prosecutors and agents could no longer have access to the calls.[160]  But Slinkard conceded that this is not what happened in these consolidated proceedings.  Individual prosecutors, including AUSA Morehead, were permitted to search their own files and if recordings were discovered, no further inquiry was made of any agencies involved in the case.[161]

While the government initially agreed to produce any relevant evidence that the USAO discovered, it later asked the Court to issue a protective order excusing it from attempting to discover such evidence by searching the USAO repositories for additional electronically stored information.[162]  After the Court denied the protective order, the government filed a Notice that the Court's orders were contrary to law and refused to comply with them.[163]  Despite this refusal to dedicate additional time or resources to the task of searching for and producing evidence to Hohn, the USAO later engaged in similar searches for the purpose of defending against his Sixth Amendment claim.[164]  These searches yielded two discoveries.

---

[159] Tr. Evid. Hrg. at 43.

[160] *Id.* at 44–45.

[161] *Id.* at 75–76.

[162] Ex. 79.

[163] Ex. 82.

[164] *See* Ex. 107 at 1–3.

First, it was discovered that the DEA remained in possession of Hohn's attorney-client call until at least July 2, 2021.[165]  The DEA relinquished the call to the USAO without a court order, and thus remained accessible to the original prosecution team until at least July 2, 2021.[166]  Second, AUSA Morehead located call CDs in defendant Jay Giannukos's physical file in an unrelated criminal case, then provided those calls to the USAO paralegal, and the calls were disgorged to the Court on January 7, 2019.[167]  But just as Morehead harbored multiple copies of Hohn's recorded calls, she harbored multiple copies of Giannukos's calls as well.[168]  It does not appear Morehead revealed these additional copies to USAO management until eighteen months later when the USAO delivered these calls to the Court on July 14, 2021.[169]  As Acting United States Attorney Slinkard acknowledged, these circumstances cannot be reconciled with the letter or the spirit of this Court's orders in *Black*.[170]  And as far as the Court is aware, the USAO has not taken steps to rectify this situation to determine whether agents remain in possession of any call recordings.[171]

Prior to the government's Notice that it would not comply with the Court's discovery orders, it conducted an examination of the computers used by prosecutors in this matter. Forensic examination of twenty laptop and desktop hard drives that were previously assigned to the prosecutors in the petitioners' criminal cases revealed that the audio file names

---

[165] *Id.*; Ex. 108.

[166] Ex. 107; Tr. Evid. Hrg. at 75–76; Farkes Dep. at 12–13.

[167] Exs. 2, 96.

[168] Exs. 109, 110.

[169] Ex. 109.

[170] Tr. Evid. Hrg. at 43–45, 76.

[171] *Black*, Doc. 856 (FPD Motion to Compel government to disgorge any recorded attorney-client communications that remain in USAO's custody or control, including those in possession of law enforcement agencies).

corresponding to the jail calls identified on the petitioners' privilege logs were not found on any of the computers, except for the hard drives assigned to former Special Assistant United States Attorney Erin Tomasic.[172]  The report prepared by Department of Justice's Computer Crime and Intellectual Property Section ("CCIPS") Cybercrime Lab lists ten file names that were found on Tomasic's computer, three of which it described as "Exact Matches" and seven of which it described as "Partial Matches."[173]  The hard drives were in use at the USAO from approximately 2012 through late August 2016.[174]  It is undisputed that the facts and findings described in the Evidence Processing Report prepared by the CCIPS Cybercrime Lab are accurate.[175]  The processing, examination, and searching of the twenty-two hard drives included the spaces on the hard drives where visible files and deleted files could be found.[176]

## V.   Conclusions of Law

To obtain collateral relief on a constitutional claim, a defendant must prove the alleged violation by a preponderance of the evidence.[177]  Hohn makes clear that he cannot demonstrate a realistic possibility of prejudice, and instead relies on the presumption of prejudice in *Shillinger*. That case holds that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement

---

[172] Doc. 1004 ¶¶ 15–21.

[173] *Id.* ¶¶ 20–21.

[174] *Id.* ¶ 17.

[175] *Id.* ¶ 14.

[176] *Id.* ¶ 18.

[177] *United States v. Washington*, 890 F.3d 891, 895 (10th Cir. 2018).

interest.[178]  Once those elements are established, prejudice is presumed, resulting in a per se

Sixth Amendment violation.[179]

### A.   Protected Attorney-Client Communications

As an initial matter, the Court briefly addresses the government's argument that Hohn

cannot maintain his Sixth Amendment claim while refusing to produce the call upon which his

claim is based.  This Court has previously addressed whether the government should be

permitted access to and review the content of the audio recordings that serve as the basis of

petitioners' claims on the grounds that petitioners either impliedly or expressly waived the

attorney-client privilege.  On June 4, 2020, this Court entered an order rejecting the

government's argument that petitioners implicitly waived the attorney-client privilege over the

communications when they placed the communications at issue in bringing their habeas

petitions.[180]  On October 16, 2020, the Court reaffirmed its ruling on the government's implied

waiver argument and, in light of the government's blanket objections to petitioners' privilege

logs, established a procedure for *in camera* review of the recordings.[181]  By then, the government

had expanded its argument that it was entitled to review the calls based on potential express

waiver of the attorney-client privilege based on pre- or post-call disclosure of the content of the

calls to non-attorneys.[182]  Instead of permitting discovery on this issue, however, the Court

directed petitioners and defense counsel to expand the record with affidavits addressing the

government's waiver and protected-communication arguments.[183]

---

[178] *Black* Order at 162 (citing *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995)).

[179] *Id.*

[180] Doc. 225 at 5–9.

[181] Doc. 588 at 10–18, 59.

[182] *Id.* at 40–43.

