## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

---

In re: CCA Recordings 2255 Litigation,
                                    **Petitioners,**

**v.**                                    **Case No. 19-cv-2491-JAR-JPO**

**(This Document Relates to Case No. 14-cr-20096-JAR-7, *United States v. Omar Orduno-Ramirez*, and Case No. 19-2166-JAR-JPO, *Omar Orduno-Ramirez v. United States*)**

**United States of America.**
                                    **Respondent.**

---

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Omar Orduno-Ramirez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 596).[1]  Petitioner alleges the government violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-client communications, and asks the Court to find that he has made a sufficient showing to warrant an evidentiary hearing.  As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or alternatively, to reduce his custodial sentence by 50% and vacate his term of supervised release.  The government has responded, opposing the motion and seeking dismissal on several grounds, including on threshold jurisdictional grounds.[2]  The Court

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 14-20096-JAR-7.  Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated case, No. 19-cv-2491-JAR-JPO.  With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

[2] *Orduno-Ramirez v. United States*, No. 19-2166-JAR-JPO, Docs. 3, 5, 6.

held that because the alleged Sixth Amendment violation occurred after Petitioner entered his guilty plea but before he was sentenced, he lacked standing to challenge his conviction, but not his sentence.[3]  The Court has reviewed the parties' submissions and the record and is prepared to rule.  For the reasons explained in detail below, Petitioner's challenge to his sentence, including any term of supervised release, is denied without an evidentiary hearing.  Petitioner is also denied a certificate of appealability.

## I.    Background

### A.    Procedural History

Petitioner was charged in a Superseding Indictment with conspiracy and possession with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 846.[4]  This count carried a statutory mandatory-minimum term of 10 years and a maximum term of life imprisonment.[5]

On April 13, 2016, Petitioner pleaded guilty to the offense with no plea agreement.[6] Based on a total offense level of 36 and a criminal history category of I, the Presentence Investigation Report ("PSR") calculated Petitioner's advisory Guidelines range at 188 to 235 months.[7]  Subsequently, he filed *pro se* objections to the PSR, contending that the total offense level, attributed drug quantity, and narrative in the PSR overstated his criminal culpability and that he was eligible for Safety Valve relief under U.S.S.G. § 5C1.2.[8]  Applying the Safety Valve, he argued that his base offense level should have been 17, not 38, the result of a significant

---

[3] *CCA Rec. Lit.*, Docs. 730, 784.

[4] Doc. 47.

[5] *Id.* at 16; *see also* 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 846.

[6] Doc. 276.

[7] Doc. 429 ¶ 72.

[8] Doc. 346 at 2–5.

downward variance.  Defendant also filed a counseled sentencing memorandum, framed around letters from his wife and children and arguing for leniency under the 18 U.S.C. § 3553(a) factors.[9]  He also objected to an offense level enhancement for importation and the absence of a minor-role adjustment.

The government did not file any objections to the PSR but it did respond to Petitioner's sentencing memorandum.[10]  It agreed he was eligible for Safety Valve relief, but contended that he had more than a minor role in the drug conspiracy.[11]  It also argued he was likely eligible for a role enhancement, but opted not to pursue one, and that a variance would not be appropriate in consideration of the sentences received by codefendants.[12]

On January 12, 2017, the Court overruled Petitioner's objections, adopted the PSR's sentencing calculations, and found that the Guidelines range was 188 to 235 months' imprisonment.[13]  The Court denied Petitioner's request for a downward departure, but did grant a variance below the advisory Guidelines range, imposing a sentence of 144 months' imprisonment, followed by five years' supervised release.[14]  Petitioner appealed his sentence, contending the Court erred in failing to apply a minor role adjustment.[15]  The Tenth Circuit affirmed Petitioner's sentence, upholding the Court's findings as to his role in the conspiracy.[16] He has not filed a prior habeas motion under 28 U.S.C. § 2255.

---

[9] Doc. 430.

[10] Doc. 464.

[11] *Id.* at 2–6.

[12] *Id.* at 6–9.

[13] Doc. 468; Sent. Tr., Doc. 500 at 181–82.

[14] Doc. 500 at 180–83.

[15] Docs. 151, 531.

