**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

In re: CCA Recordings 2255 Litigation,

                          **Petitioners,**

v.                                  **Case No. 19-cv-2491-JAR-JPO**

                                     **(This Document Relates to Case No. 14-cr-20096-JAR-1,** *United States v. Vicencio Olea-Monarez***, and Case No. 20-2051-JAR-JPO,** *Vicencio Olea-Monarez v. United States***)**

**United States of America.**

                          **Respondent**

---

## MEMORANDUM AND ORDER

      This matter is before the Court on Petitioner Vicencio Olea-Monarez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. No. 666).[1]  Petitioner alleges two grounds for relief: (1) the government violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-client communications; and (2) trial counsel performed deficiently by failing to advise him to accept the government's 25-year plea offer and by failing to advise him that testifying in support of a meritless defense theory would be detrimental to his case.  As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or alternatively, direct the government to reoffer the 25-year plea agreement and resentence him accordingly or vacate the obstruction-of-justice enhancement and resentence him without regard to his trial testimony.  The Court has reviewed the parties' submissions and the

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 14-20096-JAR-1.  Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated case, No. 19-cv-2491-JAR-JPO.  With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

record and is prepared to rule.  For the reasons explained in detail below, Petitioner's Sixth

Amendment challenge to his sentence, including any term of supervised release, is denied.

However, the Court grants Petitioner an evidentiary hearing on his ineffective assistance of trial

counsel claim.

## I.     Background

### A.     Procedural History

Petitioner was charged in a ten-defendant Superseding Indictment with conspiracy to

possess with the intent to distribute more than 50 grams of methamphetamine (Count 1) and

more than 1,000 marijuana plants (Count 2); distribution and possession with the intent to

distribute methamphetamine (Counts 3–9, 12, 15, 18–19, 21, 23–24); possession with the intent

to distribute cocaine (Count 27); maintaining a residence for the purpose of storing, using, and

distributing methamphetamine and cocaine (Counts 22, 26, 29); and possessing firearms in

furtherance of a drug trafficking crime (Counts 25, 28).[2]  Count 1 carried a statutory mandatory-

minimum term of 10 years' imprisonment and a maximum term of life, and Counts 25 and 28

carried mandatory, consecutive sentences of at least 5 years.[3]  If convicted on both

§ 924(c) charges in Counts 25 and 28, Petitioner faced a mandatory, consecutive sentence of at

least 5 years on the first § 924(c) conviction, and a mandatory, consecutive sentence of at least

25 years on the second § 924(c) conviction.[4]

Petitioner's co-defendants all ultimately entered guilty pleas.[5]  Prior to the

commencement of trial on April 20, 2016, the Court held a *Lafler-Frye* hearing after Petitioner

---

[2] Doc. 47.

[3] *Id.* at 1–11; *see also* 18 U.S.C. § 924(c)(1)(A)(i); 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846.

[4] *See* 18 U.S.C. § 924(c)(1)(C)(i) (2016).

[5] *See* Doc. 666 at 52–55.

did not accept the government's offer of a plea agreement.[6]  At this hearing, Petitioner stated that he knew the government had offered him a plea agreement calling for a sentence of 25 years' imprisonment, and it was Petitioner's decision not to accept the offer.

At trial, Petitioner testified and offered a duress defense.  He admitted to engaging in various criminal acts, including the distribution of methamphetamine;[7] testified that he began selling drugs for co-defendant Lopez in order to satisfy an outstanding drug debt left behind by his brother, who had recently died of cancer;[8] that he engaged in this criminal conduct only because he feared for his own safety and the safety of his family if he refused;[9] and that although he could have and wanted to contact the police instead of "working for [Mr.] Lopez," he chose not to because he believed the police would be unable to protect him and his family.[10]

On May 11, 2016, Petitioner was convicted by the jury on all charges.[11]  In advance of sentencing, the United States Probation Office ("USPO") prepared a Presentence Investigation Report ("PSIR"), which determined Petitioner's advisory Guidelines sentencing range on the counts of conviction was life imprisonment plus 30 years.[12]  This calculation included a two-level enhancement for obstruction of justice, which increased Petitioner's adjusted offense level from 46 to 48.[13]

---

[6] Doc. 439 at 3–6.

[7] Doc. 342 at 36–38, 82, 222.

[8] *Id.* at 22, 24, 30.