[183] *Id.* at 58–59

The government continues to argue that Hohn cannot maintain his Sixth Amendment claim if he refuses to produce the telephone call recording that forms the basis of that claim, objecting to the secret nature of the contents of the recording—a recording that was obtained by the prosecution team and harbored in its case files for years.  But as this Court's previous rulings explain, this issue can be determined short of permitting the government to review the content of the recordings, as such disclosure would needlessly perpetuate any potential Sixth Amendment violation.[184]  The Court's *in camera* review of Hohn's call confirmed that the communication involved legal advice or strategy.  The content of that communication is not relevant to the next step in the Court's analysis—whether Hohn had a reasonable expectation of confidentiality in the call or whether he waived the attorney-client privilege or his Sixth Amendment right to confidential communications with counsel by disclosing the call on a recorded phone line.  The Court's position throughout these proceedings has been that this initial review, coupled with declarations and any subsequent testimony from petitioners and counsel, would suffice to protect both petitioners' Sixth Amendment rights and the government's need to defend itself.  As discussed *infra*, this approach has borne out in this case, where the Court concludes that based on the record before it, Hohn has not satisfied the protected-communication element of his claim.

### 1. *Black* Order

The *Black* Order detailed the government's practice of obtaining attorney-client communications and its view that these communications are not protected by the attorney-client privilege or the Sixth Amendment.[185]  Prosecutors in the Kansas City office of the USAO operated under the theory that "the law is clear that CCA's preamble warning the call was being

---

[184] This approach was both necessary and prudent, as the majority of petitioners' Sixth Amendment claims are subject to dismissal on procedural grounds.  *See* Doc. 730.

[185] *Black* Order at 101–06.

recorded made the call non-privileged."[186]  Once the *Black* investigation turned adversarial, both USAO management and rank alike took this litigation posture, consistent with the position previously taken by most Kansas City prosecutors before, that the attorney-client privilege was waived.[187]  And per Acting United States Attorney Slinkard's testimony at the evidentiary hearing, that remains the USAO's official litigation position to this day.[188]

The *Black* Order further discussed, however, that this unilateral determination that the recorded calls were conditioned on a knowing waiver of the attorney-client privilege was made without factual support or accurate legal analysis.[189]  While the ultimate conclusion about whether a particular detainee waived the attorney-client privilege or Sixth Amendment right to confidential communications with counsel must be decided on a case-by-case basis, the record in *Black* allowed the Court to make findings on several common issues.  The Court found that many CCA detainees lacked the information and means to knowingly and intelligently waive their attorney-client privilege and/or the Sixth Amendment right to confidential attorney-client communications because CCA failed to adequately inform them that their calls to attorneys would be recorded unless they used the privatization process: (1) the signage near the phones did not specifically inform detainees that attorney-client calls were also subject to being recorded; (2) the Intake Booking Packet and Inmate Handbook did not sufficiently inform detainees about how to ensure confidential communications with their attorneys through the privatization process; (3) detainees routinely were not provided with the Inmate Handbook; and (4) the

---

[186] *Id.* at 112.

[187] *Id.* at 113.

[188] Tr. Evid. Hrg. at 110–11.

[189] *Black* Order at 110–13.

preamble at the beginning of the outgoing call to a non-private attorney phone number did not provide meaningful notice that the call would be recorded.[190]

The Court concluded that while the government may be able to demonstrate facts in individual cases that a detainee knowingly and intelligently waived the right to confidential attorney-client communications, the record developed after the Special Master's two-year investigation in this case called into doubt the government's ability to establish waiver based on the orientation packet, Inmate Handbook, preamble, and signage, particularly in the face of evidence that many defense attorneys advised their clients that their calls would not be recorded.[191]  The Court stressed that *Shillinger* itself stands for the proposition that it takes more than the mere presence of a third party for a person to waive their Sixth Amendment right to confidential attorney-client communications.[192]  Similarly, the mere fact that CCA warned detainees in various ways that their calls would be subject to recording and monitoring is not enough, standing alone, to constitute waiver given the many other facts in the record that detainees and their attorneys were led to believe these warnings did not apply to them.[193]

### 2.    Attorney-Client Privilege vs. Sixth Amendment

The Sixth Amendment right at issue here is the right to effective assistance of counsel; that right includes the ability to speak candidly and confidentially with counsel free from unreasonable government interference.[194]  This right is clearly related to the attorney-client privilege, which encourages "full and frank communication between attorneys and their clients

---

[190] *Id.* at 168–70.

[191] *Id.* at 176–77.

[192] *Id.* at 177.

[193] *Id.*

[194] *See Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977).

and thereby promote[s] broader public interests in the observance of law and administration of justice."[195]  The privilege is an evidentiary rule that prevents courts from compelling disclosure of confidential communications by those the privilege shields.[196]  "Because the [S]ixth [A]mendment ensures a right to effective assistance of counsel, it should follow that the [S]ixth [A]mendment subsumes the attorney-client privilege, a necessary underpinning of that right."[197]  Thus, the protection afforded by the Sixth Amendment includes, but is not limited to, the scope of the attorney-client privilege.[198]

This does not mean, however, that protection under the Sixth Amendment extends to every attorney-client communication without limits.  While Hohn maintains that he need not show an attorney-client communication is privileged to succeed on his Sixth Amendment claim, the Court has rejected petitioners' previous attempts to remove the attorney-client privilege from the analysis as wholly irrelevant or a redundant additional layer of protection.[199]  Thus, while recognizing that, standing alone, the attorney-client privilege is not a right guaranteed by the Sixth Amendment, this Court has consistently applied principles relating to the attorney-client

---

[195] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[196] *Howell v Trammell*, 728 F.3d 1202, 1222 (10th Cir. 2013) (citation omitted).