[16] *United States v. Orduno-Ramirez*, 719 F. App'x 830, 833–34 (10th Cir. 2017).

Petitioner was represented by Kevin Babbit in the underlying criminal proceedings.  The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[17]  On March 28, 2019, the FPD filed this § 2255 motion on Petitioner's behalf, setting forth a single ground for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship. Petitioner's scheduled release date is January 13, 2025.[18]

### B.    The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motion before the Court.[19]  That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA.  The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA.  The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA")

---

[17] Standing Order 18-3.

[18] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Dec. 22, 2021).

[19] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

Erin Tomasic and Assistant United States Attorney ("AUSA") Kim Flannigan accused defense attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned from the video recordings.[20]  The defense also discovered that the United States Attorney's Office for the District of Kansas ("USAO") had a practice of routinely obtaining CCA recorded attorney-client phone calls from CCA, and that it did so without notice to attorneys, clients, or courts.[21]

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[22] (2) the video and audio recordings in USAO custody to be impounded;[23] and (3) the government to preserve its computer hard drives.[24]  By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigation, that is, to determine the number of recordings possessed by the government, to index and segregate them, and to identify privileged or confidential information within those recordings.[25]

On January 31, 2017, the Special Master issued the "First Report Regarding Video Recordings."[26]  The Special Master determined that the government had obtained from CCA video recordings of the attorney-meeting rooms made between February 20, 2016, and May 16,

---

[20] *Id.* at 70–80.

[21] *Id.* at 29–30.

[22] *Black*, Doc. 253 at 3.

[23] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[24] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[25] *Black*, Doc. 146 (Appointment Order).

[26] *Black*, Doc. 193.

2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700 attorney visits.[27]  This Court in *Black* found that the USAO did not come into possession of the CCA videos until June 1, 2016.[28]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[29]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[30]

The government did not cooperate with the Special Master's investigation, however, which ultimately resulted in a lengthy delay in this Court's ability to rule on these issues. Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[31]  The Order also addressed the governing standard for an

---

[27] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

[28] *Black* Order at 66.

[29] *CCA Rec. Lit.*, Doc. 784 at 13.

[30] *CCA Rec. Lit.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[31] *Black* Order at 164–65.

intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[32]  The Order discussed the
elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's
decision in *Shillinger v. Haworth*,[33] which held that a per se Sixth Amendment violation occurs
when: (1) there is a protected attorney-client communication; (2) the government purposefully
intruded into the attorney-client relationship; (3) the government becomes "privy to" the
attorney-client communication because of its intrusion; and (4) the intrusion was not justified by
any legitimate law enforcement interest.[34]  Once those elements are established, prejudice is
presumed.[35]

     The Court further held that a finding of purposeful intrusion into the attorney-client
relationship necessarily requires a threshold showing that the recordings were protected attorney-
client communications.[36]  While recognizing that the attorney-client privilege is not a right
guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a
framework for this showing that the recordings between petitioners and counsel were protected
communications under the Sixth Amendment.  With respect to the video recordings, the Court
determined that the following threshold showings must be made after review and verification by
the FPD in each individual case: (1) the video of the attorney-client meeting exists; and (2) the
quality of the non-verbal communication in the video is sufficient to confirm communication
between the detainee and counsel.[37]  This threshold showing requires an affidavit from defense
counsel confirming that the nature and purpose of the meeting(s) were within the ambit of

---

[32] *Id.* at 145–62.

[33] 70 F.3d 1132 (10th Cir. 1995).

[34] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[35] *Id.*

[36] *Id.* at 163.

[37] *Id.* at 166.

protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[38]

### C.      Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[39]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations, as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[40]  The government raised blanket objections to the privilege logs, arguing that many fail to meet the threshold showings because (1) they do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not

---

[38] *Id.*

[39] *CCA Rec. Lit.*, Doc. 1.

[40] *CCA Rec. Lit.*, Doc. 21 at 50.

sufficient to establish privileged attorney-client communications are depicted on a soundless video.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[41]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[42]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification

---

[41] *CCA Rec. Lit.*, Docs. 587, 588.