[9] *Id.* at 32–33.

[10] *Id.* at 46.

[11] Doc. 313.

[12] Doc. 388 ¶ 143.

[13] *Id.* ¶ 107; U.S.S.G. § 3C1.1.

At sentencing on November 2, 2016, the Court overruled and denied Petitioner's motion for judgment of acquittal, finding there was sufficient evidence to support a conviction and that a reasonable jury could find Petitioner's duress defense to be not credible or based on a preponderance of the evidence.[14]  The Court also overruled Petitioner's objection to the two-level enhancement for obstruction of justice, stating:

> I have no question in my mind at all that Mr. Olea-Monarez testified falsely and he intentionally testified falsely and he committed perjury such that [the obstruction-of-justice] enhancement is justified.  He repeatedly attempted to lay all of this on the shoulders of his brother, Federico, at least drug trafficking for some period of time and his brother being kind of a big fish, his brother dying.  And that all he was doing was trying to tie up loose ends and pay off the debt so that his family wouldn't be hurt.  That's the story he told repeatedly.
> . . .
>
> So I find that the testimony by Mr. Olea-Monarez, it wasn't just inconsistent, it wasn't just the product of him being rattled on cross[-]examination.  It was the product of him lying, of him intentionally telling lies to try to explain away all of this significant and voluminous evidence against him by laying it on the soul of his poor dead brother, by, you know, claiming that he was, you know, running for his life when all of his behavior suggests otherwise.[15]

The Court then sentenced Petitioner to life in prison plus 30 years.[16]  Petitioner filed a direct appeal, and the Tenth Circuit Court of Appeals affirmed.[17]  He has not filed a prior habeas motion under 28 U.S.C. § 2255.

---

[14] Doc. 454 at 19.

[15] *Id.* at 47, 51–52.

[16] Doc. 396.  This sentence consists of life imprisonment on Counts 1, 2, 3, 5, 6, 8, 9, 12, 15, 18, 19, 21; 40 years' imprisonment on Counts 7 and 23; 20 years' imprisonment on Counts 22, 24, 26, 27, and 29; all counts to run concurrently.  The sentence for the firearms convictions in Count 25 is 60 months' imprisonment consecutive to all other counts and the sentence for Count 28 is 25 years' imprisonment consecutive to all other counts. *Id.* at 3.

[17] *United States v. Olea-Monarez*, 908 F.3d 636 (10th Cir. 2018).  On appeal, Petitioner argued that the Court's responses to the questions sent from the jury during deliberations were erroneous and required reversal of his conviction for Count 8; the Tenth Circuit disagreed.  *Id.* at 638, 640–43.

Petitioner was detained at CCA from September 2, 2014 to November 22, 2016, and was represented by Michael Clarke in the underlying proceedings. The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[18] On February 5, 2020, the FPD filed this § 2255 motion on Petitioner's behalf, setting forth two grounds for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship, and trial counsel was constitutionally ineffective during the plea-bargaining stage and at trial.

### B.   *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates one of the claims before the Court.[19] That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein. The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA. The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA. The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA")

---

[18] Standing Order 18-3.

[19] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019). As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA"). That facility has since been renamed CoreCivic. For convenience, the Court refers to it as CCA in this Order.

Erin Tomasic and Assistant United States Attorney ("AUSA") Kim Flannigan accused defense attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned from the video recordings.[20]  The defense also discovered that the United States Attorney's Office for the District of Kansas ("USAO") had a practice of routinely obtaining CCA recorded attorney-client phone calls from CCA, and that it did so without notice to attorneys, clients, or courts.[21]

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[22] (2) the video and audio recordings in USAO custody to be impounded;[23] and (3) the government to preserve its computer hard drives.[24]  By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigation, that is, to determine the number of recordings possessed by the government, to index and segregate them, and to identify privileged or confidential information within those recordings.[25]

On January 31, 2017, the Special Master issued the "First Report Regarding Video Recordings."[26]  The Special Master determined that the government had obtained from CCA video recordings of the attorney-meeting rooms made between February 20, 2016, and May 16,

---

[20] *Id.* at 70–80.

[21] *Id.* at 29–30.

[22] *Black*, Doc. 253 at 3.

[23] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[24] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[25] *Black*, Doc. 146 (Appointment Order).

[26] *Black*, Doc. 193.