[197] Note, *Government Intrusions into Defense Camp: Undermining the Right to Counsel*, 97 HARV. L. REV. 1143, 1145 (1984) (first citing *Weatherford v. Bursey*, 429 U.S. 545, 563 (1977) (Marshall, J., dissenting); and then citing *United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978)); *see* Doc. 225 at 10 (quoted in Doc. 940 at 5–6; Doc. 588 at 18.

[198] *See Weatherford*, 429 U.S. at 554 (rejecting the idea that every time "a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk" and thereby also renders inapplicable the Sixth Amendment right to consult with counsel without government intrusion); *Shillinger v. Haworth*, 70 F.3d 1132, 1134–35, 1142 (10th Cir. 1995) (holding the state violated the Sixth Amendment by intentionally and unjustifiably becoming privy to attorney-client communications; declining to address whether the communications were privileged after expressly acknowledging the possibility that the petitioner waived the privilege by speaking with counsel in the presence of a third party).

[199] Doc. 225 at 11–12; Doc. 588 at 22.

privilege as an appropriate framework for showing that the recordings between petitioners and counsel are protected communications under the Sixth Amendment.[200]

Accordingly, determining whether the privilege attached to a petitioner's attorney-client recording was the logical starting point for the Court's analysis of whether petitioners have made a threshold showing on the protected-communication element of their claims.  After the Court directed the recordings to be released, it outlined a procedure whereby the FPD would conduct an initial review to determine if the recordings met a very minimal showing of being protected communications, without revealing the substance of the calls.  This preliminary review was necessary to determine whether the recordings existed and whether they related to legal advice or strategy—threshold findings needed to establish whether petitioners are entitled to proceed to an evidentiary hearing under the Rules Governing Section 2255 Proceedings.

But the Court further explained that this threshold showing is merely that—petitioners are also required to establish there was a reasonable expectation of confidentiality with respect to the audio recordings.[201]  As this Court previously discussed, in Sixth Amendment intentional-intrusion cases, where the right claimed includes the right to confidential communications with counsel, a communication that "is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential" is protected by *both* the attorney-client privilege and from government intrusion under the Sixth Amendment.[202]

---

[200] Doc. 225 at 11–12; Doc. 588 at 22–31; *see Howell*, 728 F.3d at 1222 ("A violation of the attorney-client privilege implicates the Sixth Amendment right to counsel only . . . when the government interferes with the relationship between a criminal defendant and his attorney.") (quoting *Partington v. Gedan*, 961 F.2d 852, 863 (9th Cir. 1992)).

[201] Doc. 588 at 31.

[202] *Id.* at 18–19 (quoting *United States v. Melvin*, 650 F.2d 641, 645 (5th Cir. 1981)); *see In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (explaining a "critical component" of the privilege is whether the communication "'is made under circumstances from which it may reasonably be assumed that the communication will remain in confidence.'") (quoting *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir. 1995)).

Indeed, *Shillinger* requires petitioners to show that the government became privy to *confidential* communications.[203]  Thus, to establish the protected-communication element, Hohn must show that he had a reasonable expectation of confidentiality in his attorney-client call and that he did not otherwise waive the attorney-client privilege.[204]  Per the Court's directive, Hohn supplemented the record with an affidavit addressing the government's waiver and protected-communication argument and testified about these issues at the August 2021 evidentiary hearing.

### 3.        Reasonable Expectation of Confidentiality

The government argues that Hohn has failed to carry his burden to establish he had a reasonable expectation of confidentiality with respect to the April 23, 2012 call.  The government contends that Hohn's assertion that he considered his attorney-client communications to be confidential is objectively unreasonable and thus no attorney-client privilege or Sixth Amendment protection attached to the communications in the April 23, 2012 call.  The Court agrees.

The record before the Court—the Inmate Handbook, the telephone-call monitoring consent form, as well as Hohn's sworn statement and testimony admitting that he believed his attorney-client calls were monitored or recorded and that he knew he could make an unmonitored call to his attorney but did not take steps to do so—supports a finding that Hohn did not have a reasonable expectation of confidentiality in the April 23 call to Campbell.  On that day, after he had been at CCA for nearly three months and had studied and understood the Inmate Handbook and phone monitoring consent forms he signed, Hohn placed the call to Campbell from a CCA

---

[203] 70 F.3d at 1142.

[204] *See In re Grand Jury Proc.*, 616 F.3d 1172, 1183 (10th Cir. 2010) ("The burden of establishing the applicability of the attorney-client privilege rests on the party seeking to assert it.").  While Hohn bears the burden of proving the applicability of the attorney-client privilege, including that he has not waived the privilege, the government bears the burden of proving that Hohn did not waive his Sixth Amendment right to confidential communications with counsel.  *See Carnley v. Cochran*, 369 U.S. 506, 515–16 nn.9–10 (1962).

phone that he believed and understood was monitored and recorded.  Hohn testified that he believed and understood that his attorney-client calls were subject to recording by Securus and CCA, that he consented to the monitoring and/or recording of his attorney-client calls, that he understood the procedure to except attorney-client calls from monitoring, and that he never followed the procedure to make an unmonitored call.  There is no evidence that Campbell or former counsel Burdick ever disabused Hohn of this belief or advised him that his attorney-client calls were not subject to the numerous warnings he received.  This conduct is inconsistent with an objectively reasonable expectation of confidentiality in the attorney-client communications, and thus the attorney-client privilege and the Sixth Amendment right to confidential attorney-client communications did not attach to the April 23 call.