[42] *Id.*  The Court subsequently denied petitioners' related Motion for Spoliation Sanctions under Fed. R. Civ. P. 37(e)(2) alleging that the government destroyed or lost ESI relative to the video recordings.  *CCA Rec. Lit.*, Doc. 926.

requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[43]  Specifically, the Court ruled that three petitioners in this consolidated litigation who proceeded to trial in their underlying criminal proceedings are entitled to evidentiary hearings on their audio recording Sixth Amendment claims.   Second, the Court determined that the rule in *Tollett v. Henderson* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[44]  The Court dismissed one petitioner's § 2255 motion on these grounds and certified the issue for appeal; thirty-nine petitioners have successfully moved the Court to stay dismissal of their claims pending the appeal of that case.[45]  Third, the Court determined that approximately twenty petitioners lacked standing to advance their Sixth Amendment claims for various reasons, including: claims that alleged post-sentencing violations; claims where petitioners who had been deported challenged only their sentence; claims where petitioners challenging their sentence had been sentenced to the mandatory-minimum sentence; and claims involving binding pleas that were accepted by the court at the change-of-plea-hearing.[46]

Petitioner timely filed his Rule 2(b) certification on February 25, 2021.[47]

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[48]

### D.    Recordings in this Case

On August 13, 2019, this Court released the video recordings to the FPD as a result of

---

[43] *CCA Rec. Lit.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[44] *Id.*  (citing 411 U.S. 258 (1973)).

[45] *CCA Rec. Lit.*, Docs. 874, 922.

[46] *CCA Rec. Lit.*, Docs. 730, 784.

[47] CCA Rec. Lit., Doc. 775-1.

[48] *CCA Rec. Lit.*, Doc. 1034.

the *Black* investigation.[49]  The FPD, along with defense counsel, reviewed five video recordings of Petitioner meeting with Babbit in person at CCA on March 11 and 14, April 5 and 11, and May 6, 2016.[50]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, verifying that during these meetings, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Babbit.[51]  Petitioner also provided a sworn declaration from Babbit, stating that he reviewed the video recordings listed on the privilege log, and confirmed, with respect to the recorded meetings and each other meeting with Petitioner at CCA: (1) the only reason he met with Petitioner "was to discuss matters related to legal advice or strategy"; and (2) he had no knowledge nor did he believe that the meetings were recorded as they were attorney-client protected, that he did not consent to such, and that he was not aware such recordings would be dispensed to prosecutors.[52]

Petitioner was prosecuted by former SAUSA Erin Tomasic and AUSA David Zabel, the latter of whom denies that he viewed the recording during the pending underlying case.[53]

The Court reviewed the video recordings *in camera*. As set out in the privilege log, the Court confirms that the first video recording shows Petitioner meeting with Babbit and, as with each subsequent visit, someone Babbit identifies as an interpreter on March 11, 2016 for approximately forty-seven minutes, where they reviewed the Sentencing Guidelines.  The second recording, dated March 14, 2016, shows Petitioner meeting with Babbit for one hour and twenty-

---

[49] *Black* Order at 165.

[50] *CCA Rec. Lit.*, Doc. 205-2 at 134–37.

[51] *Id.*

[52] *Orduno-Ramirez*, 19-2166-JAR-JPO, Doc. 4-1.

[53] *Id.*, Doc. 3-1.

one minutes, during which time they reviewed documents.  The third recording shows Petitioner

and Babbit talking on April 5, 2016 for almost an hour while Babbit's laptop is open.  The fourth

recording shows a nearly two-hour conversation between Petitioner and Babbit on April 11,

2016, during which time they review documents, the Sentencing Guidelines, and Babbit's laptop.

The final recording reveals a forty-five minute conversation between Petitioner and Babbit on

May 6, 2016, with a three-ring binder and legal pad before Babbit.  In light of the analysis below,

however, further details of the meetings visible in the videos are not pertinent and will not be

discussed in this order.