2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700 attorney visits.[27]  This Court in *Black* found that the USAO did not come into possession of the CCA videos until June 1, 2016.[28]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[29]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[30]

The government did not cooperate with the Special Master's investigation, however, which ultimately resulted in a lengthy delay in this Court's ability to rule on these issues. Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[31]  The Order also addressed the governing standard for an

---

[27] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

[28] *Black* Order at 66.

[29] *CCA Rec. Lit.*, Doc. 784 at 13.

[30] *CCA Rec. Lit.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[31] *Black* Order at 164–65.

intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[32]  The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's decision in *Shillinger v. Haworth*,[33] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[34]  Once those elements are established, prejudice is presumed.[35]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[36]  While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment.  With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD in each individual case: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[37]  This threshold showing also requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit

---

[32] *Id.* at 145–62.

[33] 70 F.3d 1132 (10th Cir. 1995).

[34] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[35] *Id.*

[36] *Id.* at 163.

[37] *Id.* at 166.

of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[38]

### C.      Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[39]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations, as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[40]  The government raised blanket objections to the privilege logs, arguing that many fail to meet the threshold showings because (1) they do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not

---

[38] *Id.*

[39] *CCA Rec. Lit.*, Doc. 1.

[40] *CCA Rec. Lit.*, Doc. 21 at 50.

sufficient to establish privileged attorney-client communications are depicted on a soundless video.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts to cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[41]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[42]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification

---

[41] *CCA Rec. Lit.*, Docs. 587, 588.

[42] *Id.*  The Court subsequently denied petitioners' related Motion for Spoliation Sanctions under Fed. R. Civ. P. 37(e)(2) alleging that the government destroyed or lost ESI relative to the video recordings.  *CCA Rec. Lit.*, Doc. 926.

requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[43]  Specifically, the Court ruled that three petitioners in this consolidated litigation who proceeded to trial in their underlying criminal proceedings are entitled to evidentiary hearings on their audio recording Sixth Amendment claims.  Second, the Court determined that the rule in *Tollett v. Henderson* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[44]  The Court dismissed one petitioner's § 2255 motion on these grounds and certified the issue for appeal; thirty-nine petitioners have successfully moved the Court to stay dismissal of their claims pending the appeal of that case.[45]  Third, the Court determined that approximately twenty petitioners lacked standing to advance their Sixth Amendment claims for various reasons, including: claims that alleged post-sentencing violations; claims where petitioners who had been deported challenged only their sentence; claims where petitioners challenging their sentence had been sentenced to the mandatory-minimum sentence; and claims involving binding pleas that were accepted by the court at the change-of-plea-hearing.[46]

Petitioner timely filed his Rule 2(b) certification on February 25, 2021.[47]

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[48]

### D.    Recordings in this Case

On August 13, 2019, this Court released the video recordings to the FPD as a result of

---

[43] *CCA Rec. Lit.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[44] *Id.*  (citing 411 U.S. 258 (1973)).

[45] *CCA Rec. Lit.*, Docs. 874, 922.

[46] *CCA Rec. Lit.*, Docs. 730, 784.

[47] CCA Rec. Lit., Doc. 775-1.

[48] *CCA Rec. Lit.*, Doc. 1034.

the *Black* investigation.[49]   The FPD, along with defense counsel, reviewed three video recordings of Petitioner meeting with Clarke in person at CCA on February 26, March 23, and April 13, 2016.[50]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, verifying that during these meetings, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Clarke.[51]   Petitioner also provided a sworn declaration from Clarke, stating that he reviewed the video recordings listed on the privilege log, and confirmed, with respect to the recorded meetings and each other meeting with Petitioner at CCA: (1) the only reason he met with Petitioner "was to discuss matters related to legal advice or strategy"; and (2) he had no knowledge nor did he believe that the meetings were recorded as they were attorney-client protected, that he did not consent to such, and that he was not aware such recordings would be dispensed to prosecutors.[52]

Petitioner was prosecuted by former SAUSA Tomasic and AUSA David Zabel, the latter of whom denies that he viewed the recordings during the pending underlying case.[53]

The Court reviewed the video recordings *in camera*. As set out in the privilege log, the Court confirms that the video recordings show Petitioner meeting with Clarke on three occasions for a total of approximately three and one-half hours, where Clarke used a laptop computer and they reviewed documents, including possible stipulations and a plea offer.  In light of the

---

[49] *Black* Order at 165.