### 4.      Waiver

Even if the privilege attached, however, Hohn waived the privilege by knowingly and voluntarily disclosing attorney-client communications on a monitored or recorded phone line—effectively, a third party.  "Because confidentiality is key to the privilege, '[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party.'"[205]  "'Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege.'"[206]

This Court previously explained that *Shillinger* requires "more than the mere presence of a third party for a person to waive their Sixth Amendment right" to confidential communications with counsel.[207]  In *Weatherford* and *Shillinger*, the third party was either an undercover agent or

---

[205] *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d at 1185 (quoting *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990)).

[206] *Id.* (quoting *United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir. 1989)).

[207] *Black* Order at 176; Doc. 588 at 40.

a deputy sheriff who was required to be present.  In other words, having law enforcement present under these circumstances did not destroy the defendant's reasonable expectation of the confidentiality of the communications. [208]  Hohn argues that consent to have phone calls monitored by CCA and Securus for security purposes is no different from authorizing a deputy to monitor trial-preparation sessions for the same purpose.

But Hohn's case does not involve the "mere presence of a third party."  Key to the Court's finding is (1) Hohn's clear admission that when he consented to the monitoring or recording of his calls, he knew and understood that unless he followed the privatization procedure, his attorney-client calls were being recorded by CCA and Securus, and (2) unlike the petitioner in *Shillinger*, who was required to have the deputy present during his conversation with counsel, he knowingly and voluntarily placed the call to Campbell without taking steps available to him to privatize the call.  Because Hohn knowingly and voluntarily disclosed the content of his attorney-client call to a third party, any reasonable expectation of confidentiality, and thus the attorney-client privilege, is lost.[209]

Hohn attempts to avoid this result by arguing that even if he waived the attorney-client privilege as to CCA or Securus by consenting to the recording his attorney-client communications for security purposes, he did not waive the privilege as to the prosecution team. The government asserts that Hohn effectively proposes the Court find that his voluntary disclosure of the attorney-client communications on a line he knew was subject to recording

---

[208] *Shillinger*, 70 F.3d at 1134.

[209] *See United States v. Johnson*, No. 2:11-cr-00501-DN-PMW, 2016 WL 297451, at *4 (D. Utah Jan. 22, 2016) (denying defendant's claim that government intentionally intruded into his attorney-client relationship under *Shillinger* by obtaining Presentence Investigative Report materials that included defendant's immunized testimony; because defendant voluntarily disclosed the substance of attorney-client communications to a third party when he cooperated with government investigators, any information is not protected by the attorney-client privilege and "there can be no Sixth Amendment violation for the government obtaining it").

constitutes a form of "selective waiver" that does not waive the attorney-client privilege beyond the limited disclosure made.  However, the Tenth Circuit has refused to adopt "a selective waiver doctrine as an exception to the general rules of waiver upon disclosure of protected material."[210] The court explained that "[b]ecause exceptions to the waiver rules necessarily broaden the reach of the privilege or protection, selective waiver must be reviewed with caution."[211]  Thus, this Court is foreclosed from finding a selective waiver has taken place, and the general rules of waiver of the attorney-client privilege apply.[212]

Because the attorney-client privilege is a necessary underpinning of Hohn's Sixth Amendment right, he cannot satisfy the protected-communication element of his claim.  Hohn does not cite, nor has this Court found, case law that extends the Sixth Amendment right to confidential communications with counsel to attorney-client communications where the privilege did not attach for lack of a reasonable expectation of confidentiality or where the privilege was voluntarily waived.[213]  And because the call to Campbell was never protected under the Sixth Amendment, the Court does not reach the issue of waiver of any Sixth Amendment right.  Even if the government is required to make an additional showing that Hohn knowingly and intelligently waived his Sixth Amendment right to confidential communications with counsel, he effectively did so for the same reasons he waived application of the attorney-client privilege.

---

[210] *In re Qwest, Commc'ns Int'l Inc.*, 450 F.3d 1179, 1192 (10th Cir. 2006).

[211] *Id.* at 1195.

[212] *Id.* at 1192 (characterizing the selective waiver doctrine as "a leap, not a natural, incremental step in the common law development of privileges and protections"); *see Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.* (declining to find selective waiver under *Qwest*).  The Court gives little weight to the government's suggestion that the content of Hohn's attorney-client call implicated any facility or public safety or security concerns.  Nor does the Court address the government's argument that Hohn might have otherwise waived the privilege by sharing confidential information with non-attorneys prior to or after the call was placed.

[213] *See Johnson*, 2016 WL 297451, at *4.

Accordingly, Hohn has not satisfied the protected-communication element of his Sixth Amendment claim.

The Court stresses that this conclusion is limited to facts before it with respect to Hohn. Many petitioners in these proceedings have specifically averred that they did not understand that their attorney-client calls were subject to recording or that they consented to CCA or Securus recording the calls for any purpose.[214]

## B.     Purposeful Intrusion Into Attorney-Client Relationship

The government argues that because Hohn's April 23, 2012 call was not protected by the attorney-client privilege or the Sixth Amendment, there could not have been any purposeful intrusion into his attorney-client relationship.  The government is correct that because *Shillinger* rests on the government becoming privy to confidential communications, there can be no purposeful intrusion into the attorney-client relationship.  But the issue of whether an attorney-client communication is protected is a function of the case-specific waiver analysis conducted by the Court, not the government's cavalier attitude to jail calls in general or its unilateral and inaccurate assessment of waiver.  The facts and circumstances of this case compel the Court to offer the following discussion of this element of Hohn's Sixth Amendment claim.