## II.    Discussion.

### A.    Procedural Defenses

The government does not raise any procedural defenses in this case.[54]

### B.    Decision in Consolidated Proceedings

The Court entered a Memorandum and Order on December 10, 2021, that concluded

petitioners in the temporal category of claims who alleged Sixth Amendment violations that

occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule,

which is incorporated by reference herein.[55]

As discussed in detail in that Order, the Tenth Circuit has recognized that a per se

*Shillinger* violation constitutes a narrow variety of presumptively prejudicial constitutional error

where the government's unjustified purposeful intrusion into a defendant's attorney-client

relationship precludes application of the harmless-error standard and requires automatic relief.[56]

---

[54] The government concedes that the ruling in *Tollett v. Henderson*, 411 U.S. 258, 267 (1973), does not foreclose petitioners' claims where the alleged constitutional violation took place after a petitioner entered a guilty plea.  *See CCA Rec. Lit.*, Doc. 730 at 41.

[55] *CCA Rec. Lit.*, Doc. 1034.

[56] *Id.* at 14.

The Court went on to conclude, however, that the categorical extension of *Shillinger*'s per se rule to violations that occurred post-plea or conviction but prior to sentencing would amount to an overapplication of that ruling beyond the rationale contemplated and described by the Tenth Circuit.[57]  Accordingly, the Court declined to extend *Shillinger*'s per se rule to an alleged pre-sentence Sixth Amendment violation and prejudice is not to be presumed in this category of claims.[58]  Instead, petitioners must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[59]

### C.    Application

Petitioner's claim is in the temporal category of motions alleging post-plea/pre-sentencing Sixth Amendment violations.  Petitioner's motion falls in a sub-category of these claims where the petitioner pleaded guilty without a plea agreement.  The recorded meetings between Petitioner and Babbit took place from March 11 to May 6, 2016.  Four of the recordings predate Petitioner's April 13, 2016 guilty plea.  The other meeting took place after Petitioner entered his plea but before his January 12, 2017 sentencing.  As noted above, however, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.  Thus, any alleged Sixth Amendment violation could not have occurred until after Petitioner's plea but before he was sentenced.

As this Court discussed in its January 18, 2021 Order, when the alleged intrusion occurs after the petitioner enters a guilty plea, it eliminates the possibility that the intrusion could have

---

[57] *Id*. at 20–21.

[58] *Id.* at 21.

[59] *Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

tainted the petitioner's conviction.[60]  Thus, Petitioner does not have standing to challenge his

guilty plea under § 2255.[61]  The only tainted proceeding could be sentencing.  Having

determined that this category of governmental-intrusion claims may not rely on the *Shillinger*

presumption of prejudice, the Court turns to whether Petitioner has demonstrated a realistic

possibility of injury or benefit to the government.  Even assuming Petitioner has satisfied the

other elements of his Sixth Amendment claim, he cannot show any realistic possibility that he

was prejudiced as a result of the government's alleged intrusion.

Petitioner's sentencing bears no indicia of a tainted proceeding.  While the government

opposed Petitioner's sentencing objections and request for a downward departure, it also opted

not to pursue a role enhancement that it contended was supported by the evidence.  This Court

reached the same conclusion about the possible role enhancement in denying Petitioner's request

for a sentence reduction as a minor participant, as affirmed by the Tenth Circuit.  Petitioner

further benefitted from a downward variance of 44 months, and the government did not cross-

appeal that downward variance.  The prosecution bore all the hallmarks of a reasoned advocate

for the government and not an antagonist leveraging inside information.  Petitioner has not

demonstrated, nor can the Court imagine, any realistic possibility of prejudice under these

circumstances.

Because Petitioner has not shown and cannot show a realistic possibility of prejudice as a

result of the government's alleged intrusion into his attorney-client relationship, and nothing in

the record suggests any threat to the reliability or fairness of Petitioner's sentencing proceedings,

---

[60] Doc. 730 at 54.

[61] *Id.*

he cannot succeed on his Sixth Amendment claim.  Petitioner's § 2255 motion is therefore denied.

## III.     Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[62]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[63]  For the reasons stated above, the Court finds that Petitioner has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Omar Orduno-Ramirez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 596) is **denied** without an evidentiary hearing.  Petitioner is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: <u>January 3, 2022</u>

           S/ Julie A. Robinson
          JULIE A. ROBINSON
          UNITED STATES DISTRICT JUDGE

---

[62] 28 U.S.C. § 2253(c)(2).

[63] *Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).