[50] *CCA Rec. Lit.*, Doc. 205-2 at 131–33.

[51] *Id.*

[52] *Olea-Monarez*, 20-2051-JAR-JPO, Doc. 5-1.

[53] *Id.*, Doc. 4-1.

analysis below, however, further details of the meetings visible in the videos are not pertinent and will not be discussed in this order.

## II.   Discussion.

### A.   Procedural Defenses

The government does not raise any procedural defenses in this case.

### B.   Sixth Amendment Intentional Intrusion Claim

#### 1.   Decision in Consolidated Proceedings

The Court entered a Memorandum and Order on December 10, 2021, that concluded petitioners in the temporal category of claims who alleged Sixth Amendment intentional-intrusion violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule, which is incorporated by reference herein.[54]

As discussed in detail in that Order, the Tenth Circuit has recognized that a per se *Shillinger* violation constitutes a narrow variety of presumptively prejudicial constitutional error where the government's unjustified purposeful intrusion into a defendant's attorney-client relationship precludes application of the harmless-error standard and requires automatic relief.[55] The Court went on to conclude, however, that the categorical extension of *Shillinger*'s per se rule to violations that occurred post-plea or conviction but prior to sentencing would amount to an overapplication of that ruling beyond the rationale contemplated and described by the Tenth Circuit.[56]   Accordingly, the Court declined to extend *Shillinger*'s per se rule to an alleged pre-sentence Sixth Amendment violation and prejudice is not to be presumed in this category of

---

[54] *CCA Rec. Lit.*, Doc. 1034.

[55] *Id.* at 14.

[56] *Id*. at 20–21.

claims.[57]  Instead, petitioners must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[58]

### 2.    Application

Petitioner's claim is in the temporal category of motions alleging post-conviction/pre-sentencing Sixth Amendment violations.  The recorded meetings between Petitioner and Clarke took place prior to trial from February 26 to April 13, 2016.  As noted above, however, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.  Thus, any alleged Sixth Amendment violation could not have occurred until after the May 11, 2016 guilty verdict but before Petitioner was sentenced.

As this Court discussed in its January 18, 2021 Order, when the alleged intrusion occurs after the guilty verdict, it eliminates the possibility that the intrusion could have tainted the petitioner's conviction.[59]  Thus, Petitioner does not have standing to challenge his conviction under § 2255.[60]  The only tainted proceeding could be sentencing.  Having determined that this category of governmental-intrusion claims may not rely on the *Shillinger* presumption of prejudice, the Court turns to whether Petitioner has demonstrated a realistic possibility of injury or benefit to the government.  Even assuming Petitioner has satisfied the other elements of his Sixth Amendment claim, he cannot show any realistic possibility that he was prejudiced as a result of the government's alleged intrusion.

---

[57] *Id.* at 21.

[58] *Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

[59] Doc. 730 at 54.

[60] *Id.*

Petitioner's sentencing bears no indicia of a tainted proceeding.  As reflected in the PSIR, Petitioner received sentencing enhancements for: maintaining a premise for the purpose of manufacturing or distributing controlled substances; the importation of methamphetamine; his role in the offense as an organizer or leader of a criminal activity that involved five or more participants; and for obstruction of justice.[61]  Each of these enhancements was calculated by the USPO and based on evidence at trial.  Petitioner faced a life sentence on multiple counts of conviction and mandatory consecutive terms of imprisonment on the § 924(c) charges.[62]  While the government opposed Petitioner's objections to the PSIR, the majority of Petitioner's objections were factual in nature and did not change his total offense level.[63]  Likewise, Petitioner's objection to the obstruction enhancement did not change his Guidelines range from life imprisonment, as he would still have a total offense level over 43.[64]  This Court made detailed findings about the sufficiency of the evidence and Petitioner's apparent perjury during his testimony at trial.[65]  The prosecution bore all the hallmarks of a reasoned advocate for the government and not an antagonist leveraging inside information.  Petitioner has not demonstrated, nor can the Court imagine, any realistic possibility of prejudice under these circumstances.

Because Petitioner has not shown and cannot show a realistic possibility of prejudice as a result of the government's alleged intrusion into his attorney-client relationship, and nothing in the record suggests any threat to the reliability or fairness of Petitioner's sentencing proceedings,

---

[61] Doc. 388 ¶¶ 103–07.