Post-*Shillinger* case law suggests that purposeful intrusion into the attorney-client relationship does not occur "merely by the prosecution obtaining the protected materials; rather,

---

[214] *See, e.g.*, *United States v. Spaeth*, No. 19-2413-JAR-JPO, Doc. 874 (detailing petitioner's declaration addressing the issue of waiver where he avers that he did not know that by signing the Inmate Handbook and Call Monitoring Sheet he was consenting to the monitoring and recording of his attorney-client calls unless he took certain steps; at the time he placed the calls to counsel he did not believe that the recorded preamble or the signage near the phones applied to attorney-client calls); *United States v. Mitchell*, No. 17-2380-JPO, Doc. 16 (granting petitioner an evidentiary hearing on his 2255 motion alleging a pre-trial audio recording claim violation; detailing petitioner's declaration addressing waiver where he avers that he did not know that by signing the documents provided by CCA, he was consenting to the monitoring and/or recording of his attorney-client calls unless he took certain steps, that at the time he placed the calls to counsel he did not believe the recorded preamble applied to attorney-client calls, and that he did not believe the signage placed near CCA phones applied to attorney-client calls).

it is what the prosecution does with the materials *after obtaining them* that determines whether there has been a Sixth Amendment violation."[215]   In these subsequent cases, the prosecution team took care to avoid exposure to any attorney-client communication and there was no evidence that any member of the team became privy to the content of such.   In other words, there can be no purposeful intrusion into the attorney-client relationship unless the confidential information was actually communicated to the prosecution team.[216]   Because this element necessarily requires that the prosecution team became privy to Hohn's April 23, 2012 call, the Court considers these elements together.   As this Court has previously indicated, Hohn is free to rely on evidence of pre- and post-intrusion conduct to satisfy these elements.[217]

The government contends that this element requires Hohn to show that the prosecution team acted with the specific intent to intrude into his attorney-client relationship in the initial act of requesting or obtaining the attorney-client communications.   The government further contends that no member of the prosecution team ever became privy to the April 23, 2012 call.   The Court disagrees on both counts.

*Shillinger* makes clear that the per se rule applies when the government purposefully intrudes into the attorney-client relationship and, as a result of that intrusion, it becomes privy to protected attorney-client communications.[218]   In that case, the prosecutor intentionally intruded into the attorney-client relationship by enlisting the deputy who had been present during communications between the defendant and his attorney to report the substance of those

---

[215] *Johnson*, 2016 WL 297451, at *5 (citing *United States v. Singleton*, 52 F. App'x 456, 458–59 (10th Cir. 2002); *United States v. Zajac*, No. 06CR811DAK, 2008 WL 1808701, at *5 (D. Utah Apr. 21, 2008)).

[216] *Id.*

[217] *Black* Order at 176–77.

[218] *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995).

communications to the prosecutor.[219]  The court explained that "the prosecutor, by his own admission, proceeded for the purpose of determining the substance of [the defendant's] conversations with this attorney, and attorney-client communications were actually disclosed. This sort of purposeful intrusion on the attorney-client relationship strikes at the center of the protections afforded by the Sixth Amendment . . . ."[220]  The Court agrees with Hohn that the purposeful-intrusion element applies to the prosecution team's ultimate act of becoming privy to a defendant's attorney-client communications, not necessarily the initial act of requesting or obtaining them.[221]  Once a defendant demonstrates the requisite purpose and intrusion are present, only a legitimate law enforcement justification will remove the case from the ambit of *Shillinger*'s per se rule.

This is especially evident in cases where the government or its agents issued a general subpoena for all of a petitioner's CCA calls, without taking any steps to exclude calls to attorneys or to use a filter team.  The Court discussed this issue in detail in the *Black* Order, where the FPD argued that the USAO purposefully intruded into attorney-client relationships by collecting and saving CCA recordings that it knew or should have known included protected communications, with no exceptions for attorney-client calls or any other cautionary measures.[222]  The evidence in *Black* showed that the USAO and its agents routinely requested and received recordings of phone calls that defendants placed from CCA, with no precautions to exclude or avoid learning the content of these recordings or use of a filter or taint team.  As the government now admits, sometimes the recordings that the prosecution team obtained from CCA

---

[219] *Id.* at 1134–35.

[220] *Id.* at 1141.

[221] *Id.* at 1141–42 (focusing on the prosecutor's intent and treating the deputy's intent as irrelevant).

[222] *Black* Order at 80–123.

included calls that defendants placed to their defense attorneys.  And the record is clear that upon receiving recordings, prosecutors and their agents routinely reviewed the calls.  As discussed in the *Black* Order, when the USAO obtained calls from CCA, it had a one-in-four chance of encountering a call placed to a phone number associated with the defendant's attorney.[223]

Several agents and AUSAs in *Black* admitted to encountering attorney-client calls.  Most, like AUSA Morehead, denied they had any idea that the prosecution team was in possession of such calls or that they listened to the recordings, despite having access to the audio recordings under circumstances where they knew or should have known the material would include attorney-client communications, with no precautions to exclude or avoid learning the content of these recordings or use of a filter or taint team.  The record also showed that the USAO kept recordings of such calls for years without disclosing them to defense counsel.  Ultimately, however, the Court determined that whether the USAO purposefully intruded into a defendant's attorney-client relationship must be determined on a case-by-case basis.[224]

Here, Deputy Williams testified that he did not request Hohn's calls for the purpose of listening to conversations between Hohn and his attorney.  At Williams's direction, TFO Farkes issued a subpoena for the April 2012 recordings of calls place by Hohn and two of his co-defendants in connection with the investigation of Price's death and disappearance.  Farkes never received any training about how to handle jail calls and testified that he never listened to any of the recording he obtained pursuant to that subpoena, but instead made copies for Williams and Deputy Denton.  Williams testified that he had no reason to think it was very likely that CCA would include calls to Hohn's attorney.  No attorney-client calls were included in the CCA calls

---

[223] *Id.* at 104; Ex. 827 at 18.

[224] *Black* Order at 176–77.

he subpoenaed in February 2012, and there is no evidence that Williams subscribed to the belief that such calls were fair game. Nor is there any evidence that AUSA Morehead used Williams to obtain Hohn's CCA calls in an attempt to disavow any knowledge of improper activity.