[62] *Id.* ¶¶ 142–43.

[63] *Id.*  ¶¶ 169–189.

[64] *Id.*

[65] Doc. 454 at 19, 47–52.

he cannot succeed on his Sixth Amendment claim.  Petitioner's intentional intrusion Sixth Amendment claim is therefore denied.

### C.    Ineffective Assistance of Defense Counsel Claims

#### 1.    Legal Standard

A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[66]  First, a defendant must show counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[67]  Second, a defendant must show his counsel's deficient performance actually prejudiced his defense.[68]  The Supreme Court has held the two-part *Strickland* test applies to the plea-bargaining stage.[69]  If a defendant received ineffective advice causing him to reject a favorable plea deal and proceed to trial, resulting in a much harsher sentence, he is entitled to relief under § 2255.[70]

To prevail on *Strickland*'s performance prong, a defendant "must show 'that counsel's representation fell below an objective standard of reasonableness.'"[71]  There is a "strong presumption that counsel provided effective assistance."[72]  "A fair assessment of attorney performance requires" the court to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[73]  "[T]o show that his counsel was deficient,

---

[66] 466 U.S. 668 (1984).

[67] *Id.* at 688.

[68] *Id.* at 691–92.

[69] *Lafler v. Cooper*, 566 F.3d 156, 162–63 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).

[70] *See In re Graham*, 714 F.3d 1181, 1182 (10th Cir. 2013) (per curiam) (citing *Lafler*, 566 U.S. at 174).

[71] *United States v. Moya*, 676 F.3d 1211, 1213 (10th Cir. 2012) (quoting *Strickland*, 466 U.S. at 688).

[72] *United States v. Holloway*, 939 F.3d 1088, 1103 (10th Cir. 2019) (quoting *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000)); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

[73] *Strickland*, 466 U.S. at 689.

[defendant] must demonstrate that the errors were so serious that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"[74]

"The Supreme Court has recognized the deficient performance prong 'is necessarily linked to the practice and expectations of the legal community' as well as the 'prevailing norms of practice as reflected in American Bar Association standards and the like.'"[75]  Counsel has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'"[76]  Further, counsel's "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."[77]

*Strickland*'s prejudice prong requires a defendant to "'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[78]  "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice."[79]  When, as in this case, a defendant alleges ineffective assistance led him to reject a plea offer, a defendant must establish that "but for the ineffective advice of counsel there is a reasonable probability" that:

> [1] defendant would have accepted the plea . . . [2] the prosecution would not have withdrawn it in light of intervening circumstances . . . [3] the court would have accepted its terms, and . . . [4] the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.[80]

---

[74] *Hanson v. Sherrod*, 797 F.3d 810, 826 (10th Cir. 2015) (quoting *Strickland*, 466 U.S. at 687).

[75] *United States v. Kearn*, ---F. Supp. 3d---, 2022 WL 37648, at *6 (D. Kan. Jan. 4, 2022) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010)).

[76] *Padilla*, 599 U.S. at 370 (quoting *Libretti v. United States*, 516 U.S. 29, 50–51 (1995)).

[77] *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

[78] *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694).

[79] *Id.*

[80] *Kearn*, 2022 WL 37648, at *7 (quoting *Lafler*, 566 U.S. at 164).

 "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[81] This standard "does not require that the [defendant] show that counsel's deficient conduct more likely than not altered the outcome in the case."[82]  "However, mere speculation is not sufficient to satisfy this burden."[83]

### 2.      Application

Petitioner asserts that Clarke made errors at both the plea-bargaining stage and at trial. He contends that Clarke knew that Petitioner's conclusory and subjective testimony was insufficient as a matter of law to support a duress defense and, accordingly, should have informed him when discussing the government's 25-year plea offer that any such defense at trial would be both futile and potentially detrimental, and the only way for him to avoid a life sentence was to accept the plea.  Petitioner asserts that the evidence will show that he wanted to accept the government's offer, but Clarke convinced him not to.  Instead, Clarke informed Petitioner that he had a strong duress defense and advised him to proceed to trial on that basis. He further asserts that the evidence will show that Clarke knew Petitioner would be unable to present a duress defense unless he could first show that the alternative of contacting law enforcement was illusory or futile, and that he should have known that Petitioner's conclusory allegations and general evidence would not satisfy this requirement. [84]  Further, although Clarke located news stories about the dangerousness of the Mexican cartel, he did not present that

---

[81] *Strickland*, 466 U.S. at 694.