But the fact that the agents may have inadvertently obtained Hohn's attorney-client call by issuing a broad subpoena without any precautions does not immunize the prosecution team from liability for subsequently becoming privy to the contents of the recording. This Court has stated that it intends to take as established facts proving the "privy to" element of petitioners' claims based on the government's refusal to comply with the Court's discovery orders under Fed. R. Civ. P. 37.[225] Here, this element can also be established by independent support found in AUSA Morehead's affidavits;[226] an internal USAO email;[227] Deputy Williams's testimony at the evidentiary hearing;[228] and emails between members of the prosecution team.[229]

The April 2012 subpoena was the second time Hohn's calls were obtained by Deputy Williams. AUSA Morehead's May 29, 2020 affidavit discusses these sets of calls placed by Hohn and his co-defendants.[230] Morehead specifically states that the agents prepared reports about the obtaining and review of the calls obtained on April 24, 2012, which she represents were provided in discovery.[231]

It is clear that Deputy Williams and Deputy Denton listened to the calls they obtained in February 2012 and documented their review of the calls. The agents also documented review of

---

[225] Doc. 587 at 16. The government maintains that those discovery orders were unlawful and has preserved those arguments for any appeal. *See, e.g.*, Doc. 570 at 2–8.

[226] Ex. 807 ¶ 8; Ex. 806 ¶ 8.

[227] Ex. 6.

[228] Tr. Evid. Hrg. at 363–73.

[229] *See, e.g.*, Exs. 8, 837.

[230] Ex. 807 ¶ 8.

[231] *Id.*

other calls that they obtained in April 2012, even though those calls did not have any evidentiary value, and the government was able to locate and produce at least some of that documentation. Yet the government did not offer any documentation or testimony regarding the deputies' review of N-8—a CD that contained only Hohn's April 23, 2012 attorney-client call.  It makes little sense that the agents would not listen to N-8, given the time-sensitive nature of the Price investigation and the particular focus on Hohn's involvement in his death.  In light of the prosecution team's well-documented approach to handling the recordings of non-attorney-client calls in this case, the absence of such evidence is suspect and suggests that (1) they did listen to the call and knew it was wrong for them to do so, or (2) they did document or otherwise report their review to Morehead but did not produce any evidence related to this report.

Even if the agents did not listen to N-8, however, the evidence shows that AUSA Morehead did.  As discussed in this Court's order denying Hohn's motion for leave to amend to add a *Brady* violation claim, Morehead obtained copies of the phone call that Hohn placed to his sister on February 3, 2012, and saved the call for sentencing when she offered it as Exhibit 1 in support of her request that the court impose a life sentence.[232]  Morehead also retained her own copy of N-8, which she stored with at least one copy of sentencing Exhibit 1.  On January 7, 2019, the USAO produced three CDs to the Court: (1) an intact copy of N-8; (2) a broken copy of a CD labeled as Government's Exhibit 1; and (3) another broken CD.[233]  Ten days later, in an attachment to an email she sent to Acting United States Attorney Slinkard, former USAO employee Linda Smith referenced those same materials in connection with Hohn.[234]  This

---

[232] Doc. 1022 at 3, 8 (describing Hohn's call to his sister where he discussed taking revenge on individuals who cooperated against him).

[233] Ex. 885 at 1, 6; Ex. 90 (depicting a broken CD marked as Government's Exhibit 1, a second broken CD, and an intact CD marked as a copy of N-8).

[234] Ex. 2 at 5.

attachment indicates that Morehead located all three CDs in Hohn's physical case file and personally delivered the CDs to Smith.[235]

In addition, Acting United States Attorney Slinkard's testimony indicates that AUSA Morehead was harboring her own copy of N-8, as the USAO asked upstream agents and agencies for their copies of recorded calls only if the USAO was first unable to locate known calls in the USAO's possession.[236] Here, the USAO did not ask the DEA for copies of Hohn's calls until just prior to the August 2021 evidentiary hearing, which explains why the DEA was still in possession of the original version of N-2 (Hohn's February 2012 calls) and N-8 as of July 2021.[237] Accordingly, the copy of N-8 that the USAO produced to the Court on January 7, 2019, was a copy of N-8 that the USAO already had in its office.[238]

Further, AUSA Morehead's conduct is inconsistent with her testimony that she did not listen to or otherwise become privy to the attorney-client call on N-8. As detailed in this Court's post-evidentiary order on Hohn's proposed *Brady* claim, in the lead up to Hohn's 2013 trial, AUSA Morehead took steps to conceal her continuing possession of that call, as embodied in an April 12, 2013 email chain between Morehead, Campbell, and defense counsel Debra Vermillion, who represented co-defendant Redifer.[239] Vermillion requested Morehead provide her with calls and reports referenced in a report authored by Smith. That report referenced the materials that TFO Farkes collected from CCA on April 24, 2012: three CDs, which later became N-7 (calls place by Quick), N-8 (the call place by Hohn), and N-9 (calls place by co-

---

[235] *Id.* at 1, 5, 6.

[236] Tr. Evid. Hrg. at 75.

[237] Exs. 107, 108.

[238] Tr. Evid. Hrg. at 75.