[82] *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (quoting *Strickland*, 466 U.S. at 693).

[83] *Id.* (citations omitted).

[84] *See United States v. Beckstrom*, 647 F.3d 1012, 1016–17 (10th Cir. 2011) (holding defendant bears the burden of proving three elements of a duress defense by a preponderance of the evidence: "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." (quoting *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990))).

evidence, or any other specific reasons to doubt that the law enforcement alternative was viable, at trial, instead relying solely on Petitioner's vague and wholly uncorroborated testimony.

In support of his claims, Petitioner supplies a declaration from Clarke, who states that he did not encourage Petitioner to take the 25-year plea offer and that his general policy "was to take a case to trial unless the government is willing to offer less than 20 years."[85]  Clarke further avers that it was his idea to pursue a duress defense; that he believed Petitioner when he said he did not go to the police because he believed they would be unwilling or unable to protect his family in Mexico; that he researched the law on the requirements of a duress defense and knew that Petitioner would have to present more than his subjective belief regarding police protection; and that he located news stories about the Mexican cartel but does "not remember" whether he offered this information into evidence at trial.[86]  Clarke also does not remember whether he discussed with Petitioner the possibility that he might receive an obstruction-of-justice enhancement if he testified falsely at trial.[87]

"Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing . . . ."[88]  Petitioner's motion and Clarke's declaration assert incomplete and partially contradictory facts.  Although Clarke does not contradict every allegation asserted by Petitioner—who represented to the Court that it was Petitioner's decision to reject the plea offer and go to trial—the Court concludes the circumstances surrounding Clarke's advice regarding the rejection of a 25-year plea agreement in favor of presenting a duress defense at trial warrants an evidentiary hearing.  As Petitioner points

---

[85] *Olea-Monarez*, 20-2051-JAR-JPO, Doc. 3-7 ¶ 4.

[86] *Id.* ¶¶ 5, 8, 9, 10, 11.

[87] *Id.* ¶ 12.

[88] 28 U.S.C. § 2255(b).

out, the question is not whether Petitioner ultimately decided to reject the offer and proceed to trial, but whether Clarke unreasonably failed to discharge his duty under *Strickland* to provide Petitioner with the information he needed to make these critical decisions in the first place. Without "further development of the record," "[t]he files and records of the case do not 'conclusively show that [Petitioner] is entitled to no relief.'"[89]  An evidentiary hearing will allow the Court to consider Petitioner's factual allegations and Clarke's testimony, and "any additional evidence the parties wish to present."[90]  The Court thus orders an evidentiary hearing on the issue of whether Petitioner's trial counsel provided effective assistance of counsel when he advised Petitioner to (1) reject the plea offer and (2) instead present the duress defense at trial.

The Court will set this case for a status conference, at which time the parties shall be prepared to estimate the time needed to prepare for the evidentiary hearing and discuss a date for the hearing.  The Court also directs the FPD to provide information about the timeline for returning Petitioner to the District of Kansas for the evidentiary hearing.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Vicencio Olea-Monarez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 666) is **denied in part** on his Sixth Amendment intentional intrusion claim.  Petitioner is **granted an evidentiary hearing** on his claim of ineffective assistance of trial counsel at the plea stage and at trial as set forth above.

**IT IS FURTHER ORDERED** that the Court will conduct a telephone status conference on **August 24, 2022, at 10:00 a.m**.  At this status conference, the parties shall be prepared to

---

[89] *United States v. Herring*, 935 F.3d 1102, 1111 (10th Cir. 2019) (quoting 28 U.S.C. § 2255(b)).

[90] *Id.*; *United States v. Gonzalez*, 209 F. App'x 842, 846–47 (10th Cir. 2006) ("[I]t is ultimately the role of the district court . . . to assess credibility and weigh the evidence before it." (quoting *United States v. Browning*, 252 F.3d 1153, 1157 (10th Cir. 2001))).

estimate the time needed to prepare and return Petitioner to the District of Kansas for the evidentiary hearing.

**IT IS SO ORDERED**.

Dated: August 10, 2022

> S/ Julie A. Robinson
> JULIE A. ROBINSON
> UNITED STATES DISTRICT JUDGE