[239] Doc. 1022 at 21; Ex. 8.

defendant Tracy Rockers).[240]  Morehead responded, "I won't give out CCA/in custody calls unless they are your client's calls or I am going to somehow use them in court or unless they are otherwise discoverable."[241]  In her reply, Vermillion reminded Morehead that Campbell had been copied on the initial email requesting the April 2012 calls, that he was also requesting the calls and any associated reports, and that it appeared at least some of the calls had been placed by Campbell's client, Hohn.[242]  Vermillion's reply also sought confirmation regarding whether Morehead planned to use any of the April 2012 calls against Redifer and, if not, whether any of the calls were exculpatory or otherwise discoverable.[243]  Morehead then attempted to walk back her earlier statement that she would produce recordings of a defendant's recorded calls to the defendant's attorney; instead of providing Campbell a copy of N-8 and the associated paperwork, Morehead replied that Campbell could "get all of his client's calls directly from CCA if he chooses."[244]  Thus, Morehead did not disclose N-8 to Campbell in discovery, despite having disclosed a report that referenced the April 2012 materials, admitting this fact to government counsel in a February 13, 2019 email.[245]  By declining to do for Campbell what she represented she normally does, Morehead made it less likely that anyone would discover that she was in possession of N-8.  AUSA Morehead's behavior indicates that she possessed N-8, listened to Hohn's attorney-client call, and took steps to conceal that tactical advantage.

AUSA Morehead's subsequent conduct, along with the related conduct of the USAO, is further evidence that she was privy to Hohn's attorney-client call.  Despite previously refusing

---

[240] Ex. 16.

[241] Ex. 8.

[242] *Id.*

[243] *Id.*

[244] *Id.*

[245] Ex. 5.

Campbell's request to produce Hohn's April 2012 CCA call and subsequently admitting this to government counsel, she stated in her May 29, 2020 affidavit that she did provide Hohn's April 23, 2012 call to Campbell.[246]  During her August 2021 testimony, however, she reversed her position once again, testifying that she was never aware that the prosecution team had obtained the April 2012 calls and therefore did not produce those calls to Campbell in discovery.[247]

Further, AUSA Morehead's contrary statement about providing the April 2012 calls to Campbell was highlighted in the copy of the affidavit that the government ultimately submitted to this Court.[248]  In its § 2255 response, the government equivocates on Morehead's representation, suggesting that there remains a possibility that Campbell received these calls in discovery, and if it turns out to be the case, the Court should dismiss Hohn's § 2255 motion as procedurally defaulted.[249]  The government's careful treatment of this highlighted statement is understandable, given Acting United States Attorney Slinkard's testimony that Morehead's reputation for veracity is poor.[250]

AUSA Morehead had every opportunity to explain how, when, and why she obtained access and became privy to Hohn's attorney-client call during her August 9, 2021 testimony. Instead, she continued to minimize, deflect, and obfuscate her role in Hohn's Sixth Amendment claim.  When the USAO began the process of disgorging calls to the Court, she resisted.[251] During the course of her testimony, Morehead: equivocated about whether she subpoenaed

---

[246] Ex. 807 at ¶ 8.

[247] Tr. Evid. Hrg. at 191.

[248] Doc. 300-1; Ex. 807.  Morehead denies highlighting this portion of her affidavit. Tr. Evid. Hrg. at 198.

[249] *See Hohn*, 19-2082-JAR-JPO, Doc. 3 at 5–11.

[250] Tr. Evid. Hrg. at 336–49.

[251] Exs. 7, 58.

Hohn's and Redifer's calls;[252] attempted to minimize her role in requesting and obtaining CCA calls;[253] attempted to minimize her knowledge of the USAO's call-collection procedures between 2012 and 2015;[254] equivocated about a specific defendant's case;[255] equivocated about discovery procedures;[256] equivocated about what calls she did and did not produce in discovery;[257] equivocated about threats to government witnesses;[258] and denied any involvement with "the second batch" of calls, despite keeping a copy of N-8 in Hohn's case file.[259]  In light of this record, the Court concludes that Morehead's denial that she became privy to Hohn's attorney-client call is simply not credible.

Likewise, any suggestion that AUSA Morehead did not intend to become privy to the call is not persuasive.  Hohn concedes that if the government could demonstrate that the exposure to his attorney-client call was inadvertent rather than intentional, then Hohn would not be able to avail himself of *Shillinger*'s per se rule.  The government has never admitted, however, that any member of the prosecution team became privy to Hohn's attorney-client call at all, much less inadvertently.

As discussed in the *Black* Order, in cases where AUSAs or agents accidently encountered recorded attorney-client communications, they typically reported the experience to someone else. Some AUSAs reported the exposure immediately, either to another member of the prosecution

---

[252] *Id.* at 163–64.

[253] *Id.* at 166–68.

[254] *Id.* at 169.

[255] *Id.* at 172–75.

[256] *Id.* at 184.

[257] *Id.* at 185–92, 194–98.

[258] *Id.* at 199–204.

[259] *Id.* at 222.

team, to defense counsel, or both.[260]  The government has never asserted, nor is there evidence to

suggest, that any prosecution team member started listening to the April 23, 2012 call, heard

Campbell's voice and the nature of the conversation, and immediately stopped listening to the

call.  But as she made clear in her testimony, AUSA Morehead's prosecution tactics were

anything but typical.  Morehead's subsequent refusal to provide N-8 to Campbell, followed by

her personal subpoena of recordings of *all* telephone calls that Hohn and Redifer made from

CCA, is not the behavior of a prosecutor who inadvertently became privy to a single attorney-

client call and then took steps to keep the same thing from happening again.  But it is consistent

with the behavior of a prosecutor whose litigation philosophy was that Fed. R. Crim. P. 16 did

not require her to turn over recorded statements of the defendant unless she was going to use

them.[261]  It is also consistent with the litigation philosophy of USAO prosecutors who acted on

the belief that when they came upon such calls obtained from CCA, it was permissible to

proceed to access the call.  And it is consistent with Acting United States Attorney Slinkard's

testimony that it remains the official litigation position of the government that when it obtains

attorney-client calls that had a preamble warning that the call may be recorded, the attorney-

client privilege never attached and thus the law permits the government to listen to the call.[262]

    This record leads the Court to conclude that AUSA Morehead intended to intrude into

Hohn's attorney-client relationship by intentionally becoming privy to the April 23, 2012

attorney-client call, but failed only because of the protected-communication waiver issue that she

could not have known about at the time of the intrusion.  While such conduct is reprehensible, it

does not constitute a purposeful intrusion under *Shillinger*, which requires that the

---

[260] *See, e.g.*, Ex. 22 (Brenda Wood); Ex. 38 (Jerome Birdsong); *Black* Order at 92–93 (Gregory Rapp).

[261] Tr. Evid. Hrg. at 190–91.

[262] *Id.* at 108–09.

communications that were disclosed be protected.  The Court stresses that, as with the determination of the protected-communication element, these elements necessarily lend themselves to case-by-case analysis.

### C.     Legitimate Law-Enforcement Purpose

Finally, because the Court does not find purposeful intrusion, it need not consider whether the government had a legitimate law-enforcement purpose for obtaining Hohn's attorney-client call.  The Court notes, however, that the dispositive question on this element is not whether CCA had a legitimate law-enforcement justification for recording Hohn's attorney-client calls, or whether the prosecution team had a legitimate law-enforcement justification for requesting Hohn's communications with non-attorneys.  Instead, *Weatherford* and *Shillinger* make clear that the question is whether the prosecution team had a legitimate law-enforcement justification for becoming privy to Hohn's April 23, 2012 attorney-client call.  In *Weatherford*, the undercover agent, who was not a member of the prosecution team, had a legitimate law-enforcement reason for attending the defendant's attorney-client meetings and becoming privy to the defendant's attorney-client communications.  But that did not necessarily give him a legitimate law-enforcement justification to share what he knew with the prosecution team.[263] And in *Shillinger*, the fact that the deputy had a legitimate law-enforcement justification for monitoring the defendant's attorney-client meetings did not mean the prosecutor could use the legitimacy of that initial intrusion to justify the prosecutor's illegitimate one.[264]

---

[263] *Weatherford v. Bursey*, 429 U.S. 545, 555–58 (1979) (explaining that if the undercover agent had shared substantive information with the prosecution team, the defendant would have had "a much stronger [Sixth Amendment] case").

[264] *Shillinger v. Haworth*, 70 F.3d 1132, 1134–35, 1139 (10th Cir. 1995).

Here, the government has never asserted that any member of the prosecution team became privy to Hohn's April 23, 2012 call in order to advance a legitimate law-enforcement goal, nor is there any evidence in the record to support such an assertion. Despite the government's focus on the horrific nature of Price's death and disposal of his body, Acting United States Attorney Slinkard confirmed that there is no reason to think the prosecution team suspected or believed that Campbell and Hohn were committing a crime or perpetrating a fraud.[265] Instead, as discussed throughout this Order, the government maintains that no member of the prosecution team became privy to the attorney-client call.

## VI.   Conclusion

The Court has endeavored to follow the letter of *Shillinger* in these consolidated proceedings generally and in Hohn's case specifically. There is not much precedent for the Court to draw from for obvious reasons; such governmental intrusions into defendants' attorney-client relationships are easily prevented by the use of a taint team or other precautions.[266] The government's approach is clear from the introductory statement in its proposed findings and conclusions; it continues to trivialize the circumstances precipitating Hohn's Sixth Amendment claim at issue, referring to his claim for relief as a "windfall."[267] The Court is troubled that even after turning over scores of attorney-client calls that have been in its possession for years, including the call at issue in this case, the government has steadfastly refused to acknowledge the problem before the Court and disclaim any responsibility for fixing that problem. The government has confirmed that its official litigation position continues to be that it is legal for a

---

[265] Tr. Evid. Hrg. at 109.

[266] Indeed, the District of Kansas USAO adopted a new filter team policy in the wake of the *Black* investigation that includes a requirement that prosecutors make their requests for jail calls in writing on request forms and provides for a filter-team procedure. *Black* Order at 120.

[267] Doc. 1028 at 1.

prosecution team to make the unilateral determination that it is permissible to obtain and listen to recorded calls from detainees to counsel without any obligation to consult or seek approval from the court on the issue of waiver.  Likewise, despite evidence of her conduct in both this and other criminal cases, the government has confirmed that it has not imposed internal sanctions or discipline against AUSA Morehead on the basis of untruthfulness.[268]

Although Hohn's individual allegations ultimately fall short of establishing a constitutional violation, nothing in this Order should be construed as condoning the government's behavior.  Because a purposeful intrusion into the attorney-client relationship necessarily requires a showing that the recording was a protected attorney-client communication, there can be no Sixth Amendment violation without one.  Accordingly, Hohn has not met his burden to prove his Sixth Amendment claim, and his § 2255 motion is denied.

## VII.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[269]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[270]  For the reasons stated above, the Court finds that Hohn has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

---

[268] Tr. Evid. Hrg. at 335–49.

[269] 28 U.S.C. § 2253(c)(2).

[270] *Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).

**IT IS THEREFORE ORDERED BY THE COURT** that the government's Motion to Reconsider (Doc. 958; Doc. 774 in 12-20003-03-JAR; Doc. 11 in 19-2082-JAR-JPO) is **denied**; the Court clarifies its ruling on several legal issues as detailed herein.

**IT IS FURTHER ORDERED** that the government's Motion in Limine (Doc. 983; Doc. 28 in 19-2082-JAR-JPO) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that Petitioner Steven M. Hohn's Motion to Vacate and Discharge with Prejudice Under 28 U.S.C. § 2255 (Doc. 718 in Case No. 12-20003-03-JAR) is **denied**.  Hohn is also denied a COA.

**IT IS SO ORDERED.**

Dated: <u>December 9, 2021</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE